United States District Court
District of Connecticut
FILED AT NEW HAVEN
_Sept. 26_ 2007
Kevin F. Rowe, Clerk
By_____
Deputy Clerk

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF CONNECTICUT
------------------------------------------------------------------------X
JUAN BARRERA, JOSÉ CABRERA, DANIEL CHAVEZ,
JOSÉ DUMA, JOSÉ LLIBISUPA, ISAAC MALDONADO,
EDGAR REDROVAN, NICHOLAS SEGUNDO SANCHEZ,
JUAN CARLOS SIMBAÑA, and DANILO BRITO
VARGAS,

**307CV01436 RNC**

      Plaintiffs,

          -against-                           C.A. No. _____

MARK BOUGHTON, Mayor of Danbury, in his official and personal capacities, ALAN
BAKER, Chief of Police, Danbury Police Department, in his official and personal capacities,
Danbury Police Officers JOSÉ AGOSTO, in his official and personal capacities, RICHARD
DEJUSUS, in his official and personal capacities, JAMES A. FISHER, in his official and
personal capacities, JAMES LALLI, in his official and personal capacities, CRAIG MARTIN,
in his official and personal capacities, JOSEPH NORKUS, in his official and personal capacities,
JOHN DOES 1-15, in their official and personal capacities, CITY OF DANBURY,

ICE Agents RONALD PREBLE, in his official and personal capacities, RICHARD
MCCAFFREY, in his official and personal capacities, JAMES BROWN, in his official and
personal capacities, and JOHN DOES 15-20, in their official and personal capacities,

      Defendants
------------------------------------------------------------------------X

## COMPLAINT

      This is a civil rights suit to remedy the discriminatory and unauthorized enforcement of

federal immigration laws against Latino residents of the City of Danbury.  Under the leadership

of Mayor Mark Boughton, Danbury and its police department have repeatedly and knowingly

made illegal civil immigration arrests, engaged in impermissibly discriminatory law

enforcement, and retaliated against residents for expressive activites secured by the First

Amendment.  In their frustration with the arrival of new immigrants to Danbury, Mayor

Boughton and the police department have taken the law into their own hands.  In some instances

the City has acted unilaterally, and at other times its officials have conspired with federal

immigration agents in the conduct of this unlawful campaign.

1

Each of the ten Plaintiffs named in this action suffered illegal arrest and detention at the hands of Danbury Police Department ("DPD") officers for alleged civil immigration law violations. Yet federal immigration law preempts and prohibits local police from making civil immigration arrests unless explicitly authorized by prior written agreement with U.S. Immigration and Customs Enforcement ("ICE"). Mayor Boughton very publicly, and unsuccessfully, sought such a written agreement in Connecticut in 2005.

Despite Mayor Boughton's failure to secure authority for the civil enforcement of immigration laws, on September 19, 2006, the DPD instigated an undercover sting operation in which DPD officers, with the knowing and willing assistance of ICE, used extraordinary deception to arrest a group of Latino day-laborers who had gathered at Kennedy Park, a park in the center of downtown Danbury. DPD targeted the men based on their race, ethnicity, and perceived national origin, having no other reason to believe that any of them had violated immigration law. Furthermore, the DPD arrested the day-laborers without probable cause, in violation of the Fourth Amendment. The arrests were also calculated to silence the laborers' expression of their availability for work in a traditional public forum, in violation of the First Amendment, and to chill the speech of other day laborers who now avoid the park for fear of arrest. Nine of the day-laborers arrested on September 19, 2006 are Plaintiffs in this action.

The enforcement of civil immigration laws, despite the absence of the necessary written authorization, has been a regular custom, policy and practice of the DPD. DPD officers routinely stage pretextual traffic stops in Danbury, in which they target drivers who are or appear Latino for the purpose of investigating their immigration status. DPD officers conducting these stops run searches for the names of drivers in the FBI's principal criminal database, the National Crime Information Center ("NCIC"), arrest drivers on any civil immigration violations they

discover, and turn the arrestees over to ICE for deportation. One Plaintiff in this action was unlawfully arrested by DPD for a civil immigration violation after a pretextual and race-based traffic stop, transferred to ICE custody, and eventually deported.

The DPD's rogue actions have resulted in numerous constitutional violations, caused Plaintiffs suffering and ignominy, and endangered the civil rights of Danbury's Latino and immigrant communities at large. Plaintiffs bring this action to redress the Defendants' unlawful and discriminatory enforcement of federal immigration law. They ask this Court to issue a declaration stating that Plaintiffs' arrests violate the law and to award Plaintiffs damages for the harm they have suffered as a result of Defendants' illegal actions.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the Plaintiff's claims arising under the U.S. Constitution and federal statutes pursuant to 28 U.S.C. §§ 1331, 1343, and 1361 and supplemental jurisdiction over claims arising under the laws and Constitution of the State of Connecticut pursuant to 28 U.S.C. § 1367. Jurisdiction to grant declaratory judgment is conferred by 28 U.S.C. §§ 2201-02.

2. Venue is proper in this district under 28 U.S.C. § 1391(b) in that all events complained of and giving rise to Plaintiffs' claims arose in this district.

## PARTIES

### Plaintiffs

3. Plaintiff **Juan Barrera.** DPD officers arrested Plaintiff Barrera on September 19, 2006 and subsequently transferred him to ICE custody, where he remained until released on bond on or about October 3, 2006.

4. Plaintiff **José Cabrera.** DPD officers arrested Plaintiff Cabrera on September 19, 2006 and subsequently transferred him to ICE custody, where he remained until released on bond on or about October 23, 2006.

5. Plaintiff **Daniel Chavez.** DPD officers arrested Plaintiff Chavez on September 19, 2006 and subsequently transferred him to ICE custody, where he remained until released on bond on or about October 23, 2006.

6. Plaintiff **José Edwardo Duma.** DPD officers arrested Plaintiff Duma on September 19, 2006 and subsequently transferred him to ICE custody, where he remained until released on bond on or about October 3, 2006.

7. Plaintiff **José Froilan Llibisupa.** DPD officers arrested Plaintiff Llibisupa on September 19, 2006 and subsequently transferred him to ICE custody where he remained until released on bond on or about October 3, 2006.

8. Plaintiff **Isaac Maldonado.** DPD officers arrested Plaintiff Maldonado on September 19, 2006 and subsequently transferred him to ICE custody, where he remained until released on bond on or about October 3, 2006.

9. Plaintiff **Edgar Eladio Redrovan.** DPD officers arrested Plaintiff Redrovan on September 19, 2006 and subsequently transferred him to ICE custody, where he remained until released on bond on or about October 23, 2006.

10. Plaintiff **Nicolas Segundo Sanchez.**  DPD officers arrested Plaintiff Sanchez on September 19, 2006 and subsequently transferred him to ICE custody, where he remained until released on bond on or about October 20, 2006.

11. Plaintiff **Juan Carlos Simbaña.**  DPD officers arrested Plaintiff Simbaña on September 19, 2006 and subsequently transferred him to ICE custody, where he remained until released on bond on or about October 26, 2006.

12. Plaintiff **Danilo Brito Vargas.**  On February 17, 2007, DPD officers detained Plaintiff Vargas in a pretextual, race-based traffic stop, unlawfully arrested him on the basis of an alleged civil immigration infraction, and transferred him to ICE custody.  ICE eventually deported Mr. Vargas to Ecuador in April or May 2007.

**Danbury Defendants**

13. Defendant **Mark Boughton** is the Mayor of the City of Danbury, Connecticut.  He is the City Official charged with ultimate responsibility for implementing and administering the policies of the City of Danbury.  He is sued in his official and personal capacities.

14. Defendant **Alan Baker** is the Chief of Police of the Danbury Police Department.  He is charged with ultimate responsibility for the training and supervision of DPD officers and the administration and implementation of DPD policies.  He is sued in his official and personal capacities.

15. Defendant **James Fisher** is a Detective Lieutenant in the DPD's Special Investigations Division ("SID").  He is responsible for the training and supervision of SID officers and for carrying out the policies of the DPD; he was also the lead DPD officer for the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.

16. Defendant **James Lalli** is a Danbury Police Officer.  He is responsible for carrying out the policies of the DPD and participated in the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.

17. Defendant **José Agosto** is a Danbury Police Officer.  He is responsible for carrying out the policies of the DPD and participated in the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.

18. Defendant **Richard DeJesus** is a Danbury Police Officer.  He is responsible for carrying out the policies of the DPD and participated in the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.

19. Defendant **Craig Martin** is a Detective with the Danbury Police Department. He is responsible for carrying out the policies of the DPD and participated in the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.

20. Defendant **Joseph Norkus** is a Danbury Police Officer.  He is responsible for carrying out the policies of the DPD and participated in the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.

21. Defendants **John Does 1-5** are Danbury Police Officers who took part in the arrests on September 19, 2006, but whose identities are as yet unknown.  They are responsible for carrying out the policies of the DPD, and they are sued in their official and personal capacities.

22. Defendants **John Does 6-8** are Danbury Police Officers who participated in the civil immigration arrest of Plaintiff Vargas on the pretext of an investigative stop for an alleged traffic violation on February 17, 2007.  John Does 6-8 unlawfully investigated, detained, and arrested Plaintiff Vargas on suspicion of a civil immigration infraction, on the basis of information obtained from the NCIC database.

23. Plaintiffs are unaware of the true names and capacities, whether individual or otherwise, of Defendant Does 1 through 8, inclusive, and therefore sue those Defendants by fictitious names. Plaintiffs are informed and believe, and on that basis allege, that each of these Doe Defendants are responsible and liable for the acts and/or damages alleged in this Complaint. Plaintiffs will amend this Complaint to allege the Doe Defendants' true names and capacities when they have been ascertained.

24. Defendant **City of Danbury** is a Connecticut municipal corporation. It is sued pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and 7-101a, for the tortious acts of its employees.

**ICE Defendants**

25. Defendant **James E. Brown** is an agent of ICE's Fugitive Operations Unit in Boston, Massachusetts. He is responsible for carrying out the immigration law enforcement operations of the Fugitives Operation Unit in Boston. He took part in the September 19, 2006 sting operation at Kennedy Park in Danbury. He is sued in his official and personal capacities.

26. Defendant **Richard L. McCaffrey** is an agent of the HARFOT. He is responsible for carrying out HARFOT immigration law enforcement operations. He took part in the September 19, 2006 sting operation at Kennedy Park in Danbury. He is sued in his official and personal capacities.

27. Defendant **Ronald L. Preble** is an agent of the Hartford Fugitive Operations Team ("HARFOT"). He is responsible for carrying out HARFOT immigration law enforcement operations. He took part in the September 19, 2006 sting operation at Kennedy Park in Danbury. He is sued in his official and personal capacities.

28. Defendants **John Does 9-14** are agents of ICE who participated in Plaintiffs' arrests and detention on September 19, 2006.   They are responsible for carrying out the policies of ICE, and they are sued in their official and personal capacities.

29. Plaintiffs are unaware of the true names and capacities, whether individual or otherwise, of Defendant Does 9 through 14, inclusive, and therefore sue those Defendants by fictitious names. Each of the Doe Defendants are responsible and liable for the acts and/or damages alleged in this Complaint.   Plaintiffs will amend this Complaint to allege the Doe Defendants' true names and capacities when they have been ascertained.

30. During all times mentioned in this complaint, the Defendants were acting under color of law, that is, under color of the statutes, laws, charter, ordinances, rules, regulations, customs and usages of the United States, the State of Connecticut or the City of Danbury.

## STATEMENT OF FACTS

### Immigration Law Enforcement in Danbury under Mayor Mark Boughton

31. Mayor Mark Boughton, first elected in 2001, has been a vocal advocate of strict immigration enforcement and of local government and police involvement in immigration enforcement.

32. Mayor Boughton has promoted the local enforcement of federal immigration laws in Danbury in direct response to an increase in the number of the city's immigrant and Latino residents and out of frustration over the federal government failure's to address the impact of sudden, large-scale immigration on local municipalities.   Over the last few years, Danbury has seen a significant increase in immigrants from Brazil and other Latin American countries, especially Ecuador.

33. The arrival of new Latino immigrants, and the failure of the federal government to address immigration's local effects, has sparked a backlash from Mayor Boughton's administration, which has targeted, harassed, and intimidated these new city residents through a number of discriminatory policies. These policies include discriminatory enforcement of city ordinances, such as building code and vehicle registration regulations, shutting down neighborhood volleyball games, encouraging police harassment of day laborers, encouraging direct police enforcement of civil immigration laws through traffic stops, and requests to U.S. Senators and Representatives and ICE for federal assistance in immigration law enforcement. Upon information and belief, these policies aim ultimately to drive unwanted immigrants from Danbury and to deter future immigrants from making Danbury their home.

34. Mayor Boughton's administration has especially directed these discriminatory policies against Danbury's Ecuadorian community. For example, in April 2005, Danbury drew national media attention when the Danbury Common Council, with Mayor Boughton's support, considered an ordinance banning "repetitive outdoor group activities." The purpose of this ordinance was to shut down the Ecuadorian community's neighborhood volleyball games, one of the primary venues for community gatherings in the spring and summer. Mayor Boughton also requested that the DPD aggressively police the volleyball games to achieve the same end.

35. Moreover, around the same time, with Mayor Boughton's support, city code inspectors discriminatorily enforced Danbury's fire and building codes and parking regulations against the Ecuadorian community as well. For example, in a nighttime sweep on July 23, 2005, code enforcement officers shut down seven sites that serviced the Ecuadorian community's neighborhood volleyball games.

36. The centerpiece of Mayor Boughton's harassment campaign has been the City of Danbury's escalating involvement in the enforcement of federal immigration laws, especially through the Danbury Police Department.

37. Mayor Boughton and other Danbury city officials are fully aware and have been informed by their own Office of Corporation Counsel that local police lack the legal authority to enforce federal civil immigration laws.

38. In a letter to Connecticut Attorney General Richard Blumenthal, dated April 15, 2005, Mayor Boughton requested that Attorney General Blumenthal enter into a Memorandum of Understanding with ICE to train, supervise, and deputize state police officers to enforce federal immigration laws, pursuant to 8 U.S.C. § 1257(g).  State officials declined to pursue this course.

39. Despite this response from state officials, in a subsequent letter to Connecticut Governor Jodi Rell, Mayor Boughton stated that he had nevertheless instructed Danbury Police Chief Alan Baker to prioritize the resources of the DPD to assist with future federal and state immigration enforcement activities in Danbury.

40. In a letter to Paul Streitz of Connecticut Citizens for Immigration Reform, dated January 19, 2006, and based on legal advice from Danbury's Office of Corporation Counsel, Chief Baker acknowledged that DPD officers possess the authority to enforce only criminal—but not civil—immigration laws.

41. Despite their knowledge that DPD officers are not authorized to enforce civil immigration laws, Mayor Boughton and Chief Baker have nevertheless encouraged and instructed the DPD to carry out independent civil immigration law enforcement actions against

Danbury's unwanted immigrant and Latino residents without the requisite training, supervision, and written agreement with ICE as required by law.

42. Under Mayor Boughton and Chief Baker's leadership, the DPD's Special Investigations Division has become especially active in civil immigration law enforcement activities. SID is a special vice unit of the DPD that was established to investigate narcotics, gambling, prostitution, and organized crime. SID officers have received no formal training in immigration law enforcement and they are not supervised by ICE officers.

43. In a December 2004 letter to Eduargo Aguirre, Jr., Director of U.S. Citizenship and Immigration Services, which is an agency within the Department of Homeland Security ("DHS"), Mayor Boughton described the recent arrival of allegedly undocumented immigrants in Danbury and requested the assistance of the agency in enforcing immigration laws in Danbury. Mayor Boughton also sent a copy of this letter to Tom Ridge, then Secretary of DHS.

44. Mayor Boughton also sent copies of correspondence with state and other federal officials to the Secretary of DHS. This correspondence described the perceived problems Danbury faced as a result of illegal immigration and requested the assistance of state and federal authorities in enforcing immigration laws.

45. The repeated communications from Mayor Boughton and the DPD to DHS, whether made directly or indirectly to the agency, together with the widespread media accounts of the Mayor's initiative to rid Danbury of certain immigrant populations, rendered the ICE defendants fully aware of the Mayor's unlawful immigration enforcement campaign.

11

**Harassment of the Kennedy Park Day Laborers Under Mayor Mark Boughton**

46. As part of their local immigration enforcement campaign, Mayor Boughton and the DPD have singled out the day laborer community in Danbury's Kennedy Park for special harassment.

47. Upon information and belief, almost all of the day laborers who gather at Kennedy Park each day are Latino men, and many of them are of Ecuadorian descent.

48. Kennedy Park is a small park, open to the public, located at the intersection of Main Street and Kennedy Avenue. Kennedy Park is at the center of Danbury's downtown district and within walking distance of City Hall.

49. In recent years, Kennedy Park has become a gathering site for day laborers. Contractors in the construction, landscaping, and other industries drive by Kennedy Park in the early morning to solicit workers on a job-by-job basis. Normally, wages and work arrangements are negotiated at the park, and contractors then drive workers to worksites.

50. There is no ordinance in the Danbury Municipal Code prohibiting the expression of one's availability to solicit work in a public forum.

51. Prior to September 2006, the daily and visible gathering of the day laborers in Kennedy Park had become a source of political controversy in Danbury and subject of increasing political debate among city residents. Mayor Boughton believed the congregation of day laborers at Kennedy Park to be harmful to the city's image.

52. Upon information and belief, Mayor Boughton expressly directed the Danbury Police to harass and intimidate the day laborers who gathered peaceably in Kennedy Park, to silence their solicitation speech and prevent them from communicating with potential employers.

53. In accordance with Mayor Boughton's directives, DPD officers, from at least as early as August 2006, repeatedly harassed day laborers gathering peaceably in Kennedy Park by threatening to cite or arrest them on the grounds that they were interfering with the flow of traffic.

54. Even day laborers who were not crossing or about to cross the street in front of Kennedy Park were approached by police and warned not to congregate near the edge of the park. The DPD's campaign of threats and harassment were intended to deter and effectively prohibit day laborers from assembling peaceably in the park and to encourage them to leave Danbury.

**The Arrest of Eleven Men on September 19, 2006**

Planning the Sting Operation

55. On September 19, 2006, DPD's harassment of the day laborers culminated in an undercover immigration sting operation at Kennedy Park that resulted in the unlawful arrest of eleven men, nine of whom are Plaintiffs in this action.

56. Defendants Agosto, DeJesus, Fisher, Lalli, Martin, Norkus, and John Does 1-5 (collectively, "DPD Officers") planned and/or executed the operation. Defendants Brown, McCaffrey, Preble, and John Does 9-14 (collectively, the "HARFOT Officers") were present during the execution of the operation.

57. On an unknown date prior to September 19, 2006, some of the DPD Officers determined to arrest day-laborers at Kennedy Park as part of the broader effort by Mayor Boughton and the DPD to drive new Latino immigrants, and particularly those of Ecuadorian descent, from the city.

58. The DPD Officers knew of no particular "fugitive" or other alleged immigration violators in Kennedy Park and had no specific targets in mind in planning the undercover sting operation with ICE.

59. Nevertheless, upon information and belief, Detective Fisher communicated with one or more of the HARFOT Officers regarding the potential presence of immigration violators, including immigrants with outstanding orders of deportation or removal, among the day-laborers at Kennedy Park.

60. HARFOT Officers willfully and knowingly agreed to assist the DPD in an operation to arrest day-laborers at Kennedy Park in full awareness of Mayor Boughton and the DPD's goal of ridding Danbury of its new Latino immigrants.

61. The DPD communication to ICE was non-specific and based on group stereotypes. The communication targeted the day laborers on the basis of their race, ethnicity, and perceived national origin, while providing no identifying information about any individuals who might have been in violation of federal law.

62. Furthermore, upon information and belief, Detective Fisher submitted the tip to retaliate against the day laborers for gathering in public to express their availability to work and to communicate with potential employers.

63. Similarly, although Mayor Boughton and the DPD have repeatedly alleged, in letters to state officials and to the media, that immigration law violators are present at Kennedy Park, they have no basis for these allegations other than racial and ethnic stereotype and perceived national origin.  Mayor Boughton and the DPD have made these allegations to further their campaign to drive the day laborers from Kennedy Park and to instill fear in the rest of Danbury's immigrant population.

64. Accordingly, in participating in the sting operation, the HARFOT Officers also proceeded on the basis of racial and ethnic stereotype and perceived national origin, and without any identifying information about any individuals who might have been in violation of federal law.

65. On or about September 18, 2006, Detective Fisher and one or more HARFOT Officers agreed that the operation would take place on September 19, 2006.

66. On or about September 18, 2006, Detective Fisher informed others, including but not limited to DPD Officers DeJesus, Martin, and Norkus of the planned operation.  Detective Fisher requested the assistance of DPD Officers DeJesus, Martin, and Norkus, who agreed to work extended shifts of duty on September 19, 2006.

67. Defendants DeJesus, Martin, and Norkus were fully aware of the purpose of the operation, knowingly and willingly agreed to assist, intentionally targeted the day-laborers for arrest based on their race, ethnicity, and/or perceived national origin, and intended to retaliate against the day-laborers for their use of Kennedy Park.

68. Before September 19, 2006, the HARFOT Officers did not identify any particular suspected immigration violators among the Kennedy Park day-laborers.  The HARFOT Officers did not obtain any administrative or criminal arrest warrants in advance of the September 19th operation.

69. Detective Fisher or another of the DPD Officers arranged for the use of an undercover vehicle on September 19, 2006.

70. One of the Defendant DPD Officers dressed in clothing so as to resemble the sort of contractor or employer who typically hired day-laborers at Kennedy Park.

71. The DPD Officers and the HARFOT Officers met in the early morning of September 19, 2006 to review final plans for the sting operation.

72. Upon information and belief, Police Chief Baker failed to inform himself about, approve, and otherwise adequately supervise the sting operation as required by DPD internal policies and procedures. Chief Baker failed to do so despite the importance of such procedures to protecting the rights of arrestees, his awareness of the DPD Officers' goals of suppressing the protected speech of the day laborers, singling out the day laborers for harassment on the basis of race, ethnicity, and perceived national origin, and ultimately driving the Kennedy Park day laborers from Danbury, and his knowledge that local immigration enforcement is preempted under federal law.

<u>The Arrests</u>

73. On the morning of September 19, 2006, each of the Plaintiffs Barrera, Cabrera, Chavez, Duma, Llibisupa, Maldonado, Redrovan, Sanchez, and Simbaña (collectively, "Day-Laborer Plaintiffs") went to Kennedy Park to find work for the day.

74. Some time early that morning, each of the Day-Laborer Plaintiffs saw a vehicle drive up to the park. Each of the Day-Laborer Plaintiffs approached the vehicle, and the driver offered each of them work for the day demolishing a fence. The driver did not appear to be looking for any specific individuals.

75. In fact, the vehicle approached by each Day-Laborer Plaintiff was driven by one of the DPD Officers, and the offer of work demolishing a fence was a ruse.

76. Each Day-Laborer Plaintiff reasonably relied on the misrepresentation of the offer of work and entered the vehicle.

77. The vehicle made three trips to Kennedy Park that morning, picking up three to five workers each time.

78. On each of the three trips from Kennedy Park, the vehicle drove several blocks to a fenced-in lot behind an office building on Main Street in Danbury.  The vehicle stopped in the corner of the parking lot behind the building, which is surrounded by a tall chain link fence and closed off on the fourth side by the building.

79. The undercover officer driving the vehicle did not ask any questions of any of the Day-Laborer Plaintiffs during the drive from Kennedy Park to the parking lot.

80. When each Day-Laborer Plaintiff exited the vehicle, the DPD Officers, who were waiting in the lot, immediately surrounded each man, some officers with weapons drawn, and roughly seized each Day-Laborer Plaintiff.  Some of the arresting officers had apparently been hiding in or around several vehicles that were parked in the corner of the parking lot.

81. The HARFOT Officers were also present in the parking lot.

82. In the alternative, Plaintiffs allege that the HARFOT Officers were waiting in the lot and surrounded and seized each Day-Laborer Plaintiff when they exited the vehicle, and that the DPD Officers also present in the parking lot to assist.

83. Upon seizing each Day-Laborer Plaintiff, DPD Officers, or, in the alternative, HARFOT officers, then physically detained each Day-Laborer Plaintiff and told him that he was under arrest.  DPD Officers, or, in the alternative, HARFOT officers, handcuffed each Day-Laborer Plaintiff, placed him in a white van that was parked in the lot, and closed the door to the van.

84. Those Day-Laborer Plaintiffs who arrived first were instructed to watch while the same thing happened to subsequent day laborers.  A total of eleven day laborers were arrested and placed in the van.

85. As confirmed by DPD arrest and booking records, DPD officers arrested the Day-Laborer Plaintiffs at approximately 7:00 am on September 19, 2006.

86. In the alternative, Plaintiffs allege that HARFOT Officers arrested the Day-Laborer Plaintiffs at some point on the morning of September 19, 2006.

87. After being arrested in the parking lot, some of the Day-Laborer Plaintiffs wanted to call a family member or a lawyer and asked to make a phone call.  The arresting officers refused to let any of the Day-Laborer Plaintiffs make such a call and confiscated the cell phones of those Day-Laborer Plaintiffs who had them.

88. Only after the Day-Laborer Plaintiffs had been physically restrained, put under arrest by the DPD Officers, or in the alternative, by the HARFOT Officers, and told that they could not call anyone, did law enforcement agents question the Day-Laborer Plaintiffs about their identity, nationality, the place and manner of their entry into the United States, and their immigration status.

89. While the Day-Laborer Plaintiffs were detained in the parking lot, a DPD officer of Hispanic appearance, and who spoke Spanish well, told Plaintiff Barrera in Spanish that he had been arrested because he was standing in Kennedy Park, after the DPD had previously warned laborers not to stand there.  Upon information and belief, this individual was Officer José Agosto.

90. None of the Day-Laborer Plaintiffs had been previously warned, cited, or ticketed for standing in Kennedy Park or interfering with traffic in the area of Kennedy Park, and none had

18

any record of causing any "safety issues" in Kennedy Park, whether related to traffic or otherwise.  Indeed, Plaintiffs Chavez and Sanchez had never even solicited work at Kennedy Park before the morning of September 19, 2006.

91. None of the Day-Laborer Plaintiffs had an outstanding deportation or removal order, and no immigration warrants had been issued for any of them before their arrests on September 19, 2006.

92. Either the DPD Officers or the HARFOT Officers, or both, then transported the Day-Laborer Plaintiffs from the parking lot to the Danbury Police Station, where DPD officers fingerprinted and questioned them, and entered their booking records into the DPD's files.

93. While at the Danbury Police Station, Plaintiff Chavez saw a DPD officer that he recognized to be José Agosto.  Officer Agosto told Plaintiff Chavez in Spanish that he had been arrested because they had been standing at Kennedy Park, even though the DPD had previously warned the day laborers not to stand there.

94. Plaintiff Chavez had never been told by any police officer not to stand at or near Kennedy Park, nor had Plaintiff Chavez previously been warned, cited, or ticketed for interfering with traffic in the area of Kennedy Park.

95. At the Danbury Police Station, Plaintiff Barrera was also mockingly told by a Danbury police officer of Hispanic appearance, and who spoke Spanish well, that when he could, Plaintiff Barrera should call his family in Ecuador and tell them to meet him at the airport in Quito, because that was the first place that Plaintiff Barrera would be released from custody. Upon information and belief, this individual was Defendant DPD Officer José Agosto.

96. According to the DPD booking records for the Day-Laborer Plaintiffs, Danbury police made the arrests in the Danbury Executive Tower parking lot at 7:06 am on the charge of "Illegal Entry Into U.S."

97. The booking reports list the arresting officer to be Defendant Danbury Police Officer James Lalli.

98. No criminal charges have been filed against any of the Day-Laborer Plaintiffs.

99. Upon information and belief, Mayor Boughton was informed of the undercover operation and arrests no later than while they were occurring on the morning of September 19, 2006.

100. At no point that morning, or any point afterwards, did Mayor Boughton attempt to prevent the arrests of the Day-Laborer Plaintiffs in spite of his knowledge that the sting operation was illegal and violated the Day-Laborer Plaintiffs' civil rights.

101. Upon information and belief, Mayor Boughton allowed the arrests to take place pursuant to his administration's policy of promoting local civil immigration enforcement against Danbury's new Latino immigrants and out of total disregard for the constitutional interests of the arrestees.

102. Upon information and belief, Mayor Boughton took no disciplinary actions against the DPD Officers upon learning of the sting operation and the arrests of the Day-Laborer Plaintiffs.

## The Day-Laborer Plaintiffs' Transfer to and Detention in ICE Custody

103. After detaining each Day-Laborer Plaintiff in a holding cell or otherwise for approximately two hours at Danbury Police Headquarters, DPD officers transferred custody of the Day-Laborer Plaintiffs to ICE at approximately 9:00 am.

104.    The HARFOT Officers transported the Day-Laborer Plaintiffs, handcuffed and shackled, to Hartford, Connecticut.

105.    The ICE Agents responsible for accepting custody of the Day-Laborer Plaintiffs were the HARFOT Officers, Defendants Brown, McCaffrey, and Preble.

106.    Defendant McCaffrey also served as examining officer for the Day-Laborer Plaintiffs, though he knew or should have known that doing so violated federal immigration regulations.

107.    After two nights in Hartford, ICE agents transferred Plaintiffs Barrera, Duma, Llibisupa, and Maldonado to Suffolk County House of Corrections in Boston, Massachusetts. ICE agents transferred Plaintiffs Cabrera, Chavez, Redrovan, Sanchez, and Simbaña to Plymouth County Detention Center in Plymouth, Massachusetts.

108.    At both the Suffolk and Plymouth facilities, prison officials denied each of the Day-Laborer Plaintiffs access to a telephone for periods ranging from several days to several weeks, despite the Plaintiffs' repeated requests to call family members or a lawyer.

109.    Plaintiff Barrera did not receive access to a phone for at least four days.

110.    Plaintiff Cabrera was allowed to use a phone on his first day in Hartford, but the phone did not work, and he was denied access to a phone for the next three weeks of detention.

111.    Plaintiff Chavez was allowed to use a phone on his first day in Hartford, but the phone did not work.

112.    Plaintiff Duma asked repeatedly to make a phone call, but was denied access to a phone for the entire period of his detention.

113.    Plaintiff Llibisupa was denied access to a phone for the entire period of his detention.

114.   Plaintiff Maldonado was denied access to a phone and was unable to contact his family until they ultimately called him at the detention facility after he had been detained for several days.

115.   Plaintiff Redrovan was denied access to a phone for several days, until he was transferred to ICE custody in Massachusetts.

116.   Plaintiff Simbaña was allowed to use a phone once, on the first day of his detention in Hartford, but not subsequently.

117.   While in custody in Hartford, ICE officers instructed the Day-Laborer Plaintiffs to sign a document written in English, which had not been translated or explained to them, and which they could not read. ICE officers took the men out of the room one at a time and individually intimidated them and pressured them into signing the document.  ICE officers gave the men a number of different and wholly inadequate explanations for what the paper was.

118.   Plaintiff Barrera did not understand what the document said. An officer who spoke some Spanish stated simply that he needed to sign it to be transferred.

119.   Another officer told Plaintiff Chavez that he needed to sign the document in order to see a judge.

120.   Plaintiff Maldonado similarly could not read the document, but the officers who addressed him angrily told him that he had to sign it anyway.

121.   Officers informed Plaintiff Simbaña that, practically speaking, he already "signed" the document and terrorized him into actually doing so, leading him to believe that he needed to sign the document in order to see an Immigration Judge.

122.   While the Day-Laborer Plaintiffs were in custody in Massachusetts, an unknown law enforcement agent or agents questioned them as potential suspects or witnesses in a murder

investigation.   The agent told them that the victim had been murdered in Danbury by an Ecuadorian.  During the interrogation, the agent did not offer Plaintiffs access to counsel, nor did he inform them of their *Miranda* rights, including their right to remain silent and to have counsel present during the interrogation. Instead, the agent promised them immigration benefits if they told him about the murder.

123.   Also while in custody in Massachusetts, prison officials subjected each of the Day-Laborer Plaintiffs to a medical examination and full-body search.

124.   Prison officials forced at least Plaintiffs Barrera, Llibisupa, Maldonado, Redrovan, and Simbaña to give blood samples without their consent as part of the medical examination.

125.   Prison officials forced at least Plaintiffs Barrera, Maldonado, Redrovan, and Simbaña to give urine samples without their consent as part of the medical examination.

126.   Suffolk County correctional guards held Plaintiff Barrera in isolation for five days—in a cell with neither a toilet nor a sink—as a result of his blood test.  At no point did officers explain the reason for his confinement.

127.   On October 2, 2006, Immigration Judge ("IJ") Matthew J. D'Angelo of the Immigration Court in Boston, Massachusetts held bond redetermination hearings for Plaintiffs Barrera, Duma, Llibisupa, and Maldonado.  IJ D'Angelo found that Plaintiffs Barrera, Duma, Llibisupa, and Maldonado were neither a flight risk nor a danger to the community and set the statutory minimum bond of $1500 for each man.

128.   Plaintiffs Barrera, Duma, Llibisupa, and Maldonado were released on $1500 bond on October 3, 2006.  In total, they each spent approximately 15 days in ICE custody.

**The Remaining Day-Laborers' Transfer to and Detention in Texas**

129.    The Boston Immigration Court calendared bond redetermination hearings for Plaintiffs Chavez, Sanchez, and Simbaña for 1:00 pm on October 3, 2006.

130.    After the conclusion of the bond proceedings for other Plaintiffs on the afternoon of October 2, a DRO officer in Boston personally assured undersigned counsel that ICE would not transfer Chavez, Sanchez, and Simbaña before 3:00 pm on October 3, 2006.

131.    On the morning of October 3, however, before their 1:00 pm bond hearings, ICE began the process of transferring Plaintiffs Chavez, Sanchez, and Simbaña, along with Plaintiffs Cabrera, and Redrovan, to detention facilities in Texas.  When the Immigration Judge in Boston attempted to call the bond cases for these Plaintiffs as scheduled at the 1:00 pm video-conference calendar on October 3, jail officials informed the Court that the Plaintiffs were not available for court because they were in transit to Texas.

132.    On October 3, 2006, ICE flew Plaintiffs Cabrera, Chavez, Redrovan, Sanchez, and Simbaña, handcuffed and shackled, to Texas.  ICE kept Plaintiffs in shackles for the entire journey to Texas—a period of nearly sixteen hours.

133.    After being briefly held at the Port Isabel Processing Center in Los Fresnos, Texas, Plaintiffs Cabrera, Chavez, Sanchez, and Simbaña were detained at the Willacy Detention Center in Raymondville, Texas.   Plaintiff Redrovan continued to be held at the Port Isabel Processing Center.

134.    While at the Willacy Detention Center, Plaintiffs Cabrera, Chavez, Sanchez, and Simbaña were subjected to horrendous detention conditions. The men endured extremely overcrowded and unsanitary conditions, and prison officials denied them adequate medical care and adequate amounts of food at regular intervals. At times, the detainees were forced to eat

with their bare hands. Prison guards also frequently verbally insulted, taunted, and ridiculed the detainees.

135.   Immigration Judge ("IJ") Eleazar Tovar of the Immigration Court in Harlingen, Texas held telephonic bond redetermination hearings on October 16, 2006 for Plaintiffs Cabrera, Chavez, Sanchez, and Simbaña. IJ Tovar found that the detainees were neither a flight risk nor a danger to the community and set bond.

136.   IJ Peterson of the Immigration Court in Harlingen, Texas held a telephonic bond redetermination hearing for Plaintiff Redrovan. IJ Peterson found that Plaintiff Redrovan was neither a flight risk nor a danger to the community and set bond.

137.   Plaintiff Cabrera was released on $8,000 bond on or around October 23, 2006. In total, Mr. Cabrera was detained in ICE custody for approximately 35 days.

138.   Plaintiff Chavez was released on $10,000 bond on or around October 23, 2006. In total, Mr. Chavez was detained in ICE custody for approximately 35 days.

139.   Plaintiff Redrovan was released on $15,000 bond on or around October 23, 2006. In total, Mr. Redrovan was detained in ICE custody for approximately 35 days.

140.   Plaintiff Sanchez was released on $10,000 bond on or around October 20, 2006. In total, Mr. Sanchez was detained in ICE custody for approximately 32 days.

141.   Plaintiff Simbaña was released on $10,000 bond on or around October 26, 2006. In total, Mr. Simbaña was detained in ICE custody for approximately 38 days.

**Effect on Plaintiffs and Day Laborer Community at Large**

142.   Defendants' unlawful and retaliatory arrest and detention of the Day-Laborer Plaintiffs caused the Plaintiffs to suffer humiliation, damage to their reputations and professional

prospects, emotional distress, physical pain, and monetary damages from their arrest, detention, and restrictions on liberty.

143.    They continue to fear that they, their families, or their acquaintances will be arbitrarily and unlawfully arrested by ICE, DPD, or both.  Several of the Day-Laborer Plaintiffs no longer gather in Kennedy Park for fear of harassment by ICE and DPD officers.

144.    While sparking a great deal of political engagement and advocacy by the immigrant and Ecuadorian community in Danbury and across the State of Connecticut, the Day-Laborer Plaintiffs' very visible unlawful arrests have also created and sustained a climate of fear among day laborers at Kennedy Park and among Latino and immigrant residents in Danbury more generally.  This climate persists to this day.

145.    Fewer day laborers in general now assemble at Kennedy Park to seek work, fearing that they too will be arrested by ICE, DPD, or both, and those who do continue to gather there do so in part as a statement of their disagreement with the anti-immigrant tactics of Mayor Boughton and the DPD.

146.    Latino and immigrant residents in Danbury also remain fearful of harassment, detention, and arrest by ICE, DPD, or both.

## The Pretextual Traffic Stop and Unlawful Civil Immigration Arrest of Danilo Brito Vargas

147.    As part of Mayor Boughton's campaign against immigrant and Latino communities, the DPD has also exploited the FBI's principal criminal database, the National Crime Information Center ("NCIC"), to target Latinos for make unlawful and discriminatory immigration arrests.  DPD officers have engaged in a series of pretextual traffic stops for the purpose of investigating the immigration status of Latino drivers.  During these traffic stops,

DPD officers conduct a search for drivers' names on the NCIC database and arrest drivers on any civil immigration violations they discover.

149.    The DPD's use of the NCIC database to effect immigration arrests against Latino and immigrant drivers constitutes a form of racial and ethnic profiling.

150.    Moreover, the DPD's NCIC immigration arrests violate Congress's broad preemption of state and local police from making federal immigration arrests outside of specific statutory procedures.

**Background on the NCIC Database**

151.    The National Crime Information Center ("NCIC") provides direct on-line access to its computerized database of criminal justice information. The NCIC is the FBI's principal criminal records database and is accessed millions of times each day by state and local police nationwide.

152.    Since its creation, the NCIC database has principally contained criminal justice records, such as rap sheets, criminal warrants, and stolen property records.  Congress has not authorized the entry of civil immigration records, including administrative immigration warrants for arrest or removal, into the NCIC database.

153.    In 2002, disregarding Congress's careful statutory limitations on the entry and dissemination of non-criminal records via the NCIC, the Attorney General and other senior Justice Department officials announced a plan to enter hundreds of thousands of administrative immigration warrants into the NCIC.

154.    Since 2002, the Law Enforcement Support Center ("LESC"), a division of ICE, has entered administrative immigration warrants for tens of thousands of persons with outstanding orders of deportation, exclusion, or removal (collectively, "removal orders") whom

it believes have remained in the United States.  DHS estimates that there are more than 632,000 such persons resident in the United States, and has announced its intention to enter administrative immigration warrants for every such person into the NCIC.

155.    The administrative immigration warrants entered by DHS into the NCIC differ significantly from criminal warrants.  DHS administrative warrants are issued by an agency clerk, not by an independent judge, and there is no requirement that a warrant be issued only on probable cause, based on evidence sworn under oath.  There is no review by anyone other than the DHS official.    They are administrative warrants, alleging only a civil violation of immigration law.

156.    When a police officer runs an NCIC check on an individual who has an administrative immigration warrant listed in the NCIC, a "hit" appears with instructions to contact the Law Enforcement Support Center, a unit of ICE, for confirmation.

157.    According to ICE's data, in 2002-04, LESC failed to confirm 42% of the NCIC immigration hits that prompted the requested communication from a local police officer to LESC.

158.    Of those occasions when LESC does confirm the immigration "hit," DHS instructs the police officer to arrest the individual until the DHS officials can arrive to take custody of the individual.

**DPD's Unlawful Immigration Arrests Made Through the NCIC Database**

159.    Congress has enacted a complex and comprehensive statutory scheme regulating immigration in the United States that includes numerous and detailed provisions relating to enforcement of federal immigration laws.  In adopting this statutory scheme, Congress has

broadly preempted immigration enforcement by state and local officials, except as specifically authorized by Congress.

160. No authority exists for DPD to make a civil immigration arrest.

161. An arrest pursuant to an administrative immigration warrant in the NCIC is a civil immigration arrest.

162. Nevertheless, the DPD has developed a policy or practice of arresting persons on the basis of administrative immigration warrants in the NCIC.

163. DPD officers conducting such arrests do not typically inform NCIC immigration arrestees of their *Miranda* rights, nor are such persons subject to state or federal prosecution. DPD typically arrests and detains such persons until they are transferred to the custody of ICE.

164. Defendants Boughton and Baker knowingly promulgated, implemented, enforced, sanctioned, and/or acquiesced in this arrest policy as part of the city's ongoing immigration enforcement campaign against its new Latino and immigrant residents, despite knowledge on the part of Boughton and Baker that DPD officers are preempted by federal law from making civil immigration arrests.

165. Moreover, upon information and belief, Defendant Baker does not supervise the execution and processing of these arrests as required by internal DPD police procedure despite his knowledge that DPD civil immigration arrests are preempted by federal law and the importance of such procedures to protecting the rights of arrestees.

**Arrest of Danilo Brito Vargas**

166. On February 17, 2007, Plaintiff Danilo Brito Vargas and his wife were driving near their home in Danbury. A DPD cruiser pulled up behind them and signaled for Plaintiff Vargas to pull over, which he did.

167.    A DPD officer approached the car, told Plaintiff Vargas that he was being pulled over because his muffler was too loud, and asked to see identification. Plaintiff Vargas tendered his Ecuadorian passport, whereupon the officer took the passport, returned to the cruiser, and consulted a computer there.

168.    On information and belief, the officer used the cruiser computer to run Plaintiff Vargas's name through the NCIC and other databases, and the NCIC returned a response indicating the existence of an administrative immigration warrant for Plaintiff Vargas. The NCIC response further instructed the DPD officer to contact LESC for confirmation.

169.    Acting solely on the basis of this information, the DPD officer radioed for assistance. Two more officers arrived on the scene. The three officers told Plaintiff Vargas to step out of the car. After patting him down and searching his pockets, they handcuffed him and placed him in the cruiser. They did not explain why he was being detained.

170.    The DPD officers then transported Plaintiff Vargas to the Danbury Police Station, where he was detained in a holding cell for approximately two days. DPD officers told Plaintiff Vargas that he was being detained solely because he had "immigration problems."

171.    He was then transferred to an immigration detention facility in Hartford, and shuttled between that facility and another correctional facility in Rhode Island.

172.    Plaintiff Vargas was deported to Ecuador in April or May 2007.

173.    As a result of this arrest, Plaintiff Vargas has suffered humiliation, damage to his reputation and professional prospects, emotional distress, physical pain, and monetary damages from his arrest, detention, and restrictions on liberty.

## CLAIMS RELATING TO ARREST OF DAY-LABORERS

### FIRST CLAIM FOR RELIEF:
**(Fourth Amendment and Article First, §§ 7, 9 of the Connecticut Constitution**
**(42 U.S.C. § 1983: Danbury Defendants)**

174.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

175.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Craig Martin, Joseph Norkus, and John Does 1-5 violated the Day-Laborer Plaintiffs' rights under the Fourth Amendment to the United States Constitution, and §§ 7 and 9 of Article First of the Connecticut Constitution by arresting them for alleged civil immigration violations without valid warrants and in the absence of exigent circumstances, any probable cause, or reason to believe that the Day-Laborer Plaintiffs were engaged in any unlawful activity, and by stopping, detaining, investigating, searching and effecting seizures and/or arrests of the Day-Laborer Plaintiffs in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause.

176.    Defendants Boughton, Baker, and Fisher were personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice and/or custom of (a) arresting Latino, immigrant, and day laborer residents in Danbury for alleged civil immigration violations without valid warrants and in the absence of exigent circumstances, any probable cause, or reason to believe that the arrestees are engaged in any unlawful activity, in violation of the Fourth Amendment to the United States Constitution, §§ 7 and 9 of Article First of the Connecticut Constitution; and (b) stopping, detaining, investigating, searching, and effecting seizures of Latino, immigrant, and

31

day laborer residents in Danbury in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause in violation of the Fourth Amendment to the United States Constitution, §§ 7 and 9 of Article First of the Connecticut Constitution.

177.    Defendant Boughton, the Mayor of Danbury, is responsible for promulgating, implementing and administering the policies, practices and/or customs of the City of Danbury and for supervising and administering all City Departments.  He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

178.    Defendant Boughton was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights because he failed to remedy these violations.  Specifically, Defendant Boughton failed to act on information provided to him no later than on the morning of the Day-Laborer Plaintiffs' arrests that alerted him to these violations before they occurred or while they were occurring.  Upon learning of the violations, Defendant Boughton made no attempt to stop the violations from occurring, to minimize the harm that resulted from any violations that had already occurred, or to punish, sanction, or discipline the DPD Officers who committed the violations.

179.    Defendant Boughton was personally involved in and proximately caused the violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Baker and Defendant Fisher, who proximately caused the aforementioned violations.  Defendant Boughton's gross negligence in supervising Defendants Baker and Fisher permitted them to promulgate, implement, and administer the aforementioned

policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

180.    Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the DPD, and for supervising all DPD officers in the commission of their duties. He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the violations of the Day-Laborer Plaintiffs' rights.

181.    Defendant Baker was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Fisher, who proximately caused the aforementioned violations. Defendant Baker's gross negligence in supervising Defendant Fisher permitted Defendant Fisher to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

182.    Defendant Fisher was directly involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by participating in the violations, or by ordering or instructing the other DPD Officers to commit the unlawful arrests. Defendant Fisher knew of all relevant facts that made the actions of the DPD Officers unlawful.

183.    Defendant Fisher, the head of the DPD's SID, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the SID, and for supervising all other SID officers in the commission of their duties. He was directly involved in

the promulgation, implementation, and administration of the policy proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

184.    Defendant Fisher was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinate DPD Officers who committed the violations of the Day-Laborer Plaintiffs' constitutional rights.   Defendant Fisher knew or should have known of the DPD's policy, practice, or custom of making civil immigration arrests without probable cause, and failed to act to prevent the violations of the Day-Laborer Plaintiffs' rights from occurring.

185.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

### SECOND CLAIM FOR RELIEF:
### Fourth Amendment and Article First, §§ 7, 9 of the Connecticut Constitution: Preemption
### (42 U.S.C. § 1983: Danbury Defendants)

186.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

187.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Craig Martin, Joseph Norkus, and John Does 1-5 violated the Day-Laborer Plaintiffs' rights under the Fourth Amendment to the United States Constitution, §§ 7 and 9 of Article First of the Connecticut Constitution by intentionally and knowingly detaining and/or arresting the Day-Laborer Plaintiffs on suspicion of civil immigration violations.   The arrest and detention of the Day-Laborer Plaintiffs was unlawful, wholly without authority, and in violation of the Fourth Amendment to the United States Constitution, §§ 7 and 9 of Article First of the Connecticut Constitution, because Federal law preempts state or local police from civil immigration

34

enforcement activity, and expressly and implicitly deprives local law enforcement officials of the authority to make civil immigration arrests. The Danbury Defendants lacked any authority cognizable under 8 U.S.C. § 1357 or other relevant federal laws to make civil immigration arrests.

188.    Defendants Boughton, Baker, and Fisher were personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom of using local police to engage in unauthorized, unlawful and preempted civil immigration law enforcement against Danbury's day laborer, Latino and immigrant residents, in violation of the Fourth Amendment to the United States Constitution, §§ 7 and 9 of Article First of the Connecticut Constitution.

189.    Defendant Boughton, the Mayor of Danbury, is responsible for promulgating, implementing, and administering the policies, practices and/or customs of the City of Danbury and for supervising and administering all City Departments.  He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

190.    Defendant Boughton was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights because he failed to remedy these violations.  Specifically, Defendant Boughton failed to act on information provided to him no later than on the morning of the Day-Laborer Plaintiffs' arrests that alerted him to these violations before they occurred or while they were occurring.  Upon learning of the violations, Defendant Boughton made no attempt to stop the violations from occurring, to minimize the

35

harm that resulted from any violations that had already occurred, or to punish, sanction, or discipline the DPD Officers who committed the violations.

191.   Defendant Boughton was personally involved in and proximately caused the violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Baker and Defendant Fisher, who proximately caused the aforementioned violations. Defendant Boughton's gross negligence in supervising Defendants Baker and Fisher permitted them to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

192.   Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the DPD, and for supervising all DPD officers in the commission of their duties. He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the violations of the Day-Laborer Plaintiffs' rights.

193.   Defendant Baker was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Fisher, who proximately caused the aforementioned violations. Defendant Baker's gross negligence in supervising Defendant Fisher permitted Defendant Fisher to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

36

194.   Defendant Fisher was directly involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by participating in the violations, or by ordering or instructing the other DPD Officers to commit the unlawful arrests.  Defendant Fisher knew of all relevant facts that made the actions of the DPD Officers unlawful.

195.   Defendant Fisher, the head of the DPD's SID, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the SID, and for supervising all other SID officers in the commission of their duties.  He was directly involved in the promulgation, implementation, and administration of the policy proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

196.   Defendant Fisher was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinate DPD Officers who committed the violations of the Day-Laborer Plaintiffs' constitutional rights. Defendant Fisher knew or should have known of the DPD's policy, practice, or custom of making civil immigration arrests without probable cause, and failed to act to prevent the violations of the Day-Laborer Plaintiffs' rights from occurring.

197.   The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

### THIRD CLAIM FOR RELIEF:
### Fourteenth Amendment Equal Protection Clause and Article First, § 20 of the Connecticut Constitution
### (42 U.S.C. § 1983: Danbury Defendants)

198.   The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

199.   Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Craig Martin, Joseph Norkus, and John Does 1-5 intentionally targeted the Day-Laborer Plaintiffs for an immigration sting operation and arrested and detained them on the basis of their race, ethnicity, and perceived national origin in violation of in violation of the Fourteenth Amendment to the United States Constitution, § 20 of Article First of the Connecticut Constitution.

200.   In addition, Defendant DPD Officers subjected the Day-Laborer Plaintiffs to selective law enforcement out of a malicious and bad faith intent to drive them out of the City of Danbury.

201.   Defendants Boughton, Baker, and Fisher were personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom of targeting, harassing, and arresting Danbury's day laborer, Latino and immigrant communities on the basis of their race, ethnicity and/or perceived national origin.

202.   Defendant Boughton, the Mayor of Danbury, is responsible for promulgating, implementing, and administering the policies, practices and/or customs of the City of Danbury and for supervising and administering all City Departments.   He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

203.   Defendant Boughton was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights because he failed to remedy these violations.   Specifically, Defendant Boughton failed to act on information provided to him no

later than on the morning of the Day-Laborer Plaintiffs' arrests that alerted him to these violations before they occurred or while they were occurring.  Upon learning of the violations, Defendant Boughton made no attempt to stop the violations from occurring, to minimize the harm that resulted from any violations that had already occurred, or to punish, sanction, or discipline the DPD Officers who committed the violations.

204.   Defendant Boughton was personally involved in and proximately caused the violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Baker and Defendant Fisher, who proximately caused the aforementioned violations.  Defendant Boughton's gross negligence in supervising Defendants Baker and Fisher permitted them to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

205.   Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the DPD, and for supervising all DPD officers in the commission of their duties.  He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the violations of the Day-Laborer Plaintiffs' rights.

206.   Defendant Baker was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Fisher, who proximately caused the aforementioned violations.  Defendant Baker's gross negligence in supervising Defendant Fisher

permitted Defendant Fisher to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

207.    Defendant Fisher was directly involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by participating in the violations or by ordering or instructing the other DPD Officers to commit the unlawful arrests. Defendant Fisher knew of all relevant facts that made the actions of the DPD Officers unlawful.

208.    Defendant Fisher, the head of the DPD's SID, is responsible for promulgating, implementing and administering the policies, practices, and/or customs of the SID, and for supervising all other SID officers in the commission of their duties. He was directly involved in the promulgation, implementation, and administration of the policy proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

209.    Defendant Fisher was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinate DPD Officers who committed the violations of the Day-Laborer Plaintiffs' constitutional rights. Defendant Fisher knew or should have known of the DPD's policy, practice or custom of making civil immigration arrests without probable cause, and failed to act to prevent the violations of the Day-Laborer Plaintiffs' rights from occurring.

210.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

**FOURTH CLAIM FOR RELIEF**
**First Amendment and Article First, §§ 4, 14 of the Connecticut Constitution**
**(Suppression of and Retaliation for Protected Speech)**
**(42 U.S.C. § 1983: Danbury Defendants)**

211.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

212.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Craig Martin, Joseph Norkus, and John Does 1-5 knowingly and intentionally stopped, detained, investigated, and arrested the Day-Laborer Plaintiffs in retaliation for their exercise of protected speech and association in a public forum, in violation of the First Amendment to the United States Constitution and Article First, §§ 4 and 14 of the Connecticut Constitution.

213.    Defendant DPD Officers had no probable cause to stop, detain, investigate, or arrest the Day-Laborer Plaintiffs, and had no reason to believe that they were in violation of any immigration laws.   The DPD does not have the legal authority to make arrests solely for violations of federal civil immigration law.

214.    Defendants Boughton, Baker, and Fisher were personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice and/or custom of (a) threatening and acting to prevent Latino and immigrant day laborers from exercising their rights to protected speech and association in Kennedy Park, a public forum, and (b) of using the arrests of the Day-Laborer Plaintiffs, in concert with the broader campaign of threats and harassment, to silence other Latino day laborers who wish to gather in Kennedy Park to solicit work in the future.

215.    Defendant Boughton, the Mayor of Danbury, is responsible for promulgating, implementing, and administering the policies, practices and/or customs of the City of Danbury and for supervising and administering all City Departments.  He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

216.    Defendant Boughton was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights because he failed to remedy these violations.  Specifically, Defendant Boughton failed to act on information provided to him no later than on the morning of the Day-Laborer Plaintiffs' arrests that alerted him to these violations before they occurred or while they were occurring.  Upon learning of the violations, Defendant Boughton made no attempt to stop the violations from occurring, to minimize the harm that resulted from any violations that had already occurred, or to punish, sanction, or discipline the DPD Officers who committed the violations.

217.    Defendant Boughton was personally involved in and proximately caused the violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Baker and Defendant Fisher, who proximately caused the aforementioned violations.  Defendant Boughton's gross negligence in supervising Defendants Baker and Fisher permitted them to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

218.    Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the

DPD, and for supervising all DPD officers in the commission of their duties. He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the violations of the Day-Laborer Plaintiffs' rights.

219. Defendant Baker was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Fisher, who proximately caused the aforementioned violations. Defendant Baker's gross negligence in supervising Defendant Fisher permitted Defendant Fisher to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

220. Defendant Fisher was directly involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by participating in the violations or by ordering or instructing the other DPD Officers to commit the unlawful arrests. Defendant Fisher knew of all relevant facts that made the actions of the DPD Officers unlawful.

221. Defendant Fisher, the head of the DPD's SID, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the SID, and for supervising all other SID officers in the commission of their duties. He was directly involved in the promulgation, implementation, and administration of the policy proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

222. Defendant Fisher was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of

his subordinate DPD Officers who committed the violations of the Day-Laborer Plaintiffs' constitutional rights.   Defendant Fisher knew or should have known of the DPD's policy, practice, or custom of making civil immigration arrests without probable cause, and failed to act to prevent the violations of the Day-Laborer Plaintiffs' rights from occurring.

223.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

**FIFTH CLAIM FOR RELIEF:**
**Due Process Rights Under the Fourteenth Amendment and Article First, § 8 of the Connecticut Constitution**
**(42 U.S.C. § 1983: Danbury Defendants)**

224.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

225.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Craig Martin, Joseph Norkus, and John Does 1-5 civilly arrested the Day-Laborer Plaintiffs and deprived them of their of their liberty the Day-Laborer Plaintiffs in a manner that was without due process of law and fundamentally unfair in the totality of its circumstances, in violation of the Fourteenth Amendment to the United States Constitution and § 8 of Article First of the Connecticut Constitution.

226.    Defendants Boughton, Baker, and Fisher were personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice and/or custom of civilly arresting and depriving individuals of their liberty without due process of law and in a manner that is fundamentally unfair in the totality of its circumstances, in violation of the Fourteenth Amendment to the United States Constitution and § 8 of Article First of the Connecticut Constitution.

227.    Defendant Boughton, the Mayor of Danbury, is responsible for promulgating, implementing, and administering the policies, practices and/or customs of the City of Danbury and for supervising and administering all City Departments. He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

228.    Defendant Boughton was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights because he failed to remedy these violations. Specifically, Defendant Boughton failed to act on information provided to him no later than on the morning of the Day-Laborer Plaintiffs' arrests that alerted him to these violations before they occurred or while they were occurring. Upon learning of the violations, Defendant Boughton made no attempt to stop the violations from occurring, to minimize the harm that resulted from any violations that had already occurred, or to punish, sanction, or discipline the DPD Officers who committed the violations.

229.    Defendant Boughton was personally involved in and proximately caused the violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Baker and Defendant Fisher, who proximately caused the aforementioned violations. Defendant Boughton's gross negligence in supervising Defendants Baker and Fisher permitted them to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

230.    Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the

DPD, and for supervising all DPD officers in the commission of their duties. He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the violations of the Day-Laborer Plaintiffs' rights.

231.   Defendant Baker was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Fisher, who proximately caused the aforementioned violations. Defendant Baker's gross negligence in supervising Defendant Fisher permitted Defendant Fisher to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

232.   Defendant Fisher was directly involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by participating in the violations or by ordering or instructing the other DPD Officers to commit the unlawful arrests. Defendant Fisher knew of all relevant facts that made the actions of the DPD Officers unlawful.

233.   Defendant Fisher, the head of the DPD's SID, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the SID, and for supervising all other SID officers in the commission of their duties. He was directly involved in the promulgation, implementation, and administration of the policy proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

234.   Defendant Fisher was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of

his subordinate DPD Officers who committed the violations of the Day-Laborer Plaintiffs' constitutional rights.   Defendant Fisher knew or should have known of the DPD's policy, practice or custom of making civil immigration arrests without probable cause, and failed to act to prevent the violations of the Day-Laborer Plaintiffs' rights from occurring.

235.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

### SIXTH CLAIM FOR RELIEF
### False Arrest and False Imprisonment
### (Defendant DPD Officers)

236.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

237.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Craig Martin, Joseph Norkus, and John Does 1-5 knowingly and intentionally arrested, detained, and imprisoned the Day-Laborer Plaintiffs for alleged civil violations of federal immigration law without a warrant and without probable cause, in retaliation for protected speech, based on impermissible racial, ethnic, and national origin discrimination, and in a manner preempted by federal law.

238.    The Day-Laborer Plaintiffs were forcibly restrained and subsequently imprisoned by the Danbury Defendants and suffered damages as a result of Danbury Defendants' actions.

239.    The Defendant DPD Officers' actions constitute false arrest and false imprisonment under Connecticut common law.

240.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

## SEVENTH CLAIM FOR RELIEF
### Negligence
### (Defendant DPD Officers and Defendant Baker)

241.  The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

242.  Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Craig Martin, Joseph Norkus, and John Does 1-5 negligently arrested, detained, and imprisoned the Day-Laborer Plaintiffs without a warrant and without probable cause, in retaliation for protected speech, based on impermissible racial and ethnic discrimination, and in a manner preempted by federal law, for alleged civil violations of federal immigration law.

243.  Defendant DPD Officers and Defendant Baker owe to the Day-Laborer Plaintiffs a duty of care in the performance of their jobs.  Defendant DPD Officers and Defendant Baker breached that duty of care by arresting the Day-Laborer Plaintiffs without a warrant and without probable cause, in retaliation for protected speech, based on impermissible racial and ethnic discrimination, and in a manner preempted by federal law.

244.  Defendant DPD Officers and Defendant Baker knew that their acts or omissions would likely subject a group of identifiable persons to imminent harm, namely, the Latino and immigrant day-laborers gathered in Kennedy Park.

245.  Defendant Baker negligently failed to supervise Defendant DPD Officers as they executed the Day-Laborer Plaintiffs' unlawful arrest and detention.

246.  The Day-Laborer Plaintiffs were forcibly restrained and subsequently imprisoned by the Danbury Defendants and suffered damages as a result of Danbury Defendants' actions.

247.  The Defendant DPD Officers' actions constitute negligent false arrest and negligent false imprisonment under Connecticut common law.

248.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

**EIGHTH CLAIM FOR RELIEF**
**Intentional Infliction of Emotional Distress**
**(Defendant DPD Officers)**

249.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

250.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Craig Martin, Joseph Norkus, and John Does 1-5 intended to inflict emotional distress upon the Day-Laborer Plaintiffs by deceiving, arresting, detaining, and imprisoning them, or should have known that their conduct was likely to cause Day-Laborer Plaintiffs' emotional distress.   The Danbury Defendants' conduct was clearly extreme and outrageous, given the circumstances surrounding the arrests.

251.    The emotional distress of the Day-Laborer Plaintiffs was caused by the Danbury Defendants' conduct, and was severe.

252.    The Defendant DPD Officers' actions constitute intentional infliction of emotional distress under Connecticut common law.

253.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

**NINTH CLAIM FOR RELIEF**
**Negligent Infliction of Emotional Distress**
**(Defendant DPD Officers and Defendant Baker)**

254.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

49

255.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Craig Martin, Joseph Norkus, and John Does 1-5 created an unreasonable risk of causing the Day-Laborer Plaintiffs emotional distress.  It was clearly foreseeable that the Defendant DPD Officers' conduct would cause the Day-Laborer Plaintiffs emotional distress.

256.    Defendant DPD Officers knew that their failure to act would likely subject a group of identifiable persons to imminent harm, namely, the Latino and immigrant day-laborers gathered in Kennedy Park.

257.    Moreover, Defendant Baker negligently failed to supervise Defendant DPD Officers as they executed the Day-Laborer Plaintiffs' unlawful arrest and detention.

258.    The emotional distress of the Day-Laborer Plaintiffs was caused by the Defendant DPD Officers' conduct and was severe enough that it might result in illness or bodily harm.

259.    The Defendant DPD Officers' actions constitute negligent infliction of emotional distress under Connecticut common law.

260.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

### TENTH CLAIM FOR RELIEF
### Abuse of Process
### (Defendant DPD Officers)

261.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

262.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Craig Martin, Joseph Norkus, and John Does 1-5 abused legal process for a purpose for which it was not intended when they deceived, arrested, detained, and imprisoned the Day-

Laborer Plaintiffs and subsequently transferred them to ICE custody for the purposes of placing them in immigration proceedings.

263.    The Day-Laborer Plaintiffs suffered damages as a result of Defendants' actions.

264.    The Defendant DPD Officers' actions constitute an abuse of process under Connecticut common law.

265.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

## ELEVENTH CLAIM FOR RELIEF
### Fourth Amendment
### (*Bivens*: ICE Defendants)

266.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

267.    In the event that this Court finds that the Defendant HARFOT Officers James Brown, Richard McCaffrey, Ronald Preble, and John Does 9-14, in conjunction with or rather than DPD officers, stopped, detained, investigated, searched, seized and/or arrested the Day-Laborer Plaintiffs, the HARFOT Officers did so intentionally and knowingly and without probable cause and/or reasonable suspicion, in violation of the Day-Laborer Plaintiffs' right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.

## TWELFTH CLAIM FOR RELIEF:
### Fifth Amendment Equal Protection
### (*Bivens*: ICE Defendants)

268.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

269.    In the event that the Court finds that Defendant HARFOT Officers James Brown, Richard McCaffrey, Ronald Preble, and John Does 9-14, in conjunction with or instead of the Defendant DPD Officers, stopped, detained, investigated, searched, seized and/or arrested the Day-Laborer Plaintiffs, Defendant HARFOT Officers knowingly and intentionally did so on the basis of the Day-Laborer Plaintiffs' race, ethnicity, and perceived national origin, in violation of their right to Equal Protection under the Fifth Amendment of the United States Constitution.

270.    In addition, Defendant HARFOT Officers subjected the Day-Laborer Plaintiffs to selective law enforcement out of a malicious and bad faith intent to drive them out of the City of Danbury.

### THIRTEENTH CLAIM FOR RELIEF
### Fifth Amendment Due Process
### (*Bivens*: ICE Defendants)

271.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

272.    In the event that the Court finds that Defendant HARFOT Officers James Brown, Richard McCaffrey, Ronald Preble, and John Does 9-14, in conjunction with or instead of DPD officers, arrested the Day-Laborer Plaintiffs, Defendant HARFOT Officers civilly arrested and deprived Day-Laborer Plaintiffs of their liberty in a manner that was without due process of law and was fundamentally unfair in the totality of the circumstances, in violation of the Day-Laborer Plaintiffs' rights under the Fifth Amendment of the United States Constitution.

### FOURTEENTH CLAIM FOR RELIEF
### Conspiracy
### (42 U.S.C. § 1983 and *Bivens*; Danbury and ICE Defendants)

273.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

274. Defendant DPD Officers and HARFOT Officers entered into an agreement, amongst and between themselves, to act in concert to inflict an unconstitutional injury on the Day-Laborer Plaintiffs. Moreover, Defendant DPD Officers and HARFOT Officers performed numerous overt acts in furtherance of the goal of causing damages.

275. Defendants Boughton, Baker, and Fisher were personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom of acting in concert to inflict an unconstitutional injury on the Day-Laborer Plaintiffs.

276. Defendant Boughton, the Mayor of Danbury, is responsible for promulgating, implementing, and administering the policies, practices and/or customs of the City of Danbury and for supervising and administering all City Departments. He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

277. Defendant Boughton was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights because he failed to remedy these violations. Specifically, Defendant Boughton failed to act on information provided to him no later than on the morning of the Day-Laborer Plaintiffs' arrests that alerted him to these violations before they occurred or while they were occurring. Upon learning of the violations, Defendant Boughton made no attempt to stop the violations from occurring, to minimize the harm that resulted from any violations that had already occurred, or to punish, sanction, or discipline the DPD Officers who committed the violations.

278.   Defendant Boughton was personally involved in and proximately caused the violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Baker and Defendant Fisher, who proximately caused the aforementioned violations.  Defendant Boughton's gross negligence in supervising Defendants Baker and Fisher permitted them to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

279.   Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the DPD, and for supervising all DPD officers in the commission of their duties.  He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the violations of the Day-Laborer Plaintiffs' rights.

280.   Defendant Baker was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Fisher, who proximately caused the aforementioned violations.  Defendant Baker's gross negligence in supervising Defendant Fisher permitted Defendant Fisher to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

281.   Defendant Fisher was directly involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by participating in the violations

or by ordering or instructing the other DPD Officers to commit the unlawful arrests.  Defendant Fisher knew of all relevant facts that made the actions of the DPD Officers unlawful.

282.    Defendant Fisher, the head of the DPD's SID, is responsible for promulgating, implementing and administering the policies, practices, and/or customs of the SID, and for supervising all other SID officers in the commission of their duties.  He was directly involved in the promulgation, implementation, and administration of the policy proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

283.    Defendant Fisher was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinate DPD Officers who committed the violations of the Day-Laborer Plaintiffs' constitutional rights.  Defendant Fisher knew or should have known of the DPD's policy, practice or custom of making civil immigration arrests without probable cause, and failed to act to prevent the violations of the Day-Laborer Plaintiffs' rights from occurring.

284.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

**FIFTEENTH CLAIM FOR RELIEF**
**Conspiracy**
**(42 U.S.C. § 1985(3) and *Bivens*; Danbury and ICE Defendants)**

285.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

286.    Defendant DPD Officers and Defendant HARFOT Officers entered into an agreement to act in concert for the purpose of depriving the Day-Laborer Plaintiffs of the equal

protection of the laws, performed numerous overt acts in furtherance of the conspiracy, and committed injuries to the Day-Laborer Plaintiffs' person or property.

287.    Defendant DPD Officers and HARFOT Officers actions were motivated by racist and discriminatory animus.

288.    Defendants Boughton, Baker, and Fisher were personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom of acting in concert for the purpose of depriving the Day-Laborer Plaintiffs of the equal protection of the laws, based on the Day-Laborer Plaintiffs' race or ethnicity.

289.    Defendant Boughton, the Mayor of Danbury, is responsible for promulgating, implementing and administering the policies, practices, and/or customs of the City of Danbury and for supervising and administering all City Departments.  He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

290.    Defendant Boughton was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights because he failed to remedy these violations.  Specifically, Defendant Boughton failed to act on information provided to him no later than on the morning of the Day-Laborer Plaintiffs' arrests that alerted him to these violations before they occurred or while they were occurring.  Upon learning of the violations, Defendant Boughton made no attempt to stop the violations from occurring, to minimize the harm that resulted from any violations that had already occurred, or to punish, sanction, or discipline the DPD Officers who committed the violations.

291.    Defendant Boughton was personally involved in and proximately caused the violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Baker and Defendant Fisher, who proximately caused the aforementioned violations.  Defendant Boughton's gross negligence in supervising Defendants Baker and Fisher permitted them to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

292.    Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the DPD, and for supervising all DPD officers in the commission of their duties.  He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the violations of the Day-Laborer Plaintiffs' rights.

293.    Defendant Baker was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Fisher, who proximately caused the aforementioned violations.  Defendant Baker's gross negligence in supervising Defendant Fisher permitted Defendant Fisher to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

294.    Defendant Fisher was directly involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by ordering or instructing the

other DPD Officers to commit the unlawful arrests. Defendant Fisher knew of all relevant facts that made the actions of the DPD Officers unlawful.

295. Defendant Fisher, the head of the DPD's SID, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the SID, and for supervising all other SID officers in the commission of their duties. He was directly involved in the promulgation, implementation, and administration of the policy proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights.

296. Defendant Fisher was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinate DPD Officers who committed the violations of the Day-Laborer Plaintiffs' constitutional rights. Defendant Fisher knew or should have known of the DPD's policy, practice or custom of making civil immigration arrests without probable cause, and failed to act to prevent the violations of the Day-Laborer Plaintiffs' rights from occurring.

297. The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

## CLAIMS RELATING TO NCIC-PROMPTED ARREST

### SIXTEENTH CLAIM FOR RELIEF
### Fourth Amendment and Article First, § 7, 9 Conn. Constitution
### (42 U.S.C. § 1983: Danbury NCIC Defendants)

298. Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

299.    Defendants Mayor Mark Boughton, Police Chief Alan Baker, and DPD John Doe Officers 6-8 violated Plaintiff Vargas' rights when the DPD John Doe Officers 6-8 knowingly and intentionally conducted a pretextual investigatory stop of Plaintiff Vargas and unlawfully and without authority arrested him, in a manner preempted by federal law, based on information regarding an alleged civil immigration violation obtained from the NCIC database, in violation of Plaintiff Vargas' rights under the Fourth Amendment and Article First, §§ 7 and 9 of the Connecticut Constitution to be free from unreasonable searches and seizures.

300.    Defendants Boughton and Baker were personally involved in and proximately caused the aforementioned violations of Plaintiff Vargas' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice and/or custom of making arrests based on civil immigration warrants, through use of the NCIC database.

301.    Defendant Boughton, the Mayor of Danbury, is responsible for promulgating, implementing, and administering the policies, practices and/or customs of the City of Danbury and for supervising and administering all City Departments.  He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the aforementioned violations of Plaintiff Vargas' rights.

302.    Defendant Boughton was personally involved in and proximately caused the violations of Plaintiff Vargas' rights through his deliberate indifference to Plaintiff Vargas' and his grossly negligent supervision of his subordinates, including but not limited to Defendant Baker, who proximately caused the aforementioned violations.  Defendant Boughton's gross negligence in supervising Defendant Baker permitted them to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the

violations of Plaintiff Vargas' rights, and to plan and carry out the sting operation which resulted in those violations.

303.    Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the DPD, and for supervising all DPD officers in the commission of their duties.  He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the violations of Plaintiff Vargas' rights.

304.    Defendant Baker was personally involved in and proximately caused the aforementioned violations of Plaintiff Vargas' rights through his deliberate indifference to Plaintiff Vargas' rights and his grossly negligent supervision of his subordinates, including but not limited to Defendant DPD John Doe Officers 6-8, who proximately caused the aforementioned violations.

305.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

**SEVENTEENTH CLAIM FOR RELIEF**
**Fourteenth Amendment Equal Protection Clause and Article First, § 20 of the Connecticut Constitution**
**(42 U.S.C. § 1983: Danbury NCIC Defendants)**

306.    Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

307.    Defendants Mayor Mark Boughton, Police Chief Alan Baker, and DPD John Doe Officers 6-8 violated Plaintiff Vargas' rights when DPD John Doe Officers 6-8 targeted and arrested Plaintiff in a pretextual traffic-stop on the basis of his race, ethnicity, and national origin and for the purpose of investigating his immigration status through the NCIC database, in

violation of Plaintiff Vargas' right to Equal Protection under the Fourteenth Amendment of the United States Constitution and Article First, § 20 of the Connecticut Constitution.

308.    Defendants John Does 6-8 subjected Plaintiff Vargas to selective law enforcement out of a malicious and bad faith intent to drive him and other drivers of Latino and/or foreign-born appearance from the City of Danbury.

309.    In targeting Plaintiff Vargas for arrest, Defendants John Does 6-8 intentionally treated him differently from other similarly situated drivers without any rational basis for doing so.

310.    Defendants Boughton and Baker were personally involved in and proximately caused the aforementioned violations of Plaintiff Vargas' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice and/or custom of making arrests based on civil immigration warrants, through use of the NCIC database.

311.    Defendant Boughton, the Mayor of Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the City of Danbury and for supervising and administering all City Departments.   He was directly involved in the promulgation, implementation, and administration of the policy that proximately caused the aforementioned violations of Plaintiff Vargas' rights.

312.    Defendant Boughton was personally involved in and proximately caused the violations of Plaintiff Vargas' rights through his deliberate indifference to Plaintiff Vargas' and his grossly negligent supervision of his subordinates, including but not limited to Defendant Baker, who proximately caused the aforementioned violations.   Defendant Boughton's gross negligence in supervising Defendant Baker permitted them to promulgate, implement, and

administer the aforementioned policies, practices, and customs which proximately caused the violations of Plaintiff Vargas' rights, and to plan and carry out the sting operation which resulted in those violations.

313.    Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the DPD, and for supervising all DPD officers in the commission of their duties.  He was directly involved in the promulgation, implementation, and administration of the policy proximately caused the violations of Plaintiff Vargas' rights.

314.    Defendant Baker was personally involved in and proximately caused the aforementioned violations of Plaintiff Vargas' rights through his deliberate indifference to Plaintiff Vargas' rights and his grossly negligent supervision of his subordinates, including but not limited to Defendant DPD John Doe Officers, who proximately caused the aforementioned violations.

315.    The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

### EIGHTEENTH CLAIM FOR RELIEF
### False Arrest and False Imprisonment
### (Defendants John Does 6-8 and the City of Danbury)

316.    Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

317.    Defendant DPD John Doe Officers 6-8 arrested Plaintiff Vargas without a warrant and without probable cause, and in a manner preempted by federal law, for alleged civil violations of federal immigration law as listed in the NCIC Database.

318.     Plaintiff Vargas was forcibly restrained and subsequently imprisoned by Defendants and suffered damages as a result of Defendant DPD John Doe Officers 6-8's actions.

319.     Defendant DPD John Doe Officers 6-8's actions constitute false arrest and false imprisonment under Connecticut common law.

320.     The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

## NINETEENTH CLAIM FOR RELIEF
### Negligence
### (Defendants Baker, John Does 6-8, and the City of Danbury)

321.     Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

322.     Defendants DPD John Doe Officers 6-8 negligently caused the arrest without a warrant and without probable cause, and in a manner preempted by federal law, of Plaintiff for alleged civil violations of federal immigration law.   Plaintiff was forcibly restrained and subsequently imprisoned by Defendants and suffered damages as a result of Defendants' actions.

323.     Defendants DPD John Doe Officers 6-8 owe a duty of care in the performance of their jobs to Plaintiff Vargas.  Defendants breached that duty of care by arresting Plaintiff Vargas without a warrant and without probable cause, in a manner preempted by federal law, and on the basis of untrustworthy information retrieved from the NCIC database.

324.     Defendant DPD John Doe Officers 6-8 knew that their failure to act would likely subject a group of identifiable persons to imminent harm, namely, individuals who appear to be of Latino racial ethnic background and national origin driving in the City of Danbury.

325.     Moreover, though fully aware that civil immigration arrests are preempted by federal law, Defendant Baker negligently failed to supervise Defendant DPD John Doe Officers 6-8 as they executed Plaintiff Vargas' arrest and detention.

326.     Defendants' actions constitute negligent false arrest and negligent false imprisonment under Connecticut common law.

327.     The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

### TWENTIETH CLAIM FOR RELIEF
#### Intentional Infliction of Emotional Distress
#### (Defendants John Does 6-8 and the City of Danbury)

328.     Plaintiff Danilo Brito Vargas repeats and re-alleges the allegations in paragraphs X through Y as if fully set forth herein.

329.     Defendant DPD John Doe Officers 6-8, through the arrest of Plaintiff Vargas, intended to inflict emotional distress upon him, or should have known that Plaintiff's emotional distress was a likely consequence of their conduct. Defendants' conduct was clearly extreme and outrageous, given the circumstances surrounding the arrests.

330.     The emotional distress of Plaintiff was caused by Defendants' conduct, and was severe.

331.     Defendants' actions constitute intentional infliction of emotional distress under Connecticut common law.

332.     The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

## TWENTY-FIRST CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress
### (Defendants John Does 6-8 and the City of Danbury)

333.     Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

334.     Defendant DPD John Doe Officers 6-8, through the arrest of Plaintiff Vargas, created an unreasonable risk of causing Plaintiff Vargas emotional distress.   It was clearly foreseeable that Defendants' conduct would cause Plaintiff Vargas emotional distress.

335.     Plaintiff Vargas' emotional distress was caused by Defendant DPD John Doe Officers 6-8's conduct, and was severe enough that it might result in illness or bodily harm.

336.     Moreover, though fully aware that civil immigration arrests are preempted by federal law, Defendant Baker negligently failed to supervise Defendant DPD John Doe Officers 6-8 as they executed Plaintiff Vargas' arrest and detention.

337.     Danbury NCIC Defendants' actions constitute negligent infliction of emotional distress under Connecticut common law.

338.     The City of Danbury is liable pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and/or 7-101a, for the tortious acts of its employees.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

(1)     Enter a declaratory judgment that the actions of Defendant Danbury officials and/or Defendant ICE officials, both on September 19, 2006 and with respect to Plaintiff Vargas, violated the United States Constitution, 42 U.S.C. § 1983, the Connecticut Constitution, and Connecticut common law.

(2)     Award Plaintiffs' compensatory damages in an amount to be proven at trial.

(3)     Award Plaintiffs' punitive damages in an amount to be proven at trial.

(4)     Award Plaintiffs the cost of this action and reasonable attorney fees.

(5)     Grant such other relief as the Court deems just and equitable.

Dated September 26, 2007
New Haven, Connecticut

Respectfully submitted,


Michael Wishnie (ct27221)
Supervising Attorney


Christopher Lasch (ct27139)
Supervising Attorney

Ramzi Kassem, Supervising Attorney
Justin Cox, Law Student Intern
Rebecca Engel, Law Student Intern
Geri Greenspan, Law Student Intern
Thom Ringer, Law Student Intern
Michael Tan, Law Student Intern
JEROME N. FRANK LEGAL SERVICES
  ORGANIZATION
Yale Law School
127 Wall Street
New Haven, Connecticut 06511
Phone: (203) 432-4800

Counsel for Plaintiffs