# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUAN BARRERA, JOSÉ CABRERA, | : | |
| DANIEL CHAVEZ, JOSÉ DUMA, | : | |
| JOSÉ LLIBISUPA, ISAAC | : | |
| MALDONADO, EDGAR REDROVAN, | : | |
| NICHOLAS SEGUNDO SANCHEZ, | : | CIVIL ACTION NO. 3:07-cv-01436-RNC |
| JUAN CARLOS SIMBAÑA, and | : | |
| DANILO BRITO VARGAS, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | MARCH 7, 2008 |
| | : | |
| MARK BOUGHTON, ALAN BAKER, | : | |
| JOSÉ AGOSTO, RICHARD DEJUSUS, | : | |
| JAMES A. FISHER, JAMES LALLI, | : | |
| CRAIG MARTIN, JOSEPH NORKUS, | : | |
| JOHN DOES, CITY OF DANBURY, | : | |
| JAMES BROWN, RICHARD | : | |
| MCCAFFREY, RONALD PREBLE, | : | |
| JOHN DOES and the UNITED STATES, | : | |
| | : | |
| Defendants. | : | |

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE CITY OF DANBURY AND MARK BOUGHTON'S MOTION FOR DISQUALIFICATION

The undersigned Plaintiffs submit this memorandum of law in opposition to the Motion by the Defendants City of Danbury and Mark Boughton (collectively, "Defendants") for Disqualification of Plaintiffs' counsel, the Jerome N. Frank Legal Services Organization ("LSO") in the present action, because the representation does not constitute a conflict of interest under the Connecticut Rules of Professional Conduct. Further, due to developments since Defendants filed their motion, it is now moot.

## PRELIMINARY STATEMENT

It is undisputed that LSO has not entered into an attorney-client relationship with either Mayor Boughton or the City of Danbury.  Nonetheless, Defendants maintain that a conflict exists under Rule 1.7 of the Connecticut Rules of Professional Conduct, and that therefore LSO should be disqualified from representing the Plaintiffs in this action.  Memorandum of Law in Support of Motion for Disqualification [hereinafter, "Defs.' Br."] at 13-14.  Defendants' argument, however, necessarily relies on the erroneous premise that Mark Boughton was,[1] in fact, a client of LSO, *id.* at 17 ("In short, Mayor Boughton must be viewed as a client of [LSO]."), because he served as the president of an organization that LSO does represent, the Connecticut Coalition for Justice in Education Funding ("CCJEF").  Defendants attempt to argue that Boughton was somehow a client of LSO by misconstruing the plain text of the Connecticut Rules of Professional Conduct; by failing to mention or discuss controlling Second Circuit precedent; and by grossly exaggerating some facts, while completely ignoring others. Far from curing Defendants' errors, their retained expert, Charles W. Wolfram, replicates them by relying on the same distorted and incomplete factual record, and then building further inferences thereon.[2]

Rule 1.13 of the Connecticut Rules of Professional Conduct states unequivocally that a lawyer employed by an organization represents the organization, not its constituents.  Neither by its plain text, nor the accompanying commentary, nor in relevant case law is an exception made

---

[1] Note that although Defendants' Motion and the Memorandum of Law in Support thereof, as well as the Wolfram Declaration, all refer to Boughton as the <u>current</u> president of CCJEF, since Defendants filed their motion, Boughton's tenure as president of CCJEF expired, and CCEJF elected a new president.  *See* Affidavit of Dianne Kaplan deVries ("deVries Aff."), at ¶ 16, attached as Exhibit 4.  Accordingly, all references in this Memorandum to Boughton as president of CCJEF are in the past tense.

[2] Plaintiffs also file a cross-motion to exclude the testimony of Professor Wolfram pursuant to Rules 702 and 402 of the Federal Rules of Evidence because it is unreliable, unhelpful, misleading, and improperly argues for a legal conclusion.  As is explained in the Memorandum of Law in Support of Plaintiffs' Cross-Motion to Exclude, the Wolfram Declaration should be excluded and all references to it in Defendants Motion for Disqualification and Defendants Memorandum of Law in Support thereof should be stricken.  In the event that the Court does not grant Plaintiffs' cross-motion, and as a protective matter, Plaintiffs have retained and submitted their own expert opinion from Professor William H. Simon, which is attached as Exhibit 1.

for the leadership of the organization – much less its *past* leadership – which is what Defendants urge here.   Thus, Rule 1.7 – which generally prohibits concurrent representation of directly adverse *clients* – cannot, by its terms, apply to this situation, in which LSO represents only the organization, and not its individual constituents or past or present officers.   The letter of engagement between LSO and CCJEF, through which LSO was retained as counsel, explicitly reaffirms that LSO represents solely the organization, and none of its constituents, subparts or "any other" individual.   *See* Letter dated Oct. 19, 2004 from Robert Solomon, Esq., to Mayor Carl J. Ameto, CCJEF [hereinafter, "Retainer Agreement"], attached as Exhibit 2.   Not surprisingly, Defendants do not submit or discuss the letter of engagement, nor did their expert, Professor Wolfram, review it.[3]

Defendants attempt to circumvent the plain import of the Connecticut Rules of Professional Conduct and the Retainer Agreement by conflating Boughton's decision-making authority with that of CCJEF itself, and Professor Wolfram clearly bases his opinion on this erroneous assumption.   CCJEF's bylaws – which similarly were neither discussed by Defendants nor reviewed by Wolfram – demonstrate that CCJEF's seventy-member Board of Directors has the non-delegable decision-making authority over the litigation brought by LSO on behalf of the organization ("the CCJEF litigation").   *See* "Bylaws of the Connecticut Coalition for Justice in Education Funding, Inc., June 15, 2006" [hereinafter "CCJEF Bylaws"], attached as Exhibit 3. Indeed, Boughton's involvement in the CCJEF litigation was, as president, in fact very minimal. *See* Affidavit of Dianne Kaplan deVries (one of CCJEF's founders and its current Project Director) ("deVries Aff."), attached as Exhibit 4.   In short, in no way can it be credibly asserted that Boughton *was* – much less *is* – a client of LSO.

---

[3] Danbury Deputy Corporation Counsel Laszlo Pinter, on behalf of Boughton, requested a copy of the Retainer Agreement on October 12, 2007, and it was sent to him shortly thereafter.  *See* Declaration of Robert Solomon, Esq. ("Solomon Decl.") at ¶ 18, attached as Exhibit 5.

*At most*, Boughton could *possibly have been* considered a "vicarious" client of LSO by virtue of *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746 (2d Cir. 1981), which, again, Defendants and Wolfram fail to cite or discuss.  However, even assuming, *arguendo*, that the president of CCJEF is a vicarious client of LSO, and even were Boughton still serving as president of CCJEF, the motion for disqualification would still have to be denied because there clearly is not a "substantial relationship" between the subject matter of the CCJEF litigation and the present action.  And now that Boughton is no longer president of CCJEF, there is not even a basis for arguing that he is a "vicarious client" of LSO.

Further, Defendants have made no claim that LSO cannot vigorously represent both CCJEF and the *Barrera* plaintiffs, nor have they claimed that Boughton would be prejudiced by LSO's representation of the plaintiffs in the instant action.  In regards to the latter, LSO has not obtained and has no reason to obtain in the future any confidential information about Boughton, the City of Danbury, or any other member of CCJEF; and the *Barrera* litigation has in no way affected LSO's representation of or working relationship with CCJEF.  *See* Declaration of Robert Solomon, Esq. ("Solomon Decl."), attached as Exhibit 5.

Additionally, disqualification of counsel would work a serious hardship on the *Barrera* Plaintiffs, who are of extremely modest means and would likely be unable to secure alternate representation.  Indeed, this fact – coupled with the lack of merit in Defendants' arguments for disqualification[4] – strongly suggest that this motion is being interposed merely for tactical reasons.

---

[4] Particularly inexplicable is Defendants' decision to file the Motion for Disqualification even though they knew (or should have known) that Boughton was not going to stand for reelection as CCJEF's president.  Even if Boughton's decision was a recent one, then Defendants' should reasonably have withdrawn their motion subsequent to that decision.

Not only would disqualification severely prejudice the plaintiffs, it would also seriously and unduly hamper *pro bono* representation in the state of Connecticut – an unintended consequence of Defendants' motion, perhaps, but a consequence nonetheless, and one in direct contravention of the avowed purpose of the Connecticut Rules of Professional Conduct. *See, e.g.*, Conn. Rules Prof'l Conduct Preamble at (5).

Finally, events that have occurred since Defendants filed the Motion for Disqualification have rendered the motion moot. On February 29, 2008, CCJEF elected a new president to replace Boughton, who had completed his two-year term as president of the organization and did not stand for reelection. *See* deVries Aff. at ¶ 16. Thus, Boughton is no longer an officer of CCJEF or the chair of its Steering Committee, *id.* at ¶ 17, removing the sole ground upon which Defendants had based their Motion for Disqualification. CCJEF has also made clear in a resolution passed since Defendants filed their motion, that it not only does not perceive a conflict of interest, but also that even if one exists, it consents to it. *See* CCJEF Resolution of March 7, 2008 ["CCJEF Resolution"], attached as Exhibit A to the deVries Affidavit. Therefore, should this Court choose to do so, it could dismiss Defendants' motion as moot. However, even if the motion is still a live controversy, it is wholly without merit.

## STATEMENT OF FACTS

This is a civil rights suit to remedy illegal discrimination against Latino residents of the City of Danbury, Connecticut under color of federal immigration law. Nine of the plaintiffs, all day-laborers, were arrested in an undercover sting operation conducted on September 19, 2006 by officers of the Danbury Police Department ("DPD") and U.S. Immigration and Customs Enforcement ("ICE"), a division of the U.S. Department of Homeland Security. These nine men (the "Day-Laborer Plaintiffs") were offered work by an undercover DPD officer driving a

vehicle and posing as an employer looking for help taking down a fence.  Am. Compl. at ¶ 83.
The undercover DPD officer was not looking for anyone in particular; rather, he offered work to
whichever day-laborers he encountered in Kennedy Park, *id.*, which in recent years has become a
gathering site for predominantly Latino day-laborers.  *Id.* at ¶ 51.  The vehicle driven by the
undercover DPD officer made three trips to Kennedy Park that morning, picking up three to five
day-laborers each time.  *Id.* at ¶ 86.  On each of the three trips from Kennedy Park, the vehicle
drove several blocks to a fenced-in lot behind an office building on Main Street in Danbury.  *Id.*
at ¶ 87.  As each group of day-laborers exited the vehicle, they were immediately surrounded by
DPD and/or ICE officers,[5] told not to move because they were under arrest, were roughly seized
and placed in a van that was parked nearby.  *Id.* at ¶¶ 90-92.  None of the Day-Laborer Plaintiffs
were asked any questions until *after* they were handcuffed and placed in the van.  *Id.* at ¶ 96.
From there, each of the Day-Laborer Plaintiffs was transported to the Danbury Police Station,
where DPD officers fingerprinted and questioned them and entered their booking records into the
DPD's files.  *Id.* at ¶ 100.  Later that day, the Day-Laborer Plaintiffs were transferred from DPD
custody to that of ICE, *id.* at ¶ 112, which held them in various detention facilities in multiple
states for periods ranging from approximately 15 to approximately 38 days.  *Id.* at ¶¶ 130-131;
140-144.

The arrests of the Day-Laborer Plaintiffs are only the most dramatic examples of the
campaign of harassment that has been waged against those who are perceived to be non-citizens
in Danbury.  *See id.* at ¶¶ 31-60.  Predictably, those of Latino and, in particular, Ecuadorian
descent – like the Day-Laborer Plaintiffs – have been singled out for particularly zealous and
unlawful police action in Danbury.  The tenth plaintiff, Danilo Brito Vargas, was arrested
pursuant to another of DPD's tactics of harassment against Danbury's Latino and immigrant

---

[5] Many of the law enforcement officers had their firearms drawn.  Am. Compl. at ¶ 90.

communities: the use of pretextual traffic stops of Latino drivers for the purpose of unlawfully investigating their immigration status.  *See id.* at ¶¶ 150-168.  After ostensibly being stopped for having a loud muffler, Plaintiff Vargas was unlawfully arrested by DPD officers on an administrative immigration warrant, turned over to ICE custody, and ultimately deported to Ecuador.  *See id.* at ¶¶ 169-176.

**Requests for Records Under the Connecticut Freedom of Information Act**

On October 19 and 20 of 2006, LSO sent two requests under the Connecticut Freedom of Information Act ("FOIA"), Conn. Gen. Stat. §§ 1-200 *et seq.*, on behalf of several non-profit organizations in Danbury and New Haven, Connecticut, as well as itself.  The requests sought records related to the arrests of the Day-Laborer Plaintiffs, as well as other records related to immigration-related complaints and law enforcement in Danbury.  On November 15, 2006, LSO student interns, pursuant to Conn. Gen. Stat. § I-210(a), went to the offices of the Danbury Corporation Counsel to inspect records Danbury had identified as responsive to the requests. While at the offices of Corporation Counsel, Danbury Deputy Corporation Counsel Laszlo Pinter stated that he was not sure whether all of the documents requested had been searched for or located.  *See* FOIA Complaint, attached as Exhibit F to the Boughton Affidavit.  Indeed, Danbury had failed to identify any records responsive to several of the specific items contained in the FOIA requests.  On November 21, Plaintiffs sent Mr. Pinter a four-page list detailing the items LSO still considered outstanding.  *Id.*  Mr. Pinter agreed to speak with Danbury's Chief of Police concerning the outstanding requests by December 14, 2006.  *Id.*  When he failed to do so, and believing that Danbury had not carried its statutory burden to conduct a reasonable search for statutory records, LSO appealed to the Connecticut Freedom of Information Commission ("FOIC").  *Id.*

The Connecticut FOIC held a hearing on April 9, 2007, during which LSO and Danbury attorneys agreed that Danbury would conduct several specific additional searches for records responsive to the FOIA requests.  When Danbury conducted the searches, they identified several records responsive to the original FOIA requests, and they provided those records to the requesting organizations, and the matter was closed.

However, on December 20, 2006 – while the FOIA matter was pending – Mr. Pinter sent a letter to LSO attorneys claiming that LSO had a conflict of interest due to its concurrent representation of the requesting organizations in the FOIA matter and the representation of the Connecticut Coalition for Justice in Education Funding ("CCJEF").  *See* Letter dated Dec. 20, 2006 from Laszlo L. Pinter, Danbury Deputy Corporation Counsel, to LSO, attached as Exhibit 6.

## Background on the Connecticut Coalition for Justice in Education Funding (CCJEF)

CCJEF is a "broad-based coalition of municipalities, local boards of education, statewide education associations, advocacy organizations, parents, and others intent upon modernizing the state's fiscal infrastructure necessary for ensuring suitable and equal educational opportunities for all Connecticut schoolchildren."  *See* CCJEF Press Release, attached as Exhibit 3 to Defs.' Br.  Currently, CCJEF's membership includes 70 organizational members.  deVries Aff. at ¶ 1.  CCJEF also includes a significant number of parent and individual members.  *Id.*

CCJEF and LSO entered into a representational agreement by a letter dated October 19, 2004.  *See* Retainer Agreement.  Per the Retainer Agreement, LSO's client is CCJEF "and no other entities or persons."  *Id.*  The Agreement also noted that LSO represents "many other organizations, companies and individuals, and that our representation of [CCJEF] may present a conflict of interest."  *Id.*  By execution of the Agreement, CCJEF prospectively agreed that LSO

could "continue to represent or undertake in the future to represent existing [or] new clients in any matter that is not substantially related to our work for [CCJEF] even if the interests of such clients in those other matters are directly adverse." *Id.*

From October, 2004 to the present, CCJEF has been represented by law student interns in the Educational Adequacy Project ("EAP"), a Yale Law School clinic within the Jerome N. Frank Legal Services Organization (LSO). *See* Solomon Decl. at ¶ 2. The EAP law student interns are supervised by Clinical Professor of Law Robert Solomon, Esq. *Id.* The organizational plaintiffs and the plaintiffs in the present action are represented by students in the Worker and Immigrant Rights Advocacy Clinic ("WIRAC"), a separate clinic within LSO. *Id.* at ¶ 3. Professor Solomon does not supervise WIRAC, *id.*, and none of the students or professors involved in EAP are also involved in WIRAC. *Id.* at ¶ 4.

## Correspondence With Danbury Regarding the Alleged Conflict of Interest

On December 20, 2006, Mr. Pinter sent a letter to LSO attorneys to inform LSO that because it "presently represents the City of Danbury, together with several other municipalities and organizations, as the 'Connecticut Coalition for Justice in Education Funding,'" its concurrent representation of organizations filing FOIA requests with the City of Danbury was "not only disturbing, but probably improper." Letter dated Dec. 20, 2006 from Laszlo L. Pinter, Danbury Deputy Corporation Counsel, to LSO at 1 (emphasis omitted). Mr. Pinter advised that "The Rules of Professional Conduct, as adopted by the American Bar Association and the Connecticut Bar Association, should be consulted prior to your response." *Id.* at 2.

On February 7, 2007, LSO replied to Mr. Pinter with a letter explaining in detail how, under the Connecticut Rules of Professional Conduct, there was no conflict of interest. *See* Letter dated Feb. 7, 2007 to Laszlo L. Pinter, Danbury Deputy Corporation Counsel, from the

Jerome N. Frank Legal Services Organization, attached as Exhibit 7.  In the letter, LSO explained that under Rule 1.13, neither the City of Danbury nor Boughton was a "client" of LSO, *see id.* at 2-3, and how even if LSO were to represent clients in a suit against the City of Danbury or its mayor, Mark Boughton, there would be no conflict of interest.  *See id.* at 4.[6]

Mr. Pinter replied on March 6, 2007 to reiterate the City's view that "Danbury IS actually a (paying) client" of LSO due to the CCJEF representation.  *See* Letter dated March 6, 2007 from Laszlo L. Pinter, Danbury Deputy Corporation Counsel, to the Jerome N. Frank Legal Services Organization, at 2, attached as Exhibit 8.  Mr. Pinter concluded his letter by stating that "it thus and unfortunately becomes necessary … for the City to demand that [LSO] either petition the State Grievance Panel to be heard on this matter or remove itself forthwith from its representation of [the organizations who submitted the FOIA requests] with regard to active litigation against its client, the City of Danbury."  *Id.* at 3.

On or about March 20, 2007, LSO supervising attorney Robert Solomon met with Mr. Pinter, Boughton, and Dianne deVries, Project Director of CCJEF.  At the meeting, Professor Solomon offered to present to the LSO faculty the question of seeking an opinion from the Ethics Committee of the Connecticut Bar Association.  Solomon Decl. at ¶ 13.  Subsequent to the meeting, Professor Solomon met with the LSO faculty, and they determined that procedurally, the only way that the matter can be heard by the State Grievance Committee is if someone – such as Boughton – formally filed a complaint.  *Id.* at ¶ 17.  They also determined that any decision to seek an advisory opinion from the Connecticut Bar Association Ethics Committee should be

---

[6] Contrary to Boughton's claim that LSO "had no intention of either withdrawing from the immigration matter or conducting a serious and legitimate review of its legal representations surrounding this conflict matter," the February 7, 2007 letter from LSO to Mr. Pinter *is* a "serious and legitimate review" of the matter upon which LSO spent considerable time.  Further, its conclusion that Danbury is not a client of LSO is a correct assessment of the law, as is explained *infra*, and as was explained in the letter.

made by CCJEF, as LSO's client, and not by LSO.  *Id.* at ¶ 14.  Professor Solomon conveyed

this information to Danbury in an email dated April 5, 2007.  *Id.* at ¶ 15.  Neither Boughton, nor

the City of Danbury, nor CCJEF has sought such an opinion, and the only other communication

between Professor Solomon and any from Danbury concerning the alleged conflict was on or

about October 12, 2007, when Mr. Pinter emailed Professor Solomon to request a copy of the

Retainer Agreement between CCJEF and LSO, which was sent to him shortly thereafter.  *Id.* at ¶

18.

**<u>Procedural Posture of the Instant Action</u>**

On September 26, 2007, Plaintiffs filed a complaint, and on November 26, 2007, an

amended complaint, on behalf of the nine Day-Laborer Plaintiffs and Mr. Vargas alleging

various violations of their rights under the U.S. and Connecticut constitutions and their rights at

common law.  Plaintiffs named as defendants six named DPD officers; five unnamed DPD

officers; the Danbury Chief of Police, Al Baker; the Mayor of Danbury, Mark Boughton; the

City of Danbury; three named ICE officers; six unnamed ICE officers; and the United States.

*See* Am. Compl ¶¶ 13-29.  As is customary with suits under 42 U.S.C. § 1983,[7] Plaintiffs are

suing all of the individual municipal defendants in both their official and personal capacities.

Am. Compl. at ¶¶ 13-23.

On December 24, 2007, the first report of the Rule 26(f) planning meeting was filed, and

a telephonic conference call was held on January 23, 2008 with Magistrate Judge Donna F.

Martinez to discuss the parties' 26(f) report and to enter a scheduling order.  However, during the

conference, counsel for the individual Danbury Defendants indicated that they intended to file a

motion to disqualify plaintiffs' counsel, the LSO.  Defendants' counsel requested that discovery

be stayed until the Court resolves the motion to disqualify, and the request was granted over the

---

[7] *See generally* Martin A. Schwartz, <u>Section 1983 Litigation Claims and Defenses</u> § 6.05 (2003).

objections of Plaintiffs' counsel.  On February 1, 2008, this Motion for Disqualification was filed

by Defendant Boughton; the City of Danbury filed a motion on the same day to join in

Boughton's motion.

**Events Subsequent to the Filing of the Motion for Disqualification**

Since Defendants filed the Motion for Disqualification, two significant events have

occurred.  First, on February 29, 2008, the CCJEF Board of Directors held a regularly scheduled

meeting, during which it amended its bylaws;[8] approved an updated retainer agreement with

LSO;[9] and elected a new president.  *See* deVries Aff. at ¶¶ 6, 14, 16.  Mark Boughton, whose

term as president of CCJEF was expiring, did not stand for reelection.  *Id.* at ¶ 16.

Then, on March 7, the CCJEF membership passed a resolution stating, *inter alia*, that:

CCJEF has always had the understanding that LSO does not represent any of the
constituent members of CCJEF in virtue of its representation of CCJEF itself;
….
CCJEF has understood that it has agreed that LSO may represent any new or
existing client in any matter not substantially related to LSO's representation of
CCJEF, even if the interests of LSO's other clients are directly adverse to those of
CCJEF, so long as LSO has not obtained any confidential information that could
be used by another client of LSO to the material disadvantage of CCJEF;
…
CCJEF does not believe that there is a conflict of interest between LSO's
representation of CCJEF and its representation of the plaintiffs in *Barrera*, 3:07-
cv-01436(RNC) (D. Conn.): Now, therefore, be it

> **RESOLVED**, that –

CCJEF hereby waives any conflict of interest, potential or real, between
LSO's representation of CCJEF and its representation of the plaintiffs in
*Barrera*, 3:07-cv-01436(RNC) (D.Conn.).

---

[8] All discussions in this Memorandum of Law of CCJEF's bylaws are references to the bylaws that were in effect
from June 15, 2006 until February 29, 2008 – covering the entire period that Boughton served as president of CCJEF
– which are attached as Exhibit 3.  A copy of CCJEF's updated bylaws is attached as Exhibit 10.

[9] All discussions in this Memorandum of Law of the Retainer Agreement between LSO and CCJEF are references to
the agreement that was in effect from March 19, 2004 until February 29, 2008.  A copy of this Retainer Agreement
is attached as Exhibit 2.  A copy of the new retainer agreement between LSO and CCJEF, which contains the same
provisions regarding conflicts of interests, *see* deVries Aff. at ¶ 6, is attached as Exhibit 9.

CCJEF Resolution.  *See also* deVries Aff. at ¶ 36 (noting that the CCJEF Resolution was passed by a unanimous vote).

### STANDARD OF REVIEW

Disqualifying a party's counsel is a "drastic measure," *Reilly v. Computer Assocs. Long-Term Disability Plan*, 423 F. Supp. 2d 5, 8 (E.D.N.Y. 2006), that requires balancing two competing concerns: "a client's right freely to choose his counsel" against "the need to maintain the highest standards of the profession."  *Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 132 (2d Cir. 2005) (quoting *Gov't of India v. Cook Indus., Inc.*, 569 F.2d 737, 739 (2d Cir. 1978)).  Disqualification imposes significant costs on a party, including the "loss of time and money in being compelled to retain new counsel who in turn have to become familiar with the prior comprehensive investigation," as well as the chosen counsel's specialized knowledge and expertise.  *Gov't of India*, 569 F.2d at 739.  Some courts have considered the fact that a client is being represented *pro bono* to be included in the client's right to "freely choose his counsel."  *See, e.g.*, *Concerned Parents of Jordan Park v. Housing Auth.*, 934 F. Supp. 406, 411 (M.D. Fl. 1996).  *See also Ghee v. Artuz*, 285 F. Supp. 2d 328, 330 (E.D.N.Y. 2003) ("[P]ro bono service stands among the highest traditions of the bar, and should not be perceived, in the absence of extraordinary circumstances, as ever creating an appearance of impropriety.").

These considerations have led the Second Circuit to disfavor disqualification and to require the party seeking disqualification to "bear the heavy burden of proving facts required for disqualification," *Evans v. Artek Systems Corp.*, 715 F.2d 788, 794 (2d Cir. 1983), and meet a "high standard of proof" before a lawyer is disqualified.  *Id.* at 791.  *See also Enzo Biochem, Inc. v. Applera Corp.*, 468 F. Supp. 2d 359, 364 (D. Conn. 2007).  "Mere speculation will not suffice."  *Paretti v. Cavalier Label Co., Inc.*, 722 F. Supp. 985, 987 (S.D.N.Y. 1989).  This high

burden of proof is particularly important because motions to disqualify are "often interposed for tactical reasons," and "even when made in the best of faith, such motions inevitably cause delay." *Board of Educ. v. Nyquist*, 590 F.2d 1241, 1246 (2d Cir. 1979). *See also* Conn. Rules Prof'l Conduct R. 1.7, com. 14 (advising that a motion to disqualify "should be viewed with caution . . . for it can be misused as a technique of harassment").

Moreover, not every perceived breach of the Rules of Professional Conduct should lead to a disqualification of counsel, particularly since "[p]rofessional disciplinary bodies, including [grievance committees], are available to police the behavior of counsel." *Commercial Union Ins. Co. v. Marco Int'l Corp.*, 75 F. Supp. 2d 108, 110 (S.D.N.Y. 1999) (citing *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 748 (2d Cir. 1981)).

In light of the aforementioned concerns, "the Second Circuit has established alternative guidelines for a district court to follow on a motion to disqualify an attorney for adverse representation, depending on the particular facts of the case." *University of Rochester v. G.D. Searle & Co.*, No. 00-CV-6161L(B), 2000 U.S. Dist. LEXIS 19030 *16 (S.D.N.Y. 2000), attached as Exhibit 11.

> The more stringent alternative, known somewhat misleadingly as the "per se" rule, pertains to situations where a law firm undertakes to represent two adverse parties, both of which are "clients in the traditional sense," and the relationship between the firm and the clients is continuing. In such a case, the adverse representation is prima facie improper, and "the attorney must be prepared to show, at the very least, that there will be no actual or apparent conflict in loyalties or diminution in the vigor of his [or her] representation."

*Id.* at *17 (citing *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976)). *See also Ives v. Guilford Mills, Inc.*, 3 F. Supp. 2d 191, 202 (N.D.N.Y. 1998).

> The Second Circuit has established a less stringent standard for cases of vicarious or attenuated representation, or where the potentially improper relationship is not a continuing one. In this situation, disqualification is warranted only where there is a substantial relationship between the subject matters of the representation.

> Under the "substantial relationship" test, disqualification should be granted upon
> a showing that the relationship between the issues in the prior and present cases is
> patently clear [or] essentially the same.

*Univ. of Rochester*, 2000 U.S. Dist. LEXIS 19030 *17-*18 (citations and quotation marks

omitted).

The "restrained" or "more flexible" approach, first adopted by the Second Circuit in 1981

in *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, was developed based on the understanding that

disqualification "should ordinarily be granted only when a[n ethical] violation … poses a

significant risk of trial taint." *Glueck*, 653 F.2d at 748; *see also Bottaro v. Hatton Associates*, 680

F.2d 895, 896 (2d Cir. 1982); *Universal City Studios, Inc. v. Reimerdes*, 98 F. Supp. 2d 449, 452

(S.D.N.Y. 2000).  Given that the focus is on the possibility of "trial taint," disqualification

motions should be granted "only if there is a significant risk that the conflict will affect the

attorney's ability to represent his or her client with vigor or if the attorney is in a position to use

privileged information acquired in his or her representation of a client against that client in

another matter."  *Commercial Union*, 75 F. Supp. 2d at 110 (citing *Board of Ed. v. Nyquist*, 590

F.2d 1241, 1246 (2d Cir. 1979)).

However, even when the so-called "per se" test is applied, disqualification is not

inevitable.  Instead, the burden shifts to the accused law firm to show that "there will be no

actual or apparent conflict in loyalties or diminution in the vigor of his representation." *Cinema

5*, 528 F.2d at 1387; *see also Commercial Union*, 75 F. Supp. 2d at 111 n.25.  If the firm is able

to meet this burden, the moving party must then demonstrate that the representation has "tainted"

the trial by "affecting counsel's presentation of the case, by placing counsel in a position to use

privileged information, or by otherwise allowing counsel to gain an unfair advantage against the

other side."  *Univ. of Rochester*, 2000 U.S. Dist. LEXIS 19030 at \*20-\*21 (citing *Bottaro*, 680

F.2d at 896; *Glueck*, 653 F.2d at 750; *Nyquist*, 590 F.2d at 1246).[10]

## ARGUMENT

Whether or not Defendants' motion is moot, it is certainly without merit.[11]

**I.    Rule 1.13 of the Connecticut Rules of Professional Conduct and the retainer agreement between CCJEF and the LSO demonstrate that neither Mayor Boughton nor the City of Danbury is  or was a client of the LSO, and therefore there can be no concurrent conflict of representation under Rule 1.7 or *Cinema 5*.**

*A.   Neither Mark Boughton nor the City of Danbury is or was a client of LSO.*

It is undisputed that LSO has not entered into an attorney-client relationship with either

Mayor Boughton or the City of Danbury.  Nonetheless, the Danbury Defendants maintain that a

conflict exists under Rule 1.7 of the Connecticut Rules of Professional Conduct, and that

therefore LSO should be disqualified from representing the Plaintiffs in this action under the "per

se" test of *Cinema 5, Ltd. v. Cinerama, Inc.*, 528 F.2d 1384, 1387 (2d Cir. 1976).  *See* Defs.' Br.

at 13-14.  Defendants' argument, however, necessarily depends on the erroneous premise that

Mark Boughton was, in fact, a client of LSO.  *Id.* at 17 ("In short, Mayor Boughton must be

viewed as a client of [LSO].").

A plain reading of Rule 1.13 illustrates why Boughton could not be considered – even as

president of CCJEF, which he no longer is – a client of LSO.  Rule 1.13(a) states that "[a] lawyer

---

[10] Contrary to the Wolfram Declaration, Plaintiffs have not conceded that even if Boughton were a "client" – which he is not – LSO would be prohibited by Conn. R. Prof'l Conduct 1.7(a) from representing the Plaintiffs in the present action.  *See* Wolfram Decl. at ¶ 7.  In fact, *even if* Boughton were a client of LSO, disqualification would be improper under the "per se" test because, as explained *infra*, there is no "actual or apparent conflict in loyalties or diminution in the vigor of [LSO's] representation" of either client. *See Cinema 5*, 528 F.2d at 1387.

[11]*Even* if this Court were to find that the controversy is not moot *and* that Boughton was a client of LSO by virtue of him being president of CCJEF, Rule 1.9 – governing *former* clients – should be applied, not Rule 1.7, which governs *current* clients.  *See* Conn. R. Prof'l Conduct 1.7, 1.9.  In that situation, disqualification would only be warranted if there was a "substantial relationship" between the representations of CCJEF and the instant action, *see Government of India v. Cook Industries, Inc.*, 569 F.2d 737 (2d Cir. 1978); *Colorpix Sys. of Am. v. Broan Mfg. Co.*, 131 F. Supp. 2d 331 (D. Conn. 2001), which there clearly is not. *See infra* § II.A (explaining how the substantial relationship test is not met).

employed or retained by an organization *represents the organization* acting through its duly authorized constituents."  Conn. Rules Prof'l Conduct Rule 1.13(a) (emphasis added).  *See also* Restatement (Third) of the Law Governing Lawyers § 96(1)(a) (2007) ("When a lawyer is employed or retained to represent an organization, the lawyer represents the interests of the organization as defined by its responsible agents acting pursuant to the organization's decision-making procedures."); Declaration of William H. Simon ["Simon Decl."] at ¶ 10 ("In representing CCJEF, the LSO lawyers' principal duties are to their client – the Organization. . . . I do not believe that Mayor Boughton has any interest on which to base a claim of professional loyalty on the LSO lawyers."), attached as Exhibit 1; *id.* at ¶ 11.

Other sections of Rule 1.13 confirm the plain language and common-sense meaning of Rule 1.13(a).  Rule 1.13(d) contemplates a situation whereby the organization's interests may be adverse to those of its constituents; it makes clear that the organization's interests trump and that the lawyer does not represent the constituents "with whom the lawyer is dealing."  *Id.* at 1.13(d).  *See also* Restatement (Third) of the Law Governing Lawyers § 96(1)(a), *comment b* (2007) ("By representing the organization, a lawyer does not thereby also form a client-lawyer relationship with all or any individuals employed by it or who direct its operations."); Simon Decl. at ¶ 11 ("A lawyer for an organization has no general duty of loyalty to the organization's constituents, and an organizational client's officers have no individual expectation of trust or loyalty on the part of the organization's lawyer.").

Further, Rule 1.13(e) discusses how a "lawyer representing an organization *may also represent* any of its directors, officers, employees, members, shareholders or other constituents, subject to the provisions of Rule 1.7."  *Id.* at 1.13(e).  Clearly, if Boughton were considered to be a client of LSO simply by virtue of being a member of CCJEF or even its President, then Rule

1.13(e) would be rendered wholly superfluous. *See, e.g.*, *Penn. Dept. of Pub. Welfare v. Davenport*, 495 U.S. 552, 562 (1990) (expressing "a deep reluctance to interpret a statutory provision so as to render superfluous other provisions in the same enactment"). Instead, 1.13(e) only strengthens the most natural reading of 1.13(a), which dictates that Mark Boughton is not a client of LSO, even if he were still a current "officer" or "director" of CCJEF. Therefore, Rule 1.7 – which prohibits representing separate clients with interests "directly adverse" to one another – simply does not apply. Conn. Rules Prof'l Conduct R. 1.7(a). *See also Emons Industries, Inc. v. Liberty Mut. Ins. Co.*, 747 F. Supp. 1079, 1084 n.5 (S.D.N.Y. 1990) ("Since Liberty is not a client of the Anderson Firm, it necessarily follows that no conflict of interest exists.").

An examination of the retainer agreement between CCJEF and LSO attorney Robert Solomon – which was not mentioned by Defendants nor reviewed by their expert, Charles W. Wolfram[12] – makes the point clear:

> It is our understanding that our client for purposes of this representation is [CCJEF] and no other entities or persons. The Board of Directors of [CCJEF] may designate a primary contact person to communicate and liaise with us on its behalf, however, ultimate decision-making authority shall rest in the Board of Directors.

Retainer Agreement at 2.

As Dianne Kaplan deVries, the Project Director and one of the founders of CCJEF states, the potential conflicting views within CCJEF's membership made it "it was important to clarify that for purposes of representation, LSO represents CCJEF as an entity and not any of the individual members of CCJEF, as the October 19, 2004 Letter of Engagement explicitly states." deVries Aff. at ¶ 8. *See also* CCJEF Resolution ("CCJEF has always had the understanding that

---

[12] It is indisputable that Boughton <u>had</u> a copy of the Retainer Agreement in mid-October of 2007, at the latest. *See* n.3, *supra*.

LSO does not represent any of the constituent members of CCJEF in virtue of its representation of CCJEF itself."). There can be no disagreement, therefore, that CCJEF itself, and "no other entities or persons," is a client of LSO pursuant to the October 2004 retainer, and neither Boughton nor Professor Wolfram refute the designation of CCJEF as the client.

Moreover, the retainer agreement expressly contemplated the possibility that a conflict of interest could arise from LSO's representation of other clients, and CCJEF agreed that LSO could represent even clients with interests adverse to CCJEF so long as the subject matters are not substantially related:[13]

> By execution of this engagement letter, you agree that we may continue to represent or undertake in the future to represent existing or new clients in any matter that is not substantially related to our work for you even if the interests of such clients in those other matters are directly adverse.

*Id. See also* CCJEF Resolution ("[T]he Letter of Engagement between CCJEF and LSO reflects the agreement that LSO may represent any new or existing client in any matter not substantially related to LSO's representation of CCJEF, even if the interests of LSO's other clients are directly adverse to those of CCJEF.").

Not only did CCJEF, in the Retainer Agreement, prospectively waive any potential conflict of interest, it reaffirmed on March 7, 2008 both that it does not believe that there is a conflict of interest here, *see id.* ("CCJEF does not believe that there is a conflict of interest between LSO's representation of CCJEF and its representation of the plaintiffs in *Barrera*, 3:07-cv-01436(RNC) (D. Conn.).") , and that, insofar as there may be a conflict of interest, it waived it. *Id.* ("[B]e it RESOLVED, that CCJEF hereby waives any conflict of interest, potential or real, between LSO's representation of CCJEF and its representation of the plaintiffs in *Barrera*, 3:07-

---

[13] Note that the interests of the *Barrera* plaintiffs are not adverse to CCJEF and that the subject matters of the current action and the CCJEF representation are not substantially related, *see* § II.A, *infra*, and that neither Boughton nor Wolfram made either claim.

cv-01436(RNC) (D.Conn.).").  *See also* Simon Decl. at ¶ 11 ("[I]t is for the organization, through its decisional processes, to decide when such loyalty is compromised.").

By resting their motion for disqualification on Boughton's now-past role within CCJEF, Defendants are perversely trying both to use his position as a weapon against Plaintiffs while simultaneously attempting to obscure the agreement that binds the organization he purports to represent.  Defendants simply cannot have it both ways.  *See* Simon Decl. at ¶ 13 ("A separate reason in this case why the motion should not be allowed is that it appears that Mayor Boughton, in making the motion, may be putting at risk the interests of CCJEF and hence compromising his own duties to the organization.").

> B.  *Defendants overstate Boughton's <u>previous</u> decision-making authority for and involvement in the CCJEF litigation to try to create the appearance of a conflict of interest.*

Defendants' argument – that, despite what the Connecticut Rules of Professional Conduct say, Boughton should nonetheless be considered a "client" of LSO – relies on implicit and explicit exaggerations of Boughton's *previous* decision-making authority within CCJEF and his level of involvement in the CCJEF litigation, as well as multiple factual inaccuracies.  Professor Wolfram's conclusions are similarly based on an incomplete and distorted view of the facts,[14] which are now even more inaccurate since Boughton no longer serves as the CCJEF president.

An examination of CCJEF's bylaws – not reviewed by Professor Wolfram and not mentioned in the Defendants' Brief or the Boughton Affidavit – illustrate that Boughton, as CCJEF's president, did not have the decision-making authority claimed by Defendants and clearly assumed by Professor Wolfram.

---

[14] *See also* the Statement of Facts in the Memorandum of Law in Support of Plaintiffs' Cross-Motion to Exclude the Wolfram Declaration.

Defendants claim that "[LSO] takes direction from Mayor Boughton on behalf of CCJEF's steering committee on how to proceed in the education lawsuit" and that "[i]n his capacity as president of both the organization and the steering committee, Mayor Boughton makes decisions on behalf of CCJEF with respect to the CCJEF litigation, based upon the legal advice and guidance he receives from [LSO]." *Id.* at 15-16. It is noteworthy that Defendants cite no authority for these propositions, *see id.*, and that Boughton, for his part, makes no such claim in his affidavit. *See* Affidavit of Mark Boughton ("Boughton Aff."), attached as Exhibit 2 to Defs.' Br. In fact, a review of CCJEF's Bylaws illustrates that Boughton, even as president, did not "make[] decisions on behalf of CCJEF with respect to the CCJEF litigation."[15]

Article III, Section 1 ("Powers") of CCJEF's Bylaws states that "[CCJEF] shall act by and through its Board of Directors." *See* CCJEF Bylaws. According to the same section of the Bylaws, the powers of the Board "include, but are not limited to, the power to initiate and pursue litigation, to hire experts and other staff, and to make spending decisions." *Id.* Although the Bylaws contemplate the creation of committees to handle the day-to-day operations of CCJEF, *see* Art. V, the power to "initiate, discontinue, or settle litigation" always remains exclusively with the Board. *See id.* § 2(E).

Section 2 of Article III ("Composition") states that "Each Member of the Corporation, except Individual Members, shall also serve as a member of the Board of Directors." CCJEF's Board is composed of seventy (70) Directors. DeVries Aff. at ¶ 26. As the President of CCJEF, Boughton was a member of the Board, *see* CCJEF Bylaws, Art. V, § 2, but decisions of the Board require "a majority of the Directors at a meeting at which a quorum is present," *id.* at Art. III, § 7, and Boughton, even while serving as president, only cast the single vote that he had by virtue of representing the City of Danbury. *See* deVries Aff. at ¶ 26.

---

[15] Since Boughton is no longer president of CCJEF, this claim is now entirely unsupportable.

More of the month-to-month operations of CCJEF, such as "developing an annual budget, planning CCJEF activities, preparing the agenda for CCJEF's annual meeting and other meetings of the Board of Directors, and receiving updates on the status of litigation," are the responsibility of the Steering Committee.  deVries Aff. at ¶ 21.  The creation and composition of the Steering Committee is specifically provided for in the Bylaws, *see* CCJEF Bylaws, Art. IV, § 6, contrary to Professor Wolfram's understanding.   *Compare* Wolfram Decl. at ¶ 10 ("[Boughton] also created and serves as active president of [CCJEF's] Steering Committee."); *with* deVries Aff. at ¶ 19 ("The Steering Committee was established by the 2006 bylaws" – prior to Mark Boughton's tenure as President of CCJEF).[16]   But as deVries explains, while the Steering Committee is <u>informed</u> of developments in the litigation, their input regarding legal strategy is generally not sought or  given:

> Actual back and forth between the Steering Committee and LSO on legal strategy at [Steering Committee] meetings is limited, given that decision-making authority for litigation rests with the Board of Directors, not the Steering Committee, and CCJEF has an ad hoc Litigation Committee established specifically for the purpose of consultation with LSO about litigation matters.

deVries Aff. at ¶ 23.

Professor Wolfram seems to have confused the Litigation and Steering Committees when he stated that Boughton is "President of [CCJEF's] litigation steering group, the CCJEF Steering Committee."  Wolfram Decl. at ¶ 2.  It is the Litigation Committee – not the Steering Committee – that "serves as an informal board of legal advisors for CCJEF and LSO."  deVries Aff. at ¶ 30.  Boughton is not a member of the Litigation Committee, and, to the knowledge of deVries, who

---

[16] Boughton, for his part, also makes inaccurate factual statements regarding the Steering Committee.  *Compare* Boughton Aff. at ¶ 8 ("[LSO] sets the agendas for these [Steering Committee] meetings and keeps the minutes.") *with* deVries Aff. at ¶ 22 ("The agenda for the meeting is set by me and Executive Director Steve Cassano, in consultation with the members of the Steering Committee.") *and* ¶ 24 ("Minutes for the meetings are kept by me.").  Additionally, Boughton is simply wrong in his claim that the CCJEF litigation is a class action.  *See* Boughton Aff. at ¶ 5.  *See also* Memorandum of Law in Support of Plaintiffs' Cross-Motion to Exclude the Wolfram Declaration at nn.7, 10.

coordinates communications between LSO and the Committee, *id.* at ¶ 32, "neither Mayor Boughton, nor anyone affiliated with the City of Danbury, has provided feedback to legal materials prepared by LSO, nor has he participated in any of the conference calls of the Litigation Committee or with pre-argument mooting." *Id.* at ¶ 32. In sum, "[Boughton] has not played a significant role with respect to the legal strategy surrounding [the CCJEF litigation]. His responsibilities as President of CCJEF did not necessitate that he have any greater level of involvement with respect to legal strategy than any other member of the Steering Committee." *Id.* at ¶ 34.

      C. *Defendants erroneously ask this Court to apply* Cinema 5*, which the Second Circuit has explicitly refused to extend to this kind of situation.*

In their Memorandum in Support, Defendants erroneously cite to *Cinema 5, Ltd. v. Cinerama, Inc. et al.*, 528 F.2d 1384 (2d Cir. 1976), for the proposition that LSO's representation of the *Barrera* plaintiffs and CCJEF has created an "adversarial relationship" between LSO and Boughton, and that this relationship "constitutes a concurrent conflict of interest" under Conn. Rules of Prof'l Conduct 1.7. Defs.' Br. at 23.

*Cinema 5* held that the concurrent representation of two adversarial parties – even when the subject matters are not substantially related – is "prima facie improper," rebuttable by a showing that "there will be no actual or apparent conflict in loyalties or diminution in the vigor of [the] representation." *Cinema 5*, 528 F.2d at 1387. *See also Hempstead Video, Inc. v. Inc. Vill. of Valley Stream*, 409 F.3d 127, 133 (2d Cir. 2005) (same).

*Cinema 5* remains good law, but the Second Circuit has explicitly confined its holding to situations where an attorney or firm has entered into traditional attorney-client relationships with both parties to the alleged conflict. *Glueck v. Jonathan Logan, Inc.*, 653 F.2d 746, 749 (2d Cir. 1981).

The plain text of the Connecticut Rules of Professional Conduct and a full examination of the facts establish beyond dispute that LSO does not – and did not – represent either Mark Boughton or the City of Danbury; "it necessarily follows that no conflict of interest exists." *Emons Industries, Inc. v. Liberty Mut. Ins. Co.*, 747 F. Supp. 1079, 1084 n.5 (S.D.N.Y. 1990).

**II.**     **At most,** **Mayor Boughton could <u>possibly have been</u>** viewed as a "vicarious client" of the LSO, in which case disqualification would have been inappropriate because there is no "substantial relationship" between the subject matters of the CCJEF representation and the *Barrera* litigation.

When, instead of a traditional attorney-client relationship, the firm only "vicariously" represents a party – through, for example, a membership organization or coalition, whose constituents could only be considered "vicariously" represented by the attorney for the coalition – the substantial relationship test is applied, *Glueck*, 653 F.2d at 749, and disqualification is only warranted upon a showing that the relationship between the issues in the two cases is "patently clear" or "essentially the same."  *Government of India v. Cook Industries, Inc.*, 569 F.2d 737, 739 (2d Cir. 1978).

In *Glueck*, the issue was whether R&K Originals ("R&K"), a division of Logan, Inc., was a "client" of the law firm Phillips Nizer.  The firm represented the Apparel Manufacturers Association, Inc. ("the Association"), a non-profit trade association of dress manufacturers, of which R&K Originals was a member.  653 F.2d at 748.  Further, R&K's president was the Executive Vice-President of the Association and served on its negotiating committee.  *Id.*[17] Phillips Nizer represented the Association in negotiating collective bargaining agreements with the International Ladies Garment Workers' Union (ILGWU), and also represented Glueck, a

---

[17] It is significant that although the Second Circuit in *Glueck* noted this fact once in passing, it did not mention it again, and it was seemingly not important in its analysis.  Cases subsequent to *Glueck* have also failed to note this fact as significant.  As is explained in note 19, *infra*, the cases cited by Wolfram and Defendants that turn on the position of a particular individual are those in which the same individual serves as internal legal counsel for two different organizations.  *See also* Simon Decl. at ¶ 12 n.2.

former employee of Logan, in his suit against the company for breach of his employment contract.  *Id.*  Glueck argued that members of an incorporated trade association are not clients of the association's lawyer, and that disqualification was therefore not required; Logan argued that they were, and that a conflict of interest necessitating disqualification therefore existed under Canon 5, the New York equivalent of Connecticut Rule of Professional Conduct 1.7.  *Id.*

In considering the appeal of the Southern District of New York's granting of the motion to disqualify, the Second Circuit noted that "the issue is not whether Phillips Nizer's relationship to Logan is in all respects that of attorney and client, but whether there exist sufficient aspects of an attorney-client relationship for purposes of triggering inquiry into the potential conflict involved in Phillips Nizer's role as plaintiff's counsel in this action."  *Id.* at 748-9 (internal citation omitted).

The Second Circuit accepted the district court's determination that Logan was a "de facto" or "vicarious" client of the firm due to the "degree of functional equivalency between the association and its members."[18]  *See Glueck v. Jonathan Logan, Inc.*, 512 F. Supp. 223, 227 (S.D.N.Y. 1981).  However, the Second Circuit explicitly considered – and refused – to apply *Cinema 5*'s disqualification standard to the situation where the alleged conflict arises through the lawyer's representation of an organization:

> We do not believe the strict standards of *Cinema 5* are inevitably invoked whenever a law firm brings suit against a member of an association that the firm represents.  If they were, many lawyers would be needlessly disqualified…. That burden [of *Cinema 5*] is properly imposed when a lawyer undertakes to represent two adverse parties, both of which are his clients in the traditional sense.  But

---

[18] It is noteworthy that in the instant case, Defendants rest their motion for disqualification on Boughton's (now former) position within CCJEF, and *not* on the fact that Danbury is a member of the association.  It can hardly be argued that there is any "degree of functional equivalency" between CCJEF and Mark Boughton, strongly suggesting that even as president of CCJEF, Boughton could not really be considered a "vicarious" or "de facto" client of LSO.  The remainder of the discussion in this section is only relevant to the extent that this Court deems Boughton or Danbury a "vicarious" client of LSO, without conceding that fact or the "functional equivalency" between CCJEF and Boughton and/or Danbury.

when an adverse party is only a vicarious client by virtue of membership in an association, the risks against which Canon 5 guards will not inevitably arise.

*Glueck*, 653 F.2d at 749.  In the latter situation of only "vicarious" representation, the Second Circuit applies the "substantial relationship" test to determine when *Cinema 5*'s strict, burden-shifting test should be applied:

> Disqualification will ordinarily be required whenever the subject matter of a suit is sufficiently related to the scope of the matters on which a firm represents an association as to create a realistic risk either that the plaintiff will not be represented with vigor or that unfair advantage will be taken of the defendant.

*Id.* at 749-50.

Since *Glueck* was decided, courts in the Second Circuit have consistently discussed and applied it to situations similar to the instant case.  *See, e.g., Colorpix Sys. of Am. v. Broan Mfg. Co.*, 131 F. Supp. 2d 331 (D. Conn. 2001) (applying *Glueck* in disqualifying counsel because there was a substantial relationship in the subject matters of the representations and counsel had access to relevant privileged information that would have prejudiced one party because he had served as general counsel for both corporations); *Anderson v. Nassau County Dep't of Corr.*, 376 F. Supp. 2d 294, 297-98 (E.D.N.Y. 2005) (distinguishing the "substantial relationship" test of *Glueck* from the "per se" rule of *Cinema 5*); *Blue Planet Software, Inc. v. Games Int'l, LLC*, 331 F. Supp. 2d 273, 276-77 (S.D.N.Y. 2004) (collecting authorities as to the meaning of "vicarious or de facto client"); *Eastman Kodak Co. v. Sony Corp.*, No. 04-CV-6095, 2004 U.S. Dist. LEXIS 29883 *14-*16 (W.D.N.Y. 2004) (refusing to apply *Glueck* to a post-merger corporate parent-subsidiary situation because the parent company "essentially swallowed" the subsidiary such that the latter no longer had an independent identity, board of directors, or even legal department), attached as Exhibit 12; *Atrotos Shipping Co. v. Swedish Club*, No. 02-CV-416, 2002 U.S. Dist. LEXIS 9018 *7-*8 (S.D.N.Y. 2002) (discussing the "less stringent[] substantial relationship test

[] used for 'vicarious' clients.") (citing *Glueck*), attached as Exhibit 13; *Discotrade Ltd. v. Wyeth-Ayerst Int'l*, 200 F. Supp. 2d 355, 360 (S.D.N.Y. 2002) (discussing how *Glueck* applies when a client is a "client" only in the "'vicarious' sense stemming from membership in an association."); *Brown & Williamson Tobacco Corp. v. Pataki*, 152 F. Supp. 2d 276, 282-83 (S.D.N.Y. 2001) (construing and applying *Glueck*); *United States v. ASCAP*, 129 F. Supp. 2d 327, 336-40 (S.D.N.Y. 2001) (holding that despite a potential "vicarious" attorney-client relationship,  an attorney may represent an association in an action brought against it by a member); *Universal City Studios, Inc. v. Reimerdes*, 98 F. Supp. 2d 449, 452-56 (S.D.N.Y. 2000) (discussing *Glueck* and its progeny; holding that although the law firm acted improperly, disqualification was inappropriate because there was "no real risk" of prejudicing the moving party, but the non-moving party would be prejudiced by disqualification; noting that "[t]he proper place for this controversy is in the appropriate professional disciplinary body."); *Univ. of Rochester*, 2000 U.S. Dist. LEXIS 19030 at *15-*26 (refusing to disqualify counsel "under either the 'substantial relationship' test or the 'per se' test," noting that "the Second Circuit has established alternative guidelines for a district court to follow on a motion to disqualify" depending on whether the representation is "traditional" or "vicarious"); *Commercial Union Ins. Co. v. Marco Int'l Corp.*, 75 F. Supp. 2d 108, 111-13 (S.D.N.Y. 1999) (applying *Glueck* in denying a motion to disqualify because the interests of fairness and efficiency outweighed the minimal risk of any appearance of impropriety); *Ives v. Guilford Mills, Inc.*, 3 F. Supp. 2d 191, 202-03 (N.D.N.Y. 1998) (denying a motion to disqualify; noting that "[i]f the moving client is a 'vicarious' client, e.g. a member of an organization or entity that is being represented by the attorney, as opposed to a 'traditional' client, then the more lenient 'substantial relationship' rule

applies even if representation of the adverse parties was overlapping") (citing *Glueck*). *See also* 30-808 Moore's Federal Practice - Civil § 808.04(7) (discussing *Glueck*).[19]

To the extent that Boughton or Danbury is deemed a vicarious client, the relevant inquiry, therefore, is whether there is a substantial relationship between the two representations, which there is not.

> A. *Even assuming,* arguendo*, that Boughton or Danbury is a vicarious client of LSO,*[20] *the subject matters of the* Barrera *and CCJEF representations are not substantially related, and therefore Defendants' motion must be denied.*

The meaning of the "substantial relationship" test "has been honed in its practical application to grant disqualification only upon a showing that the relationship between the issues in the prior and present cases is 'patently clear' or when the issues are 'identical' or 'essentially the same.'" *Bergeron v. Mackler*, 225 Conn. 391, 399 (1993) (internal citation omitted); *accord Gov't of India*, 569 F.2d at 739; *Colorpix*, 131 F. Supp. 2d 331 at 338 (D. Conn. 2001). *See also Norris v. City of New Haven*, No. 3:04-CV-543, 2006 U.S. Dist. LEXIS 62793, *4-*5 (D. Conn. 2006) (same), attached as Exhibit 14.

---

[19] *Cf.* Charles W. Wolfram, Modern Legal Ethics §§ 7.1.6 n.2, 7.3.2 n.22 (1986) (citing *Glueck* while expressing doubt – since disproven – that the substantial relationship test could ever be applied in situations of even vicarious concurrent representation). *See also* Wolfram Decl. at ¶ 14 ("I have not found and am not aware of contrary authority that would support [LSO] lawyers on the same or analogous facts.").

The four cases mentioned by Professor Wolfram and discussed in Defs.' Brief actually support Plaintiffs' arguments in opposition to Defendants' motion for disqualification. In *Colorpix*, *see* Wolfram Decl. at ¶ 16; Defs.' Br. at 25, the Connecticut District Court, applying *Glueck*, disqualified counsel because there was a substantial relationship in the subject matters of the representations and counsel had access to relevant privileged information that would have prejudiced one party because he had served as general counsel for both corporations. Here, in contrast, there is not a substantial relationship, and LSO has had no access to privileged information in connection with its representation of CCJEF. In *JPMorgan Chase Bank and Eastman Kodak*, *see* Wolfram Decl. at ¶ 15; Defs.' Br. at 28, the parent and subsidiary corporations had the same legal departments, meaning that they could not be considered separate entities, in direct contrast to CCJEF and its members, such as Danbury, which clearly *does* have legal counsel and an identify separate from CCJEF and its other members. The fourth case cited by Wolfram, *North Star Hotels*, a 1987 District of Minnesota case, *see* Wolfram Decl. at ¶ 13; Defs.' Br. at 17-19, explicitly notes that "in situations where an adverse party is merely a 'vicarious client' by virtue of his membership in an organization which a law firm represents, the risks associated with simultaneous representation of adverse interests are minimal." 118 F.R.D. 109, 112. *See also id.* (discussing *Glueck*). *See also* Simon Decl. at ¶ 12 n.2 (explaining why Wolfram's interpretation of *JPMorgan* and other similar cases is erroneous).

[20] For the reasons stated in note 18, *supra*, Plaintiffs do not concede that Mark Boughton or the City of Danbury was or is a "vicarious" client of LSO.

Application of the substantial relationship test to LSO's representation of CCJEF and the *Barrera* plaintiffs leads inevitably to the conclusion that Defendants' motion should be denied. On the one hand, the instant case concerns two particular incidents of law enforcement in Danbury, Connecticut, both involving alleged non-citizens, and the municipal policies underwriting them. *See* Amended Compl. ¶¶ 61-111; ¶¶ 169-176. On the other hand, CCJEF litigation is a suit under the Connecticut Constitution to vindicate the rights of Connecticut schoolchildren to an adequately-funded education. *See Carroll-Hall v. Rell*, No. X09CV054019406, 2007 Conn. Super. LEXIS 2478 (Sup. Ct. Conn. 2007), attached as Exhibit 15; Complaint, *CCJEF et al. v. Rell et al.*, attached as Exhibit B to the Boughton Affidavit; CCJEF Bylaws, § 2 ("Purposes") ("[T]he Corporation may: (a) engage in activities that promote the adequate funding of education in the State of Connecticut; (b) engage in activities that relieve the burdens of Connecticut municipalities in funding education;…"); Retainer Agreement (stating that if CCJEF does not institute litigation "to challenge the existing funding of education in Connecticut", it and its members would waive any conflict of interest on the part of LSO in representing any other organization or member of CCJEF in order to carry out the first two purposes listed in § 2 of CCJEF's Bylaws).

Needless to say, the subject matters of the *Barrera* and CCJEF representations are remarkable in their dissimilarity; it would be difficult to imagine a better example of when the substantial relationship test is not met. Notably, neither Wolfram nor Defendants make any argument regarding the similarity of the two representations; Wolfram, in fact, seems to concede their dissimilarity. *See* Wolfram Decl. at § 13 (calling *Barrera* and the CCJEF litigation "factually unrelated matters"). The subject matters are so disparate that there is simply not a "realistic risk either that the plaintiff will not be represented with vigor or that unfair advantage

29

will be taken of the defendant." *Glueck*, 653 F.2d at 749-50.  Defendants, for their part, have made no such claim, and the LSO's *actual* client, CCJEF, and "[i]t is certainly the wish of CCJEF's Board and Steering Committee that LSO continue to represent [CCJEF]."  deVries Aff. at ¶ 7.  *See also id.* ("LSO has vigorously represented the interests of CCJEF from the beginning of our attorney-client relationship through to this day."); Solomon Decl. at ¶ 19.

The likelihood that Defendants will be taken advantage of are extremely remote and speculative; through its representation of CCJEF, LSO has not obtained any confidential information about Mark Boughton, Danbury, or any other member of CCJEF, and given the subject matter of the CCJEF representation, there is no reason to think that any confidential information will ever be required or obtained by LSO.  *See* Solomon Decl. at ¶ 10; deVries Aff. at ¶¶ 10-11.  *See also* Simon Decl. at ¶ 10 ("In the absence of a showing that the lawyers acquired such information from Mayor Boughton or the presumption that might arise from a substantial relation between the two representations, I do not believe that Mayor Boughton has any interest on which to base a claim of professional loyalty on the LSO lawyers.").

Instead of trying to show prejudice, Defendants seem to rely on overstatements of Boughton's authority in CCJEF and involvement in the litigation, discussed *supra*, and his alleged unease working with LSO students and attorneys.  *See* Boughton Aff. at ¶¶ 15-16. However, even if Boughton, as president of CCJEF, had been deemed a vicarious client of LSO and was uncomfortable working with LSO, this would not have justified disqualification, since there was no reason to think – and again, Defendants made no such claim – that LSO would not have continued to vigorously represent both the *Barrera* plaintiffs and CCJEF.  *Cf.* Restatement (Third) of The Law Governing Lawyers § 121 cmt. c (2000) ("General antagonism between clients does not necessarily mean that a lawyer would be engaged in conflicted representations

by representing the clients in separate, unrelated matters."). *See also* Simon Decl. at ¶ 9 ("[T]he dangers from the concurrent representation were [not] so great even during Mayor Boughton's tenure as President to make the conflict unconsentable.").  Further, given that Boughton no longer serves as CCJEF's president, Defendants' argument is now stripped of the only slender and illusory reed upon which it was based.  *Id.* ("Now that [Boughton] has left his executive position, his discomfort or distrust of the LSO lawyers could not be a problem for CCJEF.").

Moreover, as Professor Wolfram has written, "[t]he basic thrust of conflict of interest rules is to protect the reasonable expectations of clients with regard to the loyalty of the client's lawyer and the confidentiality of the work of a present or former lawyer."  Charles W. Wolfram, Modern Legal Ethics § 7.1.1 (1986).  As is discussed *supra*, neither LSO nor CCJEF has any confidential information about Danbury or Boughton, so that simply is not at issue.[21]  In regards to loyalty, it is, as Wolfram writes, "for the client's benefit," and the client is free to consent to an attorney's representation of adverse interests.  *Id.* at § 7.3.2.  In passing the resolution on March 7, 2008, CCJEF provided a contemporaneous waiver of the alleged conflict presented here, *see* CCJEF Resolution, which complements the prospective waiver contained in the Retainer Agreement.  *See also* deVries Aff. at ¶¶ 7-9.

## III.  Granting Defendants' Motion for Disqualification will have deleterious effects on *pro bono* representation in Connecticut.

An additional factor to be weighed in consideration of Defendants' Motion for Disqualification is its potential impact on *pro bono* representation in Connecticut.  The Jerome

---

[21] Additionally, it's worth nothing again that the "client" here is CCJEF – not Boughton or Danbury – and that any expectation of privacy on the part of Boughton would have simply been unreasonable, particularly given the Retainer Agreement.  *See* Simon Decl. at ¶ 11 ("[A]n organizational client's officers have no individual expectation of trust or loyalty on the part of the organization's lawyer.").  *See also United States v. ASCAP (In re Warren)*, 129 F. Supp. 2d 327, 338 (S.D.N.Y. 2001) ("Even if Warren had the subjective view that ASCAP's attorneys would represent him . . . , we do not find such expectation objectively reasonable.  The Articles of Association put members on notice that ASCAP attorneys would act on the Society's behalf.").

N. Frank Legal Services Organization represents CCJEF and the *Barrera* plaintiffs *pro bono*,[22] a service that is consistent with the values expressed in the Preamble to Connecticut's Rules of Professional Conduct:

> A lawyer should be mindful of deficiencies in the administration of justice and of the fact that the poor, and sometimes persons who are not poor, cannot afford adequate legal assistance, and should therefore devote professional time and civic influence in their behalf.  A lawyer should aid the legal profession in pursuing these objectives.

Conn. Rules Prof'l Conduct Preamble at (5).  As one court stated, observed, "pro bono service stands among the highest traditions of the bar, and should not be perceived, in the absence of extraordinary circumstances, as ever creating an appearance of impropriety."  *Ghee v. Artuz*, 285 F. Supp. 2d 328, 330 (E.D.N.Y. 2003).

Although Defendants casually assert that "any inconvenience to the *Barrera* plaintiffs stemming from the court's granting of the Danbury Defendants' motion to disqualify would be relatively mild", Defs.' Br. at 32, this statement could not be farther from reality.  The *Barrera* plaintiffs are of extremely modest means, and would be unable to pay for counsel should LSO be disqualified.[23]  The complexity of the litigation, as well as the relative dearth of Connecticut *pro bono* counsel in this area of the law, will likely mean that should LSO be disqualified from

---

[22] The Boughton Affidavit implies that Danbury is paying for legal services rendered by LSO.  Boughton Aff. at ¶ 6 ("[LSO] receives funding (approximating $30,000.00) from the City of Danbury to partially defray the costs of [the CCJEF] representation.").  The letters from the Deputy Corporation Counsel of Danbury, Laszlo L. Pinter, make the claim explicitly.  *See* Letter dated Dec. 20, 2006 from Laszlo L. Pinter, Danbury Deputy Corporation Counsel, to the Jerome N. Frank Legal Services Organization at 1 ("[LSO] receives funding (approximating $30,000.00) from the City of Danbury to partially defray the costs of [the CCJEF] representation"), attached as Exhibit 7; Letter dated Mar. 6, 2007 from Laszlo L. Pinter, Danbury Deputy Corporation Counsel, to the Jerome N. Frank Legal Services Organization, at 2 (calling Danbury a "paying client" of LSO), attached as Exhibit 9.
　　　In reality, in LSO's representation of CCJEF, it only seeks to be reimbursed for "disbursements," which includes "long-distance telephone charges, reproduction costs, delivery charges, computer research charges, filing fees and travel expenses, if any."  *See* Retainer Agreement.  As is the case with all of its clients, LSO is representing CCJEF *pro bono*.  *See* Solomon Decl. at ¶ 6.
[23] Additionally, one of the Plaintiffs, Danilo Brito Vargas, is no longer in this country, *see* Am. Compl. ¶ 12, and so he therefore faces an additional set of barriers to securing alternate counsel.

representing them, the *Barrera* plaintiffs will simply be without counsel, and will find the courtroom doors shut to them.

This likely result raises the possibility that Defendants are merely using this motion as a tactical device to avoid ultimate liability. *See Nyquist*, 590 F.2d at 1246 (noting that motions to disqualify are "often interposed for tactical reasons"). *See also* Conn. Rules Prof'l Conduct Preamble (18) ("[T]he purpose of the Rules can be subverted when they are invoked by opposing parties as procedural weapons."). Previously, and with much smaller stakes, Defendants have evidenced a willingness to use the Rules as a tactical shield;[24] with much more at stake in the instant case, the possibility that Defendants are again resorting to this tactic seems significant.[25]

Additionally, should the court grant Defendants' motion to disqualify LSO from representing the *Barrera* plaintiffs because of its representation of CCJEF, the Jerome N. Frank Legal Services Organization – which has represented numerous low-income, underrepresented and unrepresented organizations over just the past two decades alone, *see* Solomon Decl. at ¶ 5 – will be discouraged from representing such organizations and associations in the future, no matter their laudable goals. As Professor Solomon, supervising professor and attorney for the CCJEF litigation, explains: "If CCJEF had insisted that LSO represent the individual members and officers of CCJEF in addition to CCJEF as an entity, I would not have agreed to represent

---

[24] *See* Letter dated Feb. 7, 2007 to Laszlo L. Pinter, Danbury Deputy Corporation Counsel, from the Jerome N. Frank Legal Services Organization, attached as Exhibit 7 ("In your January 3, 2007 letter to [LSO student intern] Simon Moshenberg, you indicate that the City of Danbury will provide no further response to the FOI requests of DACORIM, et al., until LSO has addressed the alleged conflict of interest. Regardless of your concerns over any potential conflict of interest, the Rules of Professional Conduct indicate that such concerns should in no way prevent the City of Danbury from carrying out its legal obligation to provide to DACORIM, et al., the records they have requested pursuant to Connecticut's Freedom of Information law.")

[25] If Defendants truly are concerned LSO has committed an ethical violation, they could and should have filed a grievance with the Connecticut Statewide Grievance Committee of the Statewide Bar Counsel, as was suggested to them approximately nearly a year ago, *see* Solomon Decl. at ¶ 17. *See also Commercial Union Ins. Co. v. Marco Int'l Corp.*, 75 F. Supp. 2d at 110 ("[I]t does not follow necessarily that district courts should disqualify counsel whenever they perceive a breach of the canons. Disqualification motions are subject to abuse for tactical purposes . . . . Moreover, professional disciplinary bodies, including the Grievance Committee of this Court, are available to police the behavior of counsel.").

33

CCJEF, because such representation might have limited LSO's ability to represent low-income plaintiffs in the future."  Solomon Decl. at ¶ 9.  Instead, CCJEF agreed to explicit language in the Retainer Agreement that made clear that "[LSO's] client for purposes of this representation is CT CJEF and no other entities or persons." Retainer Agreement at 2.

Courts around the country have noted both the vital role that *pro bono* representation can play in the legal profession, as well as the particular vulnerability low-income plaintiffs have to motions to disqualify their *pro bono* attorneys.  As one district court put it, in denying a motion to disqualify *pro bono* counsel in a case against public housing authorities, and in language that could just as readily apply to the instant motion:

> [T]he Court disagrees with Defendant's argument that public suspicion would outweigh the social interest in allowing [a law firm] to represent Plaintiffs.  If anything, the public should be suspicious of Defendant's attempt to disqualify [the firm] from this case.  The [firm] brings a unique and powerful force to bear on issues affecting traditionally unrepresented and underrepresented individuals. It has the financial ability and legal acumen to prosecute complex cases *pro bono publico*, in the public interest, without charge to its clients.  The cases it addresses generally, and this case in particular, present unique issues that few private lawyers have the resources to address.

*Concerned Parents of Jordan Park v. Housing Auth.*, 934 F. Supp. 406, 411 (M.D. Fl. 1996).

## IV.    The Motion for Disqualification is now moot and should therefore be dismissed.

The "case or controversy" requirement in Article III, § 2 of the U.S. Constitution mandates that "federal courts may not adjudicate matters that no longer present an actual dispute between parties."  *Catanzano v. Wing*, 277 F.3d 99, 107 (2d Cir. 2001).  "[W]hen the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome," *Powell v. McCormack*, 395 U.S. 486, 496 (1969), the action is moot.  *See County of Los Angeles v. Davis*, 440 U.S. 625, 631 (1979).  Thus, when "it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, [and] interim relief or events have

completely and irrevocably eradicated the effects of the alleged violation," the issue is moot. *Id.* (internal citations, quotations, and alterations omitted). *See also Spencer v. Kemna*, 523 U.S. 1, 7, (1998).

Events have occurred since Defendants filed their Motion for Disqualification of Plaintiffs' counsel that have rendered the motion moot. On February 29, 2008, CCJEF elected a new president to replace Boughton, who had completed his term as president of the organization and did not stand for reelection. *See* deVries Aff. at ¶ 16. Thus, Boughton is no longer an officer of CCJEF or the chair of its Steering Committee, *id.* at ¶ 17, removing the sole ground upon which Defendants had based its Motion for Disqualification.

Nowhere did Defendants or their expert, Professor Wolfram, argue that there is a conflict of interest due to the fact that City of Danbury is a member of CCJEF;[26] instead, their argument for disqualifying Plaintiffs' counsel is based *only* on Boughton *being* the president of CCJEF. *See* Defs.' Br. at 20 ("In the present case … Mayor Boughton can be viewed as a key principal of CCJEF, as a result of his active participation in the CCJEF organization … justifying the disqualification of [LSO]"); *id.* at 17 (discussing how Boughton's role as president of CCJEF means that he "must be viewed as a client of [LSO]"); Boughton Aff. at ¶ 16 ("I believe that the allegations made against me by the lawyers of [LSO] in the *Barrera* case severely compromise my ability to work with them and to rely upon their legal advice *as President of CCJEF*.") (emphasis added); Wolfram Decl. at ¶ 8 ("[A]ccording to [LSO], Rule 1.13 does not require it to

---

[26] In contrast, in the two letters he sent to LSO, Danbury's Deputy Corporation Counsel Laszlo Pinter only claimed the opposite – that the alleged conflict of interest was a product of the City of Danbury being a client of LSO, with no argument that Boughton was a client of LSO. *See* Letter dated Dec. 20, 2006 from Laszlo L. Pinter, Danbury Deputy Corporation Counsel, to LSO at 1 ("As you are no doubt aware, the Jerome N. Frank Legal Services Organization presently represents the City of Danbury…."); and Letter dated March 6, 2007 from Laszlo L. Pinter, Danbury Deputy Corporation Counsel, to LSO at 2 ("Danbury actually IS a (paying) client [of LSO]…."); *id.* at 3 (demanding that LSO "remove itself forthwith" from representing parties "in active litigation against its [LSO's] client, the City of Danbury").

treat *Mayor Boughton* as its client.  While [LSO]'s position would be correct in other contexts, its position is incomplete and unduly formalistic in view of the facts here.") (emphasis added).

Additionally, nowhere did Boughton or Wolfram claim that LSO had already gained confidential information about either Boughton or Danbury through its representation of CCJEF;[27] instead, their arguments concern the prospective and speculative possibility that LSO *could* gain such information about Boughton, and how that possibility alone justifies disqualification.  *See* Wolfram Decl. at ¶ 11 ("Given that capacity [as President of CCJEF], it is clear that, *at a future point*, Mayor Boughton well might find himself listening to advice of the Frank Organization lawyers….") (emphasis added); Defs.' Br. at 24 (quoting Wolfram's statement); Wolfram Dec. at ¶ 11 ("Mayor Boughton would most likely find it extremely uncomfortable *if forced to continue to* rely on lawyers who are also his present and ongoing adversaries in this litigation brought personally against him.") (emphasis added); Defs.' Br. at 24 (quoting Wolfram's statement); Wolfram Decl. at ¶ 17 ("[LSO] lawyers, in the course of their discussions of the Equal Funding Litigation with Mayor Boughton, *will have* ample occasions to gain what might be critically important insights into the Mayor's litigation strategies....") (emphasis added); Defs.' Br. at 14-15 (quoting Wolfram's statement).

Now that Boughton no longer serves as CCJEF's president or the chair of its Steering Committee,[28] "it can be said with assurance that there is no reasonable expectation that the alleged violation will recur, [and] interim [] events have completely and irrevocably eradicated

---

[27] Danbury Deputy Corporation Counsel Lazslo Pinter also failed to make any such assertion in the two letters that he sent to LSO about the alleged conflict.  *See* Letter dated Dec. 20, 2006 from Laszlo L. Pinter, Danbury Deputy Corporation Counsel, to LSO, attached as Exhibit 7; and Letter dated March 6, 2007 from Laszlo L. Pinter, Danbury Deputy Corporation Counsel, to LSO, attached as Exhibit 9.

[28] CCJEF's current president, Mayor Mark Lauretti of Shelton, will serve for approximately a year, when CCJEF will either reelect him or elect a new president.  *See* deVries Aff. at ¶ 17.

the effects of the alleged violation." *Davis*, 440 U.S. at 631.   Consequently, not only is Defendants' motion meritless, it is now – as they could and should have predicted – also moot.

## CONCLUSION

For the forgoing reasons, Plaintiffs respectfully request that the Court deny Defendants' Motion for Disqualification of Plaintiffs' counsel and award Plaintiffs fees and costs.


Respectfully submitted,


/s/_____
Michael Wishnie (ct27221)
Supervising Attorney

/s/_____
Christopher Lasch (ct27139)
Supervising Attorney

/s/_____
Ramzi Kassem (ct27537)
Supervising Attorney

Justin Cox, Law Student Intern
Ari Holtzblatt, Law Student Intern
Heide Iravani, Law Student Intern
Michael Tan, Law Student Intern

JEROME N. FRANK LEGAL SERVICES
  ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, Connecticut 06520
Phone: (203) 432-4800

Counsel for Plaintiffs