## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUAN BARRERA, JOSE CABRERA, | : | |
| DANIEL CHAVEZ, JOSE DUMA, JOSE | : | |
| LLIBISUPA, ISAAC MALDONADO, | : | |
| EDGAR REDROVAN, NICHOLAS | : | |
| SEGUNDO SANCHEZ, JUAN CARLOS | : | |
| SIMBANA, and DANILO BRITO VARGAS | : | C.A. No. 3:07-cv-01436-RNC |
| | : | |
| *Plaintiffs*, | : | |
| | : | |
| v. | : | |
| | : | March 7, 2008 |
| MARK BOUGHTON, ALAN BAKER, | : | |
| JOSE AGOSTO, RICHARD DEJESUS, | : | |
| JAMES FISHER, JAMES LALLI, CRAIG | : | |
| MARTIN, JOSEPH NORKUS, JOHN DOES, | : | |
| CITY OF DANBURY, RONALD PREBLE, | : | |
| RICHARD McAFFREY, JAMES BROWN, | : | |
| JOHN DOES and USA | : | |
| | : | |
| *Defendants*. | : | |

### PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DANBURY DEFENDANTS' MOTION TO DISMISS AND IN SUPPORT OF CROSS-MOTIONS TO CERTIFY QUESTIONS OF LAW TO THE CONNECTICUT SUPREME COURT AND TO HOLD IN ABEYANCE DEFENDANTS' MOTION TO DISMISS

### I. INTRODUCTION

This is a civil rights suit to remedy discriminatory and unauthorized enforcement of federal immigration laws against Latino residents of the City of Danbury, Connecticut. Danbury and its police department have repeatedly and knowingly made illegal civil immigration arrests, engaged in impermissibly discriminatory law enforcement, and retaliated against residents for expressive activities.  In their frustration with the arrival of new immigrants to Danbury, Mayor Boughton and the police department have taken the law into their own hands.  In some instances

the City has acted unilaterally and at other times its officials have conspired with federal immigration agents in the conduct of this unlawful campaign.

## II. RELEVANT FACTUAL BACKGROUND

Nine of the ten Plaintiffs named in this action are Latino day-laborers (collectively, "the Day-Laborer Plaintiffs") who suffered illegal arrest and detention at the hands of Danbury Police Department ("DPD") and/or U.S. Immigration and Customs Enforcement ("ICE") officers in an undercover sting operation on September 19, 2006 at   Kennedy Park, a park in the center of downtown Danbury.  *See* Am. Compl. at ¶¶ 61-111.  In violation of Article First, § 20 of the Connecticut Constitution ("§ 20"), the DPD and ICE officers targeted the men based on their race, ethnicity, and perceived national origin, having no other reason to believe that any of them had violated immigration law.  The DPD officers subjected the men to selective law enforcement out of a bad faith and malicious intent to drive them out of the City of Danbury.  Moreover, the officers knowingly and intentionally stopped, detained, investigated, and arrested the Day-Laborer Plaintiffs in retaliation for their exercise of protected speech and association in a public forum, in violation of Article First, §§ 4 and 14 of the Connecticut Constitution ("§ 4" and "§ 14").  The DPD and/or ICE officers also arrested the Day-Laborer Plaintiffs without probable cause, in violation of their rights to due process of law under Article First, § 8 of the Connecticut Constitution ("§ 8").

The tenth plaintiff named in this action, Danilo Brito Vargas, is a Latino driver who suffered illegal arrest, detention, and deportation as the result of a pretextual, race-based traffic stop by the DPD.  *See* Am. Compl. at ¶¶ 162-176.  In targeting Plaintiff Vargas for arrest, the DPD Defendants intentionally treated him differently from other similarly situated drivers out of

a bad faith and malicious intent to drive him and other drivers of Latino and/or foreign-born appearance from the City of Danbury.  The DPD Defendants targeted and arrested Plaintiff on the basis of his race, ethnicity, and national origin and for the purpose of investigating his immigration status through the National Crime Information Center ("NCIC") database, in violation of Plaintiff Vargas' right to equal protection under Article First, § 20 of the Connecticut Constitution.

## III. RELEVANT PROCEDURAL BACKGROUND

Defendant DPD officers José Agosto, Richard DeJesus, James Lalli, Craig Martin, Joseph Norkus, John Does 1-8, Chief of the Danbury Police Department Al Baker, and Danbury Mayor Mark Boughton (collectively, "Defendants") now argue that Plaintiffs' Third, Fourth, Fifth, Sixteenth, and Nineteenth Claims for Relief should be dismissed.  *See* Individual Danbury Defendants' Motion to Dismiss.   In response, Plaintiffs ask that this Court certify four determinative questions of state constitutional law to the Connecticut Supreme Court and hold Defendants' Motion to Dismiss Plaintiffs' Third, Fourth, Fifth, and Nineteenth Claims in abeyance pending the answer to these questions.  In addition, Plaintiffs ask this Court to deny Defendants' Motion to Dismiss Plaintiffs' Sixteenth Claim.  If this Court declines to certify these questions of state law, the Motion to Dismiss should be denied it its entirety.  Alternatively, in the event that the Court rejects supplemental jurisdiction over these questions and declines to certify them to the Connecticut Supreme Court, Plaintiffs ask that the Court dismiss the relevant claims *without* prejudice so that they may be refiled in state court.

# IV.   ARGUMENT

## A.  Questions for Certification

The Second Circuit has long recognized that state courts should be afforded the first opportunity to decide significant issues of state law through the certification process. *See, e.g.*, *Great Northern Ins. Co. v. Mt. Vernon Fire Ins. Co.*, 143 F.3d 659, 662 (2d Cir. 1998). "Where a question of [constitutional] interpretation implicates the weighing of policy concerns, principles of comity and federalism strongly support certification." *Sealed v. Sealed*, 332 F.3d 51, 59 (2d Cir. 2003); *see also Freedman v. American Online, Inc.*, 412 F. Supp. 2d 174, 191 (D. Conn. 2005). Because Defendants seek to dismiss the state constitutional claims of Plaintiffs' Third, Fourth, Fifth, and Nineteenth Claims, this Court should certify the following questions to the Connecticut Supreme Court:

1. **Do Plaintiffs have a private right of action for damages under Article First, § 20, of the Connecticut Constitution?**

2. **Do Plaintiffs have a private right of action for damages under Article First, § 8, of the Connecticut Constitution?**

3. **Do non-United States citizens in Connecticut hold rights to free speech and assembly under the Connecticut Constitution?**

4. **Do Plaintiffs have a private right of action for damages under Article First, §§ 4 and 14 of the Connecticut Constitution?**

A federal court may certify questions of state law directly to the Connecticut Supreme Court "if the answer may be determinative of an issue in pending litigation in the certifying court and if there is no controlling appellate decision, constitutional provision or statute of this state." Conn. Gen. Stat. § 51-199b(d) (2002). *See also* Conn. App. Proc. § 82 (certification appropriate where the answer "may be determinative of the cause then pending in the certifying court"); Conn.App. Proc. § 82-3 (the "questions presented should be such as will be determinative of the

case, and it must appear that their present determination would be in the interest of simplicity, directness and economy of judicial action").

When deciding to certify a question to state supreme courts, the Second Circuit has considered whether: (1) state appellate precedent provides insufficient guidance on the controlling question at issue and, if so, whether that authority is conclusive; (2) the interpretation of the statute or constitutional provision implicates important public policy considerations; and (3) the issues presented in the case are likely to recur and, consequently, their resolution will assist the administration of justice in both federal and state courts. *See Parrot v. Guardian Life Ins. Co. of Am.*, 338 F.3d 140, 144 (2d Cir. 2003). *See also Freedman*, 412 F. Supp. 2d at 191. The United States District Court for the District of Connecticut has certified questions of law to the Connecticut Supreme Court based on those factors. *See Jagger v. Mohawk Mountain Ski Area, Inc.*, No. 3:01CV2163 RNC, 2002 WL 31433376, at *1 (D. Conn. 2002) (Chatigny, J.)), attached as Exhibit 1.

1. **The U.S. District Court for the District of Connecticut should certify to the Connecticut Supreme Court the question of whether Plaintiffs have a private right of action for damages under § 20.**

Defendants argue that Plaintiffs' Third and Nineteenth Claims for Relief fail to state causes of action because the Connecticut Supreme Court has not explicitly recognized a private right of action under Article First, § 20 of its state constitution. Defendants' Memorandum of Law in Support of Motion to Dismiss [hereinafter, "Defs.' Br."] at 6. The Equal Protection Clause of the Connecticut Constitution states, in pertinent part, that "[n]o person shall be denied the equal protection of the law nor be subjected to segregation or discrimination in the exercise or enjoyment of his civil or political rights because of religion, race, color, ancestry or national origin." Conn. Const., Article First, § 20. At minimum, Connecticut's Equal Protection

Clause must ensure the same rights as its counterpart in the United States Constitution. *See Zapata v. Burns*, 207 Conn. 496, 542 (1988); *Brunswick Corp. v. Liquor Control Comm'n*, 184 Conn. 75, 440 n.4 (1981); *see also State v. Anonymous*, 32 Conn. Supp. 306 (1979) ("It is undoubtedly true that a state may grant more protection to its inhabitants than does the United States, although it cannot grant less.").

Plaintiffs' Third Claim for Relief alleges that the Plaintiff day laborers were arrested and detained on the basis of their race, ethnicity, and perceived national origin, in violation of their rights to equal protection under § 20.   Am. Compl at ¶¶ 183-87.   The Nineteenth Claim for Relief, based on the NCIC-prompted arrest of Plaintiff Danilo Brito Vargas, similarly alleges that defendant Danbury police officers targeted and arrested Plaintiff on the basis of his perceived race, ethnicity, and national origin, in violation of his right to Equal Protection guaranteed by § 20.  Am. Compl at ¶¶ 289-93.

The question as to whether, under these circumstances, a private right of action exists for Plaintiffs under § 20 is determinative of the state law portion of the Third and Nineteenth Claims for Relief in this case, but there is no controlling appellate decision that governs this important issue of Connecticut law.   Because the dispute as to the existence of a private right of action under § 20 meets the Second Circuit's three-part test for certification to a state court, *see Parrot*, 338 F.3d at 144, this Court should certify the issue and hold Plaintiffs' claims in abeyance pending a decision by the Connecticut State Supreme Court.

### a. Connecticut appellate precedent provides insufficient guidance on the question of whether Article First, § 20, allows for a private right of action.

While there has been no precedent to date explicitly *granting* a private right of action for damages under Article First, § 20 of the Connecticut Constitution, the Supreme Court of Connecticut, in *Binette v. Sabo*, 244 Conn. 23 (1998), held that "[w]hether to recognize a cause

of action for alleged violations of other state constitutional provisions in the future must be determined on a *case-by-case* basis." *Id.* at 48 (emphasis added).  In *Binette*, the Supreme Court of Connecticut accepted the certification of a question from the United States District Court for the District of Connecticut regarding whether the state constitution gave rise to a private cause of action for money damages for violations of §§ 7 and 9 of Article First of the state constitution and answered the question in the affirmative.  *Id.* at 26.

In doing so, the Court also emphasized that it would retain the power to find private rights of action directly under the state constitution, and that such provisions must be examined on an individual basis:

> That determination will be based on a multifactor analysis.  The factors to be considered include: the nature of the constitutional provision at issue; the nature of the purported unconstitutional conduct; the nature of the harm; separation of powers considerations and the other factors articulated in *Bivens* [403 U.S. 388 (1971)]  and its progeny; the concerns expressed in *Kelley Property Development, Inc.* [226 Conn. 314 (1993)]; and any other pertinent factors brought to light by future litigation.

*Id*. at 48.

To dismiss claims brought under the Equal Protection Clause of the Connecticut Constitution based merely on the absence of precedent recognizing a direct cause of action would be to disregard the logic of *Binette* altogether.  In order to adhere to Connecticut's own constitutional jurisprudence, as well as to respect principles of comity, it is necessary to certify the question of the existence of a private right of action under Article First, § 20 to the state's Supreme Court.

Moreover, the factual allegations giving rise to Plaintiffs' claims for relief under Article First, § 20 of the Connecticut Constitution bear strong resemblance to the circumstances in *Binette,* and it is therefore likely that the Connecticut Supreme Court would recognize a private

right of action here.  Both cases deal with the unconstitutional conduct of law enforcement officials in violating civilian plaintiffs' civil rights.  Moreover, the Connecticut Supreme Court noted in *Binette* that "we agree with the fundamental principle underlying the United States Supreme Court's decision in *Bivens*, namely, that a police officer acting unlawfully in the name of the state 'possesses a far greater capacity for harm than an individual trespasser exercising no authority other than his own.'" *Binette*, 244. Conn. at 44 (*quoting Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 392 (1971)).  As in *Binette*, the Connecticut Supreme Court should be given the opportunity to consider whether a direct right of action is appropriate to remedy the special harm that flows from unlawful police conduct in violation of the state equal protection clause.  *See id.* at 36.

> **b.  The issue of whether Plaintiffs have a private right of action under Article First, § 20, implicates important public policy considerations.**

Certification is also appropriate because of the crucial public policy considerations implicated in the remedies available to vindicate state equal protection rights against abuses by law enforcement officers.  As a general matter, insofar as "the state constitution is interpreted as a living document," its development is intimately tied to problems of Connecticut public policy. *See State v. Dukes*, 209 Conn. 98, 110 (1988); *see also Freedman*, 412 F. Supp. 2d at 191. Moreover, with respect to equal protection in particular, the Supreme Court of Connecticut has said that § 20 may provide protections that extend beyond its federal counterpart as the public interest requires.  As Justice Berdon explained in *Barton v. Ducci Elec. Contrs., Inc.*, 248 Conn. 793 (1999):

> Our state equal protection clause is much more expansive than its federal counterpart. *See, e.g.*, E. Peters, *Capacity and Respect: A Perspective on the Historic Role of the State Courts in the Federal System*, 73 N.Y.U. L. Rev. 1065, 1067-68 (1998) ("It should be old news that state constitutions contain some provisions for which there

are no federal counterparts. . . . Over the years, our state constitution has been
amended to include an equal protection clause that is especially capacious . . . .")

*Id*. at 827 (Berdon, J. concurring in part and dissenting in part).  *See also Horton v. Meskill*, 172
Conn. 615, 641-42 (1977) (emphasis added) ("decisions of the United States Supreme Court
defining fundamental rights are . . . to be followed by Connecticut courts *only when they provide
no less individual protection than is guaranteed by Connecticut law*."); *cf. State v. Stoddard*, 206
Conn. 157 (1988) (holding that the due process provision of the Connecticut Constitution
requires more in terms of the right to counsel than the federal Constitution).

The ongoing elaboration of the Connecticut state constitution as a "living document" that
is responsive to the public interest and protects rights independently of and more expansively
than their federal counterparts means that the issue of *remedies* made available to enforce those
rights raises significant public policy concerns.   And, as explained in *Binette*, particularly
significant among those remedies is any private right of action under the state Bill of Rights. *See
Binette*, 244 Conn. 49 ("unlike the other remedies available to the plaintiffs, a *Bivens*-type
remedy comprehends both the fundamental nature of the rights protected by constitutional
provisions and the special significance of the duty breached by their violation.").

Moreover, the issue of equal protection is of special relevance in the law enforcement
context.   Local, state and federal actors the immigration context have increased immigration
enforcement efforts in Connecticut, and abuses by such actors are regularly reported.[1]  Similarly,

---

[1] *See, e.g.,* Kim Martineau, *Hopes and Handcuffs*, Hartford Courant, Dec. 14, 2006, at A1 (reporting sting operation
against Danbury day laborers in September 2006); Nina Bernstein, *Promise of I.D. Cards is Followed by Peril of
Arrest for Illegal Immigrants*, N.Y. Times, July 23, 2007, at B1 (reporting arrest of 32 immigrants in June 2007 in a
door-to-door sweep of predominantly Latino neighborhood of Fair Haven); Mark Spencer, *Police Chief Explains
Raids*, Hartford Courant, Nov. 9, 2007, at B1 (reporting arrest of 21 immigrants in November 2007); Mark Langlois,
*ICE arrests four Guatemalans in Danbury*, Danbury News-Times, Sept. 13, 2007; *Family Feared Worst During ICE
Raid*, WFSB Channel 3, Aug. 23, 2007 (reporting ICE raid on Wallingford family's home); Mark Langlois, *Arrested
Men Face Deportation*, Danbury News-Times, Aug. 14, 2007 (reporting separate immigration arrests of two Latino
men in traffic stops by local police); *ICE agents arrest four in Danbury*, Danbury News-Times, July 18, 2007; Mark

both racial profiling other race-based abuses of law enforcement officials are of continuing concern in the state. *See, e.g.*, Conn. Gen. Stat. § 54-1m (requiring that municipal police departments adopt anti-profiling policies and requiring data collection and reporting on traffic stops); *see also* Criminal Justice Policy Foundation, *The Perceptions of Connecticut Resident of Their Police*, (Aug. 1998). Given these concerns, the availability of a direct cause of action to vindicate the equal protection rights of the increasing number of Connecticut residents who are foreign-born, *see* Rafael Meija & Priscilla Canny, *Immigration in Connecticut; a Growing Opportunity* 2 (Oct. 2007), those who appear to be foreign-born, and persons of color against law enforcement misconduct is a matter of pressing public concern. As the United States Supreme Court noted in *Bivens*, "the very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury." *Bivens*, 403 U.S. at 397 (internal citations omitted). In light of the pressing public policy issues involved in the equal protection remedies available to Connecticut residents subject to both immigration law enforcement and law enforcement more generally, the Connecticut Supreme Court should be allowed to decide whether Plaintiffs may seek redress through a private right of action for damages under § 20.

### c. This question is likely to recur and its resolution will assist the administration of justice in both federal and state courts.

Finally, the issue of a private right of action under the equal protection clause of Connecticut's Constitution is sure to recur in both state and federal litigation, necessitating a prompt resolution of this question by the state Supreme Court. Equal protection claims are being actively litigated in cases involving immigration law and policy on behalf of day-laborers, non-citizens, Latinos, and those perceived to be immigrants, and these types of cases will persist at

---

Langois, *ICE four from Danbury*, Danbury News-Times, July 23, 2007 (reporting arrest, in Hartford, of Brazilian family that had lived in Connecticut for 18 years).

both state and federal levels.  *See, e.g.*, *Doe v. Village of Mamaroneck*, 462 F. Supp. 2d 520 (S.D.N.Y. 2006).

Certification to the state Supreme Court at this point will therefore advance the economical and efficient administration of justice.  *See* Conn. App. Proc. § 82-3 ("present determination [of issue] would be in the interest of simplicity, directness and economy of judicial action" for issue to be certified"). Furthermore, certification is the most efficient means available in the context of the case at bar.  Plaintiffs have raised Fourteenth Amendment claims that mirror its state law claims and are based on a common nucleus of facts.  *See, e.g.*, Am Compl. at ¶¶ 183-87; 289-93.  Discovery on Plaintiffs' Fourteenth Amendment claims will cover the same factual ground supporting their claims under the speech provisions of the Connecticut Constitution.  Consequently, the most efficient course of action is to allow certify the issue of non-citizens' state constitutional speech rights and hold Plaintiffs' claims in abeyance pending resolution by the Connecticut Supreme Court.

**2.    This Court should certify to the Connecticut Supreme Court the question of whether Plaintiffs have a private right of action for damages under Article First, § 8, of the Connecticut Constitution.**

Defendants argue that Plaintiffs' Fifth Claim for Relief fails to state a cause of action because the Connecticut Supreme Court has not explicitly recognized a private right of action under Article First, § 8 of the State Constitution.  Defs.' Br. at 8.  Article First, § 8 states, in pertinent part, that "[n]o person shall be compelled to give evidence against himself, nor be deprived of life, liberty or property without due process  of law."  Conn. Const. art. I, § 8.  The Fifth Claim for Relief alleges that Defendant DPD officers violated § 8 by depriving the Day-Laborer Plaintiffs of their liberty in a manner that was both fundamentally unfair in the totality of its circumstances and without due process of law.  Am. Compl. at ¶¶ 192-94.

As with the § 20 claims, the question as to whether a private right of action exists for Plaintiffs under § 8 in the immediate circumstances may be determinative of the state law portion of the Fifth Claim for Relief in this case; however, there is no controlling appellate decision that governs this crucial question of Connecticut law.  Because the dispute as to the existence of a private right of action under § 8 meets the Second Circuit's three-part test for certification to a state court, *see Parrot*, 338 F.3d at 144, this Court should certify the issue and hold Plaintiffs' claims in abeyance pending a decision by the Connecticut State Supreme Court.

    **a.   Connecticut Appellate precedent provides insufficient guidance on the controlling question at issue.**

The decision to recognize or deny a cause of action for alleged violations of Connecticut's state constitutional provisions must be evaluated on a case-by-case basis.  *Binette*, 244. Conn. at 48.  The two cases cited by Defendants did address the issue of whether a direct cause of action exists under § 8 but do not control in the present circumstances.  Those cases did not concern law enforcement, but instead dealt exclusively with property interests and financial interests, the impairment of which could be remedied through administrative means, *see* §§ I.B.1.a-b, *infra*, and therefore offer no meaningful guidance under the quite different factual circumstances present here.

In *Kelley Property Development, Inc. v. Lebanon*, 226 Conn. 314 (1993), the Supreme Court of Connecticut decided whether a direct cause of action under § 8 existed in the context of allegations that local officials had misused their zoning authority to obstruct a real estate project.  The Court based its decision to deny a private right of action largely on the availability of administrative relief from the allegedly unconstitutional conduct of the defendants.  *Id.* at 339 ("[A]s a general matter, we should not construe our state constitution to provide a basis for the recognition of a private damages action for injuries for which the legislature has provided a

reasonably adequate statutory remedy.").  Such administrative relief does not exist here, and there are no other remedies available to Plaintiffs to vindicate their due process rights under § 8.

In *ATC P'shp v. Town of Windham*, 251 Conn. 597 (1999), the Supreme Court of Connecticut affirmed a lower court's holding that the defendants were not liable for damages for their violation of the plaintiffs' substantive due process rights under § 8.  The Court found that "[a] municipality is not subject to constitutional reproach . . . simply because a taxpayer disputes the validity of the municipality's recourse to statutorily authorized mechanisms for the collection of local taxes."  *Id.* at 615.  Citing *Kelley*, the Court reiterated its concern that granting a private right of action would introduce the "prospect of conflict between statutorily provided administrative remedies and judicially created tort remedies arising out of the same controversy." *Id.* at 611 (citing *Kelley,* 226 Conn. at 339-40).  Yet, despite denying a private right of action in that specific instance, the Supreme Court of Connecticut was careful to emphasize that "whether such a cause of action [for an alleged § 8 violation] should be recognized *would be determined on a case-by-case basis*."  *Id.* at 614 (emphasis added) (citing *Binette*, 244 Conn. 23, 48).

The events that gave rise to Plaintiffs' § 8 claim are entirely distinguishable from those that precipitated the complaint filed in *ATC P'ship* and *Kelley*, and, as such, would present a case of first impression for the Connecticut Supreme Court.  This Court should allow the Connecticut Supreme Court to evaluate Plaintiffs' Claim for Relief under Article First, § 8 in light of the totality of the troubling facts presented.

**b.  The issue of whether Plaintiffs have a cause of action under Article First, § 8 implicates important public policy considerations.**

Certification of this question is also appropriate because of the important public policy considerations implicated in state due process rights that, under principles of comity and federalism, belong in the first instance to the Connecticut Supreme Court. Moreover, the issue of

due process is of particular relevance in the immigration-enforcement context in light of increasing enforcement efforts by state and local actors in Connecticut. See discussion, *supra*, at 9.

Whether the due process rights of civilians are protected by the recognition of a direct cause of action under the state constitution is a matter of immediate public concern for *every* resident of Connecticut. Moreover, because of rapidly growing partnerships between local law enforcement and ICE and the considerable potential for abuse in the enforcement of immigration law[2], it is particularly essential for immigrants and those perceived to be immigrants residing in the state of Connecticut to be able to claim the protection of their due process rights under the state constitution. The Supreme Court of Connecticut should be given the opportunity to reach an expeditious conclusion on this urgent matter, as so many individuals are at an obvious risk of similar, future violations.

### c. This question is likely to recur and its resolution will assist the administration of justice in both federal and state courts.

Finally, the issue of a private right of action under the due process clause of the Connecticut Constitution is sure to recur in both state and federal litigation, warranting a prompt resolution of this question by the state Supreme Court. As with the Equal Protection Clause, and for the same reasons, certification to the state Supreme Court at this point will advance the economical and efficient administration of justice. *See* Conn. App. Proc. § 82-3, supra.

---

[2] The Major Cities Chiefs ("MCC") and the International Association of Chiefs of Police ("IACP") have expressed concern about the local enforcement of immigration law. Among their worries is the fact that state and local law enforcement officers lack the knowledge, training and experience to properly enforce federal immigration law, which can lead to racial profiling and other violations of constitutional and civil rights, exposing local governments to civil liability. *See* MCC Immigration Committee, *Recommendations for Enforcement of Immigration Laws by Local Police Agencies* (June 2006), http://www.houstontx.gov/police/pdfs/mcc_position.pdf; *and* IACP, *Police Chiefs Guide to Immigration Issues* (July 2007), http://www.theiacp.org/documents/pdfs/Publications/PoliceChiefsGuidetoImmigration%2Epdf.

**3. This Court should certify the question of whether non-United States citizens possess rights to free speech and assembly under the Connecticut Constitution.**

Defendants have also moved to dismiss Plaintiffs' claim that Defendant DPD officers knowingly and intentionally stopped, detained, investigated, and arrested Plaintiff Day-Laborers in retaliation for their exercise of protected speech and association in a public forum, in violation of Article First, §§ 4 and 14 of the Connecticut Constitution. Defs. Br. at 7-8. Section 4 of Article First of the Connecticut Constitution provides that "[e]very citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty." Conn. Const, art. I, § 4. Section 14 of Article First of the Connecticut Constitution provides that "[t]he citizens have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance." Conn. Const, art. I, § 14. Relying solely on an infamous 1921 Connecticut Supreme Court decision Defendants argue the Connecticut Constitution does not guarantee Plaintiffs' speech rights because the Connecticut Constitution only protects such rights for citizens[3] of the United States. Defs. Br. at 7-8 (citing *State v. Sinchuk*, 96 Conn. 605 (Conn. 1921)).

As with the issues discussed above, the question of whether non-United States citizens have speech and assembly rights under the Connecticut Constitution is appropriate for certification. Under the three-part test, *see Parrot*, *Freedman*, and *Jagger, supra*, (1) *Sinchuk* provides insufficient guidance on the controlling question at issue; (2) the question of the scope of Connecticut's constitutional speech protection implicates important public policy concerns; and (3) the question also involves issues that are likely to recur in subsequent state and federal

---

[3] Plaintiffs are presently in removal proceedings before the Board of Immigration Appeals (BIA). Consequently, they neither confirm nor deny that they are citizens of the United States, but assert their rights under the Connecticut Constitution attach regardless of citizenship.

court litigation.  Moreover, the scope of Connecticut's constitutional speech provisions is a significant issue of state law that the Connecticut Supreme Court should have the first opportunity to decide, *see e.g. Binette v. Sabo*, 244. Conn. 23 (1998) (Important state constitutional issue taken up by the Connecticut Supreme Court following certification from federal District Court), and the resolution of this issue is determinative of the cause pending in this Court.  *See* Conn. Gen. Stat. § 51-199b; *see also* Conn. App. Proc. §§ 82-1, 82-3. Consequently, this Court should certify the issue and hold Plaintiffs' claim in abeyance pending decision by the Connecticut State Supreme Court.

### a. *Sinchuk* does not provide sufficient guidance on the instant case because it is distinguishable.

In *Sinchuk*, the Connecticut Supreme Court rejected arguments by two non- citizen anarchists that the state Sedition Act violated Article First, §§ 2, 5, 6, and 16 of the 1818 Connecticut Constitution.[4]  Defendants ask this court to read *Sinchuk* as categorically excluding non-United States citizens from Connecticut's state constitutional speech and assembly protections.  Defs. Br. at 7-8.  *Sinchuk*, however, does not sufficiently guide the instant case for at least four reasons.

First, the Court decided *Sinchuk* based on the absence of non-United States citizens' rights under § 2 of the Connecticut Constitution[5] to engage in *seditious* speech and *non-peaceable* assembly.  In this respect, the Court's reading of "citizen" in the Connecticut Constitution's speech provisions is dicta.  The *Sinchuk* court did not consider the question presented here, namely, whether the Connecticut Constitution restricts the rights to engage in

---

[4] Article First, §§ 2, 5, 6, and 16 of the 1818 Connecticut Constitution have been carried over verbatim and renumbered as Article First, §§ 2, 4, 5, and 14 of the 1965 Connecticut Constitution currently in place.

[5] Article First, § 2 guarantees the people's "right to alter their form of government."

political or commercial speech and to assemble peaceably for such purpose in a public forum, to citizens of the United States. Second, the term "citizen" in Article First, §§ 4 and 14 means Connecticut citizen and not "citizen of the United States." Third, a *per se* exclusion of non-United States citizens from state constitutional speech protections would be inconsistent with subsequent developments in federal constitutional law which recognize the speech rights of non-United States citizens and state law incorporating federal law as a constitutional floor. Fourth, such a broad rule would raise serious constitutional problems under the federal Equal Protection Clause. In order to avoid these constitutional conflicts, *Sinchuk* must be read narrowly and is therefore distinguishable from the instant case.

*Sinchuk* has been controversial since its issuance, and thus it would be inadvisable for this court, without more guidance from the Connecticut Supreme Court, to read *Sinchuk*'s dicta as controlling precedent. The majority opinion reached its holding by analogizing non-United States citizens to slaves, *see Sinchuk*, 96 Conn. at 4-5 (relying on *Jackson v. Bulloch*, 12 Conn. 38 (1837), a habeas case holding that slaves, as non-members of the social compact, were excluded from rights granted the "people" under the Connecticut Bill of Rights), inspiring a spirited dissent, *id*. at 624 (Wheeler, CJ, dissenting) ("I cannot find the parallel between the slave and the alien . . . .").[6] *Sinchuk*'s now-discredited reasoning casts doubt on the continuing validity even of its narrow holding and thus, makes it especially important that this Court give the Connecticut Supreme Court a chance to consider the certified question.

### i.   The holding of *Sinchuk* that non-United States citizens have no right to engage in seditious libel and non-peaceable assembly does not govern here.

---

[6] *See also* Note, *Illegal Aliens, the Social Compact, and the Connecticut Constitution*, 13 Bridgeport L. Rev. 331, 362 (1993) ("the majority's analogy of aliens to slaves is neither sound nor in accord with federal or state precedent").

*Sinchuk* does not govern the instant action because *Sinchuk* addressed only *seditious libel*, and not the political and commercial speech and assembly at issue here, and the Court decided the case based on the absence of non-United States citizens' rights, under § 2, to alter the form of government, rather than the speech provisions of the Connecticut Constitution.   In particular, the defendant non-citizens had been charged with "publicly exhibit[ing] or advertis[ing]" with "force and arms . . . certain disloyal, scurrilous, or abusive matter concerning the form of government of the United States and of its flag and certain matter which was intended to bring them into contempt." *Sinchuk*, 96 Conn. at 605.

In addressing defendants' arguments, the Court expressly re-characterized their speech claims as claims under Article First, § 2, which guarantees the rights of the people "to alter their form of government."  Conn. Const. of 1818, art. I, § 2 (1818).  *See Sinchuk*, 96 Conn. at 611 ("The defendants attempt to maintain that their publications are so privileged, and are a legitimate exercise of the right of free speech by what is, in practical effect, an appeal to section 2 of the Bill of Rights.").  The Court reasoned that appellants could only have free speech rights under Article First, §§ 5 and 6 of the 1818 Constitution *to agitate for the overthrow of the government* if appellants had a right under Article First, § 2 "to alter their form of government." *Sinchuk*, 96 Conn. at 612-14.  According to the Court, *Section 2* "is plainly inapplicable to the defendants" insofar as they are non-citizens and therefore not members of "the people."  *Id*. at 610-11.  *See also Id*. at 614 ("the second section … cannot refer to aliens, who have no political power … [and] who have no part nor lot in the government.")  Thus, the Court concluded that foreign nationals have no constitutional right "under cover of being engaged in good faith to [change the laws or forms of government] to engage in scurrilous or anarchistic propaganda

which has been declared by the General Assembly to be dangerous to the public welfare." *Sinchuk*, 96 Conn. at 615.

Indeed, the *Sinchuk* Court explicitly rejected the notion that the Connecticut Constitution protects no free speech rights of non-United States citizens.  The Court insisted that by its holding it "[did] not mean to say that aliens have no right to free speech."  *Id*. at 614.  Thus, the Court recognized that *Sinchuk* did not settle the question of whether the Connecticut Constitution guarantees the right of non-United States citizens to engage in non-seditious speech and assembly and left that question for future cases to settle.

Moreover, it is noteworthy that the Court did not rely on the *Sinchuk* appellants' immigration status to reject their associational claims even though the plain language of the predecessor to Article First, § 14 also applies to "citizens."  Instead, the Court noted that Article First, § 14 guarantees only "peaceable assembly" in order to "apply to those invested with the powers of government."  Since, "[n]o right of *peaceable* assembly is invaded by the statute, and there is nothing to show that the publications in question were addressed, for any purpose whatever, to those invested with the powers of government" appellants' Section 14 rights were not implicated.  *Sinchuk*, 96 Conn. at 611 (emphasis added).

In contrast, Plaintiffs here have asserted their right under state law to engage in peaceful, protected *non-seditious* political and commercial speech in a public forum and to peaceably assemble for such purposes—speech that falls well within the core, of Connecticut's constitutional speech protections and that does not depend on Article First, §2. *See, e.g.*, *Leydon v. Town of Greenwich*, 257 Conn. 318, 350 (Conn. 2001) (expressive and associational use of town park); *Grievance Committee for Hartford-New Britain Judicial Dist. v. Trantolo*, 192 Conn. 15, 25-26 (Conn. 1984) (commercial speech).

Plaintiffs' speech is readily distinguishable from the seditious libel at issue in *Sinchuk*, speech which, at the time of *Sinchuk*'s issuance in 1921, categorically fell outside constitutional speech protections, *see*, *e.g.*, *Schenck v. United States*, 249 U.S. 47 (1919); *Debs v. United States*, 249 U.S. 211 (1919), and, under more rigorous standards, can still fall outside such protections today. *See also Brandenburg v. Ohio*, 395 U.S. 444, 447 (1969) (excluding "advocacy [that] is directed to inciting or producing imminent lawless action and is likely to incite or produce such action" from constitutional protection).

Here, Plaintiffs were neither "creat[ing] or foster[ing] opposition to organized government," *Sinchuk*, 96 Conn. at 609, nor threatening "public peace and safety," *id*. at 610. Since the speech rights at issue in *Sinchuk* are clearly different than those asserted here and in light of the *Sinchuk*'s court's insistence that some non-United States citizens' speech rights survive its holding, this Court should certify the question of whether the Connecticut Constitution protects Plaintiffs' expressive and associational conduct.

> ii.     **The plain text of Article First, §§ 4 and 14 refers to Connecticut citizens, not to United States citizens.**

Defendants argue that Article First, §§ 4 and 14 "*expressly* provide for the rights to be conferred upon *citizens* of the United States." Defs. Br. at 7-8. However, the plain text of the these sections refers only to "citizens" and not to "citizens of the United States." Indeed, where provisions of the Connecticut Constitution are meant to apply to citizens of the United States, the plain text reads "citizen of the United States." *See* Conn. Const. art. VI § 1 as amended by Conn. Const, art. IX of Amendments ("Every citizen of the United States who has attained the age of eighteen years, who is a bona fide resident of the town in which he seeks to be admitted as an elector and who takes such oath, if any, as may be prescribed by law, shall be qualified to be an elector."). Following the presumption of meaningful variation, the use of different language

implies different substantive meaning. *Russello v. United States*, 464 U.S. 16, 23 (1983).  If the Constitution meant "citizen of the United States" whenever the term "citizen" was used then there would be no reason to refer more specifically to "citizen of the United States" in Article Sixth, §1.  Thus, the "citizens" protected under Article First, §§ 4 and 14 may include non-United States citizens.

Courts have long recognized that in our federal system individuals may be state citizens, even if they are not also United States citizens.  *See e.g. Slaugher House Cases*, 83 U.S. 36, 74 ("It is quite clear, then, that there is a citizenship of the United States, and a citizenship of a State, which are distinct from each other, and which depend upon different characteristics or circumstances in the individual."); *Alla v. Kornfeld*, 84 F.Supp. 823, 824 (N.D. Ill. 1949) ("There is a distinction between citizenship of the United States and citizenship of a particular state, and a person may be the former without being the latter.").  Consistent with this practice, Article First, §§ 4 and 14 apply to Connecticut citizens and not United States citizens.

Though it is clear that the term "citizen" in Article First, §§ 4 and 14 refers to citizens of the State of Connecticut and not to citizens of the United States, it is unclear what it means to be a Connecticut citizen.  Under principles of comity and federalism, the task of clarifying that ambiguity belongs in the first instance to the Connecticut Supreme Court.  Therefore, certification is appropriate here.

> ### iii. Defendants' reading of the Connecticut Constitution's speech and assembly provisions would violate the United States Constitution by providing less protection to speech and assembly than the First Amendment.

Under controlling state law precedent, the Connecticut Constitution must protect at least those free speech rights of non-United States citizens protected by the First Amendment.  Yet, under Defendants' reading of *Sinchuk*, the Connecticut Constitution *never* guarantees freedom of

speech to any non-United States citizens, even though this would lower state constitutional speech protections below the federal floor.  Thus, defendants' argument that *Sinchuk* excludes all non-United States citizens from free speech and assembly protections under the Connecticut Constitution must be rejected.

*Sinchuk* was decided prior to the incorporation of the First Amendment, via the Fourteenth Amendment, against the States.  *See Gitlow v. New York*, 268 U.S. 652, 666 (1925).  Following incorporation, the Connecticut Supreme Court has repeatedly stated that the Connecticut Constitution may protect individual rights more extensively but not less extensively than the United States Constitution.  *See, e.g.*, *State v. Linares*, 232 Conn. 345, 378 (1994) (noting, in speech case, that "federal constitutional law sets minimum national standards").

Defendants ignore these "minimum national standards" set by the First Amendment when they argue that the Connecticut Constitution never protects the free speech and assembly rights of any non-United States citizens.  Federal courts have recognized the First Amendment rights of non-United States citizens in a range of contexts.  *See, e.g.*, *De Jornaleros De Redondo Beach v. City of Redondo Beach*, 475 F. Supp. 2d 952, 956-57 (C.D. Cal. 2006) (undocumented day-laborers); *Hellenic Lines Ltd. v. Rhoditis*, 398 U.S. 306, 310 n. 5 (1970) (legal resident aliens); *Bridges v. Wixon*, 326 U.S. 136, 148 (1945) (same); *Bridges v. California*, 314 U.S. 252 (1941); *Hague v. Committee for Indus. Org.*, 307 U.S. 496, 519 (1939) ("Freedom of speech and press are rights of personal liberty secured to all persons without regard to citizenship, by the Due Process Clause of the Fourteenth Amendment.") (internal citations omitted); *Underwager v. Channel 9 Australia*, 69 F.3d 361, 365 (9th Cir. 1995) (non-United States citizen legally present in the United States).  Defendants' argument, if accepted, would place Connecticut constitutional

law in conflict with the "minimum national standards" established in these federal constitutional rulings.  Defendants' argument must therefore be rejected.

Since issuing *Sinchuk* in 1921, the Connecticut Supreme Court has had no occasion to consider how incorporation, together with intervening interpretations of the First Amendment affect whether state constitutional protections depend on United States citizenship.  *See Benjamin v. Bailey*, 234 Conn. 455, 464 n.6 (Conn. 1995) (reserving the question of what "citizen" means for purposes of state constitutional analysis). Certification to the Connecticut Supreme Court is therefore appropriate for clarification of whether and to what extent non-United States citizens receive free speech and assembly rights under the Connecticut Constitution.

> **iv.    Defendants' argument that *Sinchuk* excludes non-United States citizens from state constitutional speech and assembly protections violates the Equal Protection Clause.**

Furthermore, under federal constitutional jurisprudence, defendants' reading of *Sinchuk* creating a blanket exclusion of non-United States citizens from the Connecticut Constitution's speech and assembly guarantees would violate the Equal Protection Clause of the Fourteenth Amendment.

As is well settled, the Equal Protection Clause covers all persons within the United States, regardless of citizenship or immigration status.  *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886); *Plyler v. Doe*, 457 U.S. 202, 210-216 (1982).   State laws and policies that employ "classifications based on alienage . . . are inherently suspect and subject to close judicial scrutiny." *Graham v. Richardson*, 403 U.S. 365, 371-2 (1971); *see also Takahashi v. Fish and Game Commission*, 334 U.S. 410, 420 (1948).  Moreover, any law that discriminates between different groups' access to a fundamental right is subject to strict scrutiny as well.  *Plyler*, 457

U.S. at 217. Two such fundamental rights are the freedom of speech and the freedom of association. *See Carey v. Brown*, 447 U.S. 455, 461-462 (1980) ("When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests.").

Thus, the denial, pursuant to Defendants' interpretation of *Sinchuk*, of fundamental speech and assembly rights based on alienage would raise serious constitutional problems. In fact, the *Sinchuk* court explicitly limited its holding more than Defendants acknowledge at least in part to avoid such equal protection concerns. *See* discussion *supra* at 19; *See also Sinchuk*, 96 Conn. at 614 ("We do not mean to say that aliens have no right to free speech… [because] they are entitled to the equal protection of the laws") (citing Yick Wo v. Hopkins, 118 U.S. 356 (1886)).

This Court and the Connecticut Supreme Court can avoid these constitutional difficulties by reading "citizen" in Article First, §§ 4 and 14 to mean Connecticut citizen rather than United States citizen. *See Zadvydas v. Davis*, 533 U.S. 678, 689 (2001) ("[I]t is a cardinal principle of . . . interpretation, however, that when an Act of Congress raises a serious doubt as to its constitutionality, this Court will first ascertain whether a construction of the [law] is fairly possible by which the question may be avoided.") (internal citations omitted); *see also INS v. St. Cyr*, 533 U.S. 289, 299-300 (2001) (same). Consequently, for reasons of constitutional avoidance, comity, and federalism, this Court should certify the question of whether and to what extent the Connecticut Constitution protects the free speech and assembly rights of non-United States citizens. *See Dorman v. Satti*, 862 F.2d 432, 435 (2d Cir. 1988) (certification is appropriate where state law in question is "readily susceptible" to proffered narrowing construction that would render an otherwise unconstitutional law constitutional). Should the

Court accept defendants' interpretation and opt not to certify, Plaintiffs argue, in the alternative, that Article First, §§ 4 and 14 should be declared unconstitutional as violative of the Equal Protection Clause of the Fourteenth Amendment.

    *b.* **The scope of Connecticut's constitutional speech and assembly provisions implicates important public policy considerations.**

Certification is also appropriate here because of the crucial public policy considerations implicated in non-United States citizen speech and assembly rights that, under principles of comity and federalism, should be decided in the first instance by the Connecticut Supreme Court. As discussed *supra*, the development and interpretation of the Connecticut Constitution is intimately tied to problems of Connecticut public policy.

The free speech and assembly rights guaranteed by the Connecticut Constitution are more extensive than those guaranteed by the First Amendment. *Leydon v. Town of Greenwich*, 257 Conn. 318, 347 (2001) ("This court explicitly has stated that the Connecticut constitution, under article first, §§ 4, 5 and 14, provides greater protection for expressive activity than that provided by the first amendment to the federal constitution."); *State v. Linares*, 232 Conn. 345, 380-1 (1995) (same). Denying non-United States citizens' speech and assembly protections under the Connecticut Constitution would thus materially affect non-United States citizens by guaranteeing them fewer rights than are secured by the First Amendment.

Moreover, as the instant case reveals, the issue of non-United States citizen speech rights is of particular relevance in the immigration context in light of increasing immigration enforcement efforts by state and federal actors in Connecticut. *See* discussion, *supra*, at 9. Moreover, non-United States citizens intent on protesting such actions will do so only if they are certain that their right to engage in such protests is guaranteed. For example, as recently as February 7, 2008, thousands of people, presumably including many non-United States citizens,

rallied in Danbury, Connecticut to protest the Danbury Common Council's decision to enter into a 287(g) joint enforcement agreement with ICE.   Mark Spencer, *Crowd Protests Vote in Danbury; Police to Enforce Immigration Law*, Hartford Courant, Feb. 7, 2008, at A1.

Outside the immigration enforcement context, non-United States citizen speech and assembly rights bear on a wide range of activities, political mobilization and protest, publication and media distribution, and advertising and other forms of commercial speech.   As of 2006, 240,526 of Connecticut's residents—or 6.9% of Connecticut's population—were non-United States citizens and those numbers continue to grow.   United States Census Bureau American Community Survey 2006.[7]   Defendants' extra-ordinary and far-reaching claim would mean the Connecticut Constitution does not protect the right of hundreds of thousands of non-United States citizens that live in Connecticut to engage in political or commercial speech or to freely assemble.   Certification is appropriate here.

> *c.* **The issue of whether Connecticut's speech and assembly provisions extend to non-United States citizens is likely to recur and resolution will assist the administration of justice in both federal and state courts.**

Finally, the issue of non-United States citizens' speech rights under the state constitution is sure to recur in both state and federal litigation, calling for resolution of this question by the state Supreme Court.   Speech claims are being actively litigated in cases involving immigration law and policy on behalf of day laborers and allegedly non-United States citizen plaintiffs, and these cases will persist in state and federal fora.   *See, e.g.*, *De Jornaleros De Redondo Beach v. City of Redondo Beach*, 475 F. Supp. 2d 952 (2006).

---

[7] The 2006 ACS reports that 12.9% (452,358 persons) of Connecticut's residents were born outside of the United States.   From 1991 to 2006, Connecticut's foreign-born population grew 61%.   Between 1995 and 2025, Connecticut is expected to gain 337,000 residents through international migration, doubling the foreign-born population. Rafael Mejia & Priscilla Canny, *Immigration in Connecticut: a Growing Opportunity* 2 (Connecticut Voices for Children, Oct. 2007).

Moreover, the growing non-citizen population engaged in a wide range of speech, *see* discussion, *supra*, at 27, guarantee that the issue of state constitutional coverage will arise again. Certification to the state Supreme Court here will therefore further the more economical and efficient administration of justice.   *See* Conn. App. Proc. § 82-3 ("present determination [of issue] would be in the interest of simplicity, directness and economy of judicial action" for issue to be certified).

Finally, certification is also more efficient in the context of the case at bar.  Plaintiffs have raised First Amendment claims that mirror their state law claims and are based on a common nucleus of facts.  Discovery on Plaintiffs' First Amendment claims will cover the same factual ground supporting their claims under the speech provisions of the Connecticut Constitution.  Consequently, while discovery proceeds on Plaintiffs' federal claim the most efficient course of action is to certify the issue of non-United States citizens' state constitutional speech and assembly rights and to hold Defendants' Motion to Dismiss in abeyance pending resolution by the Connecticut Supreme Court.

**4. This Court should certify to the Connecticut Supreme Court the question of whether Plaintiffs have a private right of action for damages under Article First, §§ 4 and 14 of the Connecticut Constitution.**

Plaintiffs' Fourth Claim for Relief depends on the existence of a private cause of action for money damages for violations of §§ 4 and 14 of Article First of the Connecticut Constitution. No Connecticut court has yet considered the issue presented here.  However, as discussed *supra*, under *Binette* such determinations should be made on a *case-by-case* basis.  *Binette,* 244 Conn. at 48.

As with the issues discussed *supra*, the question of whether Connecticut recognizes a private right of action for Plaintiffs' claims is appropriate for certification. Under the three-part test, *see Parrot*, *Freedman*, and *Jagger, supra*, (1) *Binette* provides insufficient guidance on the controlling question at issue; (2) the question of the whether a private right of action exists for Plaintiffs to vindicate their free speech and association rights implicates important public policy concerns; and (3) the question involves issues that are likely to recur in subsequent state and federal court litigation.   Moreover, the resolution of this issue is determinative of the cause pending in this Court.  *See* Conn. Gen. Stat. § 51-199b; *see also* Conn. App. Proc. §§ 82-1, 82-3.

### a. Connecticut appellate precedent provides insufficient guidance on the question of whether Article First, §§ 4 and 14, permit a private right of action.

The Connecticut Supreme Court has decided no cases regarding the existence of a *Binette* action under the speech or assembly provisions of the state constitution.  However, at least one court has assumed without deciding that such a right exists.[8]  *See Murray v. Josvanger*, No. CV020344686S, 2002 WL 31440827, at *2-4 (Conn. Super. October 9, 2002), attached as Exhibit 2.  As discussed *supra*, in *Binette* the Connecticut Supreme Court held that each constitutional provision and violation thereof must be examined on an individual basis to determine whether a private right of action will lie. The factual allegations giving rise to

---

[8] Though other Connecticut courts have declined speech-based *Binette* claims in some contexts, none of those cases are relevant to the case at bar.  In particular, a handful of lower court have considered whether public employees have a private right of action against their public employer if that employer violates their free speech rights under Article First, §4.  Notably, those courts only rejected a private right of action on the basis of the existence of adequate statutory remedy that rendered a *Binette* action superfluous.  *Hankard v. Town of Avon*, No. CV 960565611S, 1999 WL 482635, at *48-49 (Conn. Super. June 22, 1999) (rejecting private right of action because "the legislature ha[d] provided an adequate remedy by statute"), attached as Exhibit 3.  *See also Smith v. City of Hartford*, No. X07CV 980070792S, 2000 WL 1058877, *4 (Conn. Super. July 14, 2000) (same), attached as Exhibit 4; *McKiernan v. Amento*, No. CV010453718S, 2003 WL 22333200, at *5 (Conn. Super. Oct. 2, 2003) (same), attached as Exhibit 5.   The relevant statute, General Statutes 31-51q "provides a damages (including punitive damages) remedy to any [public] employee who is subjected to discipline or discharge 'on account of the exercise by such employee of rights guaranteed by . . . [section] 4 . . . of article first of the Constitution of the state.'" *Hankard*, at *49.  In the case at bar, the legislature has provided no independent remedy for Plaintiffs to vindicate their free speech rights and so, without a direct cause of action, they will be unable to do so.

Plaintiffs' claims for relief under Article First, §§ 4 and 14 of the Connecticut Constitution bear strong resemblance to the circumstances in *Binette*. Both cases deal with the unconstitutional conduct of law enforcement officials in violating civilian plaintiffs' civil rights. Here, as in *Binette*, the Connecticut Supreme Court should be given the opportunity to take into consideration the harm likely to result from the absence of a direct right of action to respond to unlawful police conduct in violation of the Connecticut Constitution. *Cf. Binette*, 244. Conn. at 36. Therefore, certification is appropriate.

### b. The determination of whether a private right of action exists under Article First, §§ 4 and 14, implicates important public policy considerations.

Certification is also appropriate because of the crucial public policy considerations implicated in the existence of an inferred cause of action to vindicate free speech and associational rights, issues that, under principles of comity and federalism, should be decided in the first instance by the Connecticut Supreme Court. The free speech and associational rights guaranteed by the Connecticut Constitution are more extensive than those guaranteed by the First Amendment. *See Leydon, Linares supra*. Consequently, the Connecticut Supreme Court has a specific public policy interest in deciding whether a cause of action will be available to enforce the distinct speech and associational rights recognized by the state constitution. Therefore, certification is appropriate here.

### c. This question is likely to recur and its resolution will assist the administration of justice in both federal and state courts.

Finally, the issue of whether Connecticut recognizes a private right of action under Article First, §§ 4 and 14 of Connecticut's Constitution is sure to recur in both state and federal

litigation, necessitating a prompt resolution of this question by the state Supreme Court.  More importantly, it is likely to recur in the instant case.  Assuming *arguendo* that the Connecticut Supreme Court certifies that Plaintiffs are indeed protected under Article First, §§ 4 and 14, Defendants are likely to move to dismiss Plaintiffs' Fourth Claim on the grounds that the Connecticut Supreme Court has not recognized a private right of action under these constitutional provisions, just as Defendants have moved to dismiss Plaintiffs' other state constitutional claims addressed herein.  *See* Am. Compl. at ¶¶ 188-191.  Resolving these issues simultaneously is strongly in the interests of judicial efficiency.  Therefore, certification is appropriate here.  *See* Conn. App. Proc. § 82-3.

**B. In the alternative, Defendants' motion to dismiss Plaintiffs' Third, Fourth, Fifth, and Nineteenth Claims should be denied.**

For the reasons stated above, if this Court declines to certify the questions of state law outlined *supra*, then Defendants' Motion to Dismiss Plaintiffs' Third, Fourth, Fifth, and Nineteenth Claims should be denied.

**C. In the alternative, Plaintiffs' Third, Fourth, Fifth, and Nineteenth Claims should be dismissed without prejudice.**

In the event that this Court chooses to dismiss Plaintiffs' claims, this Court should dismiss the state law claims in Plaintiffs' Third, Fourth, Fifth, and Nineteenth Claims *without* prejudice so that plaintiffs may refile those claims in the appropriate state venue.  *See Lopez v. Smiley*, 375 F. Supp. 2d 19, 26-27 (D.Conn. 2005).   However, Plaintiffs emphasize that dismissing these claims to allow the state law issues to make their way up to the Connecticut Supreme Court through the state system would not serve the interests of judicial economy as

well as certification.  Dismissal, as opposed to certification, would require two courts to manage discovery and motion practice on overlapping constitutional claims.

**D.  Defendants' motion to dismiss Plaintiffs' Sixteenth Claim should be denied.**

Plaintiffs Sixteenth Claim for Relief alleges a cause of action for conspiracy against the defendant HARFOT officers and the DPD officers under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971).  Am. Compl. at ¶¶ 254-58.  Defendant DPD officers claim that *Bivens* is not applicable to them because they are not federal officials. Defs.' Br. at 9-10.

Defendants misunderstand Plaintiffs' Sixteenth Claim for Relief.  Although "[i]t is axiomatic that a *Bivens* action can be brought only against one … who is acting under color of federal law," *Reuber v. United States*, 750 F.2d 1039, 1054 (D.C. Cir. 1984), it is equally clear that defendants need not be federal employees to be held accountable for constitutional violations under *Bivens* if they were indeed acting under color of *federal* law.  *See id.* at 1055 n.20.  *See also Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 941 (1982) (holding that conduct "fairly attributable" to a government actor may be the basis for a claim of a violation of a federal right); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 150-52 (1970); *United States v. Price*, 383 U.S. 787, 794 (1966) ("to act 'under color' of law does not require that the accused be an officer of the State. It is enough that he is a willful participant in joint activity with the State or its agents."); *Dwares v. City of New York*, 985 F.2d 94, 98 (2d Cir. 1993); *Island Online, Inc. v. Network Solutions, Inc.*, 119 F. Supp. 2d 289, 305 (E.D.N.Y. 2000).  Indeed, when federal governmental authority "dominates an activity to such an extent that its participants must be deemed to act with the authority" of the federal government, then "constitutional constraints

apply," and the actors are held liable under *Bivens*.  *See Air Line Pilots Ass'n, Int'l v. Department of Aviation*, 45 F.3d 1144, 1149 (7th Cir. 1995).

Therefore, since the Amended Complaint alleges facts that, if true, would constitute a conspiracy to deprive Plaintiffs of their rights under color of *federal* law,[9] Defendants' motion to dismiss the Sixteenth Claim for Relief should be denied.

---

[9] Similarly, it could be found that the HARFOT and DPD officers were acting under color of *state* law, in which case they would be liable for violating the Plaintiffs' constitutional rights under § 1983.  *See* Am. Compl. at ¶¶ 195-199 (Plaintiffs' Sixth Claim for Relief).  Since discovery has not yet commenced, and "because a conspiracy by its very nature is a secretive operation," *United States v. Pitre*, 960 F.2d 1112, 1121 (2d Cir. 1992), Plaintiffs have pleaded the Conspiracy claims in the alternative.

## V. CONCLUSION

For the reasons stated above the aforementioned questions should be certified to the Supreme Court of Connecticut, Defendants' motions to dismiss Plaintiffs' Third, Fourth, Fifth, and Nineteenth claims should be held in abeyance pending a decision by the Connecticut State Supreme Court, and Defendants' motion to dismiss Plaintiffs' Sixteenth Claim should be denied. In the alternative, the Court should either deny Defendants' Motion to Dismiss entirely, or dismiss the relevant claims *without* prejudice so that they may be refiled at the state level.

Respectfully submitted,

/s/  Michael Wishnie
Michael Wishnie (ct27221)
Supervising Attorney

/s/   Christopher Lasch
Christopher Lasch (ct27139)
Supervising Attorney

/s/   Ramzi Kassem
Ramzi Kassem (ct27537)
Supervising Attorney

Justin Cox, Law Student Intern
Ari Holtzblatt, Law Student Intern
Heide Iravani, Law Student Intern
Michael Tan, Law Student Intern

JEROME N. FRANK LEGAL SERVICES
  ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, Connecticut 06520
Phone: (203) 432-4800

Counsel for Plaintiffs

## CERTIFICATE OF SERVICE

I herby certify that on March 7, 2008, a copy of the foregoing Memorandum in Opposition to the Defendants' Motion to Dismiss and in Support of Cross-Motions to Certify Questions of Law to the Connecticut Supreme Court and to Hold in Abeyance Defendants' Motion to Dismiss was filed electronically.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/  Michael Wishnie
Michael Wishnie (ct27221)
Supervising Attorney

/s/   Christopher Lasch
Christopher Lasch (ct27139)
Supervising Attorney

/s/   Ramzi Kassem
Ramzi Kassem (ct27537)
Supervising Attorney

Justin Cox, Law Student Intern
Ari Holtzblatt, Law Student Intern
Heide Iravani, Law Student Intern
Michael Tan, Law Student Intern

JEROME N. FRANK LEGAL SERVICES
  ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, Connecticut 06520
Phone: (203) 432-4800

Counsel for Plaintiffs