102F9M

**Send to:**   HELLER, REBECCA
        YALE LAW SCHOOL - LIBRARY
        127 WALL ST
        NEW HAVEN, CT 06511

**Time of Request:** Friday, April 10, 2009  14:21:09 EST
**Client ID/Project Name:**
**Number of Lines:** 627
**Job Number:**    1841:151065808

Research Information

**Service:**   LEXSEE(R) Feature
**Print Request:** Current Document: 1
**Source:** Get by LEXSEE(R)
**Search Terms:** 2006 U.S. Dist. LEXIS 2510



LEXSEE 2006 U.S. DIST. LEXIS 2510

**HUGO MARTIN RECINOS-RECINOS, ET AL VERSUS EXPRESS FORESTRY, INC., ET AL**

**CIVIL ACTION NO. 05-1355 SECTION "I" (3)**

**UNITED STATES DISTRICT COURT FOR THE EASTERN DISTRICT OF LOUISIANA**

*2006 U.S. Dist. LEXIS 2510*

**January 23, 2006, Decided
January 24, 2006, Filed**

**SUBSEQUENT HISTORY:** Class certification granted by *Recinos-Recinos v. Express Forestry, Inc., 233 F.R.D. 472, 2006 U.S. Dist. LEXIS 3119 (E.D. La., Jan. 27, 2006)*

**PRIOR HISTORY:** *Recinos-Recinos v. Express Forestry, Inc., 2005 U.S. Dist. LEXIS 36871 (E.D. La., Oct. 5, 2005)*

**COUNSEL:** [*1] For Hugo Martin Recinos-Recinos, Pablo Recinos-Alvarado, Alberto Alvarado, on behalf of themselves and all others similarly situated, Domingo Aguilar, Plaintiffs: Mary C. Bauer, Andrew H. Turner, Kristi L. Graunke, Southern Poverty Law Center, Montgomery, AL; Hector A. Linares, Juvenile Justice Project of Louisiana, New Orleans, LA.

For Express Forestry, Inc., Rick Thomas, Sandy Thomas, Defendants: Mark N. Mallery, Christine M. White, Christopher E. Moore, McGlinchey Stafford, PLLC, New Orleans, LA; Elizabeth K. Dorminey, James Larry Stine, Paul Oliver, Wimberly, Lawson, Steckel & Schneider, P.C., Atlanta, GA.

**JUDGES:** DANIEL E. KNOWLES, III, UNITED STATES MAGISTRATE JUDGE.

**OPINION BY:** DANIEL E. KNOWLES, III

**OPINION**

**MEMORANDUM OPINION AND PROTECTIVE ORDER**

In this Memorandum Opinion, the Court will further explain and supplement its rulings announced from the bench at the evidentiary hearing held in the above-captioned putative class/collective action regarding Plaintiffs' Motion for Protective Orders, Sanctions and Corrective Notice [Rec. Doc. No. 49], which was referred to the undersigned Magistrate Judge for determination [Rec. Doc. No. 68]. The purpose of the hearing was to determine [*2] whether the campaign of threats, intimidation and coercion carried out in mid-September, 2005 in the small, remote Guatemalan mountain towns of Palmira Viega and Santiago Petatan by groups of prospective and/or past seasonal workers purportedly allegedly representing the Defendants in this matter was improper and, if so, (1) whether the extent of the improprieties justify remedial action or imposition of penalties against Defendants, (2) whether there was any involvement of the Defendants through their agent, Leo Salazar, either as advisor, participant or instigator; and (3) precisely what remedy, penalties or sanctions, if any, are appropriate. As set forth more fully below, the Court has determined that the in-person campaign was improper and, indeed, may well have been unwittingly instigated by Defendants' representative, Leo Salazar, who was dispatched by the Defendants to Guatemala on September 15, 2005, the day before campaign commenced. The express purpose of Salazar's travel to Guatemala was to address Express Forestry's seasonal workers and answer any questions they had about the captioned litigation. Because it does not appear on this record that any conduct by the Defendants' [*3] agent Salazar was willful and it was not demonstrated that he actually accompanied the band of Express Forestry's "seasonal workers" who visited certain plaintiffs, opt-in plaintiffs, potential

class plaintiffs and/or their families in an attempt to facilitate the withdrawal of the captioned lawsuit, the Court finds that the imposition of sanctions is neither warranted, nor appropriate. Nevertheless, affidavit evidence and testimony elicited by the plaintiffs, together with the utter absence of any evidence of the precise statements made by Salazar to past and prospective "seasonal workers" which immediately presaged the subject face-to-face campaign, counsels in favor of issuance of a narrowly fashioned protective order designed to protect the integrity of this proceeding pending the district judge's rulings on plaintiff's motions for class certification and preliminary certification of collective action.

**BACKGROUND**

On April 7, 2005, putative class representatives, Hugo Martin Recinos-Recinos, Pablo Alvarado-Recinos and Alberto Alvarado, filed the captioned class action lawsuit. The collective/class action alleges that during the plaintiffs' and putative class members' employment [*4] with Defendants, Express Forestry, Inc., Rick Thomas and Sandy Thomas, they systematically violated the Agricultural Worker Protection Act (AWPA), *29 U.S.C. § 1801*, and the Fair Labor Standards Act (FLSA), *29 U.S.C. § 201*. The action was brought on behalf of a putative class of over 300 predominantly Guatemalan and Mexican migrant workers who planted trees and performed other forestry-related tasks for the defendants seasonal business. It is not disputed that plaintiffs/putative class representatives, opt-in plaintiffs and putative class plaintiffs were brought into the United States on temporary H-2B work visas to perform arduous tasks that American workers were not willing to perform.

Defendants operate a tree-planting service in which they bid on and negotiate contracts to plant trees on land owned by other individuals and companies. To fill manpower requirements for the contracts, they imported foreign nationals to perform forestry work on a seasonal or temporary basis, in accordance with the *Immigration and Nationality Act*. Each of the plaintiffs or putative class plaintiffs were issued an "H-2B visa" as contemplated by the aforesaid [*5] Act. Plaintiffs allegedly spent considerable sums to process visas and travel to the United States. In some cases, the plaintiffs were required to pledge collateral in the form of a deed to their land as a condition of being hired. Plaintiffs allege that the defendants allegedly have not returned the documents.

As a condition for obtaining the visas for the plaintiffs, defendants certified to the United States Department of Labor that the wages paid the plaintiffs would equal or exceed the applicable prevailing wage, and that the job would not contravene Federal, State or local law, including the applicable requirements of the H-2B program as set forth in the regulations. Under the applicable law, plaintiffs were entitled to receive a prevailing hourly wage and overtime pay but, according to the allegations, defendants took full advantage of their indigence, inability to speak the English language [1] and lack of understanding of the law and grossly underpaid them as H-2B forestry workers. Pursuant to the opt-in collective action provisions of the FLSA, thirteen of the defendants' former employees have filed written consents-to-sue, indicating publicly their intention to join this [*6] action.

> [1] Many of the immigrants speak the indigenous Mayan dialect as their primary language and Spanish as a secondary language with varying degrees of proficiency and no English.

Plaintiffs seek restitution of unpaid wages, monetary damages and declaratory and injunctive relief. Plaintiffs allege that records kept by the defendants were inadequate, inaccurate, false and misleading. They failed to pay minimum wage and the proper prevailing wage for the work performed in violation of AWPA. They further failed to pay overtime for hours worked in excess of a forty hour week and failed to reimburse plaintiffs for expenses they incurred primarily for the benefit of defendants in violation of the FLSA. As a result, plaintiffs claim that they are entitled to recover unpaid minimum and overtime wages, plus an additional amount in liquidated damages pursuant to *29 U.S.C. § 216(b)* The plaintiff class consists of all those individuals admitted as H-2B temporary foreign workers who were employed [*7] in any capacity by the defendants from April of 1999 until the date of filing the present action (April 7, 2005).

Defendants filed a Motion to Dismiss for Lack of Personal Jurisdiction, which the plaintiffs opposed. The district judge denied defendants' motion to dismiss, finding that the plaintiffs have established minimum contacts and that the Thomases made no showing with respect to the unreasonableness of this forum, let alone a compelling case that "traditional notions of fair play and substantial justice" would be offended. The court concluded that the reasonableness requirement is met. See Order and Reasons dated October 6, 2006 [Rec. Doc. No. 51].

Plaintiffs' Motions for Class Certification and for Preliminary Certification of Collective Action [2] have been fully briefed and are submitted for determination without oral hearing. [3] The Court notes that defendants have not opposed "provisional certification to proceed as a collective action" at this initial stage of the proceeding under the two-tiered process outlined in *Hipp v. Liberty Nat'l Life Ins. Co., 252 F.3d 1208, 1214 (11th Cir. 2001)*, noting the lenient preliminary standard [*8] outlined in *Mooney v. Aramco Servs. Co., 54 F.3d 1207, 1212 (5th Cir. 1995)*. [4] Defendants did, however, request that the district court prescribe the notice to be sent to the puta-

tive class, *i.e.,* court-authorized notice as opposed to notice sent by a party, noting that the description of the lawsuit must be neutral and balanced. [5] Defendants further responded that they would timely furnish the requested names, last known addresses and telephone numbers (where available) of members of the putative class, "so long as the means by which the putative class members are contacted is through Court-authorized notice consistent with the examples attached to its Memorandum in Response. [6]

> 2   *See* Plaintiffs' Motion for Certification of Class Action filed pursuant to *Fed. R. Civ. P. 23(b)(3)* [Rec. Doc. No. 22]; Plaintiffs' Motion for Preliminary Certification of Collective Action and For Disclosure of Names, Addresses and Telephone Numbers of Potential Opt-in Plaintiffs [Rec. Doc. No. 47].
> 3   *See* Defendants' Response to Defendants' Response to Plaintiffs' Motion for Certification of Collective Action [Rec. Doc. No. 57]; Plaintiffs' Reply in Support of Motion for Preliminary Certification of Collective Action [Rec. Doc. No. 58]; Defendants' Opposition to Motion for Certification of Class [Rec. Doc. No. 70]; Plaintiffs' Reply in Support of Class Certification [Rec. Doc. No. 76]; Order dated October 25, 2005 (stating that Plaintiff's Motion for Class Action shall be taken under advisement) [Rec. Doc. No. 63].

[*9]

> 4   *See* Defendants' Response to Plaintiffs' Motion for Certification of Collective Action at p. 2.
> 5   *Id.* at pp. 3-9.
> 6   *Id.* at p. 9.

**PARTIES' POSITIONS AND THE EVIDENCE**

*Via* motion filed September 30, 2005, plaintiffs ask the Court for extraordinary relief in the form of a protective order. They allege that they have been harassed by named and unnamed individuals, who have visited the homes and family members of named plaintiffs, opt-in plaintiffs, potential plaintiffs and their families in Guatemala. Plaintiffs contend that defendants have virtually unlimited access to putative class members, through continuing employer-employee relationships and their sole possession of class members' home addresses and telephone numbers. Plaintiffs argue that existing case law supports their position and that the circumstances of these face-to-face visits for purposes of discussing the instant lawsuit, inter alia, counsel in favor of issuance of a protective order where, as here, the defendants have engaged in coercive and improper conduct. Plaintiffs' position is that clearly, [*10] under the circumstances, a protective order is necessary to preserve the integrity of proceedings under *Rule 23*.

In this regard, plaintiffs contend that, in the week preceding the filing of the motion for protective orders, defendants launched an organized campaign designed to frighten, coerce and intimidate plaintiffs into withdrawing their claims. Plaintiffs contend that these individuals are agents of defendants, Express Forestry and the Thomases, and that the personal visits to the plaintiffs' and their families' homes were conducted for the purpose of coercing, threatening and/or attempting to bribe named and/or opt-in plaintiffs to withdraw from this lawsuit.

Plaintiff/Putative Class Representative, Hugo Martin Recinos-Recinos ("Hugo"), contends that a delegation of seven individuals, including the defendants' agent/manager Leo Salazar together with Celestino Diaz (an Express Forestry recruiter) and other Express Forestry workers/crew foremen, confronted his wife, Maria Jiminez-Hernandez de Recinos ("Maria") and his sister, Amparo Maria Recinos-Recinos ("Amparo"), seeking contact information on Hugo and attempting to bribe Maria by offering more than $ 6,600.00 (50,000 quetzales) [*11] in return for Hugo's withdrawal from the captioned case. Maria was instructed to communicate the offer to her husband.

Both Maria and Amparo testified consistently with their affidavits [7] that one of the men was of Mexican descent and identified himself as Leo Salazar (Defendants' manager); both testified that they recognized Celestino Diaz, a former Express Forestry worker, who had previously accompanied Hugo to work in the United States for Express Forestry.

> 7   *See* Affidavit of Maria Jimenez-Hernandez de Recinos [Plaintiffs' Exhibit 1]; Affidavit of Amparo Maria Recinos-Recinos [Plaintiffs' Exhibit 2].

According to Amparo Recinos-Recinos, the band of seven men were escorted to their house by Celestino Diaz and made two visits to her father's home in Santiago Petatan on the morning of Friday, September 16, 2005. The first visit was at 8:00 a.m. and the group of seven individuals escorted by Diaz returned at 8:30 a.m. when Hugo's wife, Maria, was present. Both Maria and Ampara testified that the men [*12] attempted to confirm Hugo's telephone number and to determine his present address, which they both refused to divulge. Maria further testified that individuals indicated that Hugo's lawsuit posed a problem insofar as their employability in the United States was concerned and that his continued participation in the captioned lawsuit could result in family members being deported, jailed or even killed.

Plaintiff contends that the defendant's agent allegedly directed Rudy Morales to make house visits in the Guatemalan town of Palmira Vieja on behalf of Express Forestry and Rick Thomas in an attempt to coerce opt-in plaintiffs to withdraw their claims from the instant lawsuit. Affidavits submitted on behalf of the plaintiffs state that Morales offered movants and opt-in plaintiffs H-2B visas for future work and money in exchange for withdrawing their claims. Plaintiffs submit that these unlawful activities threaten severe harm by interfering with this Court's ability and duty to determine the truth and merits of the claims asserted in the captioned class/collective action lawsuit.

Supplemental affidavits were submitted by Hugo's father, Pedro Recinos-Hernandez ("Pedro") and one of the [*13] plaintiffs in this lawsuit, Milder Ronaldo Velasquez-Diaz ("Milder"). Pedro attests that, at the end of October 2005, he was summoned to the municipality of Santiago Petatan, Concepcion Huista, Huehuetenango, Guatemala and confronted by a group of 7 young people. He recognized Celestino Diaz, a man who had been to the United States with Hugo to work for the forestry company. The men requested Hugo's number and explained the problems he had created. [8]

> 8 *See* Affidavit of Pedro Recinos-Hernandez dated November 18, 2005 (tendered to the Court as evidence at the November 30, 2005 hearing).

Milder stated that Morales advised him to quit the lawsuit so that he could take advantage of the opportunity to work for Express Forestry during to the 2005-2006 planting season. [9] Additionally, three Opt-in Plaintiffs, Leonel Hernandez-Lopez, Domingo Aguilar and Enrique Hernandez-Lopez, submitted affidavits [Plaintiffs' Exhibits 3-5], recounting the details of September 23, 2005 house visits made by Express Forestry recruiter/contractor, [*14] Rudy Ramirez-Morales, in the remote Guatemalan town of Palmira Vieja. All three were guaranteed work with Express Forestry if they withdrew from the lawsuit and offered money in exchange for written withdrawal from this lawsuit. *See* Plaintiffs' Exhibits 3-5.

> 9 *See* Second Affidavit of Milder Ronaldo Velasquez-Diaz dated November 20, 2005 (tendered to the Court as evidence at the November 30, 2005 hearing)

Movants seek sanctions and a protective order directed to the defendants that:

> (1) enjoins and restrains any communications with Plaintiffs and Plaintiffs' family members, except as conducted through the Court, Plaintiffs' counsel or the formal discovery process from the present to the end of the trial;
>
> (2) enjoins and restrains all communications related to the lawsuit with Movants (including putative class members), except as conducted through the Court, Plaintiffs' counsel or the formal discovery process from the present to the end of the trial;
>
> (3) enjoins and restrains any inquiry, discovery [*15] or investigation of Movants and/or Movants' family members' past or present immigration status in the United States, other than questions related to the status of individual Movants during each individual's time spent actually working for the Defendants; and
>
> (4) enjoins or restrains any reporting or other efforts to have Movants or Movants' family members arrested, detained, jailed or deported from the United States.

Defendants deny that they or any agent of theirs has engaged in any prohibited conduct and submit declarations to that effect. Defendants' position is that there is no justification for a protective order because no prohibited conduct has been engaged in by any Defendant or by any agent of Defendants. Through declarations of Rick Thomas, Sandy Thomas and Leo Salazar (Defendants' Exhibits 1-3), defendants deny they have not engaged in or directed any of the inappropriate conduct which is the subject of plaintiffs' motion for protection.

Addressing plaintiffs' demand that defendants be prohibited from inquiring into the employment history of potential class members at any time other than when those individuals were working for Express Forestry, defendants submit that [*16] they have not inquired into the "immigration status" of any of the plaintiffs but do seek information as to the work history because this is relevant to the issue of damages, *inter alia.* Defendants agree to forego such inquiries, but only if the plaintiffs agree to dismiss all of their reimbursement claims for travel, visa processing and recruitment expenses. Defendants point out that plaintiffs' argument is that these expenses must be reimbursed because they were brought to the United States "primarily for the benefit of the employer." Defendants deny that the law requires such reimbursement and further argue that, if, in fact, plaintiffs have taken advantage of their presence in the United States to work for other employers, then travel is primarily for plaintiffs' benefit and not defendants. Defendants submit that the plaintiffs have directly placed in issue

whether they have worked for employers in the United States, other than defendants after their visas expired, and that work history is relevant to the issue of whether recruitment, visa processing and transportation costs should be reimbursed as expenses incurred "primarily for the benefit of the employer." In sum, defendants [*17] argue that the plaintiff's post-visa work history is relevant because the plaintiffs have made it an issue in the case. [10]

> 10  *See Galaviz-Zamora v. Brady Farms, Inc., 230 F.R.D. 499 (W. D. Mi. 2005)* ("defendants are entitled to discover information regarding plaintiffs' work history"); *Topo v. Dhir, 210 F.R.D. 76, 78 (S.D.N.Y. 2002)* ("Where plaintiff's immigration status is relevant to prove a material aspect of the defense, a protective order is not appropriate"); *Liu v. Donna Karan Int., Inc., 207 F. Supp. 2d 191, 193 (S. D. N.Y. 2002)* (only when immigration status is not relevant, would such an inquiry present a "danger of intimidation [that] would inhibit plaintiffs in pursuing their rights.").

Defendants contend that plaintiff's reliance on *Arriaga v. Florida Pacific Farms, LLC, 305 F.3d 1228, 1242 (11th Cir. 2002)* is misplaced. Defendants note that in *Arriaga,* the Eleventh Circuit dealt with the H-2A visa program and not the H-2B [*18] program at issue in this case. Under the regulations applicable to H-2A visas, an employer must pay an H-2A worker for inbound transportation and subsistence costs, if the worker completes 50% of the contract work period, unless the employer has previously done so. *See 20 C.F.R. § 655.102(b)(5)(i).* Defendant argues that the *Arriaga* court recognized the significance of whether the plaintiffs work for other employers because the regulations stipulate that when a plaintiff works for employers other than the visa-sponsoring employer, the sponsoring employer is only responsible for a *pro rata* share of travel expenses. [11]

> 11  *See Arriaga, 305 F.3d at 1232, n. 4* (noting that the rules are different when the H-2A worker has contracted employment with a subsequent employer); *20 C.F.R. § 655.102(b)(5)(ii).*

Without further explanation, defendants argue that an indeterminate group of individuals apparently took it upon themselves to visit [*19] certain named and opt-in plaintiffs and/or their family members to try and talk them out of conduct (*i.e.,* prosecuting this lawsuit), which they believe is not in their community's best interest. Defendants urge the Court to refrain from entering any protective order, arguing that it would be a vain and useless effort because it would only restrain Defendants and their agents and not the independent individuals who have contacted and are attempting to contact plaintiffs, opt-in plaintiffs and their family members. Defendants' are concerned with the prospect that plaintiffs may seek to hold defendants liable for improprieties committed by independent individuals in the future.

Defendants submit that the cases cited by plaintiffs are inapposite, to wit: (1) *Gulf Oil Co. v. Bernard, 452 U.S. 89, 101, 101 S. Ct. 2193, 68 L. Ed. 2d 693 (1981)*; (2) *Kleiner v. First National Bank of Atlanta, 751 F.2d 1193 (11th Cir. 1985)*; (3) *Hampton Hardware v. Cotter, 156 F.R.D. 630 (N. D. Tex. 1994)*; and (4) *Burrell v. Crown Central Petroleum Co., 176 F.R.D. 239 (E. D. Tex. 1997).* Defendants attempt to distinguish these cases on the basis that they involved concrete [*20] undisputed evidence necessary to support the issuance of a protective order, whereas here there are simply competing uncorroborated affidavits. In this regard, defendants highlight that plaintiffs' evidence is comprised of oral testimony detailing oral threats or promises made by an *indeterminate group of people,* only one of whom (Leo Salazar) was purportedly an employee or in a contractual relationship with defendants.

Leo Salazar, an Express Forestry foreman of Mexican descent, admits being in Guatemala on the dates in question but categorically denies the visits and the conversations with putative class members and their families. He further denies that he made any promises or threats. The Court notes that the defendants did not produce Salazar to testify at the hearing, leaving some question as to whether or not he was one of the seven men that visited Maria and Amparo on September 16, 2005. Most notably, the defendants dispatched Salazar to Guatemala on September 15, 2005 to address potential seasonal workers, some of whom were undoubtedly putative class plaintiffs, for the express purpose of discussing the subject pending collective and putative class action litigation and [*21] to present Express Forestry's view. Nevertheless, defendants did not see fit to produce Leo Salazar in person to testify live at a midday, midweek, two hour hearing in the United States.

The Court notes that Leo Salazar's affidavit simply states his opinion, i.e., that he (Leo Salazar) did not threaten or coerce the workers he spoke to in Guatemala in mid-September 2005. Salazar does not say exactly what he, as a representative of the defendants, did in fact say about the captioned litigation. Additionally, neither of the Thomases indicate *via* affidavit testimony whether Salazar was given any precise instructions regarding what to say and what not to say. Apparently, Salazar was given free rein to discuss whatever questions the seasonal Guatemalan worker had regarding the litigation with potential putative class plaintiffs and how it would impact their prospects for employment with Express Fore-

stry in the United States. It is important to note that Leo Salazar by all accounts is simply a manager and not an attorney.

Addressing plaintiff's motion seeking production of a list of all potential class members, defendants submit that such discovery should be delayed until after the [*22] Court rules on the pending Class/Collective Action Certification Motions. Defendants refer the Court to *Abdallah v. Coca-Cola, 186 F.R.D. 672, 677 (N. D. Ga. 1999)* and argue that the *Abdallah* plaintiffs must cease and desist from contacting potential class members in an effort to woo them to join the lawsuit. See *Abdallah v. Coca-Cola, 186 F.R.D. 672, 677 (N. D. Ga. 1999)*.

Defendants note that, in addition to the class action, plaintiffs are pursuing a collective action under *FLSA § 216(b)*. Plaintiffs have already addressed their request for the names/addresses of potential plaintiffs to the district judge, arguing that such is necessary to solicit opt-in plaintiffs for purposes of the FLSA collective action. Defendants submit that is a more efficient use of resources to deny such discovery until the Court has determined the merits of plaintiffs' motion for preliminary certification of a collective action. Defendants further suggest the probability that many of the records sought do not exist. Defendants explained that Hurricane Katrina demolished a house in Ocean Springs, Mississippi owned by the Thomases, which was where Express Forestry's [*23] business records were stored.

The Court finds that the plaintiffs produced competent evidence consisting of eleven witnesses' affidavits and live testimony to establish that a campaign designed to threaten, intimidate and coerce plaintiffs, opt-in plaintiffs and potential class members to capitulate and withdraw their pending claims was in fact perpetrated. Through no fault of the plaintiffs, it is not as clear that it was perpetrated or instigated by the defendants' agent Leo Salazar. Indeed, defendants do not deny that the intimidation occurred, as they are in no position to do so. They do, however, admit that their manager, Leo Salazar, traveled to Guatemala to speak with putative class members (*i.e.,* persons who are impoverished and particularly vulnerable to economic threats) about the pending litigation the day before the campaign commenced. Plaintiffs correctly note that the basic facts of the campaign of intimidation are not contested, the question is whether it was sponsored, instigated or sparked by Salazar in Guatemala.

The weight of evidence balances in favor of finding that some of the coercive conduct at issue was actually undertaken by "seasonal workers," which [*24] may well have been influenced by Leo Salazar's communications in Guatemala. The perpetrators of the campaign were either "seasonal workers" or prospective workers who are economically dependent upon Express Forestry for lucrative "tree-planting" work available in the United States annually. A protective order is necessary to halt any improper communications and to diffuse the atmosphere of threats and coercion so as to allow the orderly progress of this litigation.

## ANALYSIS

### 1. The Applicable Standard

*Fed.R.Civ.P. 26(c)* provides that, upon motion by a party and for good cause shown, the court in which the action is pending may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one or more of the following: (1) that the disclosure or discovery not be had; (2) that the disclosure or discovery may be had only on specified terms and conditions, including a designation of the time or place; and (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery. [12]

    12   See *Fed. R. Civ. P. 26(c)*.

[*25] If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or other person provide or permit discovery. The provisions of *Rule 37(a)(4)* apply to the award of expenses incurred in relation to the motion. "*Rule 26(c)*'s requirement of a showing of good cause to support the issuance of a protective order indicates that the burden is upon the movant to show the necessity of its issuance, which contemplates a particular and specific demonstration of fact as distinguished from stereotyped and conclusory statements." [13]

    13   *In re Terra Int'l, Inc., 134 F.3d 302, 306 (5th Cir.1998)* (quotation omitted).

### 2. Defendants' Unilateral Contact with Potential Class Members and Plaintiffs

This case is a "collective action" under the *Fair Labor Standards Act* ("FLSA") as well as a proposed class action pursuant to *Federal Rule of Civil Procedure 23*. Plaintiffs seek to represent a [*26] class of non-supervisory workers admitted as H-2B foreign workers pursuant to *8 U.S.C. 1101(a)(15)(H)(ii)(b)*, who were employed by defendants between April 6, 2002 and the present. [14] A collective action, like a class action, prevents piecemeal litigation, inconsistent adjudications and difficult *res judicata* questions. A critical difference between a *§ 216(b)* collective action and a *Rule 23* class action is that the former requires each class member to opt in as party plaintiff upon receiving notice in order to

participate in any recovery or be bound by the judgment, but the latter (*Rule 23* class action) includes all absent class members who do not affirmatively opt out. [15]

> 14   Plaintiff's Complaint filed April 7, 2005 at P1 [Rec. Doc. No. 1].
> 15   *See Baldridge v. SBC Communications, Inc., 404 F.3d 930, 932 n. 6 (5th Cir. 2005).*

In spite of its own arguments against one party having unreviewed contact with absent class members, [16] defendants authorized unilateral [*27] contact with potential class members by its agent Leo Salazar for the express purpose of discussing the pending litigation. The undisclosed specific content of Salazar's communications/speech to potential class members is unquestionably speech of a commercial nature. Commercial speech merits constitutional safeguards only to the extent that it is accurate, in keeping with its purpose of insuring the free flow of reliable information crucial to independent decision making. Accordingly, no constitutional objection inheres in banning "forms of [commercial] communications more likely to deceive the public than to inform it." [17]

> 16   *See* Defendants' Response to Plaintiff's Motion for Preliminary Certification of Collective Action, at pp. 3-9.
> 17   *Central Hudson Gas Co. v. Public Service Commission, 447 U.S. 557, 563, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980).*

It is important to note that defendants in this case rely heavily on *Gulf Oil Co. v. Bernard 452 U.S. 89, 101 S. Ct. 2193, 68 L. Ed. 2d 693 (1981)* and suggest that the prior restraint [*28] strictures announced by the *en banc* court apply with equal force to this commercial case. As explained below, the defendants' position ignores the distinctions between pure and commercial speech. A fair assessment of the defendants' position requires a thorough examination of the *Gulf Oil* case, which was spawned from a set of successive race discrimination claims lodged by black employees of the Port Arthur, Texas Gulf Oil plant. [18]

> 18   *See Kleiner v. First National Bank of Atlanta, 751 F.2d 1193, 1206 (11th Cir. 1985)* (a commercial speech case).

In *Gulf Oil,* an initial EEOC proceeding culminated in a conciliation agreement providing for back pay. Dissatisfied with the resolution reached by the EEOC, plaintiffs, represented by local counsel in affiliation with the NAACP Legal Defense and Education Fund, filed a class action against Gulf alleging race discrimination. Before the date of class certification, Gulf requested an order limiting communications by plaintiffs and their counsel [*29] with actual or potential class members. The company testified that counsel for plaintiffs had advised potential class members that they stood to double their recovery by refusing to sign releases in favor of Gulf under the conciliation agreement. Without corroborating Gulf's unsworn allegations or specifying findings of fact, the trial court entered an order barring parties and counsel from contacting the plaintiff class without advance approval. The disputed order was patterned after a model order contained in the *Manual for Complex Litigation,* pt. II, § 1.41 (1973 ed.). [19]

> 19   *See Bernard v. Gulf Oil Co., 619 F.2d 459, 463-64 (5th Cir. 1980).*

On review, a panel of the former Fifth Circuit affirmed the district court, but that panel decision was vacated by the court *en banc.* The *en banc* court reversed the district court on *First Amendment* grounds, holding that the attempted solicitations constituted protected speech, non-commercial political expression [20] which called "into play the full panoply of *First Amendment* [*30] safeguards against prior restraint." [21] The *en banc* court refused to effect the order as an unconstitutional prior restraint. The disputed order was constitutionally deficient because (1) the suppressed expression posed no certain threat of direct, immediate and irreparable harm, (2) the order was not narrowly drawn and limited to the least restrictive means of regulation and (3) it lacked predicate findings of particular abuses. [22]

> 20   The *Gulf Oil* case qualified as protected political expression under *NAACP v. Button, 371 U.S. 415, 83 S. Ct. 328, 9 L. Ed. 2d 405 (1963)* and *In re Primus, 436 U.S. 412, 98 S. Ct. 1893, 56 L. Ed. 2d 417 (1978),* because counsel for the plaintiffs had no direct financial stake in the case and because the case was a vehicle for expressing the political beliefs of the NAACP. *See Gulf Oil, 619 F.2d at 472-73.*
> 21   *Id. at 473.*
> 22   *Id. at 473-477.*

On review, the Supreme Court affirmed the *en banc* court. [23] Resolving the case on statutory grounds [*31] to avoid the *First Amendment* question, the Supreme Court concluded that the contested order thwarted the named plaintiff's ability to form a class and prosecute a class action, in violation of *Rule 23.* [24] The Court held that under *Rule 23,* orders barring plaintiff contacts with members of the plaintiff class "should be based upon a clear record and specific findings that reflect a weighing of the need for limitation and the potential interference with the rights of parties." [25] In short, *Gulf Oil* was a classic case of noncommercial speech which directly implicated the doctrine of prior restraint.

23 *Gulf Oil Co. v. Bernard, 452 U.S. 89, 101 S. Ct. 2193, 68 L. Ed. 2d 693 (1981).*
24 *Id.*
25 *Id. at 101.*

Unlike *Gulf Oil,* the issue in this class/collective action case is defendants' commercial speech (*i.e.,* that of Leo Salazar's) to seasonal workers/potential class plaintiff's about the ongoing captioned litigation. Defendants' agent (Leo Salazar) has categorically denied directly contacting [*32] opt-in plaintiff (Milder Ronaldo Velazquez-Diaz) and further denied any attempt to convince or coerce or bribe him or any other putative class plaintiff to withdraw from the lawsuit in exchange for a visa/employment. However, Salazar admitted that on September 15, 2005, he traveled to Guatemala on behalf of Express Forestry for the express purpose of speaking to former employees/potential plaintiffs about the litigation that had been filed and to answer any questions that they might have. As plaintiffs' aptly point out, this is problematic because his audience consisted of indigent "seasonal employees" and potential class members dependent on Express Forestry for "seasonal work" in the United States. It is noteworthy that Express Forestry dispatched Salazar to Guatemala on September 15, 2005, which is the day before the threatening conduct allegedly commenced and approximately a month and a half before defendants expected to commence business with the necessary compliment of H-2B workers transported and ready to work for Express Forestry.

Contrary to defendants' argument, the undersigned finds that the *Kleiner* decision, a commercial speech case, is instructive rather than inapposite. [*33] In *Kleiner v. First National Bank of Atlanta, 751 F.2d 1193, 1206 (11th Cir. 1985)* the Court observed:

> It is unnecessary for a trial court to issue particularized findings of abusive conduct when a given form of speech is inherently conducive to overreaching and duress. The Supreme Court has acknowledged that unsupervised oral solicitations, by their very nature, are wont to produce distorted statements on the one hand and the coercion of susceptible individuals on the other:
>
> > In-person solicitation may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. The aim and effect of in-person solicitation may be to provide a one-sided presentation and to encourage speedy and perhaps uninformed decision-making; there is no opportunity for intervention or counter-education.... 26

The *Kleiner* court further observed:

> In the realm of litigation, a fair and just result often presupposes restraints on the speech of parties. *Seattle Times Co. v. Rhinehart, 467 U.S. 20, 104 S.Ct. 2199, 2207 n. 18, 81 L. Ed. 2d 17 (1984).* Inroads on the principle forbidding the [*34] solicitation of exclusion requests in *23(b)(3)* class actions could spell the ultimate extinction of that form of relief. Given the inherent coercion conveyed by the Bank's covert campaign, 27 we agree that the district court possessed the authority to regulate such contacts without the predicate record and findings required by *Bernard.* 28

26 *Id.* (citing *Ohralik v. Ohio State Bar Ass'n, 436 U.S. 447, 457, 98 S. Ct. 1912, 56 L. Ed. 2d 444 (1978).*
27 A telephone campaign conducted by the Bank left the court and counsel powerless to corroborate the supposedly innocent content of the conversations. The *Kleiner* court found the Bank's claims of innocence suspect because the briefing materials used to answer customer questions insinuated reprisals and distortions of fact. The court noted that the Bank's top management and counsel knew that by verbally providing information to customer's through defendant's employees there was high likelihood that the facts would become skewed in the transmission. This likelihood was further heightened by the Bank's election to use a non-lawyer, who had little familiarity with the case, but good persuasive skills, to make the primary presentation to those who would be contacting absent class members. Additionally, the loan officers who made the tele-

phone calls were the ones who controlled the customer's line of credit, and their on-the-spot entreaties pressured the listener to reach an immediate decision to comply before hearing the opposite view. The usual cure for false speech is more speech, but in the *Kleiner,* the Bank left no time for more speech before the party opted out.

[*35]
    28   *Id.*

The *Kleiner* court agreed that the district court had the power to regulate such contacts and noted that the trial court's order was narrowly drawn to avoid suppressing utterances worthy of *first amendment* protection. As a directive addressed to counsel for the Bank, the ambit of the order was restricted to communications regarding the litigation and thus did not impinge on the Bank's ability to speak with customers about routine business matters unrelated to the lawsuit.

In *Kleiner,* the class consisted of Bank borrowers, many of whom were dependent on the Bank for future financing. Not unlike *Kleiner,* the Recinos-Recinos class consists of indigent H-2B seasonal employees who are dependent upon Express Forestry for lucrative planting work in the United States annually. Not unlike the Bank in *Kleiner,* defendants authorized their representative Leo Salazar to travel to Guatemala for the express purpose of discussing the pending captioned collective/class action litigation. This the defendants have admitted. It also is important to note that Leo Salazar simply denies [*36] the plaintiff's accusations regarding coercion/bribery/threats; however, his affidavit does not reveal the specific substance of his conversations with various potential class action plaintiffs and/or their family members about the pending litigation. Defendants have not revealed the substance of the questions addressed to defendants nor Salazar's precise answers, whether scripted or unscripted. Most notably, the defendants have not provided the Court with any briefing materials utilized by Salazar to answer potential class plaintiffs' questions about the litigation. As aforestated, Salazar is a manager in the defendants' business, unschooled in the permutations of the applicable law and hardly in a position to judge whether his face-to-face communications were threatening and coercive. Considering what followed in the wake of Salazar's address, the Court can only find that such contact generated distorted statements and undue pressure, without allowing any opportunity for intervention or counter-education.

It is unnecessary for this Court to determine as a matter of fact whether Salazar was one of the seven individuals who descended upon Pedro Recinos' home on September 16, 2005 at [*37] 8:00 a.m. and then again at 8:30 a.m. Direct unilateral contact by Salazar (Defendants' agent) about the pending litigation and defendants' failure to divulge the precise contents of Salazar's representations on behalf of the company provide sufficient justification. In this regard, the Court highlights the response that the undisclosed representations apparently evoked from the potential/seasonal workers.

The undersigned Magistrate Judge finds that plaintiffs have made the requisite showing necessary for the issuance of a protective order restraining the defendants from contacting plaintiffs, opt-in plaintiffs, potential class plaintiffs and their families outside of the bounds of formal discovery *for the purpose of discussing the captioned litigation* pending issuance of the district judge's rulings on plaintiff's motions for *Rule 23* certification, for preliminary certification and for notice.

Defendants' agent Salazar has admittedly engaged in the now-proscribed conduct and plaintiffs, opt-in plaintiffs and potential class plaintiff's should be protected from these communications for the very same reasons set forth by the court in *Kleiner.* That court acknowledged, as did [*38] the Supreme Court, that unsupervised oral solicitations, by their very nature, are wont to produce distorted statements on the one hand and the coercion of susceptible individuals on the other. Moreover, in-person communications such as occurred in the present case may exert pressure and often demands an immediate response, without providing an opportunity for comparison or reflection. Clearly, the aim and effect of such in-person communication is to provide a one-sided presentation and to encourage speedy and perhaps uninformed decision-making, providing no opportunity for intervention or counter-education. The *Kleiner* court noted that, "in general, an order limiting communications regarding ongoing litigation between a class and class opponents will satisfy *first amendment* concerns if it is grounded in good cause and issued with 'heightened sensitivity' for *first amendment* concerns." 29

    29   *Kleiner, 751 F.2d at 1205. See also Abdallah v. Coca-Cola Company, 186 F.R.D. 672, 678 (N. D. Ga. 1999)* (noting that, even though Coca-Cola had not given the court any reason to suspect that it will attempt to mislead its employees and coerce them into non-participation, simple reality suggests that the danger of coercion is real and justifies imposition of limitations on Coca-Cola's communications with potential class members, regardless of whether communications occur before or after class certification, the effect is still the same).

[*39] In the present case, the court recognizes that an ongoing business relationship between the defendants and the plaintiffs and potential plaintiffs may cause communications to be coercive. Where, as here, there is a relationship that is inherently coercive, the court need

not make a finding that a particular abuse occurred. Here, the plaintiffs have provided the Court with sufficient evidence to show that defendants' communications with plaintiffs and potential plaintiff's about this litigation undermine the purposes of *Rule 23*. It is difficult to conceive of any advice from Salazar (defendants' agent) regarding the lawsuit that is not rife with the potential for confusion and abuse given defendants interest in this lawsuit. The evidence suggests that a potential for serious abuse exists.

Accordingly, Plaintiff's Motion for Protective Order is GRANTED IN PART in that the defendants and their agents shall refrain from contacting plaintiffs, opt-in plaintiffs, potential class plaintiffs and their families outside of the bounds of formal discovery *for the purpose of discussing the captioned litigation* pending the issuance of the district judge's rulings on plaintiff's motions for [*40] *Rule 23(b)(2)* certification, for preliminary certification of a collective action and for issuance of notice.

### 3. Release of Contact Information Regarding Potential Plaintiffs for the Purpose of Providing Information Concerning their Rights under the FLSA AND AWPA.

The Court is convinced that such discovery sought by the plaintiffs should await the district court's ruling on the pending motions for certification of the class and/or collective action. As to corrective notice, plaintiff submits that it is necessary because the potential class consists largely of impoverished Guatemalan migrant workers who lack familiarity with their rights and the legal system. Plaintiffs argue that the notice would advise potential plaintiffs of their right to participate, of legal protections against retaliation and how to contact plaintiffs' counsel to ask about the pending lawsuit.

"Corrective notice" has apparently already taken place insofar as the legion of affiants in favor of the plaintiffs are concerned. It is far from clear that any further "corrective notice," in addition to the notice which will issue in connection with preliminary certification, is necessary. The Court highlights [*41] the fact that the plaintiff's motion for preliminary certification of collection action is fully briefed and pending determination by the district judge. In connection with the motion for preliminary certification, plaintiff seeks production of the names, addresses and telephone numbers of all potential opt-in plaintiffs for the purpose of distribution of the proposed notice to potential opt-in plaintiffs. [30]

> 30 *See* Plaintiffs' Motion for Preliminary Certification of a Collective Action and for Disclosure of the Names Addresses and Telephone Numbers of Potential Opt-In Plaintiffs at p. 4 [Rec. Doc. No. 29].

The same discovery sought at this juncture of the proceedings is premature and should await the ruling on preliminary certification by the district judge. *See Abdallah v. Coca-Cola Company, 186 F.R.D. 672 (N. D. Ga. 1999)*. In *Abdallah,* the court observed that, while it could not say that orders authorizing communication with potential class members may never precede class certification, [*42] district courts must strive to avoid authorizing injurious class communication that might later prove unnecessary. Considering that the motions for *Rule 23* certification and preliminary certification are presently under submission and a ruling is imminent, the undersigned Magistrate Judge is simply not convinced that there is any need for corrective notice at this juncture of the proceedings. Corrective notice will issue in due course pursuant to the district judge's ruling on the uncontested motion for preliminary certification.

### 4. Reporting, Investigating or Engaging in Efforts to have Movants and their Families Arrested, Detained, Jailed or Deported from the United States.

There is no competent evidence that these threatened activities have occurred or that the defendants, their agents or non-agent individuals have made any communications aimed at having movants and/or their families arrested, detained or jailed in the U.S. or deported from the United States. As stated in open court, a protective order in this regard is not warranted.

### 5. Discovery Regarding Immigration Status and Work History of Plaintiffs and Potential Plaintiffs.

Plaintiffs, opt-in plaintiffs and [*43] potential plaintiffs came to the United States on Express Forestry H-2B visas and actually worked for defendants pursuant to those visas. Defendants are entitled to the discovery of the plaintiffs and potential plaintiffs' work history for purposes of the damage computation, if nothing else.

However, contrary to the defendant's argument, the *Arriaga* case supports rather than detracts from the plaintiffs' position regarding discovery directly addressing immigration status. In *Arriaga,* domestic agricultural employers hired non-immigrant aliens from Mexico as farm laborers to work on a seasonal basis. Laborers who passed the interview process paid for their own passage to the United States, visa costs and various recruiting fees. After deducting these expenses from wages earned, the net income fell below the statutory minimum wage. The Eleventh Circuit held that the *inbound* transportation costs were "an incident of and necessary to the employment" and that the employers must reimburse the laborers for expenses paid in coming to the employment. [31] The Court noted that the determining factor was that the transportation costs were "an inevitable and inescapable consequence [*44] of having foreign ... workers em-

ployed in the United States." [32] The *Arriaga* court held that inbound transportation expenses were inevitable under the program employers used to recruit and hire foreign workers and that the protections of the minimum wage provisions of the FLSA indisputably apply to farmworkers. Like the transportation expenses, visa costs were deemed primarily for the benefit of the employer because the visas restricted the workers to the work described on the clearance order. The Court noted that, by participating in the H-2A program, the Growers created the need for visa costs, which are not the type of expense permitted to pass on to the Farmworkers as 'other facilities.'" [33]

> [31] *See Arriaga v. Florida Pacific Farms, LLC, 305 F.3d 1228, 1242 (11th Cir. 2002).*
> [32] *Id.*
> [33] *Id. at 1244.*

The *rationale* employed by the *Arriaga* court is applicable to the H2-B program. Plaintiffs in this case correctly note that *Arriaga* is an FLSA case [*45] which does not hinge on any differences between the H-2A and the H-2B guestworker programs. Subsequent employment may yield relevant information on the issue of damages. However, immigration status information would only be a relevant area of inquiry if plaintiffs sought reimbursement of *outbound* transportation costs from the U.S. back to the plaintiffs' home country, rather than inbound transportation costs, which are at issue in this suit and were at issue in *Arriaga*. Plaintiffs in this case only seek to recoup *inbound* travel expenses for the trip from Guatemala to the U.S. pursuant to the H-2B visa and not *outbound* travel expenses.

Considering the applicable law, discovery regarding subsequent employment (work history) may provide information relevant to the issue of damages; however, plaintiff's subsequent immigration status is not relevant to any claim or issue in the case. Accordingly, insofar as the plaintiff's seek a protective order prohibiting direct inquiry into their immigration status post-H-2B visa immigration status, the motion is GRANTED IN PART; however, plaintiff's subsequent work history is fair grist for discovery, since it is relevant to the issue [*46] of damages.

**6. Sanctions**

The plaintiffs have not demonstrated an egregious case warranting the imposition of sanctions at this stage of the proceedings. It should be noted that the plaintiffs only partially prevailed on their motion. However, the parties should be apprised that any violation of the protective order entered restraining the defendants from unilateral communications with plaintiffs, opt-in plaintiffs, potential plaintiffs and/or their families regarding the captioned litigation pending the district judge's rulings on *Rule 23* certification, preliminary certification of the collective action and notice shall result in the issuance of sanctions.

Accordingly,

**IT IS ORDERED** that the plaintiff's motion for protection is GRANTED IN PART and DENIED IN PART, all as more specifically set forth above.

**IT IS FURTHER ORDERED** defendants and their agents shall refrain from any unilateral communications with plaintiffs, opt-in plaintiffs, potential plaintiffs and/or their families *regarding the captioned litigation* pending the district judge's rulings on plaintiff's motions for *Rule 23(b)(2)* certification, preliminary certification of the collective action [*47] and for the issuance notice.

New Orleans, Louisiana this 23 day of January, 2006.

**DANIEL E. KNOWLES, III**

**UNITED STATES MAGISTRATE JUDGE**

********** Print Completed **********

Time of Request: Friday, April 10, 2009   14:21:09 EST

Print Number:    1841:151065808
Number of Lines: 627
Number of Pages:

102F9M

Send To:  HELLER, REBECCA
          YALE LAW SCHOOL - LIBRARY
          127 WALL ST
          NEW HAVEN, CT 06511