UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF CONNECTICUT

```
- - - - - - - - - - - - - - - - x
                                :
JUAN BARRERA, ET AL.,           :  No. 3:07CV1436(RNC)
                                :
              Plaintiff,        :
                                :
        vs                      :
                                :
MARK BOUGHTON, ET AL.,          :
                                :  HARTFORD, CONNECTICUT
              Defendants.       :  MARCH 10, 2009
                                :
- - - - - - - - - - - - - - - - x
```

MOTIONS HEARING

BEFORE:

HON. ROBERT N. CHATIGNY, CHIEF U.S.D.J.

Darlene A. Warner, RDR-CRR
Official Court Reporter

```
 1

 2    APPEARANCES:

 3        FOR THE PLAINTIFF:

 4            JEROME N. FRANK LEGAL SERVICES
                  127 Wall Street
 5                New Haven, Connecticut 06511
              BY:  MICHAEL J. WISHNIE, ESQ.
 6                 ARI HOLTZBLATT, LAW STUDENT INTERN
                   DROR LADIN, LAW STUDENT INTERN
 7                 ELIZABETH SIMPSON, LAW STUDENT INTERN

 8
          FOR THE DEFENDANTS:
 9
              U.S. ATTORNEY'S OFFICE
10                157 Church Street, 23rd Floor
                  New Haven, Connecticut 06510
11            BY:  DOUGLAS P. MORABITO, AUSA
                   MICHELLE LYNN McCONAGHY, AUSA
12                 FRANK TANTILLO, LAW STUDENT INTERN

13            CRAMER & ANDERSON
                  30 Main Street, Suite 303
14                New Milford, Connecticut 06810
              BY:  DANIEL E. CASAGRANDE, ESQ.
15
              RYAN, RYAN & DELUCA, LLP
16                707 Summer Street
                  Stamford, Connecticut 06901
17            BY:  CHARLES A. DELUCA, ESQ.

18

19

20

21

22

23

24

25
```

10:00 A.M.

1

2

3           THE COURT:  Good morning.  We're here for

4    argument on the pending motions.  Let me begin by asking

5    you to please state your appearances, and if you would be

6    so kind, please tell me what role you propose to play in

7    this proceeding so I have some idea of who will be doing

8    what.

9           MR. MORABITO:  Good morning, Your Honor, Doug

10   Morabito for the government, specifically for the three

11   named individual federal defendants as well as the United

12   States.

13          To the right of me from the U.S. Attorney's

14   Office is Michelle McConaghy.

15          Then seated behind me is a student intern, Frank

16   Tantillo.

17          And, Your Honor, my role today will be to argue

18   for the United States as well as the individual

19   defendant's motions.

20          THE COURT:  Thank you.

21          MS. THOMAS:  Good morning, Your Honor, my name

22   is Clarisse Thomas, here on behalf of the individual

23   Danbury defendants in this case.  They are both the chief

24   of police from Danbury as well as several Danbury police

25   officers.

```
 1              I'll be here to argue our motion to dismiss as
 2    well as an opposition to the plaintiffs' motion to
 3    certify.
 4              THE COURT:  Thank you.
 5              MR. CASAGRANDE:  Good morning, Your Honor,
 6    Daniel Casagrande.  I represent the City of Danbury in the
 7    case.
 8              As there are no pending motions by the city, I
 9    will have no role in the proceeding.
10              THE COURT:  Thank you.
11              MR. CASAGRANDE:  Unless Your Honor otherwise
12    deems necessary.
13              THE COURT:  Thank you.
14              And Mr. Morabito, I take it you'll be arguing
15    first?
16              MR. MORABITO:  Whatever Your Honor wants, that's
17    fine.
18              MR. WISHNIE:  Good morning, Your Honor, Michael
19    Wishnie, Jerome N. Frank Legal Services Organization for
20    the plaintiffs.  With me today are three law student
21    interns, Ari Holtzblatt, Dror Ladin and Elizabeth Simpson.
22              Mr. Holtzblatt will argue on the Danbury
23    individual defendant's motion and the cross motion.
24              Mr. Ladin will address the Bivens claims, the
25    motion to dismiss by the individual federal defendants.
```

1            And Ms. Simpson, motion to dismiss by the United

2    States, the FTCA claims.

3            THE COURT:  All right, thank you.

4            Mr. Morabito.

5            MR. MORABITO:  Thank you, Your Honor.

6            Your Honor, just as a -- and again for the

7    record, Doug Morabito -- but just as a sort of a

8    procedural or housekeeping matter, does Your Honor wish

9    that since there are going to be two separate law students

10   arguing, should I argue the Bivens aspect of the motion to

11   dismiss and then allow them to respond and then argue the

12   federal tort claim aspect of the motion to dismiss?

13           THE COURT:  That sounds like a good idea.

14           MR. MORABITO:  Okay.  Thank you, Your Honor.

15           Your Honor, I think I can be relatively brief,

16   at least in my initial comments to Your Honor, to the

17   extent the Court doesn't have specific questions.  But I

18   would note, Your Honor, that as the Court is probably well

19   aware, at least as to the claims made by the individual

20   federal defendants, that the certain provisions of the

21   Immigration Nationality Act, or the INA, bar this action

22   against them in its entirety and also alternatively that

23   no action should lie under Bivens.

24           The Court is I'm sure well aware that there's

25   considerable authority supporting the defendants' argument

1    as well as supporting the plaintiffs' opposition to our

2    argument.  So I don't know if we would primarily rely on

3    our brief, but to the extent the Court has specific

4    questions about any of the particular arguments we make,

5    I'd certainly be willing to answer those questions that

6    the Court has.

7              I don't know if that makes more sense from your

8    perspective.

9              THE COURT:  Okay.  Well, let me start by asking

10   you about the status of the Arar case.

11             MR. MORABITO:  Again, as Your Honor knows, the

12   Second Circuit -- the original panel found that there was

13   no Bivens -- no Bivens action should lie, the Court sua

14   sponte took the case en banc.

15             My understanding was that the oral argument was

16   had on I believe December 9th, 2008.  Myself and

17   Ms. McConaghy watched that oral argument not in person,

18   but it was available on the internet.  We watched that

19   argument.  As I understand it, there has been no decision

20   to date, at least up to right now.

21             Interestingly enough, when the Court did take

22   that case en banc sua sponte, they didn't vacate, as I

23   understand it -- and it seems pretty clear from oral

24   argument en banc -- that the Second Circuit didn't vacate

25   the original panel decision that was written by Judge

1    Cabranes.

2         I'm sort of hard-pressed to argue that that

3    decision is still controlling.  I think it is to a degree,

4    but obviously its precedential value is somewhat

5    questionable based on the fact that unless the Court

6    dissolves the en banc order and doesn't issue an opinion

7    and just reverts back to the original panel decision.

8         Again, I think there's obviously clear language

9    in the opinion both as to the 1252(b)(9) argument we make,

10   although albeit in a footnote, and although it's dicta in

11   the original Arar Second Circuit opinion, again, I'm sort

12   of hard-pressed to argue that its controlling here based

13   on the fact that one would assume that there's going to be

14   a pretty extensive decision at least based on the at least

15   two hours of argument at the en banc hearing.

16        THE COURT:  Let's say that we have a decision

17   from the Court this morning affirming the panel opinion,

18   what would the effect of that be?

19        MR. MORABITO:  Again, it's an interesting -- the

20   case is interesting because my reading of -- and again, it

21   in some ways cuts against my argument because I'm not sure

22   that the -- I think Your Honor, to the extent they don't

23   talk about (b)(9) and I don't know that -- again, if they

24   talked about (b)(9) as the way Judge Cabranes did in

25   footnote 10 of the original panel decision, I think it's

1    strong support and pretty clear, or at least very good

2    argument and an indication that the Second Circuit, at

3    least this panel, agrees with our interpretation, the

4    federal defendants' interpretation of the so-called zipper

5    clause of 1252(b)(9).

6        THE COURT:  In that footnote, Judge Cabranes

7    said that the language of the statute is a clear

8    instruction to district courts.  Yet in the text of the

9    decision he said that the question raised very complex

10   issues.  How do you --

11       MR. MORABITO:  I apologize.  I think -- and I

12   think, Your Honor, it's true, it does raise very difficult

13   questions.

14       I mean, as Your Honor knows in dealing with,

15   over time, a multitude of different immigration cases in

16   different context, the INA is not the most coherently

17   written statute.  It's a very complicated, complex

18   statute.

19       I think that part of the footnote 10 was Judge

20   Cabranes's addressing some of Judge Sack's dissent in

21   saying that even though it's a difficult question or a

22   complex question, his view is that the statute, at least

23   1252(b)(9), covers all actions arising from any action

24   taken or proceeding brought to remove an alien from the

25   United States.

```
 1              You know, I understand the plaintiffs' argument

 2     about the title of the statutes as well as some of the

 3     limitations within the text of 1252(a) as well as

 4     1252(b)(1).  I would just note that the Second Circuit in

 5     many cases, and recently in Ruiz -- and I can get the cite

 6     Your Honor in a very different context -- but has

 7     oftentimes issued rulings within 1252 that are not in the

 8     context of removal orders.

 9              So I think as to that aspect, to the extent the

10     en banc panel was going to affirm the original panel

11     decision, I still think, again, footnote 10 is not the

12     holding, it's just dicta and it's sort of a response by

13     Judge Cabranes to Judge Sack's dissent.  But I think it

14     certainly provides us good support for our position.

15              THE COURT:  The Court expressly said that it did

16     not have to decide and was not deciding the jurisdictional

17     question.  Should I do that too?

18              MR. MORABITO:  I think Your Honor is certainly

19     free to not decide the question.  To the extent Your Honor

20     was going to find, as we argue, that there's no Bivens

21     cause of action, I think to the extent the Court didn't

22     agree with our argument that no Bivens action should lie,

23     I think obviously it's an argument raised that would have

24     to be addressed by Your Honor.

25              I think sort of the second part of the actual
```

1    holding, whether or not assuming the en banc court in Arar

2    affirmed the original panel decision, it's an interesting

3    reading, Your Honor to the extent that Arar is an

4    obviously a very different case than this particular

5    lawsuit brought by the plaintiffs.  I mean, a very

6    different case.

7         In that in Arar -- and Judge Cabranes still

8    ruled there was no Bivens action -- but obviously in Arar

9    there was allegations in an unverified complaint, but

10   nonetheless they accepted them as true in a particular --

11   on a motion to dismiss, that Mr. Arar was effectively

12   taken off the plane or stopped at JFK transit to Canada

13   and effectively there was a rendition and he was sent over

14   his express objection, as well as an attorney that he had,

15   to Syria.  And this is done based on his claim that the

16   United States knows that if he's sent there he's going to

17   be detained and tortured.

18        And it raises different policy -- obviously

19   different policy considerations than this particular

20   lawsuit in the sense that there were very real, at least

21   in the United States' view in the Arar case, national

22   security concerns and foreign policies implications, which

23   I'm hard-pressed to argue obviously apply in this

24   particular case.

25        I think there's foreign policy arguments under

1      the INA, but there's no national security claims here.

2      There's no -- I can't make any claims like that.  This is

3      a, you know, a straightforward arrest, in our view, of

4      illegal aliens.

5              Certainly I know it cuts against me, Your Honor,

6      but being candid with the Court, I think there's certainly

7      wiggle room, so to speak, under the Arar decision that

8      this case is different.  I think that that also can help

9      me to the extent that the Arar en banc panel overturned

10     Judge Cabranes's original decision.  I think we can

11     distinguish it obviously depending on what the Court did.

12             I think that Judge Cabranes, although he talked

13     about the comprehensive remedial nature of the INA, he was

14     more focused on the -- the panel was more focused on the

15     sort of special factors analysis in that this was a

16     national security case.  There's foreign policy

17     implications.  If you permit suit in this type of

18     situation, it could effectively chill the way we gather

19     intelligence and things of the like.

20             It's obviously not an argument I can or will

21     make to Your Honor in this case.

22             THE COURT:  Let me come back to the

23     jurisdictional issue.

24             The statute you rely on in this part of your

25     presentation, 1252(b)(9), refers to action taken to remove

1      an alien from the United States.

2                Looking at the allegations presented in the

3      complaint, what action was taken to remove the plaintiffs

4      from the United States within the meaning of the statute?

5                MR. MORABITO:  Well, the actions taken, Your

6      Honor, under (b)(9), would be the -- everything leading up

7      to the investigation, arrest, processing, issuance of the

8      notice to appear, subsequent decision to detain, and then

9      over through detention.

10               I mean, in our view, our reading of the statute

11     is a very broad reading, that it would cover any and all

12     actions relating to the removal of these 11 or 9, in this

13     case, at least as to the federal defendants, particular

14     aliens.

15               THE COURT:  I'd like to understand your position

16     in that regard.

17               Accepting these allegations as true, what was

18     the first action taken to remove them?

19               MR. MORABITO:  And again, Your Honor, this is,

20     as I prepared for today, one of the issues we obviously

21     have in that under the allegations in the complaint, which

22     if we're accepting them as true as I think we have to on a

23     motion to dismiss -- although on jurisdictional grounds

24     you can obviously look beyond the record, but we've put

25     nothing in the record to dispute those allegations -- the

1    first -- it depends how you interpret it, Your Honor.

2            I think it could be interpreted -- there are

3    allegations in the complaint that the United States as

4    well as these individual defendants conspired, so to

5    speak, with the Danbury defendants to drive out -- they

6    were generally day workers out of the city of Danbury.

7            As to the specific constitutional claims, it

8    would be the allegation that the individuals were, at the

9    point when they drive into the parking lot -- as Your

10   Honor probably is aware, the claims in the allegation is

11   that there's a ruse; these folks, the plaintiffs, get into

12   an SUV or a van; drive behind the bank.  At that point,

13   under the allegations of the complaint, they're surrounded

14   by both federal and city of Danbury police officers,

15   they're handcuffed, roughly seized, and at no point asked

16   questions.

17           So under the allegation of the complaint,

18   depending how you construe it -- you construe them, that

19   would be the first action taken.

20           THE COURT:  Am I supposed to consider each

21   plaintiff individually and ask:  What was the first action

22   taken to remove him?

23           MR. MORABITO:  I think you can, but I think for

24   our purposes, Your Honor, the record would be the same.  I

25   think the allegations are very general as to all the

1    plaintiffs.  At least the plaintiffs as to the federal

2    defendants.  There's obviously one separate individual --

3    plaintiff in this complaint that doesn't relate to the

4    situation that occurred at the day workers site in

5    Danbury.

6              THE COURT:  You believe that the phrase "action

7    taken to remove" encompasses acts preceding the decision

8    to arrest an individual?

9              MR. MORABITO:  I do, Your Honor.  I believe that

10   there's -- and I realize it's a very broad reading of the

11   statute -- I think there's not a lot of case law on the

12   issue.  I think there's clearly cases that cut against us,

13   not only district -- in district courts but otherwise, but

14   I think that there's language within AADC, the Antiair

15   Discrimination Committee -- if I'm citing that

16   correctly -- that when the Supreme Court was discussing

17   the applicability of Section 1252(g) and its sort of

18   correlation to 1252(b)(9), the Court was pretty clear that

19   1252(b)(9) and this is a quote, Your Honor, "covers the

20   universe of deportation claims."  And I think the argument

21   certainly can be made that it includes things prior to the

22   actual arrest, at least under (b)(9).

23             I think, again, it's a more difficult argument

24   under 1252(g) based on various courts' interpretation of

25   that statutory section.

1                    But I think Your Honor is, to the extent that

2       troubles Your Honor or that gives the Court concern,

3       obviously the claims can certainly be parsed out at

4       various points.  There are a number of claims made in the

5       complaint that don't only relate to at least the

6       particular allegation that they were arrested without

7       probable cause without any questions asked or, you know,

8       any questions asked regarding alienage or otherwise.

9                    So I think the Court -- and cases have sort of

10      parsed out particular claims and said, This particular

11      claim doesn't relate to an action taken to remove but

12      these particular claims do relate to an action to remove.

13                   So I think the Court is certainly, to the extent

14      it wants to, permitted to do that.

15                   THE COURT:  Have you done that analysis?

16                   MR. MORABITO:  I have roughly done it, Your

17      Honor.  I've had a difficult time because -- not of any

18      fault of the plaintiffs -- it's just a lot of the claims

19      sort of run into each other.

20                   But I think that in our view, our reading of the

21      -- a liberal reading of the complaint, is that there's

22      clearly a Fourth Amendment violation claim, as alleged in

23      the complaint, is that these particular plaintiffs were

24      arrested and handcuffed without any questions asked, which

25      from an immigration perspective, putting aside whose

1   custody they were in prior to that, from an immigration

2   perspective, I think I'd be again hard-pressed to argue is

3   not a constitutional violation, again, as alleged by the

4   plaintiffs.

5           I think they further make an equal protection

6   claim under the Fifth Amendment that this particular

7   group, Ecuadorians -- and they'll correct me if I'm

8   wrong -- but Ecuadorians were targeted for enforcement or

9   targeted based on their race and there was no identifiable

10  information and the like to support us doing what we did

11  in this particular case.

12          I believe they have a general Fifth Amendment

13  substantive -- I think it's a substantive due process

14  claim.  I think they made claims that certainly could be

15  construed as procedural due process claims also to the

16  extent that there are certainly allegations in the

17  complaint that these particular plaintiffs were denied

18  access to phone, denied access to attorneys and

19  transferred to various ICE facilities, both in

20  Massachusetts and in Texas, which I think probably could

21  be construed both as a procedural due process claim and

22  sort of a substantive due process claim as well, sort of

23  challenging the entire fairness of the removal proceedings

24  at that point.

25          I think they also -- although I am not entirely

1    sure the basis of it -- but they make a conspiracy claim

2    that the City of Danbury and the Danbury Police Department

3    as well as ICE and these particular named defendants

4    engaged in a conspiracy to drive out day workers from the

5    city of Danbury.  And then they obviously have a number of

6    tort claims -- federal tort claims, Your Honor.

7            And again, to the extent we accept as true their

8    allegations, and that the Court doesn't agree that action

9    taken to remove an alien begins prior to an actual arrest,

10    I think anything after the arrest, even under their

11    allegations in the complaint, would dismiss, in our view,

12    all the claims but for the Fourth Amendment claim to the

13    extent the Court didn't agree with our reasoning.  Because

14    clearly, all those are taken to remove these individuals

15    from the United States.

16            THE COURT:  Picking up on that comment, at what

17    point can we say the process to remove clearly began?

18            MR. MORABITO:  Again, for record purposes, our

19    view would be prior to arrest, but based on Your Honor's

20    questioning, I think under the allegations of the

21    complaint it would be once they are questioned by ICE

22    about their alienage.  But to the extent the Court didn't

23    agree with that, I think there's certainly case law that

24    supports the issuance of a notice to appear starts --

25    formally starts the removal proceedings.

1            THE COURT:  Were notices issued here?

2            MR. MORABITO:  They were, Your Honor.

3            THE COURT:  At what point?

4            MR. MORABITO:  I'm not sure if it's alleged in

5     the complaint, but my understanding is they were served on

6     the individual plaintiffs September 20th, 2008.

7            But, Your Honor, there again, being candid with

8     the Court, I believe the plaintiffs have either alleged or

9     exploring a claim that the ICE officials didn't serve

10    those notices to appear on the Court in a timely fashion.

11    They can certainly speak to that more coherently than I

12    can.

13           THE COURT:  Are you familiar with the current

14    status of the removal proceedings with regard to the

15    plaintiffs?

16           MR. MORABITO:  My understanding is, Your Honor,

17    that the case is presently stayed at the -- okay, so

18    Mr. Wishnie is nodding -- he says it was presently stayed

19    at the BIA based on an agreement between federal

20    defendants and the plaintiffs in that we were going to

21    stay discovery here pending a decision on the motion to

22    dismiss.  But Judge Martinez after a status conference

23    denied our motion to stay and at that point ICE or

24    Mr. Wishnie, I believe Mr. Wishnie, probably filed a

25    motion to lift that stay.

1          My understanding is the plaintiffs have filed

2    their briefs there and that DHS either has or will file

3    their brief in the very near future.

4          So the immigration judge has already ruled,

5    found them removable and denied their motion to suppress

6    that was filed in immigration court here in Hartford, but

7    that decision is still pending now at the BIA, Board of

8    Immigration.

9          THE COURT:  You say that the motion filed in the

10   removal proceeding was virtually identical to the claim

11   presented here.

12         MR. MORABITO:  Correct.  I mean, our view, Your

13   Honor, is that they have raised essentially the same

14   claims.  They're challenging the actions of ICE and the

15   City of Danbury, but more obviously focused on ICE in the

16   actions that led up to their arrest, to their being placed

17   in proceedings to the -- anything from the denial to the

18   initial denial bond, issuance of notice to appear, to

19   the -- their claim that these folks were transferred from

20   facility to facility to sort of skirt the immigration

21   process or to prevent them from raising certain claims,

22   that they were denied access to their lawyers, they were

23   denied access to the telephone, that they were forced to

24   suffer a number of claims which -- a number of inhumane,

25   so to speak, conditions of confinement type claims.

1          Obviously the Court I'm sure is well aware that

2     there's -- as far as the -- excuse me -- the Fourth

3     Amendment claim -- it's a somewhat more stringent standard

4     to make out a Fourth Amendment claim in immigration court.

5     Generally, the Second Circuit has said you need to show

6     either an egregious violation of a Fourth Amendment or you

7     need to show alternatively that the -- whatever

8     occurred -- whatever their claim is, has substantially

9     impaired or has sort of called into doubt fairness of the

10    entire process.

11         So it's a bit of a different standard and

12    certainly I can't argue that it's the identical standard.

13    What I can argue, Your Honor, is that the same factual

14    predicate that serves as the basis for the claims in this

15    complaint are the same ones that are going through the

16    administrative process in immigration, which I would

17    assume if the BIA rules against the plaintiffs, is going

18    to be raised in the Second Circuit.

19         So there's a possibility that at the same time

20    this case is proceeding, that the Second Circuit is going

21    to rule on maybe not the identical legal standard but

22    certainly on the factual basis for those claims.  So that

23    we run the risk of -- and I'm not sure what happens, Your

24    Honor, if the Court of Appeals issues a ruling finding

25    that something ICE did was improper, that we violated the

1     Fourth Amendment or that we violated the Fifth Amendment

2     protection clause or due process clause.  I'm not sure the

3     applicability -- I don't think it would apply to the

4     individual defendants on the Bivens action, but there's

5     certainly a question of whether or not it would apply as

6     the United States.  And then if the Court was to rule

7     against the plaintiffs, I think we could certainly make an

8     argument that they would be -- the issue's been decided or

9     at least it has some type of estoppel effect in this case.

10              I don't know.  I just say that sort of

11    intuitively.  I haven't looked at it.  It's just an issue

12    that I think could be very thorny to the extent it

13    happens.

14              THE COURT:  If I understood correctly, you

15    explained that an agreement was reached to stay the

16    removal proceeding while this case went forward?

17              MR. MORABITO:  Well, what we did, Your Honor,

18    was in an effort to save the individual defendants from

19    being subjected to depositions and written discovery and

20    the like, I proposed to the plaintiffs would they agree to

21    a stay.  They originally said no.  They came back with a

22    proposal that if we would agree to stay the BIA

23    proceedings or get ICE to stay the BIA proceedings, they

24    would agree to stay discovery only until Your Honor ruled

25    on this motion to dismiss.

1          So obviously if the Court ruled against us, both

2     stays would be lifted and we'd go forward.  But in this

3     way because, as Your Honor knows, courts generally

4     disfavor stays of discovery even when there are

5     jurisdictional motions pending.

6          So we sort of came to an agreement, we had a

7     status conference with Judge Martinez.  Other issues were

8     raised, such as the other defendants posed or raised that

9     they may want to take discovery of the federal defendants.

10    We had no such agreement with them, and at that point I

11    told Your Honor we would obvious -- obviously don't want

12    to do separate rounds of discovery.  So if that's a factor

13    we would rather have the motion denied and go forward.  So

14    that's where we were on that.

15         THE COURT:  Why wouldn't it be sensible to stay

16    this case pending the outcome of removal proceeding and

17    review in a Court of Appeals?

18         MR. MORABITO:  Well, one, it would be a long

19    time.  As we know, the BIA is not the most expeditious

20    and, you know, the Second Circuit, although I think

21    they've gotten through the bulk of their backlog and moved

22    cases quicker, it could be a very long time.

23         I guess Your Honor could.  I still think it

24    raises sort of difficult questions depending on how the

25    Court of Appeals comes out.

23

```
 1            I think it sort of -- and that sort of melds
 2    into our argument that the INA statutory sections bar
 3    jurisdictionally this action but also our Bivens claims
 4    that there's an alternative remedial process in place to
 5    address the claims.  Albeit they don't give money damages,
 6    Your Honor.  But I think the Supreme Court has been very
 7    clear that that's not the test.  The test is not whether
 8    or not you get money damages.  The test is who decides
 9    what remedy is appropriate.
10            So you know, there are a multitude of cases
11    where individuals are not going to get money damages and,
12    you know, a lot of times they are certainly in the
13    benefits context.  So although within the V.A. benefit
14    context or the civil servant context.  So sometimes
15    there's provisions for backpay and the like or retroactive
16    benefit payments if the United States has made a mistake,
17    or in the Social Security context.
18            But nonetheless, the Court has been very clear
19    that the fact that you don't have an independent damages
20    remedy doesn't alter that.  Again, it's who makes the
21    decision, courts or congress.  And when there's an
22    alternative remedial scheme in place, which our view the
23    INA is -- which there's obviously considerable
24    disagreement between us and the plaintiffs -- but also
25    there are a number of other courts that have certainly
```

1    ruled contrary to our argument, just like there are a fair

2    number that have ruled favorably.  But I think that sort

3    of goes to congress, when it enacted the INA, set up a

4    streamline provision in order to sort of get rid of

5    fragmented type litigation.

6            I understand the plaintiffs' view that only

7    applies to judicial review of removal orders.  Our view is

8    that's a very narrow reading of the statute, that again

9    AADC Supreme Court there's language that our view supports

10   our position that it's a very broad provision.  And that's

11   sort of where we are.

12           It's a difficult argument, Your Honor, because I

13   think, as I've discussed with Mr. Wishnie and others,

14   there's clearly case laws that goes both ways and the

15   Court is certainly capable of deciding it one way or the

16   other.

17           THE COURT:  What would be wrong with recognizing

18   the Bivens remedy but staying the civil case until the

19   remedial proceeding is done?

20           You refer to the risk of fragmented litigation

21   and also the risk of a patchwork of bearing

22   interpretations of legal requirements.  If the civil

23   action was stayed pending the outcome of the removal

24   proceeding, it seems to me those risks would be greatly

25   reduced, if not eliminated.

1          MR. MORABITO:  I think they certainly would be

2    reduced, Your Honor.  I don't think I can stand here and

3    say they wouldn't be.  I just wonder what the

4    applicability -- again, depending on what the Second

5    Circuit decided or to the extent they even did decide, you

6    could get a summary order, you could get --

7          THE COURT:  If these plaintiffs had been

8    arrested for breach of peace or some violation of the

9    state criminal code and they were facing criminal

10   proceedings in state court, would they be permitted to

11   pursue claims for false arrest here --

12         MR. MORABITO:  Well, I don't know.

13         THE COURT:  -- under Section 1983?

14         MR. MORABITO:  Your Honor, I don't know

15   because -- and I'm going off some of my days as a law

16   clerk.  I believe there's case law that would prevent the

17   collateral challenge at the time.  There's a -- it's not

18   Heck v. Humphrey, but something along those lines.

19         THE COURT:  There are a couple of different

20   doctrines, and the way they work is to essentially

21   preclude that scenario.  The plaintiff, asserting a Fourth

22   Amendment claim under Section 1983 for false arrest, at

23   least in Connecticut, has to prove that the criminal

24   proceeding terminated in his favor.  Then you have Heck v.

25   Humphrey on the other end which is kind of an exhaustion.

1    But in no event would you have a Court proceeding with

2    Fourth Amendment claims under Section 1983 while the

3    criminal proceeding was still underway.

4              MR. MORABITO:  Right.  I just -- Your Honor, and

5    I understand the question.  I think that under our -- in

6    our view, in the individual defendants' view as well as

7    the United States' view, that there should be no Bivens

8    action, there probably wouldn't be harm or as much harm.

9    Certainly the Court arguably could do that.

10             I think that -- but in our view, these

11   individual defendants, our position is because of the way

12   the INA has been drafted both in text and the history of

13   that statute, that no Bivens action should lie.

14             But again, Your Honor, I think that that's

15   obviously a possible alternative to the extent the Court

16   wanted to go down that avenue.

17             THE COURT:  All right, thank you.

18             MR. WISHNIE:  Your Honor, and Mr. Morabito,

19   because the INA cuts across both claims, it might make

20   sense for you to finish.

21             MR. MORABITO:  That's fine.  Just so I'm clear,

22   am I on Bivens or am I on the FTCA claim?

23             THE COURT:  I think you're on FTCA.

24             MR. MORABITO:  Okay.  I see Mr. Wishnie everyday

25   now, so we've become rather close.

1            Your Honor, really I can be very, very brief

2     with our FTCA argument.

3            In our view, the allegations in the complaint

4     that are raised in the privately run facilities or the

5     non-ICE run facilities in our view are barred by the FTCA

6     under the independent contractor exception.  I don't think

7     I have anything to add beyond what we raised in our

8     papers.  I think the contracts speak for themselves.

9            Obviously to the extent there's a factual

10    question, we can do discovery and we raise it again at

11    summary judgment in the event the facts support our

12    argument.

13            THE COURT:  Thank you.

14            MR. WISHNIE:  Does Your Honor wish to hear from

15    plaintiffs now or the rest of the defendants' arguments?

16            THE COURT:  I think it would be best if we heard

17    from your side with regard to the arguments that have been

18    presented thus far.

19            MS. SIMPSON:  Good morning, Your Honor, I'm

20    Elizabeth Simpson.  I was to address the motion to dismiss

21    by the United States of America, that is the FTCA claims,

22    but as the INA bar addresses both Bivens and the FTCA,

23    I'll be talking mostly about the INA bar and my co-counsel

24    will address the other.

25            If I could address some of the points

1    Mr. Morabito made.  You asked him a lot about

2    Section 1252(b)(9), and it's the federal government's

3    position that that is a very broad section and that it

4    encompasses anything that could possibly happen in the

5    course of the removal process and he mentioned that AADC

6    may have some language that narrows that some degree, but

7    in fact AADC and also the Supreme Court's decision in St.

8    Cyr both have language that is exactly on point, which is

9    that the plain text of 12 -- I'm quoting from St. Cyr

10   quoting AADC, which is the plain text of

11   Section 1252(b)(9) reveals that it only applies with

12   respect to review of an order of removal.  And the

13   plaintiffs here do not have an order of removal.  What

14   they are challenging is their arrest and their detention.

15         Their arrest chronologically speaking happened

16   before the notice to appear was issued, several hours

17   beforehand in fact, and the federal defendants had no

18   information specific to the plaintiffs when they made that

19   warrantless arrest.

20         It's actually a significant factual difference

21   between our case and some of the other cases that the

22   federal government relies on, such as the Sissoko

23   decision.  There the plaintiff was actually subject to a

24   mandatory detention provision of the INA, which meant that

25   as soon as the NTA notice to appear was issued and that

1    case the NTA was issued first chronologically speaking,

2    ICE was bound to arrest and detain that plaintiff.

3         And so looking then to 1252(g) which bars review

4    of any decision to commence proceedings, adjudicate cases

5    or execute removal orders, the Court found they could not

6    actually separate the arrest and detention from the

7    commencement of proceedings because of that mandatory

8    provision.  Here on the other hand, plaintiffs were

9    arrested without a warrant before ICE had any information

10   about them and then several hours later ICE decided to

11   issue a notice to appear and then after that, ICE decided

12   to detain them and those were all separate decisions.

13        Cases that have actual scenarios like that, more

14   like Medina and parts of Khorrami have found that the

15   decision to arrest and detain are separate from a decision

16   to commence proceedings so therefore --

17        THE COURT:  It might be helpful if you adjusted

18   the microphone.  I'm sorry it is not a better microphone

19   but sometimes you have to speak directly into it.

20        MS. SIMPSON:  I'll lean forward.  It sounds very

21   loud.

22        THE COURT:  That's actually okay.

23        MS. SIMPSON:  So therefore they found that the

24   INA could not bar review of those decisions to arrest and

25   detain in federal court, and that's more like the

1    situation that we have here.

2              THE COURT:  Do you conceive that once the notice

3    issues, then the statute applies to bar any claim?

4              MS. SIMPSON:  No.  The statute does apply to bar

5    any claim that challenges the actual decision to commence

6    proceedings or serve a notice to appear, but the statute

7    does not bar decisions after that.  For instance, the

8    discretion decision to detain the plaintiffs, to hold them

9    without bond and the conditions of their confinement.

10             And insofar as the federal government argues

11   that that discretion decision is also protected by other

12   provisions of the INA that shield ICE's discretionary

13   decisions, that also plaintiffs contend is not the truth.

14   Because they exercised their discretion in this instance

15   in an unconstitutional fashion and no matter what the

16   bounds of ICE discretion is, it is not within their bounds

17   to violate the constitution.

18             THE COURT:  What about the congressional concern

19   regarding fragmented litigation?

20             I try not to take it personally, but I do get

21   the feeling that congress wants me to keep my nose out of

22   immigration matters.  Why, I don't know, but that's

23   certainly the signal that they seem to send.

24             MS. SIMPSON:  Well, I think there is a very

25   specific reason why congress passed the 1996 amendments to

1    the INA, and that was to streamline the removal process.

2    The harm that congress was getting at was the harm of

3    duplicate remedies in the district court and in the

4    immigration court.  So what they wanted to stop was

5    district judges passing judgment on orders of removal and

6    slowing or stopping the removal process.

7                In this case here, nothing that Your Honor can

8    do would slow or stop the removal process.  What the

9    plaintiffs are asking for is compensatory, make whole

10   damages, for harms that are separate from the removal

11   order.

12               THE COURT:  On that note, what would be the harm

13   in staying this case until a removal proceeding is done?

14               MS. SIMPSON:  Well, there are a couple of

15   things.

16               One thing is that the Danbury defendants have

17   not moved to dismiss all of the claims, so the case is

18   going forward with Danbury and so we are going to be

19   conducting discovery.  And the defendants have estimated

20   there will be upwards of 60 depositions in this case.

21   It's going to be a very time-consuming and costly

22   discovery process and a lot of claims are very similar.

23   The factual basis is very similar.

24               So staying this case would be an enormous waste

25   of judicial resources as well as the resources of the two

1     parties.

2          THE COURT:  What if I stayed the whole case?

3          MS. SIMPSON:  Well, beyond that, at this time

4     the plaintiffs have not actually had a hearing in

5     immigration court.  The immigration judge actually denied

6     their claims without granting them a hearing.  So it's

7     possible that either on their appeal to the BIA or their

8     appeal to the Second Circuit it will be remanded for a

9     hearing.  So this process could actually take five to

10    eight years before it is actually all sorted through.

11          And in any case, because we're not asking this

12    Court to pass judgment on the order of removal, anything

13    that this Court does does not necessarily affect the

14    removal process.

15          THE COURT:  Do you recognize that there's

16    something odd about having two different courts addressing

17    at more or less the same time the legality of the arrest?

18          I mean, what if I were to rule in your favor and

19    say that the arrest lacked probable cause and therefore

20    violated the Fourth Amendment, does that matter to the

21    immigration judge?  Is he free to ignore that?  And by the

22    same token, am I free to ignore his decision the other

23    way?

24          MS. SIMPSON:  I think it is an odd thing but not

25    that odd.

1          There are often criminal and then civil trials

2     on criminal liability for instance.  And just because in a

3     criminal context the prosecution could not reach the high

4     burden of beyond a reasonable doubt does not mean that

5     that same defendant could not be held liable in a civil

6     context.

7          In regards to your question about whether the

8     immigration judge was free to disregard your opinion, in

9     the first instance, yes, he is free to disregard your

10    opinion, but second of all, even if he found your opinion

11    persuasive, he could still find that the factual scenario

12    did not reach the egregious violation that he needs to

13    find in order to suppress evidence in the immigration

14    context.

15         So the difference in standards means that even

16    if you two had the same exact conception of what had

17    happened, you would not necessarily come to the same

18    decision.

19         THE COURT:  What relief is available to the

20    person whose rights have been violated in the removal

21    proceeding?

22         MS. SIMPSON:  At this point the only relief

23    available to plaintiffs is suppression of evidence and

24    therefore termination of the removal case, so that would

25    be the end to the ongoing constitutional violation but

1    would not be a make whole remedy for the violation,

2    specifically the false arrest, the arbitrary detention,

3    and the inhumane conditions of confinement.  There would

4    be no remedy for those things.

5            THE COURT:  Does anything prevent the person

6    from being removed in a separate removal proceeding

7    commenced soon after this one terminates?

8            In other words, does the person gain some sort

9    of immunity from removal?

10           MS. SIMPSON:  No, Your Honor.

11           THE COURT:  So the only relief is the

12   termination of that removal proceeding?

13           MS. SIMPSON:  Yes.

14           I'd like to add that if you dismiss plaintiffs'

15   claims here, you're basically saying the 1996 amendments

16   apply the repeal of the Federal Tort Claims Act, and

17   that's an entirely separate statutory regime that was

18   passed some 50 years earlier.  And there was nothing in

19   the congressional, nothing in the legislative history,

20   nothing in the debates, nothing in the text of the

21   statute, that indicates that congress wanted to bar the

22   FTCA as a remedy available to plaintiffs.

23           What they were aiming at doing was streamlining

24   the removal process and therefore stopping federal judges

25   from coming in and calling into question the removal order

1    and slowing or stopping the removal process.

2           THE COURT:  Dealing with Arar, the panel opinion

3    says, "In sum, we hold that barring further guidance from

4    the Supreme Court, a Bivens remedy is unavailable for

5    claims 'arising from any action taken or proceeding

6    brought to remove an alien from the United States under

7    the authority conferred on attorney general and his

8    delegates by the INA,'" citing 1252(b)(9).  That's the

9    holding of the court.

10          What am I supposed to do with that in this case?

11          MS. SIMPSON:  For one thing, your decision on

12   the FTCA, your decision on Bivens can be separate and

13   distinct and my co-counsel will address the Bivens in a

14   little bit more detail.

15          But I'll add that although they mention

16   Section (b)(9) there in that holding, they did not rely on

17   the INA bar when they made their decision.  The decision

18   was primarily about the special factors that were unique

19   to a national security context that we don't have in this

20   case here.

21          THE COURT:  I think a fair reading of the

22   opinion is that as the first step of the Bivens analysis,

23   the Court found that the INA did provide an alternative

24   remedial scheme but that's not what you're here to talk

25   about.  You wanted to talk about the FTCA.

1          MS. SIMPSON:  That is true that I'd prefer to

2     talk about the FTCA.

3          THE COURT:  Okay, go right ahead.

4          MR. MORABITO:  Your Honor, could I just

5     briefly -- I don't mean to interrupt, and I meant to

6     advise Mr. Wishnie this as well as the law students prior

7     to -- I'm no longer -- the government's no longer pressing

8     that the INA provisions bar the FTCA claims.  So just so

9     it's clear to the Court.

10         I know our brief was not entirely coherent on

11    that particular point.  We did at times lump them

12    together.  Our primary claim -- and I'm happy to withdraw

13    it orally right now -- as to the FTCA claims, that the INA

14    provisions don't bar those particular claims in our view.

15         THE COURT:  Okay.

16         MS. SIMPSON:  Okay, well that's good to know.

17         THE COURT:  You're making good progress.

18         MS. SIMPSON:  Indeed.

19         Do you have any questions about the independent

20    contractor issue?  I can do that when --

21         THE COURT:  Agreed.

22         MS. SIMPSON:  Okay.

23         THE COURT:  I have no questions.

24         MS. SIMPSON:  Okay.

25         MR. LADIN:  Good morning, Your Honor.  My name

```
1     is Dror Ladin and I'm here to speak on the Bivens claim.

2              THE COURT:  Good morning.

3              MR. LADIN:  So I'd like to address some of

4     what's been said before.  But if I may, I'd just like to

5     open by saying that the government here is taking a

6     radical step in terms of its Bivens analysis.  So while it

7     is acting as if Bivens is being extended into a new

8     context, Bivens remedies have been found in the

9     immigration context before, and while it relies on cases

10    generally concerning either civil servants or Social

11    Security benefits, the Bivens context we're presenting is

12    Fourth Amendment, false arrest, false imprisonment and is

13    very much the traditional remedy contemplated by the

14    Court.

15             THE COURT:  You sound like Judge Sack.

16             MR. LADIN:  I find Judge Sack's opinion

17    compelling.

18             But even if Judge Sack's opinion were not

19    persuasive to this Court, just speaking generally to the

20    Arar/Bivens, first of all I'd like to note that Judge Hall

21    has decided to treat the opinion as withdrawn even though

22    the Second Circuit did not actually withdraw it.  But

23    beyond that, the Bivens analysis undertaken by that court,

24    it's not applicable to this case for two reasons.

25             One is the national security implications which
```

1    have been raised by both counsel who have spoken before

2    me, and probably don't need to be illuminated.  But beyond

3    that, the challenge in Arar was to an order of removal.

4    It was to the fact that Mr. Arar was rendered to Syria

5    where the various unconstitutional tortures were inflicted

6    upon him.

7              This case doesn't concern at all an order of

8    removal and therefore the bar contemplated by 1252(b)(9)

9    and 1252(g) is utterly inapplicable.

10             THE COURT:  As I understand the essence of the

11   case, the plaintiffs complain that officials of the

12   government, state and federal, undertook to expel them

13   from the United States, to put them away from us, to

14   remove them, and that's the heart of it.  So it's hard for

15   me to accept a proposition that this does not relate to

16   action taken to remove them from the United States.

17             MR. LADIN:  Your Honor, first of all, the

18   Danbury defendants have absolutely no authority to arrest

19   anyone for removal.  So to the extent that they did that,

20   they were already acting beyond their powers.

21             But also, we don't believe -- we're not at all

22   challenging any sort of prosecutorial discretion once

23   people were in custody, once people were -- once there was

24   probable cause to issue NTAs, we're not at all contesting

25   the issuance of those NTAs, what we're contesting is

1    basically taking a bunch of people who look like, you

2    know, and saying, you're under an arrest, handcuffing

3    them, then asking them questions about their alienage and

4    then placing them in removal proceedings.

5            So the actions that -- the actions that are at

6    issue before this Court are not at all the issuance of the

7    notice of removal, and I don't think we can safely

8    characterize them as being actions to remove plaintiffs.

9    They were actions that resulted later in the issuance of

10   an NTA.  But they were not actions undertaken pursuant to

11   an NTA.

12           THE COURT:  Do you see the same line of

13   demarcation that Mr. Morabito talked about?

14           MR. LADIN:  As to the NTA being the moment at

15   which -- we absolutely agree that the NTA is the moment at

16   which proceedings commenced.  But I would say that that's

17   not the moment when any sort of constitutional liability

18   ceases because even once NTAs have been issued as long as

19   detention is not mandatory then decisions to detain are

20   discretionary and the conditions of confinement can be

21   challenged.

22           So again, I don't think that that ends the

23   constitutional violations, but I think that is a very

24   useful point to look at when proceedings were commenced.

25           THE COURT:  Reference has been made to bond.

1    It's your position that you can maintain a Bivens claim

2    based on the denial of bond?

3            MR. LADIN:  Your Honor, to the extent that the

4    denial of bond was arbitrary or was undertaken in a

5    retaliatory fashion or was undertaken in ways that did not

6    due process, yes.  And certain -- at this point we can

7    only speak on the proceedings, but we do believe we have a

8    viable claim there.

9            THE COURT:  Does an immunity particularly attach

10   to a bond decision?

11           MR. LADIN:  An immunity to --

12           THE COURT:  Issue or deny bond.  Raise it or

13   lower it?

14           MR. LADIN:  The IJ's decision to issue bond is

15   not reviewable as far as I understand it.  But the federal

16   agents, when they act to deny bond, I believe that that

17   actually is not immune.  And I don't think that the

18   government has raised any kind of immunity defense

19   specific to that provision.

20           THE COURT:  What is the claim based on the

21   denial of bond?  It was arbitrary for them to deny bond?

22           MR. LADIN:  Arbitrary -- yes.  Arbitrary -- I

23   think the essence is arbitrariness.  Basically it's a

24   Fifth Amendment violation.

25           THE COURT:  You claim they had a right to be

1    released on bond?

2         MR. LADIN:  We claim that there are certain

3    factors that ICE considers when deciding to deny bond,

4    including flight risk, ties to the community, things like

5    that, that these factors were set aside, instead bond was

6    arbitrarily denied in violation of standard practices.

7         But again, Your Honor, I'd really rather keep it

8    to the government's motion as to dismissing all the Bivens

9    claims, which appears to be what they're arguing but, you

10   know, I'm more than happy -- if that's the only claim that

11   is contested.

12        One thing I'd like to also speak about, if I

13   may, is reasons not to hold this in abeyance pending the

14   outcome of the removal proceedings.

15        For one thing I'd like to emphasize that in

16   criminal context, as against the immigration court

17   context, there is compulsory process, so there it might

18   make sense to stay discovery because discovery will come

19   out during the criminal process anyway.  Defendants will

20   not be prejudiced if they're forced to hold their 1983

21   actions in abeyance under Heck v. Humphrey or state law.

22        However, in our proceedings we tried with the

23   immigration court to subpoena both Danbury defendants and

24   ICE defendants in order to introduce evidence about the

25   constitutional violations that we argue should have led to

1  suppression of evidence and those proceedings.  All of

2  those were denied.  We had no evidentiary hearing.

3         This is very significant because in the context

4  of this suit already, in undertaking just one deposition

5  of an ICE agent, the ICE agent already contradicted the

6  immigration judge's opinion.  So all of these things would

7  be totally lost if we were to hold this for five to eight

8  years while the case worked its way up through the BIA and

9  Second Circuit and was possibly remanded down here for

10  hearings again.  During that time, witnesses disappear,

11  memories fade, documents are lost.  It would be a very

12  difficult task to prosecute this case five to eight years

13  from now.

14         Beyond that we've just learned that the federal

15  defendants aren't even seeking to dismiss the claims

16  against the United States, which means that those claims

17  are certainly ripe, as are a number of the Danbury claims

18  that are uncontested.

19         To force that whole part of the case to wait for

20  five to eight years we think would really burden both this

21  court and our clients.

22         THE COURT:  So in the removal proceeding in

23  connection with the motion to suppress, you are not

24  entitled to an evidentiary hearing?

25         MR. LADIN:  No, Your Honor.  There are no

1    entitlements at that stage at all.  It's not -- it's a

2    completely different context.

3              And Heck v. Humphrey, I should note, has never

4    been extended to the civil immigration context.  It's

5    never been done.

6              MR. WISHNIE:  Your Honor, I apologize for

7    interjecting, but to state in immigration court there's no

8    discovery, witnesses can be compelled only if the Court

9    approves the subpoena.

10             In these cases we applied to the immigration

11   judge to subpoena the testimony of ICE agents and Danbury

12   officers.  ICE objected to that application and the

13   immigration judge refused to issue the subpoenas, refused

14   even to hold the hearings so we could introduce other

15   evidence, and we had no right to insist on that.

16             It may well be the Second Circuit sees it

17   differently and in a few years sends it back and says

18   let's have the evidentiary hearing that we have been

19   seeking all along, but on the point of law, there is no

20   discovery, there's no ability to compel testimony or

21   documents to be produced.  It's quite different from a

22   criminal case.

23             Excuse me for interrupting.

24             THE COURT:  Thank you.

25             MR. LADIN:  Beyond that, the remedies that would

1    be offered in that context would really mean that any

2    compensation our clients could receive and any

3    individualized deterrence that the ICE agents would

4    receive to not undertake these sort of constitutional

5    violations, the very deterrence event that you would

6    contemplate would be so far removed from the events in

7    question as to render in many ways ineffective.  We think

8    that is also a reason not to stay these proceedings.

9           I'd also like to point out that in the -- that

10   just -- I mean, I'm not sure where we are as to whether

11   Bivens should be available in this context, but again I'd

12   like to emphasize that there's a number of cases in our

13   brief or that I'm happy to talk about which show clearly

14   that immigration is not an area of law in which Bivens is

15   unavailable.

16          In Judge Hall's recent El Badrawi opinion, she

17   did not find Bivens relief for Mr. El Badrawi, but she

18   specifically wrote that the Court is not concluding that

19   the immigration context alone constitutes a sufficient

20   reason for the Court to stay its hand, noting again the

21   combination of immigration context and the national

22   security concerns that are wholly absent from this case.

23          There's various other authority as to Bivens

24   having been used against border patrol agents, against ICE

25   agents, during raids and against prison guards for

1    immigrants being held in INS detention.

2            Although defendants did make arguments about

3    congress's plenary power in the immigration field, the

4    plenary power is not what has caused courts to stay their

5    Bivens hand in the past given that plenary power is

6    present in the aviation context and Indian affairs,

7    patents, and Bivens remedies have been found in all these

8    contexts.

9            The case defendants cite for the plenary

10   proposition is Chappel, but Chappel is based solely on the

11   fact that congress has already barred FTCA suits by

12   service members against the military under the Ferris

13   doctrine and the Chappel is merely an application to that,

14   saying the service members, because of the unique demands

15   of military discipline, should not be able to bring Bivens

16   suits against the members of the arms services.

17           And in fact in cases like Saucier v. Katz, suits

18   by civilians against for instance military police who

19   arrested them with excessive force, have been allowed to

20   proceed.

21           This case, I'd just like to emphasize, is a

22   classic example of why Bivens remedies are necessary for

23   individual defendants who arrest people falsely and beyond

24   their constitutional purview.

25           THE COURT:  I'd like to have your thoughts on

1      the Arar panel opinion.

2              If we assume that as we speak that opinion

3      represents the law of the circuit, the circuit having

4      taken no steps to vacate it, although it clearly could do

5      so and presumably would do so if it were so inclined, how

6      do you deal with Arar?

7              MR. LADIN:  In a number of ways, Your Honor.

8      First of all, Arar does not make claims as to a false

9      arrest.

10             One of the problems the Court found with Arar's

11     claims was that the panel did not approve of the Bivens

12     argument being made as to the Fifth Amendment claims in

13     that case.  Arar did not make a Fourth Amendment claim.

14             Beyond that, the Court was very cautious to

15     tread into the national security and foreign affairs

16     territory that were implicated in the Arar case that are

17     utterly absent in this case.

18             That case concerned constitutional violations

19     that happened pursuant to an order of removal, pursuant to

20     Mr. Arar's removal to Syria.  In this case, our clients

21     are not removed and are not contesting an order of removal

22     should they be removed.  What they're contesting is the

23     arrest and their imprisonment.

24             THE COURT:  The way Judge Sack characterized the

25     claim, he said Arar was not challenging a removal order,

1    he was challenging the constitutionality of his treatment

2    by the defendant officials while he was in detention in

3    the United States.

4              MR. LADIN:  This is true.  Though Judge Sack's

5    opinion of course is not the controlling one in this case.

6              But even so, he doesn't -- as far as I

7    understand it, and please correct me if I'm wrong, but I

8    don't believe that Arar asserted arguments against his

9    arrest itself, right?  It was his treatment under custody

10   and then his rendition?

11             THE COURT:  Yes, that's true.  I understand why

12   you would want me to view it that way.

13             MR. LADIN:  The only reason I say that is

14   because Judge Sack found those claims actionable but the

15   rest of the panel didn't, but those claims are distinct

16   from our claims.  So the fact that Judge Sack found those

17   claims actionable is I think laudable but is not the law

18   of the circuit.

19             What the panel was objecting to, to the extent

20   that this objection even will still stand after they sua

21   sponte reheard it, is the extension of Bivens to this

22   rendition context which is -- I mean, just doesn't seem

23   immediately applicable to the, for instance, the false

24   arrest or the seizure claims.

25             THE COURT:  Okay.  Let's see if we can't take

1  this step by step.

2          Judge Cabranes said that Arar was inviting the

3  Court to extend the Bivens remedy into a new context.

4          Do you think he meant the context of actions

5  taken and proceedings commenced to remove people from the

6  United States or do you think he meant rendition?

7          MR. LADIN:  I think he largely meant rendition.

8  But even were he to be talking about actions taken to

9  remove people from the United States, again --

10          THE COURT:  Because after all, look at the

11  holding which you cited earlier.  As a district judge, you

12  are bound to pay attention to what they describe as

13  holdings.  It's part of the job description.

14          MR. LADIN:  I apologize, Judge.

15          I believe that actions taken to undertake

16  removal has to do with everything, including the final

17  order, the notice to appear and execution of the final

18  order.  I don't believe that it has to do with the arrest,

19  which is not an issue in Arar, the seizure, which is not

20  an issue in Arar.

21          There are conditions claims in Arar, but I think

22  the context that the judge is referring to in that case is

23  basically the rendition and removal process, again which

24  our claims precede that.

25          And as Judge Hall noted again in her El Badrawi

1    opinion, the Court has jurisdiction over El Badrawi's FTCA

2    statement for his arrest and initial detention.  Looking

3    at 1252(b)(9), which I think is what the part of the Arar

4    decision that you're pointing to, again, the extension of

5    Bivens to arrest and detention claims is not a new

6    extension of Bivens, and that's why I don't think that

7    that's what Judge Cabranes is speaking to.

8                    THE COURT:  Thank you.

9                    MR. MORABITO:  Briefly, Your Honor?

10                    THE COURT:  Sure.

11                    MR. MORABITO:  While again I don't think

12    we've -- the government has ever argued that false arrest

13    or Fourth Amendment claims or Fifth Amendment claims are

14    not potentially actionable under Bivens, what we argued

15    was that because of the comprehensive remedial scheme in

16    the INA, no Bivens action should lie.  So I don't think

17    our position could necessarily be characterized as radical

18    to the extent that we're claiming that no one could ever

19    bring a Fourth or Fifth Amendment claim.

20                    And clearly Your Honor has presided over many

21    Bivens actions and I'm sure many which have been Fourth,

22    Fifth and Eighth Amendment claims.

23                    I'd also like to just clarify a couple of things

24    as to the removal proceeding said by Mr. Wishnie.

25                    The way the process is set up in immigration

1    Court, Your Honor, is that if an alien claims that their

2    Fourth Amendment right has been violated, they're required

3    to make a prima facie showing of an egregious violation.

4    The way they can do that or the way they attempted to do

5    that in this case, my understanding is, that they

6    submitted affidavits which in -- and again, these are

7    things beyond the record so I don't want to speak too much

8    about them -- but which the immigration judge obviously

9    found did not make out a prima facie violation of the

10   Fourth Amendment.

11          ICE is not required to put on agent testimony in

12   affidavits or anything of that sort, and that's the way

13   the process is set up in immigration.

14          So I don't want the Court to think that it's

15   unusual that these particular ICE agents or ICE personnel

16   didn't want to get in before the immigration court and put

17   their version of events forward to the judge.  They're not

18   required to do so.  It's the plaintiffs' burden to show a

19   prima facie showing of an egregious violation.  They

20   didn't do that.  The Court in a written ruling found that

21   they didn't.  Obviously, as Mr. Wishnie points out, Second

22   Circuit may take a different view, they may not.  But just

23   so it's clear.

24          Also sort of the claim by Mr. Ladin that they

25   did take a deposition of a particular ICE agent as

1    discovery in this case, and he was quick to point out that

2    they've already uncovered statements from him under oath

3    that contradict things that apparently were claimed in the

4    removal proceeding.  The same could be said for things he

5    said which clearly contradict statements made in

6    affidavits by the plaintiffs in this action that were

7    submitted in removal court.

8         I think it sort of underscores the problem that

9    I raised when I first spoke, that you're going to have two

10   fact finders essentially deciding the same thing and it

11   creates, I think, some problems.  And I think this is

12   partly why the Court channels -- or excuse me -- congress,

13   under the INA, channels all these claims to the Court of

14   Appeals ultimately.

15        This is not a claim like St. Cyr where we --

16   where the interpretation or the statute said no habeas

17   jurisdiction.  No one's saying there's no forum for these

18   individuals, these plaintiffs, to raise their claims.  The

19   forum, however, is not in district court, not under

20   Bivens.

21        THE COURT:  With regard to congressional intent,

22   has anybody asked congress to provide a remedy for people

23   like the plaintiffs who claim their constitutional rights

24   have been violated in connection with removal proceedings

25   whereby they could recover money damages?

1            MR. MORABITO:  Your Honor, I'm unaware if that

2      has happened.  I can tell you I did look at the

3      legislative history which was fairly large, as the Court

4      I'm sure knows, and I didn't see anything in there to that

5      effect.  I'm sure -- I'm assuming the plaintiffs probably

6      did the same.  And I'm sure if they had found it, they

7      would have pointed that out to the Court one way or the

8      other.

9            I think it's fairly silent on that issue, Your

10     Honor.  I think again you have to, under the test outline

11     by the Supreme Court in determining whether a Bivens

12     action should lie or not, I think you have to look at

13     again the comprehensive remedial nature of the INA in our

14     view.

15           Again I understand the plaintiffs disagree and I

16     understand there's case law that cuts against us.  I fully

17     recognize that.  And just because -- so that's one aspect

18     of our Bivens argument.

19           There's clear provisions in place to challenge

20     bonds.  And again, we take a very different view of

21     whether or not there's a due process claim, an actionable

22     due process claim, for an initial denial of custody when

23     an immigration judge is going to review that decision in

24     the very near future.

25           Again, there may be factual disputes regarding

1    access to the immigration judge or positions taken, but as

2    I understand plaintiffs' claims, they're not only the

3    initial determination, they want -- they're seeking to

4    raise a claim that ICE trial lawyers took such an

5    unreasonable position that it's an abuse of process.  And

6    maybe I'm misinterpreting it, but that's my understanding

7    of the claim and that to me is a more radical approach

8    than us arguing no Bivens action.

9              THE COURT:  In this case on these motions I

10   don't believe that I've been asked to parse it out like

11   that.

12             MR. MORABITO:  I don't believe you have, Your

13   Honor.  I think that's a fair reading.

14             I just also want to say, Your Honor, obviously

15   we filed a motion to dismiss.  Assuming the Court were to

16   deny our motion or deny part and grant part, there are

17   claims left the government's going to have to answer.  At

18   that point when the government answers, we likely will

19   raise many defenses, some of which will be of the nature

20   of qualified immunity, depending on how the Court rules.

21   And we certainly, depending on how the facts shake out,

22   assuming the Court didn't grant our motion, are going to

23   raise and explore qualified immunity.  We didn't raise it

24   on a motion to dismiss because in our view it would have

25   been a waste of the Court's time.

1          I think the law is very clear that it's a

2     very -- we would have put in affidavits that said we

3     didn't do this.  They would have put in affidavits that

4     said we did do it.  And the Court would have said, okay,

5     great, let's deny this and move on.  So we weren't going

6     to waste the Court's time.

7          I think that, you know -- so we certainly are

8     going to raise a multitude of defenses if in the event the

9     Court denies this motion.

10         So, I don't know, it just -- it's troubling to

11    me, Your Honor, that as -- that again claims are made in

12    open court that in our view appear to be fact-based claims

13    from counsel that ICE targeted people based on how they

14    look.  And it could just be they argue what their clients

15    said, which is fine.  But it often appears to us that

16    those claims are coming from the lawyers as opposed to the

17    plaintiffs, which obviously the lawyers or the law

18    students are not witnesses.

19         But I would note, Your Honor, that to the extent

20    the Court has gone through the amended complaint, and I'm

21    sure it has and I'm sure your law clerks have, there's a

22    particular allegation in the complaint that says counsel

23    was advised by an ICE official that their client would not

24    be moved, would not be transferred from Massachusetts to

25    Texas.  You know, quite frankly, Your Honor, in our view,

1    whoever that counsel is is a witness, because we'll likely

2    have evidence that contradicts that.

3              So clearly, you know, these are -- I just raise

4    this, Your Honor, because it's somewhat troubling to us

5    that oftentimes claims are made, factual claims, that

6    appear to be factual claims on the part of the counsel or

7    law students.  And I don't -- I don't mean it in a way

8    that's intentional, I just say it as a sort of, from our

9    position, it sometimes causes us a little bit of pause.

10             THE COURT:  All right, thank you.

11             MR. WISHNIE:  Your Honor, if I may, to clarify

12   one thing Mr. Morabito said earlier when he interjected

13   that the government now takes the position the INA does

14   not preclude the FTCA claims.

15             So do I understand the only basis in this motion

16   to dismiss any of the FTCA claims is the independent

17   contractor exception.  But there are other FTCA claims,

18   false arrest, abuse of process.  So is it my understanding

19   the government no longer -- no longer on this motion seeks

20   dismissal of the remaining FTCA claims?  Those will go

21   forward even if this motion were granted in toto?

22             MR. MORABITO:  I think that's a fair reading,

23   Your Honor, to the extent that our focus on this motion is

24   that individual defendants are out under the INA and

25   Bivens.  I think Mr. Wishnie is right.

1          Our only claim as to the FTCA on this particular

2     motion to dismiss is the independent contractor exemption.

3          MR. WISHNIE:  Regardless of what the Court does

4     on this motion, the FTCA claims about false arrest, false

5     imprisonment, abuse of process and intentional infliction

6     of emotional distress will go forward regardless of the

7     disposition of this motion.

8          MR. MORABITO:  To the extent Your Honor

9     doesn't -- hasn't indicated he's thinking about staying

10    the entire case, I think that that's accurate.

11         MR. WISHNIE:  Thank you.

12         THE COURT:  Thank you.  We'll be in recess for

13    20 minutes.

14          (Whereupon, a break was held.)

15         THE COURT:  All set to proceed?

16         MS. THOMAS:  Hello, Your Honor, again my name is

17    Clarisse Thomas for the individual Danbury defendants in

18    this case.

19         We have filed a motion to dismiss five of the

20    plaintiffs' claims of relief.  Claims 3, 4, 5, 16 and 19.

21    I'd like to address claim relief Number 16 first.  That's

22    their Bivens claim.

23          Basically in accordance with Bivens, the United

24    States Supreme Court concluded that an federal damages

25    remedy should be available for -- or at least against

1    federal officials for unconstitutional conduct or conduct

2    allegedly unconstitutional, and subsequent Supreme Court

3    decisions have concluded that the Bivens remedy is not

4    applicable against state officials.

5         Specifically in the briefs I refer to Carlson v.

6    Green where the Court notes that a Bivens remedy is simply

7    a federal anlage to the 42 USC Section 1983 claim that's

8    available against state officials.

9         And in a more recent case, Hartman v. Moore, the

10   Supreme Court makes the same kind of analysis.

11        So in this case in the plaintiffs' amended

12   complaint, they have brought a 1983 claim against the

13   individual Danbury defendants who are basically Mayor

14   Boughton, the chief of police of Danbury and several

15   Danbury police officers, but they've also brought a Bivens

16   action, and so our position is that that particular claim

17   would be improper in light of the case law on that issue.

18             THE COURT:  Okay.

19             MS. THOMAS:  That's all I have with respect to

20   Bivens.

21             THE COURT:  That's fine.

22             MS. THOMAS:  Concerning the state constitutional

23   claims.

24        To date the Connecticut Supreme Court has not

25   recognized causes of action for violations of Sections 4,

1    14, 8 and 20 of Article I of the Connecticut constitution.

2    To date, only sections 7 and 9 of Article I concerning

3    those sections the Supreme Court has concluded that

4    private causes of action exist.

5           In the case of Binette or Binette v. Sabo, the

6    Court when it recognized causes of action for 7 and 9, 7

7    and 9 actually comport with the Fourth Amendment

8    provisions of our federal constitution, but that basically

9    made three points.

10          The Court recognized that those causes of

11   action, the first being that any future claims concerning

12   unconstitutional violations and whether or not a private

13   cause of action exists for those constitutional violations

14   must be made on a case-by-case basis.

15          Another point that Binette stressed was that not

16   every state constitutional violation can stand for or can

17   be the basis for a private cause of action.

18          And finally, the Binette court noted that with

19   respect to sections 7 and 9 the state constitution affords

20   greater protections than their federal counterparts.

21          So as for -- I'd like to start with Sections 8

22   and 20, to date no Supreme Court has concluded that

23   Sections 8 and 20 afford greater protections for those

24   provisions.  In fact, there are several cases, several

25   appellate court decisions, which I discussed in my brief

1    where the courts have indicated that the Section 8, which

2    is basically the due process component of the state

3    constitution, which is similar to due process clause under

4    the Fourteenth Amendment, and Section 20, which is the

5    equal protection provision, which is similar to the equal

6    protection clause under the Fourteenth Amendment of the

7    federal constitution, courts have concluded that they are

8    similar.  The federal and state due process and equal

9    protection clause are similar in meaning, similar in

10   limitation and also similar in terms of the amount of

11   protection that they afford.

12           So in conjunction with that, the Supreme Court

13   has also not recognized a private cause of action for

14   violations of Sections 8 and 20.  And following that

15   course, the district court has also concluded that no

16   private cause of action exists for Sections 8 and 20.

17           Specifically in some of the decisions by Judge

18   Hall, Housatonic case, as well as the Spector v. Board of

19   Trustees case, Judge Hall actually dismissed state

20   constitutional claims that were made on that basis in

21   light of the Supreme Court precedent as it currently

22   stands.

23           With respect to Sections 4 and 14, although the

24   plaintiffs point out that the Supreme Court has at least

25   stated that Sections 4 and 14, which are basically the

1    free speech provisions, they do afford greater

2    protections, however, to date the Supreme Court has not

3    recognized any cause of action for a violation of Sections

4    4 and 14.  Additionally, the district court has also

5    decided that issue as well.

6            I found a case that came out in 2009.  It's

7    actually the -- it's the Doninger v. Niehoff case.  And

8    that was issued by Judge Kravitz in January of this year.

9    I made copies for you and for counsel.

10           THE COURT:  Thank you.

11           MS. THOMAS:  Basically page 11 of this decision,

12   Judge Kravitz specifically notes that the Supreme Court

13   has not created a new cause of action.  It says, "If the

14   Court were to decide this claim, it would have to decide

15   not only to create a new cause of action that Connecticut

16   courts have not recognized, but also whether to grant

17   greater protections for students' speech under the

18   Connecticut constitution.  This is categorically not the

19   role of the federal court.  Hence, the Court declines to

20   exercise supplemental jurisdiction over the plaintiffs'

21   claims."  And in that case she brought state

22   constitutional claims under Sections 4, 5 and 14 of the

23   state constitution.

24           So the district court's position on this issue

25   is that it's already addressed it and in several cases it

 1   has declined to exercise supplemental jurisdiction and has

 2   dismissed claims made on that basis in light of the fact

 3   there's no case law out there in the Supreme Court to

 4   date.

 5              THE COURT:  What do you understand the claim to

 6   be under these provisions of the Connecticut constitution

 7   relating to free speech?

 8              MS. THOMAS:  I'm not really sure what speech the

 9   plaintiffs' claim is protected.

10              Based on the allegations of the amended

11   complaint, they were saying that they were in Kennedy

12   Park, I guess they were day laborers looking for work.

13   I'm not really sure what speech is protected.

14              Let me just review the Section 4 specifically of

15   the constitution.

16              It says that every citizen may freely speak,

17   write and publish sentiments on all subjects.  And

18   Section 14, the citizens have a right in peaceable manner

19   to assemble for their common good and to apply to those

20   invested with the powers of government for redressive

21   grievances or other proper purposes.

22              So I mean, that's -- so they're somehow claiming

23   that some kind of speech was protected, but I'm still not

24   sure exactly what they're pointing to.  It's not clear

25   from their amended complaint.

1          THE COURT:  Just so you know, Ms. Thomas,

2    Darlene would interrupt me too, but I've learned to speak

3    slowly.  It's taken me awhile but --

4          MS. THOMAS:  I'll try to work on that.

5          So our other argument with respect to the

6    plaintiffs' claims under Sections 4 and 14 are that those

7    particular provisions expressly provide for the rights

8    that are available to citizens.  And our argument is that

9    the plaintiffs cannot survive -- their complaint cannot

10   survive our motion to dismiss because their complaint is

11   legally insufficient as pled.

12         They make no allegations with respect to their

13   citizenship status.  And as such, you know, they're not

14   really letting us know whether or not they are entitled to

15   relief.  They're not really letting us know if those

16   sections are actually applicable to them.

17         I also, in our briefs, I refer to the State v

18   Sinchuk case, which was an older decision, 1921.  And in

19   that particular case, before the Court was an act

20   concerning sedition, and the defendants in that particular

21   case were arguing that that particular act was

22   unconstitutional as it violated what are now Sections 2,

23   5, 4 and 14.  And the Court addressing all of those

24   sections concluded that those sections were inapplicable

25   to the defendants as the defendants were aliens.

1          And in a more recent decision, Benjamin v.

2    Bailey, the Court cites to Sinchuk but just for the

3    proposition that Sinchuk concluded that Sections 4 and 14

4    are not applicable to aliens.

5          So as it stands, Sinchuk is still good law.  I

6    understand that the plaintiff disagree in their briefs.

7    The plaintiffs disagree with the holding, but the fact

8    still remains Sinchuk is still law and it remains that

9    plaintiffs have not alleged anything with respect to their

10    citizenship status.

11          So it's also unclear what questions they hope to

12    get certified to the Supreme Court.  Because if you

13    can't -- because in order to properly frame questions for

14    certification, you have to establish that your questions

15    are justiciable.  And one of the requirements is that

16    you're showing the Court that you are entitled to

17    practical relief if you were to get an answer to the

18    question.  But in the plaintiffs' briefs, they have

19    clearly indicated that they will either affirm or deny --

20    they will neither affirm nor deny their citizenship

21    status, and as such the Court has no way of knowing

22    whether any practical relief can be afforded to them if

23    those questions were to be decided.

24          THE COURT:  As I understand the plaintiffs'

25    position on that point, they would rely on the Connecticut

1   Supreme Court to tell them what the language means and

2   thus find out whether they qualify as citizens of

3   Connecticut, and then we would know.

4           MS. THOMAS:  Okay, but the only problem that I

5   see with that is that it's like they're forcing the Court

6   to issue an advisory opinion so that they can then decide

7   how they want to go.

8           The problem is that, you know, that might be

9   what they want to do but that's not how you create a

10  justiciable question.  You have to show -- you have to

11  establish to the Court that you would be entitled to some

12  form of practical relief.

13          You can't use your citizenship status as a sword

14  and a shield.  You can't say in your amended complaint

15  that you're not going to say anything about your

16  citizenship status but then turn around and say that

17  you're entitled to relief under certain sections which

18  expressly provide for reciprocity given to citizens.  You

19  can't have it both ways.

20          THE COURT:  As a practical matter, if we were to

21  go that route, if we were to certify some question under

22  these provisions, I think at this stage of the game it

23  would be clear that the plaintiffs are not citizens of the

24  United States and that they would like to be protected by

25  the Connecticut constitution on the theory that they are

1    citizens of Connecticut.  This would seem to me to be

2    implicit in the claim.

3            MS. THOMAS:  The only thing about it is they

4    haven't even alleged that -- at a minimum, they haven't

5    even alleged that in their amended complaint.  And I just

6    wanted to bring something up in the plaintiffs' reply

7    brief, because they indicate that the defendant somehow

8    conceded something.  Let me just -- I just wanted to read

9    something from their reply brief.

10           THE COURT:  Take your time.

11           MS. THOMAS:  "The plaintiffs argue that the

12   defendants have accepted that Section 4 and Section 14 can

13   protect a Connecticut citizen who is not a United States

14   citizen."  That's on page 6 of their reply brief, and I

15   just wanted to clarify for the Court that the defendants

16   have made no such statements or claims in their papers.

17   And the defendants argument has consistently been the

18   plaintiff has not alleged facts sufficient to survive a

19   motion to dismiss.

20           The reason for this argument, again, is that the

21   plaintiffs don't allege anything about their citizenship

22   status.  And that was the only point the defendants have

23   tried to have emphasized in their briefs.  It wasn't that

24   it could be citizens of Connecticut or not.  That's not

25   even our point.  We don't even get there because they

1     haven't alleged anything at all.  And that was the only

2     point that was being made in the briefs.

3                THE COURT:  Okay.

4                MS. THOMAS:  Your Honor, I can't recall if you

5     asked me a question about something and I got distracted

6     about --

7                THE COURT:  Just a general question:  Do you see

8     a downside to my certifying one or more questions to the

9     Supreme Court?

10                MS. THOMAS:  Several.

11                The first being that it will be a tremendous

12     amount of time, be very time consuming.  It will severely

13     delay this case.  Because if certification were to be

14     granted, we would then have to wait for the Connecticut

15     Supreme Court to decide those questions before we could

16     file an answer.

17                And here in this particular case, we have

18     several defendants where the plaintiffs have made claims

19     against the mayor and everyone else saying that they were

20     racially profiling and that they were involving literally

21     this immigration campaign against them, and I just don't

22     think it's fair to these defendants to have them sit and

23     wait around several years for a decision to be decided

24     when the fact still remains that the district court has

25     already addressed these kinds of issues and has concluded

1    that it should not exercise its jurisdiction.  And even in

2    Doninger, the Court concluded that certification was not

3    necessary.

4              If you look at Footnote 5 in the Doninger case,

5    the Court notes, Ms. Doninger suggests that this Court

6    should certify the question to the Connecticut Supreme

7    Court.  However, as her counsel acknowledged at oral

8    argument, certification would require that the parties

9    agree on the facts.  Although the Court has granted

10   summary judgment on Ms. Doninger's blog entry First

11   Amendment claim, there are still numerous factual disputes

12   that would make certification impossible.  Therefore the

13   court declines to certify the question to the Connecticut

14   Supreme Court.

15             In light of the fact that the plaintiffs have

16   filed a 325 paragraph complaint, it is very clear that the

17   parties will not agree on a lot of facts and most of those

18   facts would be relevant for formulating the proper

19   questions for certification of the issue to the

20   Connecticut Supreme Court.

21             So that's basically my position, Your Honor.

22             THE COURT:  Thank you very much.

23             MR. HOLTZBLATT:  Your Honor, may it please the

24   Court, my name is Ari Holtzblatt.  I will be addressing

25   the Danbury defendants' motion to dismiss and the

1    plaintiffs' cross motion to certify questions of law to

2    the Connecticut Supreme Court.

3          I would first like to address, as the defendants

4    did, the 16th claim for relief and conspiracy claim and I

5    would like to point the Court -- and I would like to first

6    apologize for not having pointed the Court to this

7    sooner -- but point the Court to I believe important

8    authority in the Second Circuit, which is Kletschka v.

9    Driver.  The cite is 411 F.2d 436.  It's a 1969 case.

10         And to quote from that case, the Court held in

11   that case, "We can see no reason why a joint conspiracy

12   between federal and state officials should not carry the

13   same consequences under a Section 1983 action as does

14   joint action by state officials and private persons.  It

15   was the evident purpose of Section 1983 to provide a

16   remedy when federal rights have been violated through the

17   use or misuse of a power derived from a state."

18         In that case the Court was speaking to a joint

19   conspiracy where the federal defendants were being taken

20   into the case under Section 1983.  As counsel for Danbury

21   indicated, since Bivens in 1983, actions are considered

22   analogous.  We see no reason why that authority is not

23   good for the same proposition that a conspiracy claim

24   could be brought against the state defendants under Bivens

25   when the allegation is that they coconspired with the

1    federal defendants as they have in this case.

2           THE COURT:  What does this particular claim do

3    for your clients?

4           MR. HOLTZBLATT:  Your Honor, we have pled in

5    this case in the alternative.  There are multiple theories

6    of the case.

7           Under one theory, the state defendants are the

8    driving force behind this action and so liability could

9    hold against them for their violations of our clients'

10   constitutional rights with the federal defendants

11   potentially as coconspirators in that effort.

12   Alternatively, the federal defendants were the driving

13   force in this case and the Danbury and state defendants

14   would be held -- could be held then liable under Bivens as

15   a coconspirator in that effort.

16          So that the point of the claim is in order to

17   establish that no matter who, after discovery and the

18   facts are revealed, is ultimately the driving force behind

19   this effort, that either sets of parties could be held

20   liable as coconspirators in that effort.

21          THE COURT:  Let's say that after discovery here

22   that the federal defendants were in the driver's seat,

23   would there be a problem with holding the state defendants

24   liable under Section 1983 for having conspired with those

25   federal defendants who themselves were liable under

1    Bivens?

2              I realize the symmetry isn't quite as pretty,

3    but I wonder if it matters legally.

4              MR. HOLTZBLATT:  Your Honor, I'm not sure

5    whether it matters.  I think had it been available to the

6    court in Kletschka to hold the federal defendants liable

7    under a Bivens action and the state defendants liable

8    under a 1983 action, that would have been available there,

9    I think because in Kletschka, that was not what the court

10   found.  The Court found that 1983 would be the box that

11   you would stick the coconspiracy in.  I think similarly

12   you would stick the box of coconspiracy under Bivens.

13             THE COURT:  It seems to me in the scenario just

14   described, the federal defendants would be liable under

15   Bivens and the state defendants under Section 1983, a

16   cause of action expressly granted by congress for state

17   officials who violate federal rights.

18             MR. HOLTZBLATT:  I think the plaintiffs would

19   have no problem holding both responsible so long as we

20   were able to if they were coconspirators in this action.

21             THE COURT:  Fair enough.

22             MR. HOLTZBLATT:  I'd like now to turn to the

23   state constitutional claims.

24             THE COURT:  Okay.

25             MR. HOLTZBLATT:  The Danbury defendants' motion

1    to dismiss raises important unresolved questions of state

2    law.

3           In the case of the free speech and freedom of

4    assembly clauses, the defendants would have this Court

5    exclude 240,000 Connecticut residents from the unique

6    protections of the free speech and freedom of assembly

7    provisions.  They would do that relying solely on what we

8    believe is ambiguous constitutional text and a single

9    highly problematic case that was decided nearly 90 years

10   ago and that is clearly distinguishable from the facts in

11   this case.  Only the Connecticut supreme court can decide

12   whether the Connecticut constitution excludes a quarter

13   million residents in the state of Connecticut.

14           THE COURT:  Let me understand this claim.

15           In what way was the free speech provision

16   violated?  Assuming it applies, how is it violated on the

17   allegations of the complaint?

18           MR. HOLTZBLATT:  Your Honor, the complaint

19   alleges that the plaintiffs assembled in Kennedy Park,

20   engaged there in political and commercial speech, and that

21   the Danbury defendants retaliated against them for the

22   exercise of that speech, and that that speech was

23   protected, and as a result the Danbury defendants should

24   be held responsible for the violation of their protected

25   speech in what is a public forum.

1        THE COURT:  So if we were to certify a question

2   to the Connecticut Supreme Court, we would ask whether

3   those allegations state a claim for relief under these

4   provisions of the Connecticut constitution?

5        MR. HOLTZBLATT:  Your Honor, obviously this

6   Court can certify any question it wants to the Connecticut

7   Supreme Court.  I would point out the Danbury defendants

8   have not alleged that it does not state a claim under

9   either the First Amendment -- certainly they have not

10  alleged it does not state a claim at all under the First

11  Amendment; that that claim continues to be in our amended

12  complaint; and they have not alleged that under the state

13  constitution it does not state a claim.  They've made

14  simply the blanket assertion that no citizen of the United

15  States who lives in Connecticut has protections under that

16  provision.

17        THE COURT:  Would you have any problem with

18  certifying the question whether the allegations state a

19  claim for relief under these provisions of the Connecticut

20  constitution?  As opposed to presenting them with the

21  abstract question without even the slightest skeletal

22  facts.

23        MR. HOLTZBLATT:  Your Honor, since this motion

24  to -- since the question for certification were to arise

25  in a context of a motion to dismiss, obviously the

1    Connecticut supreme, as it did in Binette, which was a --

2    which came to the Connecticut Supreme Court on a question

3    for certification in the context of a motion to dismiss in

4    the District of Connecticut, the Connecticut Supreme Court

5    could take the entire amended complaint as the factual

6    basis for reaching its decision.  And I would have, Your

7    Honor, have the Connecticut Supreme Court take these facts

8    as true for the purposes of -- and the allegations as true

9    for the purposes of resolving the question of whether

10   these provisions apply to plaintiffs in this context.

11            THE COURT:  Okay.

12            MR. HOLTZBLATT:  With respect to the -- with

13   respect to the equal protection and due process claims,

14   defendants would have this Court immunize municipal police

15   from liability for violating individual's equal protection

16   and due process rights under the Connecticut constitution.

17   The Binette court recognized that a police officer not

18   only is required to respect our rights but is sworn to

19   protect and defend those rights.  For that reason,

20   unconstitutional police misconduct causes special harm,

21   special harm that justifies in the absence of a reasonably

22   adequate statutory remedy, judicial recognition of a

23   private right of action under the Connecticut

24   constitution.

25            These factors are present in this case, the

1    special harm of unconstitutional police misconduct and the

2    lack of an -- a reasonably adequate statutory remedy.  For

3    that reason, we believe that this Court should either deny

4    the Danbury defendants' motion to dismiss or certify the

5    question of whether a cause of action lies under the equal

6    protection due process clause of the Connecticut

7    constitution to the Connecticut Supreme Court.

8              I would like to speak in general to the

9    certification question.

10             Defendants have argued that it would cause delay

11   to this case to certify the question to the Connecticut

12   Supreme Court.  I would point out that in Doninger, first

13   of all, there was no issue that -- in this case, unlike

14   Doninger, there is no issue to agree on the facts.

15   Because this arises not at summary judgment but in the

16   context of a motion to dismiss, the facts can be taken as

17   true in the amended complaint.

18             I would also add that we've agreed and the Court

19   has ordered that over a year long discovery process which

20   provides ample opportunity for this case to go forward,

21   for discovery to be conducted, for the First Amendment

22   claims and the equal protection claims and the due process

23   claims, which mirror the state claims, to be -- for

24   discovery to be conducted under those claims as we wait

25   for an answer from the Connecticut Supreme Court.  So I

1    don't believe there would be any delay.

2            In fact, the real delay would incur, if, as the

3    defendants have asked, these claims are dismissed.

4    Because if these claims are dismissed, plaintiffs would be

5    forced -- plaintiffs who are themselves indigent

6    represented by pro bono counsel, would be forced with the

7    decision of whether to abandon state law claims or to

8    pursue redundant and expensive litigation parallel through

9    the state courts in order to resolve those legal questions

10   which could instead be more efficiently resolved directly

11   from certification from this court to the Connecticut

12   Supreme Court.

13           THE COURT:  Speaking practically, what do the

14   state claims do for you that the federal claims do not?

15           MR. HOLTZBLATT:  Your Honor, it is true that the

16   state claims mirror the federal claims and that the -- and

17   that plaintiffs have not presented any legal theory under

18   which the state claims provide any greater protection.

19           I would note that the Binette case itself was

20   certified from the District of Connecticut to the

21   Connecticut Supreme Court in spite of that very same fact,

22   that Chief Judge Dorsey who wrote the opinion to certify

23   noted in his opinion that though Section 7 and 9 grant

24   greater protection in general under the Connecticut

25   constitution, in that very case, they granted no

1    additional protections.

2              And so the circumstances of Binette are similar

3    to the circumstances that are presented here.

4              THE COURT:  So if the plaintiffs view the

5    federal claims as providing no lesser remedy than the

6    state claims, why bother?  Other than the very important

7    point of giving Connecticut Supreme Court more work to do,

8    which I am totally sympathetic with.  But other than that,

9    why would -- why bother?

10             MR. HOLTZBLATT:  First, to directly respond to

11   your concern about giving the Connecticut Supreme Court

12   more work, under the certification statute in Connecticut,

13   the Connecticut Supreme Court, once a question for

14   certification has been directed to it can, before even

15   taking it up, decline to accept jurisdiction.  So I

16   believe the Connecticut Supreme Court has ample tools to

17   defend itself if it believes this is not an important

18   constitutional question in Connecticut.

19             I would add, as the defendants have argued to

20   many district court of Connecticut cases -- District of

21   Connecticut court cases, were this Court to dismiss this

22   claim, this opinion would become like those on fodder for

23   future defendants to argue that no such causes of action

24   where it may be necessary lie.

25             Finally, we have not reached in any way the

1   legal basis for the viability of any of these claims

2   against the Danbury defendants.  They have not moved to

3   dismiss any of them.  So at this time it would be

4   premature for us to evaluate whether a different legal

5   theory may be available under the Connecticut

6   constitutional claims that would not be available under

7   the federal claims.

8            THE COURT:  Isn't there some suggestion that the

9   state equal protection clause may actually provide broader

10  protection than the federal?

11           MR. HOLTZBLATT:  I honestly don't know, Your

12  Honor.

13           Your Honor, I would add that the Connecticut

14  Supreme Court did not -- the factor of whether the

15  Sections 7 and 9 afford a greater protection was presented

16  as one of three reasons to reject 1983 as an adequate

17  statutory remedy for a private cause of action under the

18  Connecticut constitution.  So the Connecticut Supreme

19  Court considered whether it mattered whether 1983 existed.

20  It rejected that consideration.  And in doing so, it

21  considered as only one of those factors the greater

22  protections afforded by 7 and 9 and was not dissuaded by

23  the fact that 7 and 9 afforded no greater protection to

24  those -- to the individuals in that very case.

25           Your Honor, I also should point this Court to

1    two other decisions of Judge Hall.

2            The first in the opinion of Ward v. Housatonic

3    Area Regional Transit, which the defendants cite, Judge

4    Hall acknowledges actually the existence of a private

5    cause of action under Sections 4 and 14 in that opinion.

6    So there is counter -- contradictory authority on that

7    question.  The defendants argue that there has been no

8    recognition, no prior cause of action under Sections 4 and

9    14.  Judge Hall apparently found one.

10           And I would also like to direct the Court to

11    another of Judge Hall's opinions which is unpublished and

12    so unfortunately I did not bring it -- cite it earlier,

13    but I have brought copies of it for the Court, where Judge

14    Hall finds in Doe v. City of Hartford, 2004, U.S. District

15    Court, Lexis 8545.  And in Pacer, it's 3:03CV1454.  And

16    let me make available copies of that case.

17           Your Honor, this case, like our case, involved

18    unconstitutional police misconduct.  In this case, the

19    plaintiff, Jane Doe, called 911.  Two officers responded,

20    one of whom forced Jane Doe to perform oral sex on him.

21    Judge Hall rejected a motion by the other officer that the

22    officer not accused of forcing the sexual act, to dismiss.

23    Judge Hall rejected the motion to dismiss Jane Doe's due

24    process claim under the Connecticut constitution.

25           In this case, like in the current case, where at

1    issue was the special harm of unconstitutional police

2    misconduct, Judge Hall found it appropriate, absent an

3    adequate statutory remedy, to find a private cause of

4    action under the due process clause of the Connecticut

5    constitution.

6         So the distinction that we believe is relevant

7    here under Binette, is the distinction between where at

8    the core of the case is the special harm of

9    unconstitutional police misconduct where there is no

10   adequate statutory remedy.  In those circumstances,

11   whatever the provision of the Connecticut constitution, it

12   is appropriate to find a private right of action as

13   opposed to all of the cases that the defendants have cited

14   where at issue were riding privileges on a bus or

15   employment discrimination, or property disputes between --

16   over eminent domain or over zoning.

17        In this case, like in the Doe v. City of

18   Hartford case where at issue is the special harm,

19   unconstitutional police misconduct, a private right of

20   action is appropriate.

21             THE COURT:  Okay.  Thank you very much.

22             Anything further?

23             MS. THOMAS:  Your Honor, if I may?

24             MR. HOLTZBLATT:  I'm sorry, Your Honor, may I

25   address one final issue?

1          THE COURT:  Okay.

2          MR. HOLTZBLATT:  I'm sorry, your Honor.

3          Your Honor raised during the earlier

4     conversation over the federal defendants' motion to

5     dismiss the question of whether we should stay this case

6     pending the resolution of the immigration proceedings.

7     And as this would affect the plaintiffs' claims against

8     the state defendants, I'd like briefly to speak to that

9     question and the particular concerns that arise in respect

10    to our case against the local defendants.

11         I would first point out that the individual

12    Danbury defendants with respect to the nine individuals at

13    issue on that question would have only moved to dismiss

14    four of the 13 claims against them.  The city of Danbury

15    has not moved to dismiss its claim against it.  And the

16    federal defendants have conceded that they have not moved

17    to dismiss most of the Federal Tort Claims Act claims

18    against them.  So the core of this case, the core of this

19    case is moving forward.

20         I would add that none of these parties, neither

21    the federal defendants nor the state defendants, have

22    asked for a stay and so that question has not been

23    briefed.

24         The concern the plaintiffs have in this case is

25    to preserve the record with the right claims that we have

1    against all parties, but especially with respect to the

2    Danbury defendants; that that ability to preserve the

3    record is present in a criminal context where adequate

4    discovery will occur, where the tools of discovery are

5    substantial.  But they are not, as we've demonstrated

6    substantially in immigration context.  And the extreme

7    delay that would be caused by waiting for the resolution

8    of that case would likely lead to the disappearance of

9    this record.

10          Moreover, in a criminal context, if a defendant

11   is found not guilty, that defendant is able to stay in the

12   area.  If the defendant is found guilty, that defendant is

13   in prison and from prison is able to litigate their case.

14   It is difficult but is not nearly as difficult as the

15   difficulties of litigating a case from another country and

16   without the ability to return to conduct depositions,

17   which would be tremendously expensive, or to consult with

18   their attorneys.

19          I would also add that one of the benefits of

20   discovery is the ability for indigent parties, such as

21   ours, to explore the identities of some of the John Does,

22   many of whom -- we have many John Does in this case --

23   before the statute of limitations has run.

24          If we stay this case and discovery is stayed,

25   then our ability to identify those John Does prior to the

1    running of the statute of limitations would be

2    nonexistent.

3                  The effect of all of these is that the effect of

4    a stay would be to maintain in theory the cause of action

5    that plaintiffs have in this case but not the fact.  And

6    there is no indication that congress, with the INA,

7    intended to eliminate the existence of a cause of action

8    against -- certainly not against any municipal or state

9    employees that engage in unconstitutional activity, but

10   because of the effect of eliminating in fact the cause of

11   action that our clients would have in this case, a stay

12   would amount to a granting of in fact immunity from the

13   litigation of this case.

14                  THE COURT:  So here half a loaf would be no

15   better than none?

16                  MR. HOLTZBLATT:  In effect, Your Honor.

17                  THE COURT:  If the argument that you're making

18   is that damages are an important remedy both for the

19   injured party and for society generally because it serves

20   as a deterrent function, and I'm thinking, okay, then why

21   not wait until the risk of fragmented litigation and the

22   patchwork of differing interpretations is no longer an

23   issue.  You're saying we don't want that half a loaf

24   because that's no better than none for us.

25                  I mean, if you were in congress and you were

1    asked the question, recognize a 1983 type cause of action

2    in this context but the action is stayed pending removal

3    proceeding completing its course through review in the

4    circuit court, or no 1983 type action, you would say if

5    that's all you can do for us, we just as soon not have

6    one?

7             MR. HOLTZBLATT:  Your Honor, I believe what

8    congress actually considered when it passed the 1996

9    amendments to the INA and I know of no indication that

10   congress foresaw the effectual delay and disappearance of

11   the ability to litigate a 1983 action by virtue of passing

12   the 1983 act.

13            THE COURT:  I know that your role today is to

14   argue the claims relating to the Danbury defendants, but

15   are you aware of any indication from congress that

16   supports recognizing a Bivens cause of action here?

17   Anything I could point to to say, see, this is what

18   congress wants too, they just haven't gotten around to

19   doing it?

20            MR. HOLTZBLATT:  I would have to defer to my

21   colleagues who have briefed that issue.

22            MR. WISHNIE:  Your Honor, I would respond only

23   this and in brief.

24            Before 1996, the courts recognized Bivens claims

25   against immigration agents.  I actually have read through

1    the voluminous legislative history of the 1996 amendments,

2    both the April amendments and the September amendments.

3    There is no indication that I have seen nor any cited by

4    any party on the other side that congress intended to oust

5    a cause of action that courts had already recognized.  And

6    we cite some of those cases in our briefing.

7              Certainly there is nothing in the statutory

8    language that is expressed on this point, nor in the

9    history, that indicates in (b)(9) or (g), that congress

10   intended to oust claims that already existed and the

11   courts presumed congress to understand the law to have

12   been.

13             So this leaves aside what we think is the plain

14   language of all those provisions, the titles, that

15   congress was focused on ending bifurcated review of

16   removal proceedings which before '96 did occur sometimes

17   in the district courts and the courts of appeals.  And

18   congress said no, we're going to streamline removal

19   orders.  That was the mischief it sought to remedy.  It

20   knew Bivens claims already existed.  It took no action

21   affirmatively to stop them.  And that may be in part why

22   courts continue to recognize Bivens remedies even after

23   '96.

24             THE COURT:  Thank you.

25             I'd like to follow up on that, and I don't think

1    we need to stand on formality here, but if you'd like to

2    conclude your argument --

3              MR. HOLTZBLATT:  I just would add one last

4    question on this stay.

5              It is clearly true that there is a tremendous

6    prejudice to plaintiffs for delaying this case as opposed

7    to denial.  But I would add that counsel for Danbury has

8    already indicated a concern that defendants have with

9    delaying this case, which is that the specter of these

10   allegations would continue to hang over the Danbury

11   defendants.  That we have allegations against the mayor,

12   the police chief, the actions of the entire Danbury police

13   department.  If this case is delayed, and I'm not going to

14   speak for the Danbury -- counsel for Danbury defendants,

15   but they have spoken that they are concerned about the

16   effect of delay on these issues hanging over their heads.

17             So that's the last on this particular issue.

18             THE COURT:  Thank you.

19             Mr. Wishnie, let me come back to you, if I may.

20   I'd like your help on one troubling aspect of the case.

21             Dealing with the false arrest claim, let's

22   suppose that we were in a position to conduct a full and

23   fair hearing on that claim and I were to find that there

24   was an egregious, outrageous violation of the Fourth

25   Amendment, would that not have some potential impact on

1    the removal proceeding in which the IJ came out the other

2    way?  And if so, how does that square with the need to

3    avoid fragmented litigation so to speak?  Why wouldn't it

4    provide an incentive for everybody in the plaintiffs'

5    predicament to go into the district court and try to

6    litigate, relitigate, this question that is present in the

7    removal proceeding?  And how do you deal with the risk of

8    inconsistent adjudications.

9         Any help you can give me on that would be

10   appreciated.

11        MR. WISHNIE:  I'll try, Your Honor.

12        A couple of points.  To start, I understand the

13   question.  I think it's a legitimate question of course

14   not only because you're the one saying it.  As you said

15   earlier, there's something odd here about parallel

16   proceedings.

17        I think as Mr. Ladin addressed, the criminal

18   context is different because those are very different

19   proceedings.  And so rules of order drawn from that may

20   not be parallel here.

21        I think that most importantly if this Court is

22   trying to balance all of these considerations, the need to

23   preserve evidence and allow plaintiffs a full opportunity

24   to participate in their civil rights suit with these

25   coordinate proceedings, it may be that the Court need to

1    fashion rules appropriate to this case.

2              I would suggest that most of the concerns you've

3    heard here are about record preserving, that is letting

4    discovery go forward.  It may be that that could be

5    accomplished without then reaching adjudications that

6    might be inconsistent.  By which I mean it may be that our

7    clients' interest can be preserved and discovery at least

8    going forward.  And perhaps a stay at that point, if at

9    all, before summary judgment motions that could result in

10   inconsistent adjudication.  So that the record evidence in

11   this case can be preserved, the John Does identified and

12   so forth.

13             That said, your first question was:  Is there a

14   potential here to impact the removal cases?

15             Certainly there is a potential.  I have not

16   worked through and we have not briefed rather there's

17   strict operation of estoppel or something like that, and I

18   don't believe that there necessarily would be.  Just as I

19   don't believe this Court is estopped by anything that

20   happens in the immigration cases.

21             As Ms. Simpson pointed out, the legal standard

22   on the false arrest claim is different in the immigration

23   context.  It must be an egregious violation.  That's not

24   the standard here.  Nevertheless, if there were inquiry

25   into those circumstances and certain underlying factual

1    findings were made by this Court, those might be

2    inconsistent with underlying findings made in immigration

3    court.  And I understand that to be the thrust of your

4    question.

5          We don't believe it's appropriate in a case

6    where no defendant has sought a stay where claims against

7    each and every defendant are not even the subject of

8    motions to dismiss, that is there are claims going forward

9    against each defendant, where congress has approved both

10   the Federal Tort Claims Act and Section 1983 as

11   independent avenues to pursue rights, that a stay would be

12   appropriate at all.

13         So in light of all that, I don't believe a stay

14   is appropriate.  And I might suggest that if the

15   defendants come to feel a stay is appropriate, they might

16   have leave to make that motion at the close of discovery

17   in advance of any adjudications by this Court that could

18   be inconsistent.  And should they make such a motion, we

19   might consent to it.  As Mr. Morabito indicated, we have

20   worked some of these things out before.  And if not, there

21   would be an opportunity for this Court on full briefing to

22   consider that issue.

23         But to stop discovery when no one has asked for

24   it -- in fact, the defendants did ask Judge Martinez did

25   for a stay of discovery.  She denied it.  None of them

1      appealed to this Court.  With discovery underway and the

2      record preserved, my sense is perhaps we can defer the

3      risk of inconsistent adjudication to the moment where that

4      might occur.

5              On the claims against each defendant, there's

6      nothing before the Court.

7              THE COURT:  This particular problem bears on the

8      jurisdictional issue and availability of a Bivens remedy.

9      Do you want to comment on that?

10             Putting aside the commonsense logistical points

11     that you've made, which I think are valuable, do you want

12     to comment on how this impacts on the analysis of a

13     jurisdictional question and the Bivens question?

14             I mean, how separate and distinct are these

15     claims if there is this risk of an inconsistent

16     adjudication?

17             MR. WISHNIE:  I'm not certain I understand what

18     the Court is getting at.

19             THE COURT:  Okay.  Coming back to Arar and the

20     statement of the holding, the court specifically cites the

21     statute.  If I were to decide that in a case like this

22     where the individual is arrested before the person's

23     identity is known to the agents and thus before action had

24     been taken to remove the person or proceeding had been

25     commenced, I would have jurisdiction over the false arrest

1    claim and I would need to decide whether to recognize a

2    Bivens remedy.  And in considering that, I would need to

3    look at Arar and see the discussion about how the INA does

4    provide this alternative remedial scheme, no money

5    damages, but you do get judicial review in the end.  In

6    that context I'm asking myself, well, sure enough, if I

7    exercise jurisdiction over that claim under a Bivens

8    theory and found that there was an outrageous violation of

9    Fourth Amendment, that puts me directly in conflict with

10   the IJ.

11             MR. WISHNIE:  Thank you, Your Honor.  I think I

12   understand more clearly.

13             I think if this Court were to hold the motion to

14   dismiss the Bivens claims in abeyance pending the Second

15   Circuit en banc decision in Arar on the possibility it

16   would give guidance relative to here -- it may not of

17   course.  It could go in a different direction.  But it may

18   give guidance here.  I don't think that -- I think there's

19   some sense in that.  To be honest, we thought the Court

20   might be doing that sub silentio given the briefing was

21   done a year ago, but it occurred to us that this Court may

22   have decided to wait for the Second Circuit's guidance and

23   simply hold the motions.

24             And given that the federal defendants are only

25   moving to dismiss the independent contractor exemption of

1    the FTCA, even if this Court were to hold the federal

2    defendants' motions in abeyance, even if it ultimately

3    granted the motion to dismiss all plaintiffs' claims

4    including the false arrest, we would be doing discovery on

5    false arrests under the FTCA.  We would be doing discovery

6    on the false arrest claims under 1983 against the Danbury

7    defendants, which they have not moved to dismiss.  We

8    would be doing the same discovery memorializing the same

9    witness testimony, securing the same records.

10            So I think if this Court were to hold at least

11   the Bivens or the entirety of the federal defendants'

12   motion, if that were an easier way to organize the docket,

13   in abeyance pending Arar as long as discovery can proceed,

14   we'll cover the same ground.

15            And again, the defendant sought its day of

16   discovery from Judge Martinez.  She denied it.  They did

17   not appeal to this Court.  It's really moving forward on

18   discovery that I think is most critical for the interests

19   of plaintiffs.

20            THE COURT:  Okay.  Thank you very much.  That's

21   helpful.

22            MR. MORABITO:  Your Honor, could I just reply

23   very briefly?  Just a couple of points and more logistical

24   points.

25            Because we -- the U.S. Attorney's Office

1   represents not only the United States but these three ICE

2   agents in their individual capacity, we obviously don't

3   agree or we wouldn't agree to hold any motion to abeyance.

4   Obviously the Court, especially as to the jurisdictional

5   argument:

6           I think clearly you can hold in abeyance on

7   Bivens based on the fact that the Arar court may

8   ultimately decide the question.  It may not.

9           But I think for the ethical obligation that we

10  owe our individual clients, we couldn't agree to hold in

11  abeyance what are valid jurisdictional arguments.

12          That's the only point I wanted to make, Your

13  Honor.  Thank you.

14          THE COURT:  Well, I think I have a decision for

15  you, and please don't infer that this is a reflection on

16  anybody's advocacy.  I think that everybody did a fine job

17  and I appreciate the efforts that you've made, both with

18  your papers and today.

19          But in fact, like you, I've been waiting to find

20  out what the Second Circuit would do with the Arar case,

21  and I don't know what their schedule looks like at the

22  moment, but I think in view of what I've learned from you

23  today, it makes sense for me to go ahead and act on these

24  motions, so let me do that.

25          I have jurisdiction to determine my

1    jurisdiction, of course, and the question whether I lack

2    subject matter jurisdiction because congress has denied

3    jurisdiction to district courts with regard to claims

4    arising from action taken to remove a person is one that I

5    need to address at the earliest opportunity.

6         I think that the question actually depends to a

7    degree on the facts of the case.  It may be that the

8    action of a rogue police officer or ICE agent in

9    confronting somebody and seizing them is not action taken

10   to remove the person within the meaning of the statutes.

11   If and to the extent that happened here, then a claim

12   based on that activity would not be barred.  I would have

13   jurisdiction to entertain that claim.

14        So I'm interested in knowing what the facts

15   actually are in deciding whether a claim based on those

16   facts would be barred.  I don't know right now.  In the

17   absence of an opinion from the en banc court in Arar, I'm

18   not going to dismiss for lack of jurisdiction based on the

19   statutes cited in support of the motion to dismiss.

20        It may well be that after further development of

21   the record and after we hear from the Second Circuit in

22   Arar, the ICE defendants will want to make a dispositive

23   motion renewing their challenge to the Court's

24   jurisdiction, in which case we'll hear it as I will be

25   obliged to do really at the earliest opportunity.

1          As to whether there is a Bivens remedy for such

2    a claim, again, it would be very good to know what the

3    Second Circuit thinks about that.

4          I think plaintiffs are right to draw the

5    distinctions that are readily available in view of the

6    national security foreign policy, concerns that are

7    discussed in detail in Arar and are clearly not an issue

8    here.  But at the same time I think the panel opinion can

9    be fairly read to support the defendants' position.  We'll

10   know more hopefully soon.  In the meantime, I'm not going

11   to rule out the possibility that there is a Bivens remedy

12   for at least that much of the case.

13         With regard to the independent contractor issue,

14   I agree with the plaintiffs that this involves issues of

15   fact.  I don't think the contracts are dispositive on

16   their face.

17         With regard to the motion by the individual

18   Danbury defendants, I agree that the Sixteenth count can

19   be safely dismissed without risking any prejudice to the

20   plaintiffs since Section 1983 is indeed available to

21   provide a basis for holding those defendants libel if

22   indeed it turns out the federal defendants were in the

23   driver's seat.

24         With regard to the other counts addressed in

25   that motion, I want to think about how to proceed.  It may

1    be that certifying one or more questions to the

2    Connecticut Supreme Court would serve everybody's

3    interest.  Were I to do that, I would certify it along the

4    lines we discussed.  That is, I would ask them whether the

5    allegations state a claim for relief.  In that regard I

6    think that the equal protection clause in particular might

7    provide a basis for a certification and perhaps the free

8    speech and free assembly sections as well.  But I'm

9    denying the motion to dismiss those and I'll get back to

10   you on whether I think we should certify one or more of

11   those questions to the Connecticut Supreme Court.

12           I will tell you that in my experience the Court

13   is very good about acting promptly to let you know whether

14   they will accept the certification or not.  If they do

15   accept it, they're very good about acting within that very

16   term and ruling on the question.  So I think that were we

17   to do so, it wouldn't result in delay of more than maybe a

18   year, something like that.  That's my best guess anyway.

19           So there you are.  The motions to dismiss are

20   denied and the cross-motion is taken under advisement.

21   What I will try to do is arrange a telephone conference

22   soon, meaning in the next couple of weeks, and give you an

23   answer on that cross-motion at that time.  All right?

24           Thank you all for coming in.

25                   (Proceedings adjourned at 1:00 p.m.)

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3                    C E R T I F I C A T E

4

5               In Re: BARRERA  vs. BOUGHTON

6

7

8          I, Darlene A. Warner, RDR-CRR, Official Court

9     Reporter for the United States District Court for the

10    District of Connecticut, do hereby certify that the

11    foregoing pages are a true and accurate transcription of

12    my shorthand notes taken in the aforementioned matter to

13    the best of my skill and ability.

14

15

16

17
                   /s/_____
18
                      DARLENE A. WARNER, RDR-CRR
19                      Official Court Reporter
                       450 Main Street, Room #223
20                     Hartford, Connecticut 06103
                          (860) 547-0580
21

22

23

24

25