**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

JUAN BARRERA, JOSÉ CABRERA DANIEL CHAVEZ, JOSÉ DUMA, JOSÉ LLIBISUPA, ISAAC MALDONADO, EDGAR REDROVAN, NICHOLAS SEGUNDO SANCHEZ, JUAN CARLOS SIMBAÑA, and DANILO BRITO VARGAS,

Plaintiffs,

v.

MARK BOUGHTON, ALAN BAKER, JOSÉ AGOSTO, RICHARD DEJUSUS, JAMES A. FISHER, JAMES LALLI, CRAIG MARTIN, JOSEPH NORKUS, JOHN DOES, CITY OF DANBURY, JAMES BROWN, RICHARD MCCAFFREY, RONALD PREBLE, JOHN DOES and THE UNITED STATES,

Defendants.

CIVIL ACTION NO. 3:07-cv01436RNC

May 14, 2009

**PLAINTIFFS' REPLY BRIEF IN SUPPORT OF MOTION FOR A PROTECTIVE ORDER REGARDING DISCOVERY INTO IMMIGRATION STATUS AND ALIENAGE BY INDIVIDUAL DANBURY DEFENDANTS**

**Michael J. Wishnie, Supervising Attorney**
**Rebecca Engel, Law Student Intern**
**Rebecca Heller, Law Student Intern**
**Ari Holtzblatt, Law Student Intern**
**Dror Ladin, Law Student Intern**
**Elizabeth Simpson, Law Student Intern**
**Jerome N. Frank Legal Services Organization**
**Yale Law School**
**P.O. Box 209090**
**New Haven, CT 06511**

## INTRODUCTION

In their opening Memorandum of Law, Plaintiffs demonstrated the significant in terrorem effects of permitting discovery into their immigration status and alienage. Defendants' requests for information and documentation bearing on Plaintiffs' immigration status and alienage are not reasonably calculated to lead to the discovery of admissible evidence and are annoying, embarrassing, oppressive and unduly burdensome. See Fed. R. Civ. P. 26(c). Further, permitting such discovery would have a substantial chilling effect on the ability of any non-citizens to vindicate their civil rights in federal courts. In the case of Danbury Defendants, such discovery requests are consistent with a larger pattern of attempting to harass Plaintiffs into giving up their civil rights claims. See, e.g., Reply Memoranda of Law in Support of Non-Parties' Motion to Quash [hereinafter "MTQ"].

Danbury Defendants make the following principal arguments: first, that Plaintiffs have not demonstrated good cause for the protective order they seek, Danbury Memorandum of Law in Opposition to Plaintiffs' Motion for Protective Order [hereinafter "Danbury Memo"] at 2; second, that discovery is relevant to Plaintiffs' claims under the Connecticut Constitution, id. at 5; third, that Plaintiffs have put their own immigration status at issue by filing the complaint, id. at 6; and fourth, that the cases cited by Plaintiffs in support of their Motion are distinguishable, id. at 13.

Danbury Defendants' main argument is that Plaintiffs may invoke the Fifth Amendment privilege against self-incrimination, so a Protective Order would be redundant. Danbury Brief in Opposition to Plaintiffs' Motion for a Protective Order [hereinafter "Danbury Response"] at 3. But thirteen pages later, Danbury Defendants claim that there is no Fifth Amendment right to protect immigration status and alienage. Id at 16. These contradictory arguments only highlight the need for a Protective Order.

Danbury Defendants previously moved to dismiss certain State Constitutional claims

on the grounds that those constitutional provisions apply only to U.S. citizens. Judge Chatigny denied their Motion to Dismiss. Accordingly, Plaintiffs may proceed with their claims that, as residents of the State of Connecticut at the time of their unlawful arrest, they were protected by the Connecticut Constitution. In filing a suit to vindicate their civil rights, Plaintiffs have not put their alienage orimmigration status at issue, and Plaintiffs' access to federal court must not be conditioned on their willingness to divulge such information. Finally, their arguments that Plaintiffs misread the case law are inaccurate. In fact, several cases relied on by the Danbury Defendants hold the *opposite* of the proposition for which Defendants cite them, and in two other instances, the artful use of ellipses by Defendants results in a failure to disclose the actual rationales behind the decisions in Catalan v. Vermillion Ranch L.P., 2007 U.S. Dist. LEXIS 22638 (D. Colo. Mar. 28, 2007) and Rajah v. Mukasey, 544 F.3d 427, 433-34 (2d. Cir. 2008).

**I. Danbury Defendants' determination to force Plaintiffs to disclose information about their immigration status and alienage as a prerequisite to vindicating their civil rights in federal court underscores that Plaintiffs have demonstrated good cause for entry of a protective order.**

Since the outset of this case, Danbury Defendants have attempted to use the discovery process to annoy, embarrass, oppress, and unduly burden Plaintiffs in order to bar their access to federal court. Four out of their five Requests for Production to Plaintiffs demanded documents about Plaintiffs' immigration status and alienage. See Plalintiffs' Rule 37 Memorandum at 4. The Danbury Defendants have served numerous interrogatories about the immigration status of Plaintiffs and their family members. Id. As part of this effort, the Danbury Defendants have also subpoenaed four small community organizations attempting to support new immigrants and others in Danbury and New Haven. MTQ at 1. Danbury Defendants' arguments in their Response to Plaintiffs' Motion for a Protective Order only further emphasize their intent to condition Plaintiffs' access to the courts on Plaintiffs'

willingness to divulge information that may be used to prosecute or deport them.

Danbury Defendants do not contest that the "good cause" standard applicable on this motion is set forth in Fed. R. Civ. P. 26(c), which "permits a District Court to make any Order which justice requires to protect any party or person from annoyance, embarrassment, oppression, or undue burden or expense upon a showing by a movant for the order of good cause." Gambale v. Deutsche Bank Ag, 377 F .3d 133, 142 (2d Cir. 2004). Nor do they contest that information provided by Plaintiffs in discovery in this case could be used to deport them, see Plaintiffs' Memorandum of Law in Support of Motion for Protective Order [hereinafter "Memo of Law"] at 2-4, nor that allowing discovery into this information would terrorize Plaintiffs and substantially chill the ability of others who are similarly situated to seek justice in federal courts. Id. at 7-13.

Danbury Defendants' claim that Plaintiffs have not satisfied their burden to prove "good cause" (Danbury Response at 3) boils down to a claim that the Protective Order is redundant since (a) an Immigration Judge has already ordered Plaintiffs removed, and (b) Plaintiffs may invoke their Fifth Amendment privilege against self-incrimination.[1]

Danbury Defendants misunderstand the posture of Plaintiffs' case in Immigration Court. Cf. Danbury Response at 3. As Plaintiffs explained in their Memorandum of Law, in a removal proceeding, the government bears the burden of establishing the "alienage" of each respondent; if the government succeeds, then the burden shifts to the respondent to demonstrate that his presence in this country is lawful. 8 U.S.C. § 1229a(c)(3). In their removal proceedings, each moving Plaintiff denied the government's allegation of alienage, at which point the government offered as its only proof of alienage statements obtained from

[1] Danbury Defendants cite to Aguilar v. Ice, 07cv8224(JGK)(FM) (S.D.N.Y. 2009), *motion to reconsider pending*, but do not explain how the reasoning of that decision could negate Plaintiffs' showing of good cause in this case, especially given that Danbury Defendants are not authorized to make the type of immigration arrest at issue in Aguilar. As set forth in their reply brief as to the Federal Defendants, Aguilar is non-final, distinguishable, and wrongly decided.

each Plaintiff on September 19, 2006. Mem of Law at 3-4. Each Plaintiff then moved to suppress these statements, on the ground they were the fruit of an illegal detention and arrest. Id. If Plaintiffs are successful in their Motion to Suppress, their removal orders will be vacated and the case remanded to the Immigration Judge. At this point, the government will have to present new evidence. If Plaintiffs are forced to provide evidence relating to their immigration status and alienage in this civil rights action, the government may use this evidence in an effort to satisfy its burden to prove alienage. Therefore, forcing Plaintiffs to provide this evidence in discovery in this action may directly result in their deportation. Id.[2] Finally, the Fifth Amendment will not sufficiently protect Plaintiffs because Defendants may seek to draw an adverse inference from its invocation. Danbury Response at 3.

**II. Judge Chatigny has already rejected the contention that Plaintiffs' immigration status is relevant to their claims under the Connecticut Constitution.**

Judge Chatigny has already rejected Defendants' argument that Plaintiffs' free speech and freedom of assembly rights under the Connecticut Constitution depend on Plaintiffs' citizenship or immigration status. Danbury Response at 5; Denial of Mot. to Dismiss [Dkt. No. 129]; see also Transcript at 95 [Dkt. No. 167]. Plaintiffs' citizenship or immigration status is also irrelevant to the existence of private right of action under the Equal Protection and Due Process clauses of the Connecticut Constitution, and in any event, Judge Chatigny has also already rejected Defendants' arguments that no such private right of actions exist. Id. Defendants argue that Judge Chatigny's denial of the cross-motion to certify means that Plaintiffs' immigration status is relevant (Danbury Response at 6), but in denying Defendant's Motion to Dismiss, Judge Chatigny held exactly the opposite. Denial of Mot. to Dismiss [Dkt. No. 129]; see also Transcript at 95 [Dkt. No. 167].

---

[2] In fact, Federal Defendants have stated that they are free to use evidence obtained in discovery in this case against Plaintiffs in their removal proceedings. Federal Response to Plaintiffs' Motion for a Protective Order at 9.

**III. Claiming discrimination and false arrest based on *perceived* immigration status does not make information about Plaintiffs' actual immigration status and alienage relevant.**

Danbury Defendants maintain that by filing this complaint, Plaintiffs put their own immigration status at issue. Danbury Response at 6. This argument would condition any access to the courts for Plaintiffs claiming false arrest or discrimination by immigration agents on a willingness to disclose evidence about immigration status and alienage. Memo of Law at 7-13.

As an example of places where Plaintiffs have made immigration status an issue, Danbury Defendants cite the portion of Plaintiffs' Amended Complaint that alleges a policy of discrimination on the part of the City of Danbury against immigrants, as well as several of Plaintiffs' Equal Protection Claims. Danbury Response at 7-8. Danbury Defendants offer no analysis as to why Plaintiffs' actual immigration status is relevant to proving that they were discriminated because of a general policy targeting *perceived* immigrants. They do not contest Plaintiffs' argument that the only defense to this claim would be to prove that the seizure of Plaintiffs had *nothing to do with Plaintiffs' perceived immigration status*. Memo of Law at 16-17. Defendants make no argument about why they need information about Plaintiffs' immigration status to prove that they were enforcing a policy that did not discriminate on the basis of race, ethnicity or national origin. See Vill. Of Arlington Heights v. Metro Hous. Dev. Corp., 429 U.S. 252, 265-66, 270 (1977).

Danbury Defendants further argue that Plaintiffs' immigration status is somehow relevant to whether they can seek damages, Danbury Response at 8-9, and that if Plaintiffs are present illegally, they should only be able to recover damages related to their "professional prospects in their home country, if at all." Id at 9. Danbury Defendants cite no case law in support of the novel suggestion that non-citizens cannot recover damages at civil suit in federal court. The Supreme Court has upheld the right of non-citizens to vindicate

their civil rights in federal court. See, e.g., Yick Wo v. Hopkins, 118 U.S. 356, 369 (1886) (the protections of the Constitution "are universal in their application to persons within the territorial jurisdiction, without regard to any differences of race, of color or of nationality") Further, Judge Chatigny has already upheld Plaintiffs' right to seek damages under the U.S. and Connecticut Constitutions, as well as the Federal Tort Claims Act. Denial of Mot. to Dismiss [Dkt. No. 129].

Defendants conclude this section by citing a single, unpublished case from a District Court in Colorado in which a motion for protective order regarding immigration status was denied. Danbury Response at 9 (citing Catalan v. Vermillion Ranch L.P., 2007 U.S. Dist. LEXIS 22638 (D. Colo. Mar. 28, 2007)). There is no explanation as to why this one case should outweigh the strong contrary precedent from within the Second Circuit and throughout the country. Further, in spite of citing a substantial amount of dicta from this case, Danbury Defendants uses ellipses to omit precisely the paragraph where Magistrate Judge Watanabe distinguished the case before him from other cases upholding the chilling effect of such discovery (Danbury Response at 10, quoting to **4-5):

> "Moreover, this court finds that producing such requested discovery would not have a 'chilling effect' or an in terrorem effect on Plaintiffs because unlike in the Rivera and First Wireless Group Inc. cases cited by Plaintiffs, in this case, Defendants, as H-2A employers of Plaintiffs, have an affirmative legal duty to report workers who abscond to Immigration Customs Enforcement (f/n/a INS 'Immigration') within twenty-four (24) hours of discovery… Failure by the H-2A employer (i.e., Defendants) to comply with this reporting requirement would subject the employer to liquidated damages." Id at *5.

These circumstances are clearly not present in this case.

Finally, Danbury Defendants claim that Plaintiffs' requests that Danbury produce information about immigration policies put Plaintiffs' own immigration status at issue. Danbury Response at 10-11. But Plaintiffs and Danbury are not similarly situated when it comes to this information. The information Plaintiffs seek relates to official municipal actions and policies relating to immigration issues, maintained by a *public entity*. The

information Danbury Defendants seek relates to information about private individuals that can be used to prosecute or deport them. The mere fact that the word "immigration" appears in Plaintiffs' Request for Production is not sufficient to prove that the immigration status of the individual Plaintiffs is relevant to a specific claim or defense under Rule 26(c). Danbury Response at 11.

**IV. The substantial amount of case law cited by Plaintiffs confirms the appropriateness of a Protective Order.**

Danbury Defendants also seriously misrepresent the holdings of the cases cited by Plaintiffs. First, Danbury Defendants claim that Simmons v. United States, 390 U.S. 377 (1968) is not relevant because Plaintiffs in this case have already invoked the Fifth Amendment in their removal proceedings, and thus do not need to sacrifice one set of rights in order to vindicate another. Danbury Response at 13. The claim that the Fifth Amendment is sufficient to protect Plaintiffs' rights in the matters at issue in this Protective Order is discussed in Part I, infra. Danbury Defendants further claim that Simmons is inapplicable because it applied to a criminal defendant, and Plaintiffs in this case "voluntarily commenced the present action." Danbury Response at 14. However, Plaintiffs commenced this action only after they were involuntarily seized, arrested, detained and put in removal proceedings, as the only way to recover for the abuse against them. Forcing them to disclose alienage or status information in order to vindicate their civil rights is analogous to the situation in Simmons. Memo of Law at 6-7.

Defendants next claim that Plaintiffs incorrectly cite Rajah v. Mukasey 544 F.3d 427, 433-34 (2d. Cir. 2008), to "contend that compelling disclosure into immigration and alienage information is prejudicial and oppressive." Danbury Response at 14. Plaintiffs in fact do not cite Rajah for this proposition at all, as Rajah relates to a Motion to Suppress information about immigration status that Plaintiffs admitted was voluntarily disclosed to

employees of the Department of Homeland Security as part of a valid regulatory regime encouraging immigrants to register with DHS, and is thus totally different from the case at hand. Rajah, 544 F.3d at 433-34 (explaining the factual background of case, in which Plaintiffs voluntarily appeared to register their immigration information and then claimed that regulatory scheme was unconstitutional). Plaintiffs instead cite a portion of Rajah in which the Second Circuit acknowledges that documents and information immigration status could lead to prosecution and/or deportation, and cites a number of specific instances in the U.S. Code. Memo of Law at 6.

Danbury Defendants go on to cite long passages of dicta, employing ellipses to hide the parts of the case that both support Plaintiffs' contentions and make the overall holding of the case obviously distinguishable. For example, the first two passages of the case cited by Defendants are:

> "In immigration proceedings, ***suppression of evidence is available only under limited circumstances under either the Fourth or Fifth Amendment.*** With regard to Fourth Amendment violations, suppression is warranted only when the evidence indicates "either (a) that an egregious violation that was fundamentally unfair has occurred, or (b) that the violation -- regardless of its egregiousness or unfairness -- undermine[s] the reliability of the evidence in dispute."
> ….
> Immigration laws, difficult to enforce by their very nature, would become completely unenforceable if…" Danbury Response at 17.

The omitted passage between these paragraphs reads:

> "In the present matter, there was no Fourth Amendment violation, much less one that was egregious or that undermined the probative value of evidence collected. The Fourth Amendment does provide protection against random or gratuitous questioning related to an individual's immigration status. For example, government agents may not stop a person for questioning regarding his citizenship status without a reasonable suspicion of alienage. United States v. Brignoni-Ponce, 422 U.S. 873, 884, 95 S. Ct. 2574, 45 L. Ed. 2d 607 (1975); see also id. at 884 n.9 (reserving decision on whether that suspicion must be of illegal alienage or may be of mere alienage)." Id at 441.

Danbury Defendants then use another set of ellipses to omit the Court's statement that "Moreover, petitioners make no claim that any alleged Fourth Amendment violation undermined the probative value of documents or statements taken from them." Id. The third

set of ellipses is used to omit the portion of the case cited by Plaintiffs in their Memorandum of Law. "Forcing an alien to perform the act of producing a foreign passport, I-94, or statement regarding immigration status at least arguably forces the alien to admit alienage and thus provide possible evidence of one or more crimes involving immigration violations…" Id; Memo of Law at 6.

Danbury conclude this section by claiming attempting to distinguish several of the cases cited by Plaintiffs in their Memorandum of Law. Danbury Response at 16-17. But Danbury Defendants' attempts only highlight the variety of areas in which similar protective orders have been employed- they distinguish one case because it was about an employment discrimination claim, another because it was under the Fair Labor Standards Act, a third because it was about backpay and a fourth because it was about whether a Legal Services Corporation could represent an alleged immigrant. Id. The common thread of these decisions, however, is a judicial commitment to tread extremely carefully in this area, and to scrutinize with much skepticism the various arguments offered up by defendants for compelled discovery of immigration status or alienage. See Memo of Law at 11-13; Topo v. Dhir, 210 F.R.D. 76, 78 (S.D.N.Y. 2002) ("Although the cases addressing this issue typically relate to the Fair Labor Standards Act, the underlying principle is still the same. When the potential for abuse of procedure is high, the Court can and should act within its discretion to limit the discovery process, even if relevancy is determined.") District Courts have also granted similar orders in several false arrest cases. See Committee for Immigrants Rights v. County of Sonoma, 3:08-cv-04220-PJH (N.D. Cal. April 24, 2009); De La O v. Arnold-Williams, 2006 U.S. Dist. LEXIS 76816 (E.D. Wa. Oct. 20, 2006).

Finally, Danbury Defendants claim that Topo v. Dhir states that discovery into immigration status is appropriate if immigration status is relevant. Danbury Reply at 17. But

Magistrate Judge Ellis in Topo v. Dhir interprets Second Circuit precedent to find that protective orders may be granted solely on the basis of good cause. 210 F.R.D. 76, 77 (S.D.N.Y. 2002). Judge Ellis goes on to rule that the *in terrorem* effect of immigration-based discovery requests *alone* is sufficient to justify a protective order *regardless of relevance*. Id. at 78-79. ("Even with regard to relevant matters, courts have broad discretion to limit or bar discovery altogether."). See also Zeng Liu v. Donna Karan, 207 F. Supp. 2d 191, 192-93 (S.D.N.Y. 2002) ("[E]ven if such discovery were relevant, and at this juncture it appears not to be, the risk of injury to the plaintiffs if such information were disclosed outweighs the need for its disclosure."); Flores v. Amignon, 233 F. Supp. 2d 462, 465 (E.D.N.Y. 2002) ("Not only does this Court find that the information is not relevant to defendant's defense, but as the court in Liu noted, even if it were, the potential for prejudice far outweighs whatever minimal probative value such information would have"); Trejos v. Edita's, 2009 U.S. Dist. LEXIS 21239 at *6 (E.D.N.Y. March 17, 2009) ("Finally, even if the information sought were somehow relevant, the in terrorem effect of the questions defendants seek to press outweighs the need for disclosure.").

**V. Conclusion**

Danbury Defendants are attempting to use the discovery process to terrorize Plaintiffs into dropping their civil rights claims. They fail to prove that any of their discovery requests for information bearing on Plaintiffs' immigration status and alienage are relevant to a specific claim or defense under Fed. R. Civ. P. 26. Their arguments as to the general relevance of Plaintiffs' immigration status and alienage underscore their intent to abuse the discovery process to prevent each Plaintiff from having his day in court. Plaintiffs respectfully request that a protective order barring discovery into alienage or immigration status be entered.

Respectfully submitted,

/s/____________________
Michael J. Wishnie, ct27221

Ramzi Kassem, Supervising Attorney, ct27537
Christopher N. Lasch, Supervising Attorney, ct27139
Ari Holtzblatt, Law Student Intern
Heide Iravani, Law Student Intern
Elizabeth Simpson, Law Student Intern
Rebecca Heller, Law Student Intern
Dror Ladin, Law Student Intern
Jerome N. Frank Legal Services Organization
Yale Law School
127 Wall Street
New Haven, CT 06511
Telephone: (203) 432-4800
Facsimile: (203) 432-1426
michael.wishnie@yale.edu
christopher.lasch@yale.edu
ramzi.kassem@yale.edu
Counsel for Plaintiffs

Dated: May 14, 2009