## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

--------------------------------------------------------

| | | |
|---|---|---|
| JUAN BARRERA, JOSE CABRERA | : | |
| DANIEL CHAVEZ, JOSE DUMA, | : | |
| JOSÉ LLIBISUPA, ISAAC | : | |
| MALDONADO, EDGAR REDROVAN, | : | |
| NICHOLAS SEGUNDO SANCHEZ, | : | CIVIL ACTION NO. 3:07-cv-01436-RNC |
| JUAN CARLOS SIMBAÑA, and | : | |
| DANILO BRITO VARGAS, | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | May 29, 2009 |
| | : | |
| MARK BOUGHTON, ALAN BAKER, | : | |
| JOSÉ AGOSTO, RICHARD DEJUSUS, | : | |
| JAMES A. FISHER, JAMES LALLI, | : | |
| CRAIG MARTIN, JOSEPH NORKUS, | : | |
| JOHN DOES 1-8, CITY OF DANBURY, | : | |
| JAMES BROWN, RICHARD | : | |
| MCCAFFREY, RONALD PREBLE, | : | |
| JOHN DOES 9-14 and the | : | |
| UNITED STATES, | : | |
| | : | |
| Defendants. | | |

--------------------------------------------------------

## <u>MOTION FOR LEAVE TO AMEND THE COMPLAINT, AMEND THE CAPTION, AND JOIN ADDITIONAL DEFENDANTS</u>

Plaintiffs[1] file this Motion for Leave to Amend the Complaint and  Amend the Caption,

pursuant to Rule 15(a)(2) of the Federal Rules of Civil Procedure, and to Join Additional

Defendants, Pursuant to Rule 20(a)(2). In the proposed Second Amended Complaint, attached as

Exhibit "A," Plaintiffs seek leave to:

    (1)    Add factual allegations in support of Plaintiffs' claims for violations of their Fifth

---

[1] On May 14, 2009, this Court granted the motion of undersigned counsel to withdraw as counsel for Plaintiffs Duma and Vargas.  [Dkt. # 184].  This motion is submitted on behalf of the eight other Plaintiffs, referred to throughout as "Plaintiffs."

Amendment due process rights against Defendant McCaffrey, and their claims against the United States for false arrest and false imprisonment and abuse of process. (Second Am. Compl. ¶¶ 151-169, 174-75, 316-318, 338, 349.)

(2)    Join additional party Julio Lopez, Detective, Danbury Police Department as a Defendant, add relevant facts to the complaint, and amend the caption to reflect the addition of Mr. Lopez. (Second Am. Compl. ¶¶ 20, 237, 240. 243, 24, 252, 287, 291, 295, 304.)

(3)    Join additional party Luis Ramos, Detective, Danbury Police Department, as a Defendant, add relevant facts to the complaint, and amend the caption to reflect the addition of Mr. Ramos. (Second Am. Compl. ¶¶ 23, 237, 240. 243, 248, 252, 287, 291, 295, 304.)

(4)    Join additional party Mitchell Weston, Captain, Danbury Police Department, as a Defendant, add relevant facts to the complaint, and amend the caption to reflect the addition of Mr. Weston. (Second Am. Compl. ¶¶ 15, 82, 83, 84, 89, 90, 92, 265 266, 269 271-275, 281-85, 297, 302, 304.)

(5)    Join additional party George Sullivan, ICE Assistant Field Officer, Hartford, CT, as a Defendant, add relevant facts to the complaint, and amend the caption to reflect the addition of Mr. Sullivan. (Second Am. Compl. ¶¶ 28, 98-116, 170-75, 326-331.)

(6)    Join additional party Jim Martin, ICE Deputy Field Office Director, Boston, MA, as a Defendant add relevant facts to the complaint, and amend the caption to reflect the addition of Mr. Martin. (Second Am. Compl. ¶¶ 29, 98-116, 170-75, 326-331.)

(7)    Join additional party Bruce Chadbourne, ICE Field Office Director, Boston, MA, as a Defendant, add relevant facts to the complaint, and amend the caption to reflect the addition

of Mr. Chadbourne.  (Second Am. Compl. ¶¶ 30, 98-116, 170-75, 326-331.)

(8)     Add claim for personal supervisory liability under <u>Bivens v. Six Unknown Federal Narcotics Agents</u>, 403 U.S. 388 (1971) against Proposed Defendants Sullivan, Martin, and Chadbourne for violations of Plaintiffs' rights under the Fourth and Fifth Amendments. (Second Am. Compl. ¶¶ 325-331.)

(9)     Add factual allegations in support of Plaintiffs' claims for supervisory liability against Defendants Mark Boughton and Alan Baker. (Second Am. Compl. ¶¶ 40, 42, 45, 64-65.)

(10)     Add and/or delete words in several existing factual allegations and claims. (Second Am. Compl ¶¶ 41, 43, 46, 49, 351, 369, 371-374, 377-379.)

(11)     Delete what was numbered as Paragraph 133 from the First Amended Complaint.

(12)     Amend caption to reflect the joinder of new defendants and to correct the spelling of Defendant Richard DeJesus.

Dated May 29, 2009
New Haven, Connecticut

                                        Respectfully submitted,

                                        _____/s/_____
                                        Michael Wishnie (ct27221)
                                        Supervising Attorney

                                        Christopher Lasch, Supervising Attorney
                                        Ramzi Kassem, Supervising Attorney

                                        Rebecca Engel, Law Student Intern
                                        Rebecca Heller, Law Student Intern
                                        Ari Holtzblatt, Law Student Intern
                                        Dror Ladin, Law Student Intern
                                        Elizabeth Simpson, Law Student Intern

                                        JEROME N. FRANK LEGAL SERVICES

ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, Connecticut 06520
Phone: (203) 432-4800
*Counsel for Plaintiffs*


Joel M. Cohen (phv03297)
Sarah Blackman (phv03295)
Lawrence Bluestone (phv03296)
Elizabeth Goergen (phv03300)
Dan Michaels (phv03299)
Siham Nurhussein (phv03298)

CLIFFORD CHANCE US LLP
31 West 52nd Street
New York, New York 10019
Telephone: (212) 878-8000
*Counsel for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that on May 29, 2009, a copy of the foregoing Motion for Leave to Amend the Complaint, Amend the Caption, and Join Additional Defendants was filed and served electronically   Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept email as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

                                          _____/s/_____

                                        Michael Wishnie (ct27221)

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JUAN BARRERA, JOSE CABRERA DANIEL CHAVEZ, JOSE DUMA, JOSÉ LLIBISUPA, ISAAC MALDONADO, EDGAR REDROVAN, NICHOLAS SEGUNDO SANCHEZ, JUAN CARLOS SIMBAÑA, and DANILO BRITO VARGAS, | : : : : : : : : : | CIVIL ACTION NO. 3:07-cv-01436-RNC |
| Plaintiffs, | : : | |
| v. | : : | May 29, 2009 |
| MARK BOUGHTON, ALAN BAKER, JOSÉ AGOSTO, RICHARD DEJESUS, JAMES A. FISHER, JAMES LALLI, CRAIG MARTIN, JOSEPH NORKUS, JOHN DOES, CITY OF DANBURY, JAMES BROWN, RICHARD MCCAFFREY, RONALD PREBLE, JOHN DOES and the UNITED STATES, | : : : : : : : : : : | |
| Defendants. | | |

## **MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION FOR LEAVE TO AMEND THE COMPLAINT, AMEND THE CAPTION, AND JOIN ADDITIONAL DEFENDANTS**

1

# TABLE OF CONTENTS

**Page**

**HISTORY OF THE PROCEEDINGS** ........................................................................... 1

**SUMMARY OF THE PROPOSED AMENDMENTS** ................................................ 2

    A. Addition of Factual Allegations Regarding Existing Claims........................... 2

    B. Joinder of Additional DPD Defendants ........................................................... 3

    C. Joinder of Additional ICE Defendants and Addition of New Claim for
        Supervisory Liability ...................................................................................... 4

    D.  Other Amendments to Plaintiffs' Complaint ................................................... 5

**STANDARD FOR MOTION TO AMEND** .................................................................. 6

**ARGUMENT** ................................................................................................................ 7

  **I.  PLAINTIFFS' MOTION TO JOIN ADDITIONAL DEFENDANTS
      SHOULD BE GRANTED** ................................................................................ 7

    A.  Plaintiffs Satisfy the Standard for Permissive Joinder of Defendants ............. 7

  **II.  PLAINTIFFS' MOTION TO AMEND THE COMPLAINT
       SHOULD BE GRANTED** .............................................................................. 8

    A.  Plaintiffs Satisfy the Liberal Standards for Leave to Amend ......................... 8

        1. There Has Been No Undue Delay, Bad Faith, or Dilatory Motive........ 9

        2. Leave to Amend Will Not Cause Prejudice to the Defendants............. 9

        3. The Proposed Amended Complaint is Not Futile ............................... 10

            a.  Joinder of Detectives Lopez and Ramos to existing
            claims is not futile....................................................................... 11

            b. The addition of factual allegations against Defendant
            McCaffrey in support of Plaintiffs' existing claims for
            violation of due process rights under the Fifth Amendment,
            and for abuse of process and false arrest and imprisonment
            under the FTCA, is not futile. ..................................................... 13

            c. The addition of factual allegations against Defendants
            Baker and Boughton, is not futile ................................................ 17

i

d. Joinder of Captain Westin is not futile ................................... 18

e. Joinder of Officials Sullivan, Martin, and Chadbourne is not futile ...................................................................................... 21

4. There has been no repeated failure to cure deficiencies by amendments previously allowed ................................................................... 22

**III.  Plaintiffs' Motion to Amend the Caption Should Be Granted** .......................... 22

**CONCLUSION** .......................................................................................................... 23

# TABLE OF AUTHORITIES

## CASES

A.I.A. Holdings, S.A. v. Lehman Brothers and Bear, Stearns, & Co.,
   1998 WL 159059 (S.D.N.Y. Apr. 1, 1998)....................................................................7

A.V. by Versace, Inc. v. Gianni Versace S.p.A.,
   87 F.Supp.2d 281 (S.D.N.Y. 2000) ..........................................................................10

Abraham v. Volkswagen of America,
   795 F.2d 238 (2d Cir. 1986)..................................................................................7, 8

Ashcroft v. Iqbal,
   556 U.S. ___ (2009)..................................................................................19, 20, 21

Bell Atlantic Corp. v. Twombly, ...................................................................................19
   550 U.S. 544 (2008)

Binette v. Sabo,
   710 A.2d 688, 244 Conn. 23 (1998) ................................................................ passim

Bivens v. Six Unknown Federal Narcotics Agents,
   403 U.S. 388 (1971)....................................................................................... passim

Blesedell v. Mobil Oil Co.,
   708 F. Supp. 1408 (S.D.N.Y. 1989) ..........................................................................7

Block v. First Blood Associates,
   988 F.2d 344 (2d Cir. 1993)................................................................................9, 10

Corye v. Cass,
   2008 WL 466216 (N.D.N.Y. Feb. 15, 2008) .........................................................4, 11

County of Sacramento v. Lewis, ...................................................................................22
   523 U.S. 833, 846 (1998)

Foman v. Davis,
   371 U.S. 178 (1962)..................................................................................................6

Garcia v. Brown, ........................................................................................................12
   268 F. App'x 127(2d Cir. 2008)

Hayut v. State Univ. of N.Y., .......................................................................................18
   352 F.3d 733, 753 (2d Cir. 2003)

iii

Hines v. City of Albany,
    542 F.Supp.2d 218 (N.D.N.Y. 2008) ........................................................................ 11

Infosint S.A. v. H. Lundbeck A/S,
    2007 WL 2489650 (S.D.N.Y. Sept. 4, 2007) ............................................................. 9

Iqbal v. Hasty,
    490 F.3d 143 (2d Cir. 2007) ....................................................................................... 20

Lopez v. Henry Phipps Plaza South, Inc.,
    498 F.2d 937 (2d Cir. 1974) ....................................................................................... 14

Lowenstein v. Rooney,
    401 F. Supp. 952 (E.D.N.Y. 1975) ............................................................................ 11

Mathews v. Eldridge .................................................................................................... 13
424 U.S. 319 (1976)

McCarthy v. Dun & Bradstreet Corp.,
    482 F.3d 184 (2d Cir. 2007) ......................................................................................... 6

Mozzochi v. Beck ......................................................................................................... 16
529 A.2d 171, 173 (Conn. 1987)

Outlaw v. City of Meriden, ........................................................................................... 16
    682 A.2d 1112

Phoomahal v. Ridgehaven Village,
    2007 WL 2292741 (E.D.N.Y. Aug. 9, 2007) ............................................................... 7

Poe v. Leonard,
    282 F.3d 123, 140 (2d Cir.2002)) ............................................................................. 22

Presser v. Key Food Stores Coop., Inc.,
    218 F.R.D. 53 (E.D.N.Y. 2003) .................................................................................. 6

Rachman Bag Co. v. Liberty Mut. Ins. Co.,
    46 F.3d 230 (2d Cir. 1995) ........................................................................................ 6

Rogowski v. Reno,
    94 F. Supp. 2d 177 (D. Conn. 1999) ................................................................... 14, 15

Russell v. Hughes, ........................................................................................................ 12
    2009 WL 1212754 (D. Conn. Apr. 30, 2009)

Russo v. City of Bridgeport, ......................................................................................... 22

iv

479 F.3d 196, 211 (2d Cir. 2007);

S.S. Silberblatt, Inc. v. East Harlem,
    608 F.2d 28 (2d Cir. 1979)...........................................................................6, 10

Small v. Reno,
    127 F.Supp.2d 305 (D. Conn. 2000) ...................................................................14

St. John v. McElroy,
    917 F. Supp. 243 (S.D.N.Y. 1996) ................................................................13, 15

Thomas v. McElroy,
    1996 WL 487953 (S.D.N.Y. Aug. 27, 1996) ..........................................................14

Tucker v. George,.......................................................................................20
    2009 WL 1444194 (W.D. Wis. May 21, 2009)

Tyree v. Zenk,..........................................................................................21
    2009 WL 1456554 (E.D.N.Y. May 22, 2009)

United Mine Workers v. Gibbs,
    383 U.S. 715 (1966).....................................................................................7

United States v. Continental Ill. Nat'l Bank & Trust Co.,
    889 F.2d 1248 (2d Cir. 1989)...........................................................................10

Vann v. City of New York,
    72 F.3d 1040 (2d Cir. 1995) ...........................................................................22

Withrow v. Larkin,
    421 U.S. 35 (1975)......................................................................................14

Wray v. City of New York,
    490 F.3d 189 (2d Cir. 2007) ......................................................................19, 21

Zavydas v. Davis,
    533 U.S. 678 (2001).....................................................................................14

## STATUTES AND RULES

8 C.F.R. § 287.3 (2009) ................................................................................13

42 U.S.C. § 1983 ................................................................................... *passim*

Fed. R. Civ. P. 12(b)(6)........................................................................... *passim*

Fed. R. Civ. P. 15(a)(2)........................................................................1, 6, 8, 10

Fed. R. Civ. P. 20(a)(2) .........................................................................1, 3, 7

Plaintiffs[1] submit this Memorandum of Law in support of their Motion for Leave to Amend the Complaint and the Caption, and for Leave to Join Additional Defendants, pursuant to Federal Rules of Civil Procedure 15(a)(2) and 20(a)(2).  Plaintiffs have brought this action against Defendants to vindicate numerous violations of their civil and constitutional rights.  As set forth in the Proposed Second Amended Complaint, Plaintiffs now seek to (1) add factual allegations to several existing claims; (2) join three Danbury Police Department ("DPD") detectives as defendants; (3) join three U.S. Immigration and Customs Enforcement ("ICE") officials as defendants and add a claim for supervisory liability against the new ICE defendants; and (4) amend the caption to reflect these changes, and make other small wording changes.

## HISTORY OF THE PROCEEDINGS

This is a civil rights action seeking to remedy the unlawful arrest and detention of Latino day laborers by the DPD and ICE.  Plaintiffs filed their initial complaint on September 26, 2007, naming as defendants several "John Doe" DPD and ICE officials whose identities were then unknown.

Plaintiffs filed a First Amended Complaint on November 26, 2007.  In their First Amended Complaint, Plaintiffs added additional factual allegations and added claims for relief for conspiracy between DPD and ICE officers, personal supervisory liability against high ranking Danbury officials, municipal liability against the City of Danbury, and liability under the Federal Tort Claims Act ("FTCA") against the United States.  Additionally, Plaintiffs withdrew claims for negligence and abuse of process against various DPD defendants.  The Individual Danbury Defendants and the Federal Defendants filed motions to dismiss the First Amended Complaint

---

[1] On May 14, 2009, this Court granted the motion of undersigned counsel to withdraw as counsel for Plaintiffs Duma and Vargas.  [Dkt. # 184].  This motion is submitted on behalf of the eight other Plaintiffs, referred to throughout as "Plaintiffs."

on February 1, 2008 [Dkt ## 49, 51], which this court denied on March 10, 2009.  [Dkt # 129]. [2]

On February 10, 2009, this Court entered a scheduling order setting a deadline of May 29, 2009 for motions to amend the Complaint or join parties.  [Dkt # 124]  The discovery period is scheduled to close on February 1, 2010.  Id.  Plaintiffs have not been able to obtain defense counsels' consent for leave to file the Proposed Second Amended Complaint.

## SUMMARY OF THE PROPOSED AMENDMENTS

### A.  Addition of Factual Allegations Regarding Existing Claims

First, for an existing claim for relief based on violations of their rights to due process under the Fifth Amendment of the United States Constitution--as well as their rights to be free from false arrest/false imprisonment and abuse of process under the FTCA-- Plaintiffs seek to add additional factual allegations supporting their claim.  In addition, Plaintiffs have discovered additional facts supporting their existing claim for supervisory liability against Defendants Baker and Boughton.

Regarding the first addition of facts, Plaintiffs have learned that Defendant McCaffrey, one of the ICE officers who arrested Plaintiffs, also made the initial custody determination for Plaintiffs, thus failing to provide Plaintiffs with a neutral arbitrator as required by the Fifth Amendment.  Plaintiffs have also learned that Defendant McCaffrey detained Plaintiffs without bond, despite the absence of any special justification that would have allowed him to refuse to set bond.  Further, Plaintiffs have learned that McCaffrey or another ICE official failed to forward Plaintiffs' requests for custody redeterminations to the Immigration Court for periods of

---

[2] The Danbury Defendants moved to dismiss only the Binette v. Sabo. 710 A.2d 688 (Conn. 1998) claims and the conspiracy claim.  [Dkt. # 49.]  The Federal Defendants moved to dismiss all counts.  [Dkt. # 51].  The Court dismissed one count of conspiracy as against the Danbury defendants [Count 16 of the First Amended Complaint], but found that all other claims for relief satisfied the requirements of Rule 12(b)(6) of the Federal Rules of Civil Procedure. Consistent with that ruling, Plaintiffs expect the Court to likewise dismiss Count 16 of the Proposed Second Amended Complaint as to the Danbury Defendants, but include it here for purposes of preserving any potential appeal.

2

24 to 167 days.   These facts further support Plaintiffs' claim that Defendant McCaffrey violated their rights to due process under the Fifth Amendment of the United States Constitution  (Prop. Sec. Am. Compl. Fifteenth Claim for Relief) and committed the torts of false arrest/false imprisonment and abuse of process in violation of the FTCA. (Prop. Sec. Am. Compl. Eighteenth Claim for Relief).

Secondly, Plaintiffs seek to add facts supporting their claim for supervisory liability violations against Defendants Baker and Boughton.  Through discovery, Plaintiffs have learned that Defendants Baker and Boughton participated in conversations relating to the imposition of discriminatory policies in Danbury, including those related to backyard volleyball games popular in the Ecuadorian community and discriminatory enforcement of the local housing code in Ecuadorian communities.  (Prop. Sec. Am. Compl. ¶¶ 42, 45.)  These facts further support Plaintiffs' claim that Defendants Baker and Boughton failed to supervise in violation of 42 U.S.C. § 1983 and Binette v. Sabo, 710 A.2d 688 (Conn. 1998).

B.  Joinder of Additional DPD Defendants

In the period since the filing of the First Amended Complaint, Plaintiffs have been conducting discovery to develop the factual record.  See Joint Status Report by All Parties [Dkt # 205].   Through discovery, Plaintiffs have identified three additional DPD officials who were either directly involved in their illegal arrest and detention, or who knowingly participated in the creation of an official discriminatory policy in violation of the Plaintiffs' rights, or both.

First, Plaintiffs seek to join Julio Lopez and Luis Ramos, both detectives in the DPD who were present during the operation on September 19, 2006 and who participated directly in the illegal arrests of Plaintiffs.  (Prop. Sec. Am. Compl. ¶¶ 20, 23, 74.)  Plaintiffs seek to substitute these defendants for the fictitious "John Doe" defendants, pursuant to Rule 20(a)(2) of the

3

Federal Rules of Civil Procedure.  See Corye v. Cass, 2008 WL 466216, at *1 (N.D.N.Y. Feb. 15, 2008) ("When plaintiff does identify the 'John Doe' defendants, he may then make a motion to amend.").  Detectives Lopez and Ramos violated Plaintiffs' rights under various provisions of the Connecticut and U.S. Constitutions, and Plaintiffs accordingly allege liability under 42 U.S.C. §1983 and Binette v. Sabo, 710 A.2d 688 (Conn. 1988), as well as common law conspiracy, false arrest, false imprisonment, intentional infliction of emotional distress, and negligent infliction of emotional distress.  (Prop. Sec. Am. Compl. First through Seventh Claims for Relief, and Tenth through Twelfth Claims for Relief.)

Second, Plaintiffs seek to join Mitchell Weston, Captain in the DPD, to the Complaint.  In the Proposed Second Amended Complaint, Plaintiffs allege that Defendant Fisher, the senior detective for DPD on site during the operation, reports directly to Captain Weston, and furthermore, that Captain Weston knew about the sting operation in advance, and either authorized, approved, or acquiesced to it. (Prop. Sec. Am. Compl.  ¶¶ 15, 82, 83, 84). With either deliberate indifference or gross negligence, Captain Weston failed to train and supervise the individual DPD officers who conducted the actual arrest of Plaintiffs.  (Prop. Sec. Am. Compl.  ¶¶ 89, 90, 92.)  Plaintiffs allege liability under 42 U.S.C. § 1983 and Binette v. Sabo, 710 A.2d 688 (Conn. 1998) for federal and state constitutional violations and for common law negligent infliction of emotional distress. (Prop. Sec. Am. Compl. Eighth and Twelfth Claims for Relief.)

C.   Joinder of Additional ICE Defendants and Addition of New Claim for Supervisory Liability

Through discovery, Plaintiffs have identified three additional ICE officials who were directly involved in the illegal arrest and detention of Plaintiffs, either through their deliberate

indifference or their gross negligence in supervising and training the other named federal Defendants.   As to these officials, Plaintiffs seek to add a cause of action for personal supervisory liability.

Plaintiffs seek to join George Sullivan, Jim Martin, and Bruce Chadbourne to the Complaint.  At all relevant times, George Sullivan served as Assistant Field Office Director for the ICE Detention and Removal Office ("DRO") in Hartford, Connecticut; Jim Martin served as Deputy Field Office Director of the Boston DRO; and Bruce Chadbourne served as Field Office Director for the Boston DRO. (Prop. Sec. Am. Compl ¶¶ 28-30.) Proposed Defendants Sullivan, Martin, and Chadbourne were directly responsible for the conduct of the Hartford and Boston ICE officers who participated in the illegal arrests and detention, and with either deliberate indifference or gross negligence, failed to train and supervise their subordinates.  (Prop. Sec. Am. Compl ¶¶ 98-116.)  In addition, officials from both the Boston and the Hartford DRO had been actively involved in immigration operations or actions in Danbury for several years before the illegal arrests in 2006, and had knowledge both of what a typical operation or action looked like, as well as the charged nature of the immigration debate in the city.  (Prop. Sec. Am. Compl. ¶¶ 110-116.)

Plaintiffs seek to add a cause of action against ICE Officials Sullivan, Martin, and Chadbourne for personal supervisory liability. (Prop. Sec. Am. Compl.  Seventeenth Claim for Relief).  Sullivan, Martin, and Chadbourne's subordinates violated Plaintiffs' rights under the Fourth and Fifth Amendments, and Plaintiffs allege liability under Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971).  (Prop. Sec. Am. Compl.  Thirteenth through Sixteenth Claims for Relief.)

D.  Other Amendments to Plaintiffs' Complaint

5

In addition to the above substantive changes, Plaintiffs seek to amend the caption to the Complaint to conform to the additions, and also seek to correct the spelling of Defendant Richard DeJesus, which was unintentionally misspelled and not corrected in the First Amended Complaint. Plaintiffs also make several small wording and numbering changes at various points in the text of the Proposed Second Amended Complaint. (Prop. Sec. Am. Compl ¶¶ 41, 43, 46, 49, 351, 369, 371-374, 377-379.) Finally, Defendants have deleted what was numbered as Paragraph 133 in the First Amended Complaint.

## STANDARD FOR MOTION TO AMEND

The granting of an opportunity to amend the complaint is within the sound discretion of the District Court. Foman v. Davis, 371 U.S. 178 (1962). Courts "should freely give leave" to file amended complaints "when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has interpreted the "freely give leave" standard liberally, such that "amendment should normally be permitted." Rachman Bag Co. v. Liberty Mut. Ins. Co., 46 F.3d 230, 234 (2d Cir. 1995).

Leave to amend should be denied only for undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, or futility of the amendment. Foman, 371 U.S. at 182; see also McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 200 (2d Cir. 2007). Moreover, "plaintiff need not establish the factual merits of her proposed amendment," but must only show that the amendment "would survive a motion to dismiss for failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6)." Presser v. Key Food Stores Coop., Inc., 218 F.R.D. 53, 56 (E.D.N.Y. 2003); see also S.S. Silberblatt, Inc. v. East Harlem, 608 F.2d 28, 42-43 (2d Cir. 1979). Ultimately, "the proposed amendment must be viewed in the light most favorable to the party moving to amend . . . and leave to amend should only be denied if the moving party can prove no

set of facts which would entitle her to relief." Presser, 218 F.R.D. at 56.

As part of their proposed Second Amended Complaint, Plaintiffs also seek to join additional parties as Defendants pursuant to Rule 20(a)(2) of the Federal Rules of Civil Procedure, which provides that:

> Persons. . . may be joined in one action as defendants if any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and any question of law or fact common to all defendants will arise in the action.

The purpose of Rule 20 is to promote trial convenience and expedite the final determination of disputes, thereby preventing multiple lawsuits. Blesedell v. Mobil Oil Co., 708 F. Supp. 1408, 1421 (S.D.N.Y. 1989). "Under the [Federal Rules of Civil Procedure], the impulse is toward entertaining the broadest possible scope of action consistent with fairness to the parties; joinder of claims, parties, and remedies is strongly encouraged." United Mine Workers v. Gibbs, 383 U.S. 715, 724 (1966).

The Second Circuit has interpreted Rule 20(a)(2) to allow permissive joinder of defendants if the claims for relief asserted against them: (1) lead to or arise out of the same transaction or occurrence or series of transactions or occurrences, and (2) some question of law or fact common to all parties will arise in the litigation. Abraham v. Volkswagen of America, 795 F.2d 238, 251 (2d Cir. 1986). See also Blesedell, 708 F. Supp. at 1421; A.I.A. Holdings, S.A. v. Lehman Brothers and Bear, Stearns, & Co., 1998 WL 159059, *5 (S.D.N.Y. Apr. 1, 1998); Phoomahal v. Ridgehaven Village, 2007 WL 2292741. *3 (E.D.N.Y. Aug. 9, 2007). The Second Circuit has interpreted the phrase "same transaction or occurrence" in Rule  (20)(a)(2) to include all "logically related claims by or against different parties to be tried in a single proceeding." Blesedell, 708 F. Supp. at 1421. As set forth below, Plaintiffs meet the aforementioned standards both for permissive joinder of defendants and amendment of the complaint.

7

<u>ARGUMENT</u>

**I.  PLAINTIFFS' MOTION TO JOIN ADDITIONAL DEFENDANTS SHOULD BE GRANTED BECAUSE PLAINTIFFS SATISFY THE STANDARD FOR PERMISSIVE JOINDER OF DEFENDANTS**

As part of their Proposed Second Amended Complaint, Plaintiffs seek to join three additional members of the DPD and three ICE officials as defendants in this dispute.  Joinder of these defendants should be permitted because the claims against these individuals arise out of the same transaction and occurrence as the claims against the current Defendants, and will involve resolution of the same legal and factual issues.  See <u>Abraham</u>, 795 F.2d at 251.

The current Complaint alleges constitutional and other violations arising out of a sting operation leading to the illegal arrest and detention of the Plaintiffs.  The proposed additional defendants are DPD officers or supervising officers in ICE who were personally involved in the same illegal arrest and detention.  Resolution of the claims against these individuals will require the adjudication of the same factual and legal issues already before the Court.  Plaintiffs allege that proposed Defendants ICE officials Sullivan, Martin, and Chadbourne participated in the illegal arrest and detentions by failing to train and supervise ICE officers, through either deliberate indifference or gross negligence.  (Prop. Sec. Am. Compl. ¶¶ 98-116.)  Plaintiffs also allege that proposed Defendants DPD Detectives Weston, Lopez, and Ramos supervised and/or participated in the sting operation leading to the illegal arrests.  (Prop. Sec. Am. Compl.  ¶¶ 15, 20, 23, 68, 74 82, 83, 84, 89, 90, 92.)  Therefore, because the claims against the proposed defendants are "logically related" to the claims against the already named defendants, the court should permit joinder.  <u>Blesedell,</u> 708 F. Supp. at 1421.

**II. PLAINTIFFS' MOTION TO AMEND THE COMPLAINT SHOULD BE GRANTED BECAUSE PLAINTIFFS SATISFY THE LIBERAL STANDARDS FOR LEAVE TO AMEND**

Plaintiffs' Motion for Leave to Amend meets the liberal standard governing the amendment of pleadings expressed in Federal Rule of Civil Procedure 15(a)(2) and as articulated by the Second Circuit.  Leave to amend should be granted in this case because there has been no undue delay, no bad faith on the part of the Plaintiffs, and Defendants will suffer no undue prejudice should the motion be granted.  The proposed amendment is not futile because Plaintiffs have adequately alleged violations of the U.S. Constitution, Connecticut Constitution, and Connecticut state law.  Moreover, there has been no repeated failure to cure deficiencies by amendments previously allowed.

### A. There Has Been No Undue Delay, Bad Faith, or Dilatory Motive

The Plaintiffs have not unduly delayed amendment of the Complaint to add the proposed additional defendants.  Pursuant to the scheduling order filed February 10, 2009, Plaintiffs may move to amend the complaint or join additional parties until May 29, 2009.  [Dkt # 124 at 1].  Plaintiffs' motion has been filed within the allowable time.  Moreover, there has been no bad faith or dilatory motive on the part of Plaintiffs in moving to amend at this time.  Acting pursuant to the discovery schedule set by this court, Plaintiffs have only recently obtained much of the information implicating the additional DPD and ICE officials involved in the illegal arrests and detentions at issue in this action.  See, e.g., Infosint S.A. v. H. Lundbeck A/S, 2007 WL 2489650, *2 (S.D.N.Y. Sept. 4, 2007) (rejecting argument that the party moving to amend should have acted faster to discover identities of the proper parties to the action).

### B.  Leave to Amend Will Not Cause Prejudice to the Defendants

Plaintiffs' Proposed Second Amended Complaint will not unduly prejudice Defendants. In determining what constitutes "prejudice," the Second Circuit considers "whether the assertion of the new claim would: (i) require the opponent to expend significant additional resources to

conduct discovery and prepare for trial; (ii) significantly delay the resolution of the  dispute; or (iii) prevent the plaintiff from bringing a timely action in another jurisdiction." Block  v. First Blood Associates, 988 F.2d 344, 350 (2d Cir. 1993).

Here, the addition of six DPD and ICE officials as defendants does not implicate any of these factors.  No trial date has been set, discovery is not scheduled to conclude before February 1, 2010, and the proposed amendment raises only one new claim--for supervisory liability for three ICE officials-- and no new factual claims.  See e.g., A.V. by Versace, Inc. v. Gianni Versace S.p.A., 87 F.Supp.2d 281, 299 (S.D.N.Y. 2000) (granting motion for leave to amend where trial date had not been set, discovery had not closed, and claims against additional defendants were related to events originally pleaded).  Further, the proposed amendment will have no material impact on the duration and scope of discovery.  Id.  Even if the additions result in a slight increase in discovery, "the adverse party's burden of undertaking discovery, standing alone, does not suffice to warrant denial of a motion to amend a pleading."  United States v. Continental Ill. Nat'l Bank & Trust Co., 889 F.2d 1248, 1255 (2d Cir.1989); see also S.S. Silberblatt, Inc. v. East Harlem Pilot Block-Bldg. 1 Hous. Dev. Fund Co., 608 F.2d 28, 43 (2d Cir. 1979).  The possibility that the proposed amendment will require Defendants to expend additional time, effort, or money does not amount to undue prejudice.  A.V. by Versace, Inc., 87 F.Supp.2d at 299 (quoting Block, 988 F.2d at 351).  Therefore, leave to amend should be "freely granted," Fed. R. Civ. P. 15(a), when, as here, Defendants will not be prejudiced.

### C.  The Proposed Amended Complaint is Not Futile

Plaintiffs' Second Amended Complaint does not put forth futile claims.  The six individuals that Plaintiffs seek to add as defendants will face similar claims as the DPD and ICE officers originally named as Defendants.  The factual allegations Plaintiffs now seek to add

simply provide more support, particularization, and information on claims that are already in the case.

In the Second Circuit, "the futility analysis of Plaintiffs' motion to amend mirrors the analysis of Defendants' Rule 12(b)(6) motion to dismiss." Hines v. City of Albany, 542 F. Supp. 2d 218 (N.D.N.Y. 2008) (granting motion for leave to amend). Here, the proposed amendments are not futile because they rest on the same claims that have already survived Defendants' motion to dismiss. As noted above, on March 10, 2009, this Court denied the federal Defendants' motion to dismiss the Bivens claims against existing ICE Defendants, some of the FTCA claims against the United States, as well as the Danbury Defendants' motion to dismiss the state constitutional claims via Binette v. Sabo, 710 A.2d 688 (Conn. 1988).

The current amendments request relief under Bivens or Binette and allege similar claims against the proposed defendants. Additionally, Plaintiffs' allegations state valid causes of action under §1983 and various state law provisions. Plaintiffs' allegations, therefore, meet the pleading requirements of Federal Rule of Civil Procedure 12(b)(6).

### 1. Joinder of Detectives Lopez and Ramos to existing claims is not futile.

Plaintiffs seek to join Detectives Lopez and Ramos, two DPD detectives who participated in Plaintiffs' illegal arrests, by substituting them for already named "John Doe" Defendants. The Second Circuit permits the naming of "John Doe" Defendants when Plaintiffs know that such Defendants exist but do not yet know their identity. See Lowenstein v. Rooney, 401 F. Supp. 952, 960 (E.D.N.Y. 1975); 2-10 Moore's Federal Practice, Civil § 10.02[d][i] (2009). Once the identities of the former "John Doe" Defendants are ascertained, the Plaintiff may then join the Defendants through Rule 15 amendment procedures. See Corye, 2008 WL 466216, at *1.

Plaintiffs discovered that Detectives Lopez and Ramos participated in the illegal arrest

through the discovery process.  Plaintiffs now seek, at the first available time, to amend the Complaint to add these defendants to various §1983 claims, state constitutional claims, and claims under Connecticut common law.  And as to the <u>Binette</u> claims under the Connecticut constitution, this Court has already denied the Danbury Defendants' motion to dismiss identical claims against other, existing Defendants.  For Detectives Lopez and Ramos, these claims will therefore, not be futile.

To state a valid cause of action under §1983, plaintiffs must allege "(1) that the conduct in question deprived a person of a right, privilege, or immunity secured by the Constitution or the laws of the United States, and (2) that the acts were attributable at least in part to a person acting under color of state law."  <u>Garcia v. Brown</u>, 268 F. App'x 127, 129 (2d Cir. 2008); <u>see also</u> <u>Russell v. Hughes</u>, 2009 WL 1212754, at *2 (D. Conn. Apr. 30, 2009).  Plaintiffs allege that Detectives Lopez and Ramos violated Plaintiffs' Fourth Amendment rights by illegally arresting them without a warrant or exigent circumstances, and that they did so when federal law preempts state and local police from participating in civil immigration enforcement. (Prop. Sec. Am. Compl.. ¶¶ 237, 240.)  Also, Plaintiffs allege that Detectives Lopez and Ramos violated their rights under the Equal Protection Clause of the Fourteenth Amendment because they were arrested solely on the basis of their race, ethnicity, and perceived national origin.  (<u>Id.</u> at ¶ 243.)  Additionally these actions unreasonably deprived the Plaintiffs of their liberty in violation of their Fourteenth Amendment due process rights.  (<u>Id.</u> at ¶ 252.)  Finally, the detectives' actions were done in retaliation for the Plaintiffs' exercise of protected speech and association in a public forum, in violation of their First Amendment rights.  (<u>Id.</u> at ¶ 248.)

In addition, Detectives Lopez and Ramos were, as DPD officers, acting under color of state law. (<u>Id.</u> at ¶¶ 20, 23.)  The §1983 claims against Proposed Defendants Lopez and Ramos rest on

the same factual allegations already made against other existing DPD detectives. As such, Plaintiffs have alleged facts to support several §1983 claims against the two detectives, clearly meeting their burden under Fed. R. Civ. P 12(b)(6). Therefore, joinder of Detectives Lopez and Ramos will not add futile claims.

              2. The addition of factual allegations against Defendant McCaffrey in support of Plaintiffs' existing claims for violation of due process rights under the Fifth Amendment, and against the United States for false arrest/false imprisonment and for abuse of process under the FTCA, is not futile.

        In addition, Plaintiffs add several new factual allegations in support of their Due Process claims against Defendant McCaffrey, as well as in support of their FTCA false arrest/false imprisonment and abuse of process claims against the United States. Since all of these factual allegations are in support of claims that meet the Rule 12(b)(6) standard, none of these claims are futile.

        First, Plaintiffs allege that Defendant McCaffrey, an ICE Supervisory Detention and Deportation Officer, improperly served as the plaintiffs' examining officer for purposes of determining whether to grant bond. (Prop. Sec. Am. Compl. ¶¶ 150, 151). These allegations, if proven, state a claim for relief under Fed. R. Civ P. 12(b)(6) as constituting a violation of Plaintiffs' due process rights. Courts have already recognized that individuals have a due process right to a custody determination or redetermination by a neutral adjudicator. See St. John v. McElroy, 917 F. Supp. 243, 250 (S.D.N.Y. 1996) ("The balance of all of the relevant factors under Mathews v. Eldridge, 424 U.S. 319 (1976) convinces me that an impartial adjudicator is necessary to vindicate the requirements of due process . . ."). Additionally, ICE's own regulations require that in the case of a warrantless arrest, "an officer *other than the arresting officer*" will determine if there is *prima facie* evidence of an immigration violation. 8 C.F.R. § 287.3 (2009) (emphasis added).

The ICE regulation vindicates arrestees' due process rights and does so without imposing significant costs on the Government.  The availability of a neutral decision maker has been held to be fundamental to ensure due process in the administrative context.  See Withrow v. Larkin, 421 U.S. 35, 46-47 (1975); Lopez v. Henry Phipps Plaza South, Inc., 498 F.2d 937, 944 (2d Cir. 1974). The ICE regulation ensures neutrality and impartiality in the initial examination.

Faced with an equally important determination, whether to grant the arrestee bond or continue to deprive the arrestee of liberty, it is a due process right to be provided with a neutral examining officer. Defendant McCaffrey, one of the arresting officers who was present in the bank parking lot the morning of the Plaintiffs' arrests (Prop. Sec. Am. Compl. at ¶ 32), is clearly not "neutral" under constitutional standards.  See Withrow, 421 U.S. at 58 n. 25 ("[W]hen review of an initial decision is mandated, the decisionmaker must be other than the one who made the decision under review.") (internal citations omitted); see also Thomas v. McElroy, 1996 WL 487953, *3-4 (S.D.N.Y. Aug. 27, 1996) (holding that review by a neutral Immigration Judge of a bond determination in the immigration context is required by due process).  Plaintiffs' allegations, therefore, adequately allege a Fifth Amendment violation, and are in no way futile.

Second, Plaintiffs add allegations that Defendants McCaffrey failed to set bond, and third, that he or another ICE official failed to file Plaintiffs' requests for a custody redetermination for between 24 and 167 days, in violation of the Plaintiffs' due process rights and various Connecticut common law torts under the FTCA.  (Prop. Sec. Am. Compl. ¶ 151-169, 316-318, 338, 349.)  Immigration arrestees have a due process right to prompt bail determination.  See Rogowski v. Reno, 94 F. Supp. 2d 177, 183-84 (D. Conn. 1999) (holding that a detained immigration arrestee has a due process right to a prompt bail determination, and noting that "[a] hearing presents a readily available, less restrictive means for the government to achieve its

purposes."); <u>Small v. Reno</u>, 127 F. Supp. 2d 305 (D. Conn. 2000) (same); <u>see also</u> <u>Zavydas v. Davis</u>, 533 U.S. 678, 693 (2001) ("[T]he Due Process Clause applies to all persons within the United States, including aliens, whether their presence is lawful, unlawful, temporary, or permanent."); <u>St. John</u>, 917 F. Supp. at 245-47 (returning immigration arrestee retained due process right to prompt parole hearing).

Plaintiffs allege three distinct Fifth Amendment violations with respect to Defendant McCaffrey's bond determination, each of which are adequately plead and state a claim for relief under Fed. R. Civ. P. 12(b)(6). First, as detailed above, it was improper for Defendant McCaffrey to act as the officer who determined bond because, as an arresting officer, he was not neutral. Second, Defendant McCaffrey's decision to deny bond was improper because he had no information from which to conclude that any of the Plaintiffs were dangerous or a flight risk. (Prop. Sec. Am. Compl. ¶¶ 155-58, 317.) Plaintiffs allege that the failure to set bond was a violation of due process because it deprived them of their liberty without justification, as well caused them to suffer additional injuries, including a transfer to Texas, horrendous prison conditions, and higher bond payments than would have otherwise occurred. (<u>Id.</u> at ¶¶ 174- 175, 317).

Third, Plaintiffs had a right to challenge Defendant McCaffrey's decision to deny them bond in front of a neutral immigration judge. Plaintiffs allege that Defendant McCaffrey or another ICE officer's delay of between 24 and 167 days in submitting Plaintiffs' requests for bond redetermination continued to arbitrarily restrict Plaintiffs' liberty. (<u>Id.</u> at ¶ 161-169, 318, 338, 349.) Plaintiffs had a right to challenge the bond determination promptly before a neutral immigration judge. <u>See</u> <u>Rogowski</u>, 94 F. Supp. 2d at 183-84. Instead, Defendant McCaffrey or another ICE officer prevented Plaintiffs from being able to challenge their bond determination,

resulting in their continued detention and the further deprivation of their liberty.  All three of these allegations are adequately pled and state a claim for relief under the Fifth Amendment.

These same allegations establish that the United States is liable for abuse of process under the FTCA. To state a claim for abuse of process, a plaintiff must allege that the defendant used "legal process against another in an improper manner or to accomplish a purpose for which it was not designed."  Mozzochi v. Beck, 529 A.2d 171, 173 (Conn. 1987). Plaintiffs here allege that Defendants Preble, McCaffrey and Brown abused legal process by arresting and detaining Defendants as a means of intimidation and coercion, a claim which has already survived the federal Defendants' motion to dismiss.  (Prop. Sec. Am. Compl. ¶ 348.)  In this amendment, the Plaintiffs simply seek to add additional facts, alleging that the federal Defendants also abused legal process by failing to provide for a neutral adjudicator for Plaintiffs' initial custody determination, by detaining Plaintiffs without any special justification or evidence of dangerousness or flight risk, and by failing to forward or cause to be forwarded the request of each Day-Laborer Plaintiff for an Immigration Judge to review ICE's denial of bond.  (Id. at ¶¶ 349-51.)

These same allegations also establish that the United States is liable for false arrest and false imprisonment under the FTCA, which likewise has already survived the federal Defendants' motion to dismiss. False arrest is defined as "the unlawful restraint by one person of the physical liberty of another." Outlaw v. City of Meriden, 682 A.2d 1112, cert. denied, 239 Conn. 946, 686 A.2d 122 (1996).  In addition to unlawfully taking custody of, arresting, or causing the arrest of the Plaintiffs, the amended Complaint additionally alleges that the federal Defendants unlawfully took custody of Plaintiffs by, once again, failing to provide for a neutral adjudicator for Plaintiffs' initial custody determination, by detaining Plaintiffs without any

special justification or evidence of dangerousness or flight risk, and by failing to forward or cause to be forwarded the request of each Plaintiff for an Immigration Judge to review ICE's denial of bond.

The United States is liable under the FTCA for these damages.  28 U.S.C. § 1346(b). (Prop. Sec. Am. Compl. ¶ 355.)  As the Plaintiffs adequately allege a cause of action for abuse of process and false arrest/false imprisonment under the FTCA, these claims are not futile.

> ### 3.  The addition of factual allegations against Defendants Baker and Boughton, is not futile.

Plaintiffs seek to add several factual allegations against Defendants Baker and Boughton learned through the course of discovery, which are intended to clarify claims already in the Complaint. Specifically, Plaintiffs have learned that Defendants Baker and Boughton were present for or participated in discussions regarding the implementation of discriminatory policies, including a discriminatory policy against backyard volleyball games popular with the Ecuadorian community (Prop. Sec. Am. Compl. ¶ 42) and a policy relating to housing code violations heavily affecting Ecuadorian neighborhoods (Id. at ¶ 45).  Mayor Boughton also participated in or was present for discussions relating to the decision to create a new lobbying organization called "Mayors and County Executives for Immigration Reform." (Id. at ¶ 40). Both Mayor Boughton and Chief Baker participated in or were present for discussions relating to a request for a Memorandum of Understanding between state officials and ICE regarding the possible training of state police officers to enforce federal immigration laws.  (Id. at ¶ 49). Defendants Boughton and Baker also participated in or were present for discussions relating to Kennedy Park and other day-laborer sites, and the effect of such sites on the City of Danbury, its government, its police department, its residents, and its neighborhoods.  (Id. at ¶ 64-65)  These allegations expand the factual record and support Plaintiffs' existing claims for supervisory

liability against Defendants Boughton and Baker.  See infra Part II.C.4 (discussing supervisory

liability).  These allegations also support Plaintiffs' claims for negligent infliction of emotional

distress against Defendants Boughton and Baker.

### 4.  Joinder of Captain Weston to existing claims is not futile.

Plaintiffs also seek to join DPD Captain Weston as a defendant.  Through evidence newly

discovered through discovery, Plaintiffs now allege that Captain Weston had previous

knowledge of the sting operation that led to the illegal arrests.  (Prop. Sec. Am. Compl ¶¶ 15,

82.)  Plaintiffs also allege that Defendant Weston either approved, authorized, and/or acquiesced

to the sting operation, and with deliberate indifference or gross negligence, failed to train and

instruct the officers who would participate in the arrests in the proper procedures necessary to

make a constitutional arrest.  (Id. at ¶ 15, 83, 89-90, 92, 272-275).

As to the state constitutional claims, in its March 10, 2009 order, this Court already upheld

similar claims under Binnette against Defendants Boughton, Baker, and Fisher, as adequately

pled to withstand a Rule 12(b)(6) challenge.

As to the §1983 claims, joining Weston as a defendant will not be futile.  To adequately

allege supervisory liability under §1983, the Second Circuit requires a showing of "personal

involvement," which:

> is not limited to direct participation by the supervisor in the challenged conduct, but may
> also be established by evidence of an official's (1) failure to take corrective action after
> learning of a subordinate's unlawful conduct, (2) creation of a policy or custom fostering
> the unlawful conduct, (3) gross negligence in supervising subordinates who commit
> unlawful acts, or (4) deliberate indifference to the rights of others by failing to act on
> information regarding the unlawful conduct of subordinates.

Hayut v. State Univ. of N.Y., 352 F.3d 733, 753 (2d Cir. 2003).  Plaintiffs allege that Captain

Weston was deliberately indifferent and/or grossly negligent in supervising his subordinates who

committed the constitutional violations, because he knew to a "moral certainty" that his

subordinates would need to make "difficult choices" in arresting day laborers with the assistance of ICE; that he knew that proper supervision and training would make those choices less difficult; and that he knew that his subordinates were likely to commit constitutional violations without that supervision or training.  Wray v. City of New York, 490 F.3d 189, 195-6 (2d Cir. 2007).

Captain Weston was responsible for supervising the Detectives Bureau of the DPD. (Prop. Sec. Am. Compl. ¶¶ 15, 272, 273.)  He either knew about the operation previously, or he was involved in actually planning and executing the sting operation: in both situations, he knew or should have known beforehand about the potential problems that would arise.  (Id. at ¶ 82, 83, 89, 90, 92.)  By failing to adequately prepare his subordinates, Captain Weston disregarded the risk of constitutional violations.  Plaintiffs' allegations, therefore, adequately allege a claim under § 1983, and are therefore not futile.

Nothing in the Supreme Court's recent decision in Ashcroft v. Iqbal, 556 U.S. ___, 2009 WL 1361536 (2009) alters the above analysis.  In Iqbal, the Supreme Court dismissed Bivens supervisory liability claims against former Attorney General John Ashcroft and FBI Director Robert Mueller, holding that the plaintiff's pleadings were insufficient under Fed. R. Civ. P. 8. Id. at *4.  The plaintiff in Iqbal alleged discriminatory treatment in prison after being detained as a suspected terrorist shortly after the September 11, 2001 attacks.  Id. *5-*6.  The Court held that in a Bivens action, "purpose rather than knowledge is required to impose . . . liability on the subordinate for unconstitutional discrimination;  the same holds true for an official charged with violations arising form his or her superintendent responsibilities."   Id. at *12.   The Court rejected the Iqbal plaintiff's "bare assertions" that the Attorney General and FBI Director "knew of, condoned, and willfully and maliciously agreed to subject him to harsh conditions of

confinement" as insufficient under Rule 8 as interpreted by the Court in <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544 (2008).  <u>Iqbal</u>, 2009 WL 1361536, at *14.

Moreover, the <u>Iqbal</u> decision explicitly reflects the Supreme Court's concern "at the prospect of subjecting high ranking Government officials--entitled to assert the defense of qualified immunity and charged with responding to 'a national and international security emergency unprecedented in the history of the American Republic'--to the burdens of discovery on the basis of a Complaint as nonspecific as [Iqbal's]." <u>Id</u>. at *7 (quoting <u>Iqbal v. Hasty</u>, 490 F.3d 143, 155 (2d Cir. 2007) (Cabranes J., concurring)).  In light of these two special factors -- Defendants who were cabinet-level officials and allegations that arose amidst an "unprecedented" national emergency -- the Court held that Iqbal's allegations were not sufficient to state a claim.  <u>Id</u>. at *16.

Of course, neither factor is present in this case.  The new Defendants whom Plaintiffs propose to add -- DPD officers and local and regional ICE officials, <u>see</u> <u>infra</u> Part II.C.5 -- are not "high ranking Government officials," nor can the arrest of a small group of day-laborers in Danbury, Connecticut plausibly be characterized as a response to "'a national and international security emergency unprecedented in the history of the American Republic." <u>See</u> <u>Iqbal</u>, 2009 WL 1361536, at *16.

<u>Iqbal</u> does not eliminate supervisory liability, but rather clarifies the level of involvement necessary to meet the pleading requirements of Rule 8.  <u>See</u>, <u>e.g.</u>, <u>Tucker v. George</u>, 2009 WL 1444194, *8 (W.D. Wis. May 21, 2009) (refusing to grant motion to dismiss and explaining "<u>Ashcroft v. Iqbal</u> . . . is not on point: Defendants are not asserting that plaintiff's Complaint did not meet the standard necessary to comply with Fed. R. Civ. P. 8, as was the case in <u>Iqbal</u> but rather are arguing that there is *no* set of facts under which plaintiff can prevail"). Given Captain

Weston and all three ICE Defendants' level of personal involvement in the discriminatory arrest and detention, Iqbal's clarification on the law of supervisory liability will not prevent Plaintiffs' Bivens claims against Captain Weston and ICE officials Sullivan, Martin, and Chadbourne. See Tyree v. Zenk, 2009 WL 1456554, at *7 (E.D.N.Y. May 22, 2009) (finding that "[t]he concerns expressed in Iqbal are not applicable here" because the complaint contained detailed factual allegations of personal involvement).

### 5. Joinder of Officials Sullivan, Martin, and Chadbourne is not futile

Plaintiffs seek to join Sullivan, Martin, and Chadbourne as Defendants, and allege supervisory liability under Bivens for violations of the Plaintiffs' constitutional rights. Joinder of Sullivan, Martin, and Chadbourne will not be futile because plaintiffs adequately allege supervisory liability under Bivens.

Sullivan, Martin, and Chadbourne were the senior ICE officials for Danbury at the time of Plaintiffs' arrest. (Prop. Sec. Am. Compl. ¶¶ 28-30) Plaintiffs allege that all three officials were deliberately indifferent and/or grossly negligent in supervising their subordinates, because they knew to a "moral certainty" that their ICE agent subordinates would engage in questioning, detention, and arrests; that such questioning, detention, and arrests call for agents to make "difficult choices" that call for special training; that the current training was inadequate; that ICE had a long and known history of mishandling these arrests; and that their agents were likely to commit egregious constitutional violations in the absence of closer supervision and improved training. (Prop. Sec. Am. Compl. ¶¶ 98-116). Wray, 490 F.3d , at 195-6.

Plaintiffs also allege that all three Defendants knew personally of previous operations in Danbury and therefore knew the high likelihood of problems that would arise, and failed to act as they should have to adequately supervise or train the field officials involved in the illegal arrests. Such claims against mid-level ICE officials are sufficient under Second Circuit law, as clarified

21

by Iqbal. (Prop. Sec. Am. Compl. ¶¶ 110-116).

The claims against the ICE officials for Defendant McCaffrey's violations of the rights of the Plaintiffs also survive the futility analysis. Plaintiffs allege that Defendant McCaffrey violated Plaintiffs' due process rights, and the United States is also liable, through the tort of abuse of process and false arrest/false imprisonment, for his actions. See supra II.A.3.d. Plaintiffs allege that Sullivan, Martin, and Chadbourne had knowledge of previous custody violations, they knew that the current training on custody decisions was inadequate, yet they failed to train their subordinates on how to make custody decisions, thereby exhibiting " 'deliberate indifference to the rights of others by [] failure to act on information indicating unconstitutional acts.'" (Prop. Sec. Am. Compl. ¶¶ 170-174). Russo v. City of Bridgeport, 479 F.3d 196, 211 (2d Cir. 2007) (citing Poe v. Leonard, 282 F.3d 123, 140 (2d Cir.2002)). See also County of Sacramento v. Lewis, 523 U.S. 833, 846 (1998); Vann v. City of New York, 72 F.3d 1040, 1049 (2d Cir. 1995). Again, because these allegations allege knowledge by mid-level officials and allege either deliberate indifference or gross negligence, the allegations are adequate under Second Circuit law. Thus, the supervisory liability claims are not futile.

### D. There has been no repeated failure to cure deficiencies by amendments previously allowed

Plaintiffs have not failed to cure deficiencies by previous amendment. Plaintiffs' Second Amended Complaint seeks to add information that Plaintiffs recently learned or developed through discovery, or that further elaborates on claims and facts pled more generally. The instant Motion is Plaintiff's first opportunity to cure omissions in the Complaint relating to newly acquired information.

## III. PLAINTIFFS' MOTION TO AMEND THE CAPTION SHOULD BE GRANTED

If leave to amend the Complaint if granted, Plaintiffs respectfully request leave to amend

the caption to identify the additional Defendants.  No prejudice will result to Defendants from the amendment of the caption.

## <u>CONCLUSION</u>

For the reasons stated above, Plaintiffs request leave to file the attached Second Amended Complaint.

## **CERTIFICATE OF SERVICE**

I hereby certify that on May 29, 2009 a copy of the foregoing Memorandum of Law In Support of Plaintiffs' Motion to Amend the Complaint and Amend the Caption was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by email to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the Court's CM/ECF System.


_____/s/_____
Michael Wishnie (ct27221)

# Exhibit A

# Proposed Second Amended Complaint

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**
-----------------------------------------------------------------X

JUAN BARRERA, JOSÉ CABRERA, DANIEL            :
CHAVEZ, JOSÉ DUMA, JOSÉ LLIBISUPA,            :
ISAAC MALDONADO, EDGAR REDROVAN,              :
NICHOLAS SEGUNDO SANCHEZ, JUAN                :
CARLOS SIMBAÑA, and DANILO BRITO              :
VARGAS,                                       :
                                              :
Plaintiffs,                                   :
                                              :
    v.                                        :
                                              :    **Proposed Second Amended Complaint**
MARK BOUGHTON, Mayor of Danbury, ALAN         :    **No. 3:07-cv-01436-RNC**
BAKER, Chief of Police, Danbury Police        :
Department, MITCHELL WESTON, Captain,         :
Danbury Police Department, Danbury Police     :
Officers JOSÉ AGOSTO,RICHARD DEJESUS,         :
JAMES A. FISHER, JAMES LALLI, JULIO           :
LOPEZ, CRAIG MARTIN, JOSEPH NORKUS,           :
LUIS RAMOS, JOHN DOES 1-8,                    :
CITY OF DANBURY                               :
                                              :
ICE Assistant Field Office Director GEORGE    :
SULLIVAN, ICE Deputy Field Office Director    :
JIM MARTIN, ICE Field Office Director BRUCE   :
CHADBOURNE, ICE Agents JAMES BROWN,           :
RICHARD MCCAFFREY, RONALD PREBLE,             :
JOHN DOES 9-14, and the UNITED STATES         :

Defendants.
-----------------------------------------------------------------X

## PROPOSED SECOND AMENDED COMPLAINT

This is a civil rights suit to remedy the discriminatory and unauthorized enforcement of

federal immigration laws against Latino residents of the City of Danbury.  Under the leadership

of Mayor Mark Boughton, Danbury and its police department have repeatedly and knowingly

made illegal civil immigration arrests, engaged in impermissibly discriminatory law

enforcement, and retaliated against residents for expressive activities secured by the First Amendment. In their frustration with the arrival of new immigrants to Danbury, Mayor Boughton and the police department have taken the law into their own hands. In some instances the City has acted unilaterally and at other times its officials have conspired with federal immigration agents in the conduct of this unlawful campaign.

Each of the ten Plaintiffs named in this action suffered illegal arrest and detention at the hands of Danbury Police Department ("DPD") officers for alleged civil immigration law violations. Yet federal immigration law preempts and prohibits local police from making civil immigration arrests unless explicitly authorized by prior written agreement with U.S. Immigration and Customs Enforcement ("ICE"). Mayor Boughton very publicly, and unsuccessfully, sought such a written agreement in Connecticut in 2005.

Despite Mayor Boughton's failure to secure authority for the civil enforcement of immigration laws, on September 19, 2006, the DPD instigated an undercover sting operation in which DPD officers, with the knowing and willing assistance of ICE, used extraordinary deception to arrest a group of Latino day-laborers who had gathered at Kennedy Park, a park in the center of downtown Danbury. DPD targeted the men based on their race, ethnicity, and perceived national origin, having no other reason to believe that any of them had violated immigration law. Furthermore, the DPD arrested the day-laborers without probable cause, in violation of the Fourth Amendment. The arrests were also calculated to silence the day-laborers' expression of their availability for work in a traditional public forum, in violation of the First Amendment, and to chill the speech of other day-laborers who now avoid the park for fear of arrest. Nine of the day-laborers arrested on September 19, 2006 are Plaintiffs in this action.

The enforcement of civil immigration laws, despite the absence of the necessary written authorization, has been a regular custom, policy, and practice of the DPD.  DPD officers routinely stage pretextual traffic stops in Danbury, in which they target drivers who are or appear Latino for the purpose of investigating their immigration status.  DPD officers conducting these stops run searches for the names of drivers in the principal criminal database of the Federal Bureau of Investigation ("FBI"), called the National Crime Information Center ("NCIC"); arrest drivers on any civil immigration violations they discover; and turn the arrestees over to ICE for deportation.  One Plaintiff in this action was unlawfully arrested by DPD for a civil immigration violation after a pretextual and race-based traffic stop, transferred to ICE custody, and eventually deported.

The DPD's rogue actions have resulted in numerous constitutional violations, caused Plaintiffs suffering and ignominy, and endangered the civil rights of Danbury's Latino and immigrant communities.  Plaintiffs bring this action to redress the Defendants' unlawful and discriminatory enforcement of federal immigration law.  They ask this Court to issue a declaration stating that Plaintiffs' arrests violate the law and to award Plaintiffs damages for the harm they have suffered as a result of Defendants' illegal actions.

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the Plaintiff's claims arising under the U.S. Constitution and federal statutes pursuant to 28 U.S.C. §§ 1331, 1343, and 1361 and supplemental jurisdiction over claims arising under the laws and Constitution of the State of Connecticut pursuant to 28 U.S.C. § 1367.  Jurisdiction to grant declaratory judgment is conferred by 28 U.S.C. §§ 2201-02.

2.  Venue is proper in this district under 28 U.S.C. § 1391(b) in that all events complained of and giving rise to Plaintiffs' claims arose in this district.

**PARTIES**

**Plaintiffs**

3.  Plaintiff **Juan Barrera.**  DPD officers arrested Plaintiff Barrera on September 19, 2006 and subsequently transferred him to ICE custody.  ICE detained Mr. Barrera in Hartford, Connecticut and then in the Suffolk County House of Corrections in Boston, Massachusetts, where he remained until his release on bond on or about October 3, 2006.  Plaintiff Barrera is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

4.  Plaintiff **José Cabrera.**  DPD officers arrested Plaintiff Cabrera on September 19, 2006 and subsequently transferred him to ICE custody.  ICE detained Mr. Cabrera in Hartford, Connecticut, the Plymouth County Detention Center in Plymouth, Massachusetts, and the Willacy Detention Center in Raymondville, Texas, where he remained until released on bond on or about October 23, 2006.  Mr. Cabrera is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

5.  Plaintiff **Daniel Chavez.**  DPD officers arrested Mr. Chavez on September 19, 2006 and subsequently transferred him to ICE custody.  ICE detained Mr. Chavez in Hartford, Connecticut, the Plymouth County Detention Center in Plymouth, Massachusetts, and the Willacy Detention Center in Raymondville, Texas, where he remained until released on bond on or about October 23, 2006.  Mr. Chavez is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

6.  Plaintiff **José Edwardo Duma.**  DPD officers arrested Mr. Duma on September 19, 2006 and subsequently transferred him to ICE custody.  ICE detained Mr. Duma in Hartford,

Connecticut and then in the Suffolk County House of Corrections in Boston, Massachusetts, where he remained until released on bond on or about October 3, 2006.  Mr. Duma is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

7.   Plaintiff **José Froilan Llibisupa.**  DPD officers arrested Mr. Llibisupa on September 19, 2006 and subsequently transferred him to ICE custody.  ICE detained Mr. Llibisupa in Hartford, Connecticut and then in the Suffolk County House of Corrections in Boston, Massachusetts, where he remained until released on bond on or about October 3, 2006.  Mr. Llibisupa is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

8.   Plaintiff **Isaac Maldonado.**  DPD officers arrested Plaintiff Maldonado on September 19, 2006 and subsequently transferred him to ICE custody.  ICE detained Mr. Maldonado in Hartford, Connecticut and then in the Suffolk County House of Corrections in Boston, Massachusetts, where he remained until released on bond on or about October 3, 2006.  Mr. Maldonado is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

9.   Plaintiff **Edgar Eladio Redrovan.**  DPD officers arrested Mr. Redrovan on September 19, 2006 and subsequently transferred him to ICE custody.  ICE detained Mr. Redrovan in Hartford, Connecticut, the Plymouth County Detention Center in Plymouth, Massachusetts, and the Port Isabel Processing Center in Los Fresnos, Texas, where he remained until released on bond on or about October 23, 2006.  Mr. Redrovan is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

10. Plaintiff **Nicolas Segundo Sanchez.**   DPD officers arrested Mr. Sanchez on September 19, 2006 and subsequently transferred him to ICE custody.  ICE detained Mr. Sanchez in Hartford, Connecticut, the Plymouth County Detention Center in Plymouth, Massachusetts, and the Willacy Detention Center in Raymondville, Texas, where he remained

until released on bond on or about October 20, 2006.  Mr. Sanchez is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

11. Plaintiff **Juan Carlos Simbaña.**  DPD officers arrested Mr. Simbaña on September 19, 2006 and subsequently transferred him to ICE custody.  ICE detained Mr. Simbaña in Hartford, Connecticut, the Plymouth County Detention Center in Plymouth, Massachusetts, and the Willacy Detention Center in Raymondville, where he remained until released on bond on or about October 26, 2006.  Mr. Simbaña is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

12. Plaintiff **Danilo Brito Vargas.**  On February 17, 2007, DPD officers detained Mr. Vargas in a pretextual, race-based traffic stop, unlawfully arrested him on the basis of an alleged civil immigration infraction in or around the intersection of Rose Hill Avenue and Hoyt Street in Danbury, and transferred him to ICE custody.  ICE detained Mr. Vargas in Hartford, Connecticut and Rhode Island and eventually deported him to Ecuador in April or May 2007.  Plaintiff Vargas is of Latino race and ethnicity.

**Danbury Defendants**

13. Defendant **Mark Boughton** is the Mayor of the City of Danbury, Connecticut. Under state and municipal law, he is the city official charged with ultimate responsibility for implementing and administering the policies, practices, and/or customs of the City of Danbury. Defendant Boughton is sued in his official and personal capacities. During all times mentioned in this complaint, Defendant Boughton was acting under color of state law.

14. Defendant **Alan Baker** is the Chief of Police of the Danbury Police Department. Under state and municipal law, he is the city official charged with ultimate responsibility for the training and supervision of DPD officers and the administration and implementation of DPD

policies, practices, and/or customs.  Defendant Baker is sued in his official and personal capacities.  During all times mentioned in this complaint, Defendant Baker was acting under color of state law.

15. Defendant **Mitchell Weston** is a Captain in the Danbury Police Department and is the supervisor for the Detective Bureau.  Weston has supervisory responsibility for all of the DPD Defendants in the Detective Bureau, including those whose conduct resulted in the arrest and detention of Plaintiffs.  He also had knowledge of the undercover sting operation before it occurred, or he directed, authorized, approved, and/or acquiesced in the operation.  Defendant Weston is sued in his official and personal capacities.  During all times mentioned in this complaint, Defendant Weston was acting under color of state law.

16. Defendant **James Fisher** is a Detective Lieutenant in the DPD's Special Investigations Division ("SID").  He is responsible for the training and supervision of SID officers and for carrying out the policies, practices, and/or customs of the DPD.  He was also the lead DPD officer for the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.  During all times mentioned in this complaint, Defendant Fisher was acting under color of state law.

17. Defendant **José Agosto** is a Danbury Police Officer.  He is responsible for carrying out the policies, practices, and/or customs of the DPD and participated in the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.  During all times mentioned in this complaint, Defendant Agosto was acting under color of state law.

18. Defendant **Richard DeJesus** is a Danbury Police Officer.  He is responsible for carrying out the policies, practices, and/or customs of the DPD and participated in the undercover sting operation on September 19, 2006.  He is sued in his official and personal

capacities.  During all times mentioned in this complaint, Defendant DeJesus was acting under color of state law.

19. Defendant **James Lalli** is a Danbury Police Officer. He is responsible for carrying out the policies, practices, and/or customs of the DPD and participated in the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.  During all times mentioned in this complaint, Defendant Lalli was acting under color of state law.

20. Defendant **Julio Lopez** is a Detective with the Danbury Police Department.  He is responsible for carrying out the policies, practices, and/or customs of the DPD and participated in the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.  During all times mentioned in this complaint, Defendant Lopez was acting under color of state law.

21. Defendant **Craig Martin** is a Detective with the Danbury Police Department. He is responsible for carrying out the policies, practices, and/or customs of the DPD and participated in the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.  During all times mentioned in this complaint, Defendant Martin was acting under color of state law.

22. Defendant **Joseph Norkus** is a former Danbury police officer. While a Danbury Police Officer, he was responsible for carrying out the policies, practices, and/or customs of the DPD and participated in the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.  During all times mentioned in this complaint, Defendant Norkus was acting under color of state law.

23. Defendant **Luis Ramos** is a Detective with Danbury Police Department.  He is responsible for carrying out the policies, practices, and/or customs of the DPD and participated

in the undercover sting operation on September 19, 2006.  He is sued in his official and personal capacities.  During all times mentioned in this complaint, Defendant Ramos was acting under color of state law.

24. Defendants **John Does 1-5** are Danbury Police Officers who took part in the arrests on September 19, 2006, but whose identities are as yet unknown.  They are responsible for carrying out the policies, practices, and/or customs of the DPD, and they are sued in their official and personal capacities.   During all times mentioned in this complaint, Defendants John Does 1-5 were acting under color of state law.

25. Defendants **Does 6-8** are Danbury Police Officers who participated in the civil immigration arrest of Plaintiff Vargas on the pretext of an investigative stop for an alleged traffic violation on February 17, 2007.  John Does 6-8 unlawfully investigated, detained, and arrested Plaintiff Vargas on suspicion of a civil immigration infraction, on the basis of information obtained from the NCIC database.  They are sued in their official and personal capacities. During all times mentioned in this complaint, John Does 6-8 were acting under color of state law.

26. Plaintiffs are unaware of the true names and capacities, whether individual or otherwise, of Defendant Does 1 through 8, inclusive, and therefore sue those Defendants by fictitious names.  These Doe Defendants are responsible and liable for the acts and/or damages alleged in this Complaint.  Plaintiffs will amend this Complaint to allege the Doe Defendants' true names and capacities when they have been ascertained.

27. Defendant **City of Danbury** is a Connecticut municipal corporation. It is sued both under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) for the execution of

its unconstitutional customs and policies and pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and 7-101a for the tortious acts of its employees.

**ICE Defendants**

28. Defendant **George Sullivan** is the Assistant Field Office Director for the Detention and Removal Office ("DRO") in Hartford, Connecticut.  Sullivan has supervisory responsibility for all of the ICE Defendants in the Hartford office, including those whose conduct resulted in the arrest and detention of Day-Laborer Plaintiffs.  Defendant Sullivan is sued in his personal capacity. During all times mentioned in this complaint, Defendant Sullivan was acting under color of federal law.

29. Defendant **Jim Martin** is the Deputy Field Office Director for the Boston regional DRO, which governs the Hartford sub-office. Defendant Martin has supervisory responsibility for all of the ICE Defendants in the Boston region, including those whose conduct resulted in the arrest and detention of Day-Laborer Plaintiffs. Defendant Martin is sued in his personal capacity. During all times mentioned in this complaint, Defendant Martin was acting under color of federal law.

30. Defendant **Bruce Chadbourne** is the Field Office Director for the Boston regional DRO office, which governs the Hartford sub-office. Defendant Chadbourne is the federal official charged with the ultimate responsibility for the training and supervision of all ICE officers in the Boston region, and for the administration and implementation of the regional office's policies, practices, and/or customs. Defendant Chadbourne is sued in his personal capacity. During all times mentioned in this complaint, Defendant Chadbourne was acting under color of federal law.

31. Defendant **James E. Brown** is an agent of ICE's Detention and Removal Office, Fugitive Operations Unit, in Boston, Massachusetts.  He is responsible for carrying out the immigration

law enforcement operations of the Fugitives Operation Unit in Boston.  He took part in the sting operation at Kennedy Park in Danbury and the arrest and detention of nine Plaintiffs on September 19, 2006.  He is sued in his personal capacity.  During all times mentioned in this complaint, Defendant Brown was acting under color of federal law.

32. Defendant **Richard L. McCaffrey** is an agent of the ICE Detention and Removal Office, Hartford Fugitive Operations Team ("HARFOT").  He is responsible for carrying out HARFOT immigration law enforcement operations.  He took part in the sting operation at Kennedy Park in Danbury and the arrest and detention of nine Plaintiffs on September 19, 2006.  He is sued in his personal capacity.  During all times mentioned in this complaint, Defendant McCaffrey was acting under color of federal law.

33. Defendant **Ronald L. Preble** is an agent of the HARFOT.  He is responsible for carrying out HARFOT immigration law enforcement operations.  He took part in the sting operation at Kennedy Park in Danbury and the arrest and detention of nine Plaintiffs on September 19, 2006.  He is sued in his personal capacity.  During all times mentioned in this complaint, Defendant Preble was acting under color of federal law.

34. Defendants **John Does 9-14** are agents of ICE who participated in the arrest and detention of nine Plaintiffs on September 19, 2006.   They are responsible for carrying out the policies of ICE, and they are sued in their personal capacity.  During all times mentioned in this complaint, Defendants John Does 9-14 were acting under color of federal law.

35. Plaintiffs are unaware of the true names and capacities, whether individual or otherwise, of Defendant Does 9 through 14, inclusive, and therefore sue those Defendants by fictitious names. Each of the Doe Defendants is responsible and liable for the acts and/or

damages alleged in this Complaint. Plaintiffs will amend this Complaint to allege the Doe Defendants' true names and capacities when they have been ascertained.

36. During all times mentioned in this complaint, all Defendants were acting under color of law, that is, under color of the statutes, laws, charter, ordinances, rules, regulations, customs and usages of the United States, the State of Connecticut, or the City of Danbury.

## STATEMENT OF FACTS

**Immigration Law Enforcement in Danbury under Mayor Mark Boughton**

37. Mayor Mark Boughton, first elected in 2001, has been a vocal advocate of strict immigration enforcement and of local government and police involvement in immigration enforcement.

38. Mayor Boughton has promoted the local enforcement of federal immigration laws in Danbury in direct response to an increase in the number of the city's immigrant and Latino residents and out of frustration over the federal government failure's to address the impact of sudden, large-scale immigration on local municipalities. In recent years, Danbury has seen a significant increase in immigrants from Brazil and other Latin American countries, especially Ecuador.

39. The arrival of new Latino immigrants, and the failure of the federal government to address immigration's local effects, has sparked a backlash from Mayor Boughton's administration.

40. For example, in early 2006, Mayor Boughton participated in or was present for discussions relating to his decision to create and lead a new nonprofit organization called "Mayors and County Executives for Immigration Reform." The organization, now disbanded, sought to lobby lawmakers to overhaul federal immigration laws.

41. Mayor Boughton's administration has also targeted, harassed, and intimidated Danbury's new city residents through a number of discriminatory policies. These policies include discriminatory enforcement of city ordinances, such as building code and vehicle registration regulations; shutting down neighborhood volleyball games; encouraging police harassment of day-laborers; encouraging direct police enforcement of civil immigration laws through traffic stops; and requests to U.S. Senators and Representatives and ICE for federal assistance in immigration law enforcement. Upon information and belief, these policies aim ultimately to drive unwanted immigrants from Danbury and to deter future immigrants from making Danbury their home.

42. Mayor Boughton has especially directed these discriminatory policies against Danbury's Ecuadorian community. For example, both Mayor Boughton and Chief Baker were present for or participated in discussions relating to the effect of backyard volleyball games on the City of Danbury, its government, its police department, its residents, and its neighborhoods. Mayor Boughton and Chief Baker also participated in discussions relating to how to develop a backyard volleyball game ordinance, and whether to introduce it to the Danbury Common Council.

43. In April 2005, Danbury drew national media attention when the Danbury Common Council, with Mayor Boughton's support, considered an ordinance banning "repetitive outdoor group activities." The purpose of this ordinance was to shut down the Ecuadorian community's neighborhood volleyball games, one of the primary venues for community gatherings in the spring and summer.

44. Mayor Boughton also requested that the DPD aggressively police the volleyball games in order to harass the Ecuadorian community.

45. Around this same time, Mayor Boughton and Chief Baker also participated in or where present for discussions relating to housing code violations in heavily Ecuadorian neighborhoods in Danbury.  They were also present for or participated in discussions relating to the creation, promotion, or operation of housing code enforcement programs, such as the Office of Neighborhood Assistance (ONA) and the Unified Neighborhood Inspection Team (UNIT).

46. Pursuant to Mayor Boughton's policy, city code inspectors discriminatorily enforced Danbury's fire and building codes and parking regulations against the Ecuadorian community. For example, in a nighttime sweep on July 23, 2005, code enforcement officers shut down approximately seven sites that serviced the Ecuadorian community's neighborhood volleyball games.

47. The centerpiece of Danbury's harassment campaign under Mayor Boughton, however, has been the City of Danbury's escalating involvement in the enforcement of federal immigration laws, especially through the Danbury Police Department.

48. Mayor Boughton and other Danbury city officials are fully aware and have been informed by their own Office of Corporation Counsel that local police lack the legal authority to enforce federal civil immigration laws.

49. In a letter to Connecticut Attorney General Richard Blumenthal, dated April 15, 2005, Mayor Boughton requested that Attorney General Blumenthal enter into a Memorandum of Understanding ("MOU") with ICE to train, supervise, and deputize state police officers to enforce federal immigration laws, pursuant to 8 U.S.C. § 1257(g).  State officials declined to pursue this course.  Both Mayor Boughton and Chief Baker participated in or were present for discussions relating to this request for an MOU.

50. Despite this response from state officials, in a subsequent letter to Connecticut Governor Jodi Rell, Mayor Boughton stated that he had nevertheless instructed Danbury Police Chief Alan Baker to prioritize the resources of the DPD to assist with future federal and state immigration enforcement activities in Danbury.

51. In a letter to Connecticut Citizens for Immigration Reform, dated January 19, 2006, and based on legal advice from Danbury's Office of Corporation Counsel, Chief Baker acknowledged that DPD officers possess the authority to enforce only criminal—but not civil— immigration laws.

52. Despite their knowledge that DPD officers are not authorized to enforce civil immigration laws, Mayor Boughton and Chief Baker have nevertheless encouraged and instructed the DPD to carry out independent civil immigration law enforcement actions against Danbury's unwanted immigrant, Latino, and Ecuadorian residents without the requisite training, supervision, and written agreement with ICE as required by law.

53. Pursuant to the direction of Mayor Boughton and Chief Baker, the DPD's Special Investigations Division ("SID") has become especially active in civil immigration law enforcement activities.

54. SID is a special vice unit of the DPD that was established to investigate narcotics, gambling, prostitution, and organized crime.  SID officers have received no formal training in immigration law enforcement and they are not supervised by ICE officers.

55. In a December 2004 letter to Eduargo Aguirre, Jr., Director of U.S. Citizenship and Immigration Services, which is an agency within the Department of Homeland Security ("DHS"), Mayor Boughton described the recent arrival of allegedly undocumented immigrants in

Danbury and requested the assistance of the agency in enforcing immigration laws in Danbury. Mayor Boughton also sent a copy of this letter to Tom Ridge, then Secretary of DHS.

56. Mayor Boughton also sent copies of correspondence with state and other federal officials to the Secretary of DHS.  This correspondence described the perceived problems Danbury faced as a result of illegal immigration and requested the assistance of state and federal authorities in enforcing immigration laws.

57. The ICE Defendants were fully aware of the Mayor's unlawful immigration enforcement campaign.

**Harassment of the Kennedy Park Day-Laborers Under Mayor Mark Boughton**

58. As part of their local immigration enforcement campaign, Mayor Boughton and the DPD have singled out the day-laborer community in Danbury's Kennedy Park for special harassment.

59. Upon information and belief, almost all of the day-laborers who gather at Kennedy Park each day are Latino men—many of Ecuadorian descent—and Mayor Boughton and the DPD have targeted them for harassment on the basis of their race, ethnicity, and perceived national origin.  Plaintiffs Barrera, Cabrera, Chavez, Duma, Llibisupa, Maldonado, Redrovan, Sanchez, and Simbaña are all Latino and are all alleged by ICE to be citizens of Ecuador.

60. Kennedy Park is a small park, open to the public, located at the intersection of Main Street and Kennedy Avenue.  Kennedy Park is at the center of Danbury's downtown district and within walking distance of City Hall.

61. In recent years, Kennedy Park has become a gathering site for day-laborers. Contractors in the construction, landscaping, and other industries drive by Kennedy Park in the

early morning to solicit workers on a job-by-job basis.  Normally, wages and work arrangements are negotiated at the park, and contractors then drive workers to worksites.

62. No ordinance in the Danbury Municipal Code prohibits the expression of one's availability to solicit work in a public forum.

63. Prior to September 2006, the daily and visible gathering of the day-laborers in Kennedy Park had become a source of political controversy in Danbury and subject of increasing debate among city residents.

64. Mayor Boughton and Chief Baker participated in or were present for discussions relating to Kennedy Park and other day-laborer sites, and the effect of such sites on the City of Danbury, its government, its police department, its residents, and its neighborhoods.

65. Mayor Boughton and Chief Baker also participated in or were present for discussions about the possibility of finding alternate sites where day-laborers could gather.

66. Upon information and belief, Mayor Boughton expressly directed the Danbury Police to harass and intimidate the day-laborers who gathered peaceably in Kennedy Park in order to silence their solicitation speech and prevent them from communicating with potential employers. Mayor Boughton and the DPD targeted the day-laborers for such harassment and intimidation on the basis of their race, ethnicity, and perceived national origin.

67. In accordance with Mayor Boughton's directives, DPD officers, from at least as early as August 2006, repeatedly harassed day-laborers gathering peaceably in Kennedy Park by threatening to ticket, cite, or arrest them on the grounds that they were interfering with the flow of traffic.

68. Police approached even day-laborers who were not crossing or about to cross the street in front of Kennedy Park and warned them not to congregate near the edge of the park.

69. The DPD's campaign of threats and harassment was intended to deter and effectively prohibit day-laborers from assembling peaceably in the park and to encourage them to leave Danbury. The DPD also directed these threats and harassment against the day-laborers on the basis of their race, ethnicity, and perceived national origin.

70. There is a second site in Danbury where immigrant day-laborers gather to solicit employment, located outside Minas Carne & Deli, a Brazilian restaurant at 36 Osborne Street.

71. The men who gather at the site on Osborne Street are predominantly of Brazilian descent, in contrast to the largely Ecuadorian Kennedy Park site.

72. Upon information and belief, no day-laborers have ever been arrested for civil immigration violations at the site on Osborne Street.

**The Arrest of Eleven Men on September 19, 2006**

Planning the Sting Operation-- Danbury Defendants

73. On September 19, 2006, DPD's harassment of the day-laborers culminated in an undercover immigration sting operation at Kennedy Park that resulted in the unlawful arrest of eleven men, nine of whom are Plaintiffs in this action.

74. Defendants Agosto, DeJesus, Fisher, Lalli, Lopez, Martin, Norkus, Ramos, Weston, and John Does 1-5 (collectively, the "DPD Officers") planned and/or executed the operation. Defendants Brown, McCaffrey, Preble, and John Does 9-14 (collectively, the "HARFOT Officers") were present in Danbury during the execution of the operation.

75. Consistent with Mayor Boughton and the DPD's efforts to drive new Latino and Ecuadorian immigrants from the city, Defendant DPD Officers determined, prior to September 19, 2006, to arrest day-laborers at Kennedy Park.

76. The DPD Officers knew of no particular "fugitive" or other alleged immigration violators in Kennedy Park and had no specific targets in mind in planning the undercover sting operation with ICE.

77. Nevertheless, Detective Fisher communicated with one or more of the HARFOT Officers regarding the potential presence of immigration violators, including immigrants with outstanding orders of deportation or removal, among the day-laborers at Kennedy Park.

78. The DPD communication to ICE was non-specific and based on group stereotypes. The communication targeted the day-laborers on the basis of their race, ethnicity, and perceived national origin, while providing no identifying information about any individuals who might have been in violation of federal law.

79. Furthermore, upon information and belief, Detective Fisher submitted the tip to retaliate against the day-laborers for gathering in public to express their availability to work and to communicate with potential employers.

80. Although Mayor Boughton and the DPD under the leadership of Chief Baker have repeatedly alleged, in letters to state officials and to the media, that immigration law violators are present at Kennedy Park, they have no basis for these allegations other than racial and ethnic stereotype and perceived national origin.  Mayor Boughton and the DPD have made these allegations to further their campaign to drive the day-laborers from Kennedy Park and to instill fear in the rest of Danbury's immigrant population.

81. On or about September 18, 2006, Detective Fisher and the HARFOT Officers agreed that the operation would take place on September 19, 2006.

82. Defendant Weston was advised and knew about the planned operation in advance.

83. Defendant Weston also directed, authorized, approved, and/or acquiesced to the sting operation.

84. On or about September 18, 2006, Detective Fisher informed others, including but not limited to Captain Weston and DPD Officers DeJesus, Martin, and Norkus of the planned operation. Detective Fisher personally requested the assistance of DPD Officers DeJesus, Martin, and Norkus, who agreed to work extended shifts of duty on September 19, 2006.

85. Defendants DeJesus, Martin, and Norkus were fully aware of the purpose of the operation, knowingly and willingly agreed to assist, intentionally targeted the day-laborers for arrest based on their race, ethnicity, and/or perceived national origin, and intended to retaliate against the day-laborers for their peaceable expressive activities in Kennedy Park.

86. Detective Fisher or another of the DPD Officers arranged for the use of an undercover vehicle on September 19, 2006.

87. One of the Defendant DPD Officers dressed in clothing so as to resemble the sort of contractor or employer who typically hired day-laborers at Kennedy Park.

88. The DPD Officers and the HARFOT Officers met in Danbury in the early morning of September 19, 2006 to review final plans for the sting operation.

89. Defendant Weston knew or should have known that the DPD Officers had no authority to make civil immigration arrests.  He knew or should have known that the DPD Officers would need to make difficult choices in questioning, detaining, and/or arresting day laborers for alleged federal immigration violations, and further, that proper supervision and training would make those choices less difficult.

90. Defendant Weston also knew or should have known that the DPD Officers were likely to commit constitutional violations in questioning, detaining, and/or arresting individual day-laborers without proper supervision or training.

91. Upon information and belief, although he was aware of a potentially serious problem of unconstitutional conduct by DPD Officers, and of the serious need for corrective action and supervision, Police Chief Baker failed to inform himself about or approve and otherwise adequately supervise the sting operation as required by DPD internal policies and procedures.

92. Chief Baker and Captain Weston failed to so despite the importance of such procedures to protecting the rights of arrestees, their knowledge that local immigration enforcement is preempted under federal law, and their awareness of the DPD Officers' goals of suppressing the protected speech of the day-laborers, of singling out the day-laborers for harassment on the basis of race, ethnicity, and perceived national origin, and of ultimately driving the Kennedy Park day-laborers from Danbury.

93. The DPD Officers' misconduct was so manifest as to imply the constructive acquiescence of Police Chief Baker in his capacity as supervisor and policymaking official for the City of Danbury.

Planning the Sting Operation-- ICE Defendants

94. Pursuant to Mayor Boughton and the DPD's goal of ridding Danbury of its new Latino and Ecuadorian immigrants, HARFOT Officers willfully and knowingly agreed to assist the DPD in an operation to arrest day-laborers at Kennedy Park.  The HARFOT Officers were aware of the DPD Officers' discriminatory intent in undertaking the operation.

95. Before September 19, 2006, the HARFOT Officers did not identify any particular suspected immigration violators among the Kennedy Park day-laborers.  The HARFOT Officers

did not obtain any administrative or criminal arrest warrants in advance of the September 19th operation.

96. The HARFOT Officers were aware that the DPD Officers' tip contained no identifying information about any individuals who might have been in violation of federal law and that the DPD Officers provided it to them on a racially discriminatory basis.

97. Moreover, in participating in the sting operation, the HARFOT Officers themselves proceeded on the basis of racial and ethnic stereotype and perceived national origin, and without any identifying information about any individuals who might have been in violation of federal law.

98. The HARFORT Officers were members of a Fugitive Operations Team (FOT), whose congressional mandate is to identify, locate, apprehend, and remove dangerous fugitive aliens from the United States, with the highest priority placed on those fugitives who have been convicted of crimes.

99. In 2006, there were fewer than seventy-five working FOTs operating in the United States. FOTs typically consist of seven members: a Supervisory Deportation Officer (SDO), an Immigration Enforcement Agent (IEA), a Deportation Assistant, and four Deportation Officers (DOs). The SDO is responsible for planning fugitive operations, which are carried out by the SDO and the DOs, with support from other team members.

100.    Since at least early 2006, FOTs have come under increasing public criticism for a pattern of widespread constitutional violations. Over the past three years, FOTs have conducted warrantless home invasions, engaged in racial profiling, conducted coercive questioning, stopped and questioned subjects without reasonable suspicion, detained individuals without probable cause, denied detained subjects access to counsel and prohibited them from using the phone in

states such as Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Iowa, Maryland, Massachusetts, Minnesota, Nebraska, New Jersey, New Mexico, New York, North Carolina, Ohio, Rhode Island, Tennessee, Texas, and Washington.

101.    The FOTs' frequent constitutional violations in the course of operations have become such a widespread problem that Congress has held hearings on the issue. Non-governmental organizations investigating the problem have revealed widespread constitutional violations ranging from due process violations, illegal entry of homes without warrants, and denying subjects access to counsel and phone calls once detained.

102.    The FOT training program was woefully inadequate to prevent officers from engaging in frequent and egregious constitutional violations during their operations.  The training program consists of a one-time three-week class for new FOT members, which focuses on teaching agents how to prepare and review fugitive case files, locate fugitives through computer databases, use confidential informants, conduct surveillance, and plan operations.

103.    Much of the training is designed to show participants how to use the FOT fugitive database system and perform other administrative tasks. It does not sufficiently instruct agents in how to make arrests without violating constitutional rights.

104.    Although it is purportedly mandatory, many FOT members never attend this training. Even those who may work for up to two years on an FOT before they attend this training. ICE provides no national in-service training at any time to inform agents of new legal developments or ensure their understanding of lawful enforcement tactics. Inadequate training places FOT members at heightened risk of engaging in unconstitutional actions.

105.    Furthermore, ICE has no specific training program that provides instruction for FOT members about working with "partnering" cities such as Danbury, even though city police officers often participate in FOT activities alongside FOT members.

106.    Nor does ICE have a specific training program that provides instruction for FOT members about how to perform "sting" or undercover operations without violating arrestees' constitutional rights.

107.    Upon information and belief, Defendants Sullivan, Martin, and Chadbourne knowingly failed to implement an adequate training program for the HARFOT Defendants on how to question, detain, and make the arrests of individuals without violating their constitutional rights.

108.    Defendants Sullivan, Martin, and Chadbourne knew or should have known that the HARFOT Defendants would engage in questioning, detain individuals, and make arrests; that such questioning, detention, and arrests call for agents to make difficult choices that call for special training to avoid serious and unconstitutional misconduct; that the FOT training provided to the HARFOT Defendants before September 19, 2006 was inadequate; that FOT teams had a long and known history of engaging in unconstitutional questioning, detention, and arrests; and that the HARFOT Defendants were likely to commit egregious constitutional violations in mishandled questioning, detention, and arrests. Defendants' failure to create an adequate training or supervision program caused Plaintiffs' injuries.

109.    Defendants Sullivan, Martin, and Chadbourne were also grossly negligent in their supervision and training of their ICE agent subordinates. They knew or should have known that there was a high degree of risk that their subordinates would violate individuals' constitutional

rights in the course of their questioning, detention, and arrests, and yet they consciously or recklessly disregarded that risk by failing to take any corrective actions.

110.    Furthermore, the Hartford FOT had conducted numerous immigration enforcement operations or actions in and around Danbury prior to September 19, 2006.

111.    Some of the Hartford FOT operations or actions in Danbury prior to September 19, 2006 had been based on information provided by the DPD.

112.    In all Hartford FOT operations or actions in Danbury prior to September 19, 2006, whether based on DPD information or otherwise, the Hartford FOT had targeted a specific individual or individuals, at a specific location or locations.

113.    In addition, ICE regional and national public affairs officials regularly collect and circulate throughout the agency news clippings regarding immigration matters, including reports from local media sources.  These agency distributions are known as "ICE Clips."

114.    Defendants Sullivan, Martin, and Chadbourne regularly receive distributions of ICE Clips.

115.    Defendants Sullivan, Martin, and Chadbourne knew or should of known of the anti-immigrant campaign and activities of Mayor Boughton and the City of Danbury before September 19, 2006, based on the inclusion of media accounts of these activities in ICE Clips, prior Hartford FOT operations or actions in Danbury, the absence of specific targets for the September 19, 2006 operation or action, and other sources.

116.    As the supervisors of an FOT unit that had an extensive history with Danbury, Defendants Sullivan, Martin, and Chadbourne knew or should have known that that there was a high degree of risk that the Danbury operation or action was discriminatory and non-specific, and that one or more of the HARFOT Defendants would violate the constitutional rights of the

arrestees by participating in it.   However, Defendants Sullivan, Martin, and Chadbourne either deliberately or recklessly disregarded that risk by failing to take any actions to supervise the operation, and that failure caused Plaintiffs' constitutional injuries.

### The Arrests

117.    On the morning of September 19, 2006, each of the Plaintiffs Barrera, Cabrera, Chavez, Duma, Llibisupa, Maldonado, Redrovan, Sanchez, and Simbaña (collectively, "Day-Laborer Plaintiffs") went to Kennedy Park to find work for the day.

118.    Some time early that morning, each of the Day-Laborer Plaintiffs saw a vehicle drive up to the park.  Each of the Day-Laborer Plaintiffs approached the vehicle, and the driver offered each of them work for the day demolishing a fence.  The driver did not appear to be looking for any specific individuals.

119.    In fact, the vehicle approached by each Day-Laborer Plaintiff was driven by one of the DPD Officers, and the offer of work demolishing a fence was a ruse.

120.    Each Day-Laborer Plaintiff reasonably relied on the misrepresentation of the offer of work and entered the vehicle.

121.    The vehicle made three trips to Kennedy Park that morning, picking up three to five workers each time.

122.    On each of the three trips from Kennedy Park, the vehicle drove several blocks to a fenced-in lot behind an office building on Main Street in Danbury.  The vehicle stopped in the corner of the parking lot behind the building, which is surrounded by a tall chain link fence and closed off on the fourth side by the building.

123.    The undercover DPD officer driving the vehicle did not ask any questions of any of the Day-Laborer Plaintiffs during the drive from Kennedy Park to the parking lot.

124.    Both DPD Offices and HARFOT Officers were present in the parking lot when each of the Day-Laborer Plaintiffs arrived.

125.    When each Day-Laborer Plaintiff exited the vehicle, the DPD Officers and/or HARFOT Officers, who were waiting in the lot, immediately surrounded each man, some officers with weapons drawn, and roughly seized each Day-Laborer Plaintiff.  Some of the arresting officers had apparently been hiding in or around several vehicles that were parked in the corner of the parking lot.

126.    Upon seizing each Day-Laborer Plaintiff, the DPD Officers and/or HARFOT officers, then physically detained each Day-Laborer Plaintiff and told him that he was under arrest.  The DPD Officers and/or HARFOT officers handcuffed each Day-Laborer Plaintiff, placed him in a white van that was parked in the lot, and closed the door to the van.

127.    Those Day-Laborer Plaintiffs who arrived first were instructed to watch while the same thing happened to subsequent day-laborers.  A total of eleven day-laborers were arrested and placed in the van.

128.    The DPD Officers arrested the Day-Laborer Plaintiffs at approximately 7:00 am on September 19, 2006.

129.    In the alternative, Plaintiffs allege that HARFOT Officers arrested the Day-Laborer Plaintiffs at some point on the morning of September 19, 2006.

130.    After being arrested in the parking lot, some of the Day-Laborer Plaintiffs wanted to call a family member or a lawyer and asked to make a phone call.  The arresting officers refused to let any of the Day-Laborer Plaintiffs make such a call and confiscated the cell phones of those Day-Laborer Plaintiffs who had them.

131.    Only after the Day-Laborer Plaintiffs had been physically restrained, put under arrest by the DPD Officers and/or HARFOT Officers, and told that they could not call anyone, did law enforcement agents question the Day-Laborer Plaintiffs about their identity, nationality, the place and manner of their entry into the United States, and their immigration status.

132.    While the Day-Laborer Plaintiffs were detained in the parking lot, a DPD officer of Hispanic appearance, and who spoke Spanish well, told Plaintiff Barrera in Spanish that he had been arrested because he was standing in Kennedy Park, after the DPD had previously warned laborers not to stand there.  Upon information and belief, this individual was Defendant José Agosto.

133.    None of the Day-Laborer Plaintiffs had been previously warned, cited, or ticketed for standing in Kennedy Park or interfering with traffic in the area of Kennedy Park, and none had any record of causing any "safety issues" in Kennedy Park, whether related to traffic or otherwise.

134.    None of the Day-Laborer Plaintiffs had an outstanding deportation or removal order, and no immigration warrants had been issued for any of them before their arrests on September 19, 2006.

135.    The DPD Officers and/or HARFOT Officers then transported the Day-Laborer Plaintiffs from the parking lot to the Danbury Police Station, where DPD officers fingerprinted and questioned them and entered their booking records into the DPD's files.

136.    While at the Danbury Police Station, Plaintiff Chavez saw a DPD officer that he recognized to be José Agosto.  Officer Agosto told Plaintiff Chavez in Spanish that he had been arrested because they had been standing at Kennedy Park, even though the DPD had previously warned the day-laborers not to stand there.

137.    Plaintiff Chavez had never been told by any police officer not to stand at or near Kennedy Park, nor had Plaintiff Chavez previously been warned, cited, or ticketed for interfering with traffic in the area of Kennedy Park.

138.    At the Danbury Police Station, Plaintiff Barrera was also mockingly told by a Danbury police officer of Hispanic appearance, and who spoke Spanish well, that when he could, Plaintiff Barrera should call family in Ecuador and tell them to meet him at the airport in Quito, because that was the first place that Plaintiff Barrera would be released from custody.  Upon information and belief, this individual was Defendant José Agosto.

139.    According to DPD booking records, Danbury police arrested each Day-Laborer Plaintiff in the Danbury Executive Tower parking lot at 7:06 am on the charge of "Illegal Entry Into U.S."

140.    The booking reports list the arresting officer to be Defendant and DPD Officer James Lalli.

141.    No criminal charges have been filed against any of the Day-Laborer Plaintiffs.

142.    Upon information and belief, Mayor Boughton was informed of the undercover operation and arrests no later than while they were occurring on the morning of September 19, 2006.

143.    At no point that morning, or any point afterwards, did Mayor Boughton attempt to prevent the arrests of the Day-Laborer Plaintiffs in spite of his knowledge that the sting operation was illegal and violated the Day-Laborer Plaintiffs' civil rights.

144.    Upon information and belief, Mayor Boughton allowed the arrests to take place pursuant to his administration's policy of promoting local civil immigration enforcement against Danbury's new Latino and Ecuadorian immigrants, targeting the City's Latino and Ecuadorian

immigrants for discrimination, and retaliating against Latino and Ecuadorian day-laborers for their use of Kennedy Park to express their availability for work.

145.    Mayor Boughton also allowed the arrests to occur out of total disregard for the constitutional interests of the arrestees.

146.    Upon information and belief, Mayor Boughton took no disciplinary actions against the DPD Officers upon learning of the sting operation and the arrests of the Day-Laborer Plaintiffs.

**The Day-Laborer Plaintiffs' Transfer to ICE Custody**

147.    After detaining each Day-Laborer Plaintiff in a holding cell or otherwise for approximately two hours at Danbury Police Headquarters, DPD officers transferred custody of the Day-Laborer Plaintiffs to ICE at approximately 9:00 am.

148.    The HARFOT Officers transported the Day-Laborer Plaintiffs, handcuffed and shackled, to Hartford, Connecticut.

149.    The ICE Agents responsible for accepting custody of the Day-Laborer Plaintiffs were the HARFOT Officers, Defendants Brown, McCaffrey, and Preble.

150.    Defendant McCaffrey also served as examining officer for the Day-Laborer Plaintiffs, though he knew or should have known that doing so violated federal immigration regulations.

151.    As the examining officer, Defendant McCaffrey made the initial custody determination for each Day-Laborer Plaintiff.

152.    This initial custody decision for each Day-Laborer Plaintiff was memorialized on ICE Form I-286, Notice of Initial Custody Determination.

153.    The Form I-286 for each Day-Laborer Plaintiff was printed with the name "George Sullivan" and signed for Defendant Sullivan by Defendant McCaffrey.

154.    None of the Day-Laborer Plaintiffs was in a category of persons determined by Congress to be subject to mandatory immigration detention pursuant to 8 U.S.C. § 1226(c).

155.    For persons not subject to mandatory detention, the factors relevant to an initial custody determination are dangerousness and risk of flight.

156.    None of the Day-Laborer Plaintiffs was dangerous or a flight risk on September 19, 2006.

157.    When Defendant McCaffrey made the initial custody determination for each Day-Laborer Plaintiff on September 19 or 20, 2006, he had no evidence any one of the Day-Laborer Plaintiffs was dangerous or a flight risk.

158.    Nevertheless, Defendant McCaffrey declined to set bond for each Day-Laborer Plaintiff, despite the fact that none of the Day-Laborer Plaintiffs was subject to mandatory detention or presented a flight risk or posed any danger to the community.

159.    One of the HARFOT Defendants served the appropriate Form I-286 on each Day-Laborer Plaintiff and asked that Plaintiff whether he requested a redetermination of the initial custody decision by an Immigration Judge.

160.    Each Day-Laborer Plaintiff stated that he did request a review by an Immigration Judge ICE's initial custody determination, and that request was noted on each Form I-286.

161.    However, ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Barrera's request for bond redetermination with any Immigration Court until March 5, 2007, 167 days after his request for review.

162.    ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Chavez's request for bond redetermination with any Immigration Court until October 13, 2006, 24 days after his request for review.

163.    ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Duma's request for bond redetermination with any Immigration Court until March 5, 2007, 167 days after his request for review.

164.    ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Llibisupa's request for bond redetermination with any Immigration Court until March 5, 2007, 167 days after his request for review.

165.    ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Maldonado's request for bond redetermination with any Immigration Court until March 5, 2007, 167 days after his request for review.

166.    ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Simbana's request for bond redetermination with any Immigration Court until March 5, 2007, 167 days after his request for review.

167.    ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Sanchez's request for bond redetermination with any Immigration Court until October 13, 2006, 24 days after his request for review.

168.    ICE officials did not file or cause to be filed the Form I-286, with Plaintiff Cabrera's request for bond redetermination with any Immigration Court until October 19, 2006 30 days after his request for review.

169.     ICE officials did not file or cause to be filed the Form I-286, with Plaintiff Redrovan's request for bond redetermination with any Immigration Court until October 19, 2006, 30 days after his request for review.

170.     Defendants Sullivan, Martin, and Chadbourne supervise HARFOT officers in their detention-related decisions, and are responsible for training HARFOT officers on how to make initial custody determinations and how to set appropriate bond.

171.     Upon information and belief, Defendants Sullivan, Martin, and Chadbourne knowingly failed to implement an adequate training program for the HARFOT Defendants on how to make initial custody determinations, and how to set bond for detainees without violating their constitutional rights.

172.     By failing to implement an adequate training or supervision program on custody and bond decisions for the HARFOT officers, Defendants Sullivan, Martin, and Chadbourne acted with deliberate indifference to the rights of Day-Laborer Plaintiffs. They knew their agents would make custody and bond decisions; that such decisions call for agents to make difficult choices that call for special training; that the current training was inadequate; and that agents were likely to commit egregious constitutional violations in mishandled custody and bond decisions without proper supervision or training. Defendants' Sullivan, Martin, and Chadbourne's failure to create an adequate training or supervision program caused Plaintiffs' injuries.

173.     Defendants Sullivan, Martin, and Chadbourne were also grossly negligent in their supervision and training of their ICE agent subordinates on custody and bond decisions. They knew or should have known that there was a high degree of risk that their subordinates would

violate individuals' constitutional rights in the course of their custody and bond decisions, and yet they consciously or recklessly disregarded that risk by failing to take any corrective actions.

174.    As a result of Defendant McCaffrey's failure to set any bond for the Day-Laborer Plaintiffs, even though there was no evidence that any of the Plaintiffs was dangerous or a flight risk or within a category of persons subject to mandatory detention, and of Defendants' failure to file or cause to be filed in Immigration Court the request of each Plaintiff for review of the ICE no-bond decision by an Immigration Judge -- along with Defendant Sullivan, Martin and Chadbourne's failure to remedy these constitutional violations-- the Day-Laborer Plaintiffs were unconstitutionally detained in violation of the Fifth Amendment.

175.    Several of the Day-Laborer Plaintiffs also suffered additional injuries, including a transfer to Texas, horrendous prison conditions, and higher bond payments, due to the actions of Defendants McCaffrey, Sullivan, Martin and Chadbourne.

**The Day-Laborer Plaintiffs' Detention While in ICE Custody**

176.    After two nights in Hartford, ICE agents transferred Plaintiffs Barrera, Duma, Llibisupa, and Maldonado to the Suffolk County House of Corrections in Boston, Massachusetts. ICE agents transferred Plaintiffs Cabrera, Chavez, Redrovan, Sanchez, and Simbaña to Plymouth County Detention Center in Plymouth, Massachusetts.

177.    Throughout the course of their detentions, ICE officials and prison officials at the Day-Laborer Plaintiffs' respective facilities denied each of the Day-Laborer Plaintiffs access to a telephone for periods ranging from several days to several weeks, despite the Plaintiffs' repeated requests to call family members or a lawyer.

178.    Specifically, ICE officials denied Plaintiffs Barrera, Duma, Llibisupa, Maldonado, and Redrovan phone access while they were in custody in Hartford.

179.    ICE officials allowed Plaintiffs Cabrera and Chavez to use a phone on their first day in Hartford, but the phone did not work.

180.    While in custody in Hartford, ICE officers instructed the Day-Laborer Plaintiffs to sign a document written in English, which had not been translated or explained to them, and which they could not read. ICE officers took the men out of the room one at a time and individually intimidated them and pressured them into signing the document. ICE officers gave the men a number of different and wholly inadequate explanations for what the paper was.

181.    Plaintiff Barrera did not understand what the document said. An officer who spoke some Spanish stated simply that he needed to sign it to be transferred.

182.    Another officer told Plaintiff Chavez that he needed to sign the document in order to see a judge.

183.    Plaintiff Maldonado similarly could not read the document, but the officers who addressed him angrily told him that he had to sign it anyway.

184.    Officers informed Plaintiff Simbaña that, practically speaking, he already "signed" the document and terrorized him into actually doing so, leading him to believe that he needed to sign the document in order to see an Immigration Judge.

185.    While the Day-Laborer Plaintiffs were in custody in Massachusetts, an unknown law enforcement agent or agents questioned them as potential suspects or witnesses in a murder investigation.  The agent told them that the victim had been murdered in Danbury by an Ecuadorian.  During the interrogation, the agent did not offer Plaintiffs access to counsel, nor did he inform them of their *Miranda* rights, including their right to remain silent and to have counsel present during the interrogation. Instead, the agent promised them immigration benefits if they told him about the murder.

186.    Also while in custody in Massachusetts, prison officials subjected each of the Day-Laborer Plaintiffs to a medical examination and full-body search.

187.    Prison officials forced at least Plaintiffs Barrera, Llibisupa, Maldonado, Redrovan, and Simbaña to give blood samples without their consent as part of the medical examination.

188.    Prison officials forced at least Plaintiffs Barrera, Maldonado, Redrovan, and Simbaña to give urine samples without their consent as part of the medical examination.

189.    Suffolk County correctional guards held Plaintiff Barrera in isolation for five days—in a cell with neither a toilet nor a sink—as a result of his blood test.  At no point did officers explain the reason for his confinement.

190.    On October 2, 2006, Immigration Judge ("IJ") Matthew J. D'Angelo of the Immigration Court in Boston, Massachusetts held bond redetermination hearings for Plaintiffs Barrera, Duma, Llibisupa, and Maldonado.  IJ D'Angelo found that Plaintiffs Barrera, Duma, Llibisupa, and Maldonado were neither a flight risk nor a danger to the community and set the statutory minimum bond of $1500 for each man.

191.    Plaintiffs Barrera, Duma, Llibisupa, and Maldonado were released on $1500 bond on October 3, 2006.  In total, they each spent approximately 15 days in ICE custody.

**The Remaining Day-Laborers' Transfer to and Detention in Texas**

192.    The Boston Immigration Court calendared bond redetermination hearings for Plaintiffs Chavez, Sanchez, and Simbaña for 1:00 pm on October 3, 2006.

193.    On the morning of October 3, however, before their 1:00 pm bond hearings, ICE began the process of transferring Plaintiffs Chavez, Sanchez, and Simbaña, along with Plaintiffs Cabrera, and Redrovan, to detention facilities in Texas.  When the Immigration Judge in Boston

attempted to call the bond cases for these Plaintiffs as scheduled at the 1:00 pm video-conference calendar on October 3, jail officials informed the Court that the Plaintiffs were not available for court because they were in transit to Texas.

194.    On October 3, 2006, ICE flew Plaintiffs Cabrera, Chavez, Redrovan, Sanchez, and Simbaña, handcuffed and shackled, to Texas.  ICE kept Plaintiffs in shackles for the entire journey to Texas—a period of nearly sixteen hours.

195.    ICE briefly held Plaintiffs Cabrera, Chavez, Sanchez, and Simbaña at the Port Isabel Processing Center in Los Fresnos, Texas and then detained them at the Willacy Detention Center in Raymondville, Texas.  ICE continued to hold Plaintiff Redrovan at the Port Isabel Processing Center.

196.    While at the Willacy Detention Center, Plaintiffs Cabrera, Chavez, Sanchez, and Simbaña were subjected to horrendous detention conditions. The men endured extremely overcrowded and unsanitary conditions, and prison officials denied them adequate medical care and adequate amounts of food at regular intervals.  At times, the detainees were forced to eat with their bare hands.  Prison guards also frequently verbally insulted, taunted, and ridiculed the detainees.

197.    Immigration Judge ("IJ") Eleazar Tovar of the Immigration Court in Harlingen, Texas held telephonic bond redetermination hearings on October 16, 2006 for Plaintiffs Cabrera, Chavez, Sanchez, and Simbaña.  IJ Tovar found that the detainees were neither a flight risk nor a danger to the community and set bond.

198.    IJ Peterson of the Immigration Court in Harlingen, Texas held a telephonic bond redetermination hearing for Plaintiff Redrovan.  IJ Peterson found that Plaintiff Redrovan was neither a flight risk nor a danger to the community and set bond.

199.    Plaintiff Cabrera was released on $8,000 bond on or around October 23, 2006.  In total, Mr. Cabrera was detained in ICE custody for approximately 35 days.

200.    Plaintiff Chavez was released on $10,000 bond on or around October 23, 2006. In total, Mr. Chavez was detained in ICE custody for approximately 35 days.

201.    Plaintiff Redrovan was released on $15,000 bond on or around October 23, 2006. In total, Mr. Redrovan was detained in ICE custody for approximately 35 days.

202.    Plaintiff Sanchez was released on $10,000 bond on or around October 20, 2006. In total, Mr. Sanchez was detained in ICE custody for approximately 32 days.

203.    Plaintiff Simbaña was released on $10,000 bond on or around October 26, 2006. In total, Mr. Simbaña was detained in ICE custody for approximately 38 days.

**Effect on Plaintiffs and Day-Laborer Community at Large**

204.    Defendants' unlawful and retaliatory arrest and detention of the Day-Laborer Plaintiffs and the restrictions Defendants placed on Plaintiffs' liberty caused Plaintiffs to suffer humiliation, damage to their reputations and professional prospects, emotional distress, physical pain, and monetary damages.

205.    The Day-Laborer Plaintiffs continue to fear that they, their families, or their acquaintances will be arbitrarily and unlawfully arrested by ICE, DPD, or both.  Several of the Day-Laborer Plaintiffs no longer gather in Kennedy Park for fear of harassment by ICE and DPD officers.

206.    While sparking a great deal of political engagement and advocacy by the immigrant and Ecuadorian community in Danbury and across the State of Connecticut, the Day-Laborer Plaintiffs' unlawful arrests have also created a climate of fear among day-laborers at

Kennedy Park and among Latino, Ecuadorian, and immigrant residents in Danbury more generally. This climate persists to this day.

207.    Fewer day-laborers in general now assemble at Kennedy Park to seek work, fearing that they too will be arrested by ICE, DPD, or both, and those who do continue to gather there do so in part as a statement of their disagreement with the anti-immigrant tactics of Mayor Boughton and the DPD.

208.    Latino, Ecuadorian, and immigrant residents in Danbury also remain fearful of harassment, detention, and arrest by ICE, DPD, or both.

**The Pretextual Traffic Stop and Unlawful Civil Immigration Arrest of Danilo Brito Vargas**

209.    Pursuant to Mayor Boughton's campaign against immigrant, Latino, and Ecuadorian communities, the DPD has also exploited the FBI's principal criminal database, the National Crime Information Center ("NCIC"), to target Latinos for make unlawful and discriminatory immigration arrests.

210.    DPD officers have engaged in a series of pretextual traffic stops for the purpose of investigating the immigration status of Latino drivers. During these traffic stops, DPD officers conduct a search for drivers' names on the NCIC database and arrest drivers on any civil immigration violations they discover.

211.    The DPD's use of the NCIC database to effect civil immigration arrests against Latino and immigrant drivers constitutes a form of racial and ethnic profiling.

212.    Moreover, the DPD's NCIC immigration arrests violate Congress's broad preemption of state and local police from making federal civil immigration arrests outside of specific statutory procedures.

**Background on the NCIC Database**

213.    The NCIC provides direct on-line access to its computerized database of criminal justice information. The NCIC is the FBI's principal criminal records database and is accessed millions of times each day by state, local, and tribal police nationwide.

214.    Since its creation, the NCIC database has principally contained criminal justice records, such as rap sheets, criminal warrants, and stolen property records. Congress has not authorized the entry of civil immigration records, including administrative immigration warrants for arrest or removal, into the NCIC database.

215.    In 2002, disregarding Congress's careful statutory limitations on the entry and dissemination of non-criminal records via the NCIC, the Attorney General and other senior Justice Department officials announced a plan to enter hundreds of thousands of administrative immigration warrants into the NCIC.

216.    Since 2002, the Law Enforcement Support Center ("LESC"), a division of ICE, has entered administrative immigration warrants for tens of thousands of persons with outstanding orders of deportation, exclusion, or removal (collectively, "removal orders") whom it believes have remained in the United States. DHS estimates that there are more than 632,000 such persons resident in the United States, and has announced its intention to enter administrative immigration warrants for every such person into the NCIC.

217.    The administrative immigration warrants entered by DHS into the NCIC differ significantly from criminal warrants. DHS administrative warrants are issued by an agency clerk, not by an independent judge, and there is no requirement that a warrant be issued only on probable cause, based on evidence sworn under oath. There is no review by anyone other than the DHS official. They are administrative warrants, alleging only a civil violation of immigration law.

218.    When a police officer runs an NCIC check on an individual who has an administrative immigration warrant listed in the NCIC, a "hit" appears with instructions to contact the LESC, for confirmation.

219.    According to ICE's data, in 2002-04, the LESC failed to confirm 42% of the NCIC immigration hits that prompted the requested communication from a local police officer to LESC.

220.    Of those occasions when the LESC does confirm the immigration "hit," DHS invariably instructs the police officer to arrest and detain the individual until the DHS officials can arrive to take custody of the individual.

### DPD's Unlawful Immigration Arrests Made Through the NCIC Database

221.    Congress has enacted a complex and comprehensive statutory scheme regulating immigration in the United States that includes numerous and detailed provisions relating to enforcement of federal immigration laws.  In adopting this statutory scheme, Congress has broadly preempted immigration enforcement by state and local officials, except as specifically authorized by Congress.

222.    No authority exists for DPD to make a civil immigration arrest.

223.    An arrest pursuant to an administrative immigration warrant in the NCIC is a civil immigration arrest.

224.    Nevertheless, the DPD has developed a policy, practice, and/or custom of arresting persons on the basis of administrative immigration warrants in the NCIC.

225.    DPD officers conducting such arrests do not typically inform NCIC immigration arrestees of their *Miranda* rights, nor are such persons subject to state or federal prosecution. DPD typically arrests and detains such persons until they are transferred to the custody of ICE.

226.    Defendants Boughton and Baker knowingly promulgated, implemented, enforced, sanctioned, and/or acquiesced in the DPD's policy, practice, and/or custom of performing such arrests as part of the city's ongoing immigration enforcement campaign against its new Latino and immigrant residents, despite their knowledge that DPD officers are preempted by federal law from making civil immigration arrests.

227.    Moreover, upon information and belief, Defendant Baker does not supervise the execution and processing of these arrests as required by internal DPD police procedure despite his knowledge that DPD civil immigration arrests are preempted by federal law and the importance of such procedures to protecting the rights of arrestees.

**Arrest of Danilo Brito Vargas**

228.    On February 17, 2007, Plaintiff Danilo Brito Vargas and his wife were driving near their home in Danbury.  A DPD cruiser pulled up behind them in or around the intersection of Rose Hill Avenue and Hoyt Street and signaled for Plaintiff Vargas to pull over, which he did.

229.    Defendant John Doe 6, a DPD officer, approached the car, told Plaintiff Vargas that he was being pulled over because his muffler was too loud, and asked to see identification. Plaintiff Vargas tendered his Ecuadorian passport, whereupon Officer Doe 6 took the passport, returned to the cruiser, and consulted a computer there.

230.    On information and belief, the officer used the cruiser computer to run Plaintiff Vargas's name through the NCIC and other databases, and the NCIC returned a response indicating the existence of an administrative immigration warrant for Plaintiff Vargas.  The NCIC response further instructed the DPD officer to contact the LESC for confirmation.

231.    Acting solely on the basis of this information, the DPD officer radioed for assistance.  Two more officers, Defendants John Does 7 and 8, arrived on the scene.  Officers

Does 6-8 told Plaintiff Vargas to step out of the car. After patting him down and searching his pockets, they handcuffed him and placed him in the cruiser. They did not explain why he was being detained.

232. Officers Does 6-8 then transported Plaintiff Vargas to the Danbury Police Station, where he was detained in a holding cell for approximately two days. Officers Does 6-8 told Plaintiff Vargas that he was being detained solely because he had "immigration problems."

233. Plaintiff Vargas was then transferred to an immigration detention facility in Hartford, Connecticut and shuttled between that facility and another correctional facility in Rhode Island.

234. Plaintiff Vargas was deported to Ecuador in April or May 2007.

235. Plaintiff Vargas has suffered humiliation, damage to his reputation and professional prospects, emotional distress, physical pain, and monetary damages as a result of his arrest, detention, and the restrictions placed on his liberty.

## CLAIMS RELATING TO ARREST OF DAY-LABORERS

### FIRST CLAIM FOR RELIEF:
**Fourth Amendment and Article First, §§ 7, 9 of the Connecticut Constitution
(42 U.S.C. § 1983 and *Binette v. Sabo*, 244 Conn. 23 (1998): Defendant DPD Officers)**

236. The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

237. Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos and John Does 1-5 violated the Day-Laborer Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article First, §§ 7 and 9 of the Connecticut Constitution by arresting them for alleged civil immigration violations without valid warrants and in the absence of exigent

circumstances, any probable cause, or any reason to believe that the Day-Laborer Plaintiffs were engaged in any unlawful activity, and by stopping, detaining, investigating, searching, and effecting seizures and/or arrests of the Day-Laborer Plaintiffs in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause.

238.    As a result of Defendant DPD Officers' actions, the Day-Laborer Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

**SECOND CLAIM FOR RELIEF:**
**Fourth Amendment and Article First, §§ 7, 9 of the Connecticut Constitution: Preemption**
**(42 U.S.C. § 1983 and *Binette v. Sabo*: Defendant DPD Officers)**

239.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

240.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 violated the Day-Laborer Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article First, §§ 7 and 9 of the Connecticut Constitution by intentionally and knowingly detaining and/or arresting the Day-Laborer Plaintiffs on suspicion of civil immigration violations.  The arrest and detention of the Day-Laborer Plaintiffs was unlawful, wholly without authority, and in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article First, §§ 7 and 9 of the Connecticut Constitution because federal law preempts state or local police from civil immigration enforcement activity and expressly and implicitly deprives local law enforcement officials of the authority to make civil immigration arrests.  The Defendant DPD Officers lacked any authority under federal law to make civil immigration arrests.

241.    As a result of Defendant DPD Officers' actions, the Day-Laborer Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

### THIRD CLAIM FOR RELIEF:
**Fourteenth Amendment Equal Protection Clause and Article First, § 20 of the Connecticut Constitution**
**(42 U.S.C. § 1983 and *Binette v. Sabo*: Defendant DPD Officers)**

242.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

243.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 intentionally targeted the Day-Laborer Plaintiffs for an immigration sting operation and arrested and detained them on the basis of their race, ethnicity, and perceived national origin in violation of the Fourteenth Amendment to the United States Constitution and Article First, § 20 of the Connecticut Constitution.

244.    In addition, Defendant DPD Officers subjected the Day-Laborer Plaintiffs to selective law enforcement on the basis of their race, ethnicity, and perceived national origin in violation of the Fourteenth Amendment to the United States Constitution and Article First, § 20 of the Connecticut Constitution.

245.    Defendant DPD Officers also subjected the Day-Laborer Plaintiffs to selective law enforcement out of a malicious and bad faith intent to drive them out of the City of Danbury in violation of the Fourteenth Amendment to the United States Constitution and Article First, § 20 of the Connecticut Constitution.

246.   As a result of Defendant DPD Officers' actions, the Day-Laborer Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

## FOURTH CLAIM FOR RELIEF
### First Amendment and Article First, §§ 4, 14 of the Connecticut Constitution
### (Suppression of and Retaliation for Protected Speech)
### (42 U.S.C. § 1983 and *Binette v. Sabo*: Defendant DPD Officers)

247.   The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

248.   Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 knowingly and intentionally stopped, detained, investigated, and arrested the Day-Laborer Plaintiffs in retaliation for their exercise of protected speech and association in a public forum, in violation of the First and Fourteenth Amendments to the United States Constitution and Article First, §§ 4 and 14 of the Connecticut Constitution.

249.   Defendant DPD Officers had no probable cause to stop, detain, investigate, or arrest the Day-Laborer Plaintiffs and had no reason to believe that they were in violation of any immigration laws.   The DPD does not have the legal authority to make arrests solely for violations of federal civil immigration law.

250.   As a result of Defendant DPD Officers' actions, the Day-Laborer Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

## FIFTH CLAIM FOR RELIEF:
### Due Process Rights Under the Fourteenth Amendment and Article First, § 8 of the Connecticut Constitution
### (42 U.S.C. § 1983 and *Binette v. Sabo*: Defendants DPD Officers)

251.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

252.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 civilly arrested the Day-Laborer Plaintiffs and deprived them of their of their liberty in a manner that was without due process of law and fundamentally unfair in the totality of its circumstances, in violation of the Fourteenth Amendment to the United States Constitution and Article First, § 8 of the Connecticut Constitution.

253.    As a result of Defendant DPD Officers' actions, the Day-Laborer Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

**SIXTH CLAIM FOR RELIEF**
**Conspiracy**
**(42 U.S.C. § 1983: Defendant DPD Officers and HARFOT Officers)**

254.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

255.    Defendant DPD Officers and HARFOT Officers entered into an agreement, between and amongst themselves, to act in concert to inflict an unconstitutional injury on the Day-Laborer Plaintiffs.  Specifically, one or more Defendant DPD Officers spoke by telephone with one or more Defendant HARFOT Officers during the week or weeks prior to the September 19, 2006 arrests to plan the operation.   Furthermore, Defendant DPD Officers met with Defendant HARFOT Officers in the early morning of September 19, 2006 for the purpose of planning the operation.   The conspiracy included, but may not have been limited to, an

agreement to arrest and detain Day-Laborer Plaintiffs in violation of their rights under the United

States and Connecticut Constitutions.

256.    Defendant DPD Officers and Defendant HARFOT Officers performed several

overt acts in furtherance of this conspiracy, including but not limited to posing as a contractor in

order to lure Day-Laborer Plaintiffs in a vehicle, arresting Day-Laborer Plaintiffs, and detaining

Day-Laborer Plaintiffs in violation of their rights under the U.S. and Connecticut Constitutions.

257.    Defendant DPD Officers played a significant role in the conspiracy and in the

overt acts taken in furtherance thereof.

258.    As a result of the conspiracy between and among the Defendant DPD Officers

and the Defendant HARFOT Officers and the overt actions taken in furtherance thereof, the Day-

Laborer Plaintiffs suffered damages, including but not limited to violations of their

Constitutional rights, loss of liberty, and emotional distress.

**SEVENTH CLAIM FOR RELIEF**
**Conspiracy**
**(42 U.S.C. § 1985(3): Defendant DPD Officers and HARFOT Officers)**

259.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every

allegation contained in the preceding paragraphs as if fully set forth herein.

260.    Defendant DPD Officers and Defendant HARFOT Officers entered into an

agreement to act in concert for the purpose of depriving the Day-Laborer Plaintiffs of the equal

protection of the laws.  Specifically, one or more Defendant DPD Officers spoke by telephone

with one or more Defendant HARFOT Officers during the week or weeks prior to the September

19, 2006 arrests to plan the operation.  Further, Defendant DPD Officers met with Defendant

HARFOT Officers in the early morning of September 19, 2006 for the purpose of planning the

operation.  The conspiracy included, but may not have been limited to, an agreement to arrest and detain Day-Laborer Plaintiffs in violation of their right to equal protection of the law.

261.    Defendant DPD Officers and Defendant HARFOT Officers performed several overt acts in furtherance of this conspiracy, including but not limited to posing as a contractor in order to lure Day-Laborer Plaintiffs in a vehicle, arresting Day-Laborer Plaintiffs, and detaining Day-Laborer Plaintiffs in violation of their right to equal protection of the law.

262.    Plaintiffs are Latino men and alleged by ICE to be citizens of Ecuador.  The conspiracy between and among the Defendant DPD Officers and the Defendant HARFOT Officers and the overt actions taken in furtherance thereof were motivated by a discriminatory animus against Day-Laborer Plaintiffs based on their race, ethnicity, and/or perceived national origin.

263.    As a result of the conspiracy between and among the Defendant DPD Officers and the Defendant HARFOT Officers and the overt actions taken in furtherance thereof, the Day-Laborer Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

### EIGHTH CLAIM FOR RELIEF
#### Personal Supervisory Liability
**(42 U.S.C. § 1983 and *Binette v. Sabo*: Defendants Boughton, Baker, Weston, and Fisher)**

264.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

265.    Defendants Boughton, Baker, Weston, and Fisher are liable in their individual capacities as the supervisors of Defendant DPD Officers for the violations of the Day-Laborer Plaintiffs' rights described in Claims 1-7.

266.    Defendants Boughton, Baker, Weston, and Fisher were personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom in which local police engaged in the unconstitutional conduct described in Claims 1-7.

267.    Defendant Boughton, the Mayor of Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the City of Danbury and for supervising and administering all City Departments.  He was directly involved in the promulgation, implementation, and administration of the policy, practice, and/or custom that proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights described in Claims 1-7.

268.    Defendant Boughton was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights described in Claims 1-7 because he failed to remedy these violations.  Specifically, Defendant Boughton failed to act on information provided to him no later than on the morning of the Day-Laborer Plaintiffs' arrests that alerted him to these violations before they occurred or while they were occurring.  Upon learning of the violations, Defendant Boughton made no attempt to stop the violations from occurring, to minimize the harm that resulted from any violations that had already occurred, or to punish, sanction, or discipline the DPD Officers who committed the violations described in Claims 1-7.

269.    Defendant Boughton was personally involved in and proximately caused the violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including

but not limited to Defendant Baker and Defendant Fisher, who proximately caused the aforementioned violations described in Claims 1-7.  Defendant Boughton's gross negligence in supervising Defendants Baker, Weston, and Fisher permitted them to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights described in Claims 1-7 and to plan and carry out the sting operation which resulted in those violations.

270.    Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the DPD, and for supervising all DPD officers in the commission of their duties.  He was directly involved in the promulgation, implementation, and administration of the policy, practice, and/or custom that proximately caused the violations of the Day-Laborer Plaintiffs' rights described in Claims 1-7.

271.    Defendant Baker was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendants Weston and Fisher, who proximately caused the aforementioned violations described in Claims 1-7.  Defendant Baker's gross negligence in supervising Defendants Weston and Fisher permitted Defendants Weston and Fisher to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and for Defendant Fisher to plan and carry out the sting operation which resulted in those violations.

272.    Defendant Weston, the supervisor the Danbury Police Detective Bureau, was directly involved in and proximately caused the aforementioned violations of the Day-Laborer

Plaintiffs' rights through his beforehand knowledge of the undercover sting operation, and/or through directing, authorizing, approving, and/or acquiescing in the unlawful arrests described in Claims 1-7. Defendant Weston knew of all relevant facts that made the actions of the DPD Officers unlawful.

273. Defendant Weston was at all relevant times responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the Detective Bureau, and for supervising all DPD detectives in the commission of their duties. He was directly involved in the promulgation, implementation, and administration of the policy, practice, and/or custom that proximately caused the violations of the Day-Laborer Plaintiffs' rights described in Claims 1-7.

274. Defendant Weston was also personally involved in and proximately caused the aforementioned violations through his deliberate indifference to the rights of the Day-Laborer Plaintiffs. He knew to a moral certainty that his subordinates would need to make difficult choices in arresting day laborers with the assistance of ICE; he knew that proper supervision and training would make those choices less difficult, and he knew his subordinates were likely to commit constitutional violations without that supervision or training.

275. Defendant Weston was also personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his grossly negligent supervision of his subordinates, including but not limited to Defendant Fisher, who proximately caused the aforementioned violations described in Claims 1-7. Defendant Weston's gross negligence in supervising Defendant Fisher permitted Defendant Fisher to promulgate, implement, and administer the aforementioned policies, practices, and customs which

proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

276.    Defendant Fisher was directly involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights by participating in the violations, and/or by ordering or instructing the other DPD Officers to commit the unlawful arrests described in Claims 1-7.  Defendant Fisher knew of all relevant facts that made the actions of the DPD Officers unlawful.

277.    Defendant Fisher, the head of the DPD's SID, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the SID, and for supervising all other SID officers in the commission of their duties.  He was directly involved in the promulgation, implementation, and administration of the policy, practice, and/or custom that proximately caused the violations of the Day-Laborer Plaintiffs' rights described in Claims 1-7.

278.    Defendant Fisher was personally involved in and proximately caused the aforementioned violations of the Day-Laborer Plaintiffs' rights through his deliberate indifference to the rights of the Day-Laborer Plaintiffs and his grossly negligent supervision of his subordinate DPD Officers who committed the violations of the Day-Laborer Plaintiffs' constitutional rights described in Claims 1-7. Defendant Fisher knew or should have known of the DPD's policy, practice, or custom of making civil immigration arrests without probable cause, and failed to act to prevent the violations of the Day-Laborer Plaintiffs' rights from occurring.

279.    As a result of Defendants Boughton, Baker, Fisher, and Weston's acts and/or omissions, the Day-Laborer Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

## NINTH CLAIM FOR RELIEF
### Municipal Liability
### (42 U.S.C. § 1983:  Defendant City of Danbury)

280.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

281.    The City of Danbury is liable pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) for the promulgation and execution of municipal policy and/or custom by Defendants Boughton, Baker, Weston, and Fisher prior to and during the arrest of the Day-Laborer Plaintiffs on September 19, 2006.

282.    As individual policymakers who have been vested with final policymaking authority by municipal and state law, Defendants Boughton, Baker, Weston, and Fisher acts and edicts resulted in policies and/or customs exhibiting deliberate indifference to the constitutional rights of persons in the City of Danbury and occasioned the aforementioned violation of the Day-Laborers Plaintiffs' rights described in Claims 1-7.

283.    In addition, in their capacities as official policymakers, Defendants Boughton, Baker, Weston, and Fisher were averted to a potentially serious problem of unconstitutional conduct by Danbury Police Officers described in Claims 1-7.  In spite of an obvious need for supervision and/or corrective action, Defendants Boughton, Baker, Fisher, and Weston failed to supervise their subordinates and/or investigate or rectify the situation, evidencing deliberate indifference to the Day-Laborer Plaintiffs' constitutional rights and conspiracies between local police and ICE to violate them, thereby rendering the City of Danbury liable.

284.    The unconstitutional conduct of Danbury Police Officers described in Claims 1-7 was so manifest as to imply the constructive acquiescence of Defendants Boughton, Baker,

Weston, and Fisher in their capacities as policymaking officials, thus rendering the City of Danbury liable.

285.    All of the Danbury Defendants—including Officers Agosto, DeJesus, Lalli, Lopez, Martin, Norkus, Ramos, John Does 1-5, and Defendants Baker, Boughton, Weston, and Fisher—were, at the time of the incidents in question, employees of the City of Danbury.

**TENTH CLAIM FOR RELIEF**
**False Arrest and False Imprisonment**
**(Defendant DPD Officers)**

286.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

287.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 knowingly and intentionally arrested, detained, and imprisoned the Day-Laborer Plaintiffs without a warrant and without probable cause, in retaliation for protected speech, based on impermissible racial, ethnic, and national origin discrimination, and in a manner preempted by federal law.

288.    The Day-Laborer Plaintiffs were forcibly restrained and subsequently imprisoned by the Danbury Defendants and suffered damages as a result of Danbury Defendants' actions.

289.    The Defendant DPD Officers' actions constitute false arrest and false imprisonment under Connecticut common law.

**ELEVENTH CLAIM FOR RELIEF**
**Intentional Infliction of Emotional Distress**
**(Defendant DPD Officers)**

290.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

291.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 intended to inflict emotional distress upon the Day-Laborer Plaintiffs by deceiving, arresting, detaining, and imprisoning them, or should have known that their conduct was likely to cause Day-Laborer Plaintiffs' emotional distress.   The Danbury Defendants' conduct was clearly extreme and outrageous, given the circumstances surrounding the arrests.

292.    The emotional distress of the Day-Laborer Plaintiffs was caused by the Danbury Defendants' conduct and was severe.

293.    The Defendant DPD Officers' actions constitute intentional infliction of emotional distress under Connecticut common law.

## TWELFTH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress
### (Defendant DPD Officers, Defendant Baker, Defendant Weston, and the City of Danbury)

294.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

295.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 created an unreasonable risk of causing the Day-Laborer Plaintiffs emotional distress.   It was clearly foreseeable that the Defendant DPD Officers' conduct would cause the Day-Laborer Plaintiffs emotional distress.

296.    Defendant DPD Officers knew that their failure to act would likely subject a group of identifiable persons to imminent harm, namely, the Latino and immigrant day-laborers gathered in Kennedy Park.

297.   Moreover, Defendants Baker and Weston negligently failed to supervise Defendant DPD Officers as they executed the Day-Laborer Plaintiffs' unlawful arrest and detention.

298.   The emotional distress of the Day-Laborer Plaintiffs was caused by the Defendant DPD Officers' conduct and was severe enough that it might result in illness or bodily harm.

299.   The Defendant DPD Officers' actions constitute negligent infliction of emotional distress under Connecticut common law.

300.   Pursuant to Conn. Gen. Stat. §§ 7-465(a) and 7-101a, the City of Danbury is required to indemnify its employees "for all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for . . . for physical damages to person or property." Conn. Gen. Stat. § 7-465(a).

301.   All of the Day-Laborer Plaintiffs have satisfied the notice requirement of Conn. Gen. Stat. § 7-465(a).

302.   The actions of the DPD officers, Chief Baker, and Captain Weston in subjecting the Day-Laborer Plaintiffs to be free from negligent false arrest and false imprisonment were not wanton or willful.

303.   Pursuant to Conn. Gen. Stat. § 52-557n(a)(A), the City of Danbury is also directly liable for the "negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties."

304.   At all times relevant to this Complaint, the Danbury employees—including Officers Agosto, DeJesus, Fiser, Lalli, Lopez, Martin, Norkus, Ramos, John Does 1-5, Chief Baker, and Captain Weston—were employees of the City of Danbury and acting within the scope of their employment and/or their official duties as employees of the City of Danbury.

305.    In all times relevant to this complaint, the Day-Laborer Plaintiffs were the identifiable and/or foreseeable victims of the Danbury employees' actions.

## THIRTEENTH CLAIM FOR RELIEF
### Fourth Amendment
### (*Bivens*: ICE Defendants)

306.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

307.    Defendant HARFOT Officers James Brown, Richard McCaffrey, Ronald Preble, and John Does 9-14 stopped, detained, investigated, searched, seized and/or arrested the Day-Laborer Plaintiffs intentionally and knowingly and without probable cause and/or reasonable suspicion, in violation of the Day-Laborer Plaintiffs' right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.

308.    As a result of Defendant HARFOT Officers' actions, the Day-Laborer Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of xliberty, and emotional distress.

## FOURTEENTH CLAIM FOR RELIEF:
### Fifth Amendment Equal Protection
### (*Bivens*: ICE Defendants)

309.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

310.    Defendant HARFOT Officers James Brown, Richard McCaffrey, Ronald Preble, and John Does 9-14 stopped, detained, investigated, searched, seized and/or arrested the Day-Laborer Plaintiffs knowingly and intentionally on the basis of the Day-Laborer Plaintiffs' race, ethnicity, and perceived national origin in violation of their right to Equal Protection under the Fifth Amendment of the United States Constitution.

311.    In addition, Defendant HARFOT Officers subjected the Day-Laborer Plaintiffs to selective law enforcement on the basis of their race, ethnicity, and perceived national origin in violation of their right to Equal Protection under the Fifth Amendment of the United States Constitution.

312.    Defendant HARFOT Officers also subjected the Day-Laborer Plaintiffs to selective law enforcement out of a malicious and bad faith intent to drive them out of the City of Danbury in violation of their right to Equal Protection under the Fifth Amendment of the United States Constitution.

313.    As a result of Defendant HARFOT Officers' actions, the Day-Laborer Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

## FIFTHTEENTH CLAIM FOR RELIEF
### Fifth Amendment Due Process
### (*Bivens*: ICE Defendants)

314.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

315.    Defendant HARFOT Officers James Brown, Richard McCaffrey, Ronald Preble, and John Does 9-14 civilly arrested and deprived Day-Laborer Plaintiffs of their liberty in a manner that was without due process of law and was fundamentally unfair in the totality of the circumstances, in violation of the Day-Laborer Plaintiffs' rights under the Fifth Amendment of the United States Constitution.

316.    Defendant HARFOT Officer Richard McCaffrey made the initial custody determination for each of the Day-Laborer Plaintiffs, memorialized on the ICE Form I-286 for each Plaintiff, thus failing to provide Day-Laborer Plaintiffs with a neutral arbitrator as required

by law, in violation of their rights to due process under the Fifth Amendment of the United States Constitution.

317.    Defendant HARFOT Officer Richard McCaffrey detained Day-Laborer Plaintiffs without bond without any special justification to do so, in violation of their rights to due process under the Fifth Amendment of the United States Constitution.

318.    Defendant HARFOT Officer Richard McCaffrey or another ICE official failed to file or cause to be filed the request of each Day-Laborer Plaintiff for an Immigration Judge to review their detention without bond for periods of 24 to 167 days, in violation of their rights to due process under the Fifth Amendment of the United States Constitution.

319.    As a result of Defendant HARFOT Officers' actions, the Day-Laborer Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

**SIXTEENTH CLAIM FOR RELIEF**
**Conspiracy**
(***Bivens*****: Defendant HARFOT Officers and DPD Officers)**

320.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

321.    Defendant HARFOT Officers and DPD Officers entered into an agreement, between and amongst themselves, to act in concert to inflict an unconstitutional injury on the Day-Laborer Plaintiffs.  Specifically, one or more Defendant HARFOT Officers spoke by telephone with one or more Defendant DPD Officers during the week or weeks prior to the September 19, 2006 arrests to plan the operation.  Further, Defendant HARFOT Officers met with Defendant DPD Officers in the early morning of September 19, 2006 for the purpose of planning the operation.  The conspiracy included, but may not have been limited to, an

agreement to arrest and detain Day-Laborer Plaintiffs in violation of their various rights under the United States and Connecticut Constitutions.

322.    Defendant HARFOT Officers and Defendant DPD Officers performed several overt acts in furtherance of this conspiracy, including but not limited to posing as a contractor in order to lure Day-Laborer Plaintiffs in a vehicle, arresting Day-Laborer Plaintiffs, and detaining Day-Laborer Plaintiffs, in violation of their rights under the United States and Connecticut Constitutions and common law.

323.    Defendant HARFOT Officers played a significant role in the conspiracy and in the overt acts taken in furtherance thereof.

324.    As a result of the conspiracy between and among the Defendant HARFOT Officers and the Defendant DPD Officers and the overt actions taken in furtherance thereof, the Day-Laborer Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

### SEVENTEENTH CLAIM FOR RELIEF
### Personal Supervisory Liability
### (*Bivens*: Defendants Sullivan, Martin, and Chadbourne)

325.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

326.    Defendants Sullivan, Martin, and Chadbourne are liable in their individual capacities as the supervisors of Defendant HARFOT Officers James Brown, Richard McCaffrey, Ronald Preble, and John Does 9-14 for the violations of the Day-Laborer Plaintiffs' rights described in Claims 13-16.

327.    Defendants Sullivan, Martin and Chadbourne were personally involved in and proximately caused the aforementioned violations of Day-Laborer Plaintiffs' rights by

knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom, in which Defendant HARFOT Officers engaged in violations of Day-Laborers Plaintiffs' constitutional rights.

328.    Defendants Sullivan, Martin, and Chadbourne were deliberately indifferent to the rights of Day-Laborer Plaintiffs because they knew to a moral certainty that their ICE agent subordinates would engage in questioning, detention, and arrests and make initial custody determinations for those arrested; that such questioning, detention, arrest and initial custody determinations call for agents to make difficult choices that call for special training; that the current FOT training was inadequate; that ICE had a long and known history of mishandling these decisions; and that their agents were likely to commit egregious constitutional violations in the absence of closer supervision and improved training.

329.    In the alternative, Defendants Sullivan, Martin, and Chadbourne were grossly negligent in their supervision and training of their ICE agent subordinates. They knew or should have known that there was a high degree of risk that their subordinates would violate individuals' constitutional rights in the course of both their arrests and their bond decisions, and yet they consciously or recklessly disregarded that risk by failing to take any corrective actions.

330.    Defendants Sullivan, Martin, and Chadbourne were also grossly negligent in regards to the Danbury operation in particular.  As the supervisors of an FOT unit that had an extensive history of enforcement operations and actions within Danbury, and the recipients of regular ICE media briefings on the anti-immigrant campaigns of Defendant Boughton and the City of Danbury, Defendants Sullivan, Martin, and Chadbourne knew or should have known that that there was a high degree of risk that the September 19, 2006 Danbury operation or action was

discriminatory and non-specific, and that one of their subordinates would violate the constitutional rights of the arrestees by participating in it.

331.    Defendants Sullivan, Martin, and Chadbourne either deliberately or recklessly disregarded that risk by failing to take any actions to supervise the operation, and that failure caused Plaintiffs' constitutional injuries.

**EIGHTEENTH CLAIM FOR RELIEF**
**Federal Tort Claims Act**
**(28 U.S.C. § 1346(b); The United States)**

332.    The Day-Laborer Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

*False arrest and false imprisonment*

333.    Defendant HARFOT Officers Ronald L. Preble, Richard L. McCaffrey, James E. Brown, and John Does 9-14 knowingly and intentionally arrested, detained, and imprisoned the Day-Laborer Plaintiffs without a warrant and without probable cause, in retaliation for protected speech, based on impermissible racial, ethnic, and national origin discrimination, and in a manner preempted by federal law.

334.    The HARFOT officers took custody of the Day-Laborer Plaintiffs from Danbury police officers, or arrested them or caused their arrest, as but several of many Latino, Spanish-speaking, day-laborers at Kennedy Park on the morning of September 19, 2006.  The "sting" operation—essentially a random sweep of the park—was based on mere speculation that immigration law violators would be found in the crowd of Latino day-laborers.

335.    Accordingly, the ICE Defendants lacked any reasonable basis for believing that the Day-Laborer Plaintiffs in particular had violated immigration law.  Rather, they arrested them on the basis of their race, ethnicity, and perceived national origins alone.

336.    ICE also unlawfully took custody of, arrested, or caused the arrest of, and unlawfully detained the Day-Laborer Plaintiffs prior to asking them any questions regarding their immigration statuses, or even their names.    Without any other reasonable basis for the arrest, ICE's enforcement actions—where officers took custody or arrested first and asked questions later—by definition lacked probable cause.

337.    The Day-Laborer Plaintiffs were forcibly restrained and subsequently imprisoned by the ICE Defendants and suffered damages as a result of ICE Defendants' actions.

338.    The Defendant HARFOT Officers also unlawfully took custody of Day-Laborer Plaintiffs by failing to provide a neutral adjudicator for their initial custody determination, by detaining Day-Laborer Plaintiffs without any special justification or evidence of dangerousness or flight risk, and by failing to forward or cause to be forwarded the request of each Day-Laborer Plaintiff for an Immigration Judge to review ICE's denial of bond, as indicated on the Form I-286 served on each Day-Laborer Plaintiff.

339.    The Defendant HARFOT Officers' actions constitute false arrest and false imprisonment under Connecticut common law.

*Intentional infliction of emotional distress*

340.    Defendant ICE Officers Ronald L. Preble, Richard L. McCaffrey, James E. Brown, and John Does 9-14 also intended to inflict emotional distress upon the Day-Laborer Plaintiffs by deceiving, arresting, detaining, and imprisoning them, or should have known that their conduct was likely to cause Day-Laborer Plaintiffs' emotional distress.    The ICE Defendants' conduct was clearly extreme and outrageous, given the circumstances surrounding the arrests.

341.    The emotional distress of the Day-Laborer Plaintiffs was caused by the ICE Defendants' conduct and was severe.

342.    The Defendant HARFOT Officers' actions constitute intentional infliction of emotional distress under Connecticut common law.

*Negligent infliction of emotional distress*

343.    Defendant HARFOT Officers Ronald L. Preble, Richard L. McCaffrey, James E. Brown, and John Does 9-14 further created an unreasonable risk of causing the Day-Laborer Plaintiffs emotional distress.  It was clearly foreseeable that the Defendant HARFOT Officers' conduct would cause the Day-Laborer Plaintiffs emotional distress.

344.    Defendant HARFOT Officers knew that their failure to act would likely subject a group of identifiable persons to imminent harm, namely, the Latino and immigrant day-laborers gathered in Kennedy Park.

345.    Moreover, Defendant McCaffrey negligently failed to supervise Defendant ICE Officers as they executed the Day-Laborer Plaintiffs' unlawful arrest and detention.

346.    The emotional distress of the Day-Laborer Plaintiffs was caused by the Defendant ICE Officers' conduct and was severe enough that it might result in illness or bodily harm.

347.    The Defendant HARFOT Officers' actions constitute negligent infliction of emotional distress under Connecticut common law.

*Abuse of process*

348.    Defendant HARFOT Officers Ronald L. Preble, Richard L. McCaffrey, James E. Brown, and John Does 9-14 abused legal process for a purpose for which it was not intended when they deceived, arrested, detained, transferred, imprisoned, coerced, intimidated, and

humiliated the Day-Laborer Plaintiffs in order to force them to abandon their legal rights and privileges.

349.    ICE officials also abused legal process by failing to provide a neutral arbitrator for their initial custody determination, by detaining Day-Laborer Plaintiffs without any special justification or evidence of dangerousness or flight risk, by failing to forward or causing to be forwarded the request of each Day-Laborer Plaintiff for an Immigration Judge to review ICE's refusal to set any bond, by transferring the Day-Laborer Plaintiffs to detention facilities far from their friends, family and legal counsel, and by frivolously opposing bond in order to harass and intimidate the Day-Laborer Plaintiffs into abandoning their immigration proceedings.

350.    From the outset, ICE's unnecessary and illegitimate detention of the Day-Laborer Plaintiffs on the basis of the ICE District Sub-Office's initial custody determination subjected the Day-Laborer Plaintiffs to extensive humiliation and harassment, isolated them from counsel and witnesses, and placed severe pressure on them to abandon their legal defense and to take voluntary departure.

351.    Similarly, ICE's abrupt transfer of the Day-Laborer Plaintiffs to detention facilities as far away as Texas, where they endured horrendous prison conditions, and where the men have no friends, family, or ties to the community not only separated them from their legal counsel and witnesses, but secured a forum for ICE in a more favorable jurisdiction and placed further pressure on the men not to contest the charges against them.  ICE continued its efforts to strong-arm the Day-Laborer Plaintiffs into abandoning their legal defense at their bond hearings, where it opposed the setting of bond.

352.    Unknown ICE officials at the ICE Hartford Sub-Office also abused legal process by attempting to coerce the Day-Laborer Plaintiffs into signing documents they could neither read nor understand, telling them that they had to do so.

353.    The Day-Laborer Plaintiffs suffered damages as a result of Defendant ICE officials' actions.

354.    The Defendant ICE Officers' actions constitute an abuse of process under Connecticut common law.

355.    The United States is liable pursuant to the Federal Tort Claims Act ("FTCA") for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

356.    At all times relevant to this Complaint, the ICE agents—including Officers Preble, McCaffrey, Brown, and John Does 9-14—were acting within the scope of their employment and/or their official duties as employees of U.S. Immigration and Customs Enforcement in the Department of Homeland Security ("DHS"), an agency of the U.S. Government.

357.    In these circumstances, if the United States were a private person, liability would be imposed in accordance with the law of Connecticut.

358.    The Day-Laborer Plaintiffs have also administratively exhausted their claims under the FTCA. Pursuant to 28 U.S.C. § 2675(a), the Day-Laborer Plaintiffs filed FTCA administrative claims with DHS for the tortious actions constituting false arrest and false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional

distress, and abuse of process committed by Defendant ICE officers. The claims were received on May 1, 2007.

359.    DHS has failed to make final disposition of the claims within six months after they were filed, and the Day-Laborer Plaintiffs deem this failure a final denial pursuant to 28 U.S.C. § 2675(a).

## CLAIMS RELATING TO NCIC-PROMPTED ARREST

### NINETEENTH CLAIM FOR RELIEF
**Fourth Amendment and Article First, § 7, 9 Conn. Constitution**
**(42 U.S.C. § 1983: Defendant DPD Officers John Does 6-8)**

360.    Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

361.    Defendant DPD Officers John Does 6-8 knowingly and intentionally conducted a pretextual investigatory stop of Plaintiff Vargas and arrested him unlawfully and without authority, in a manner preempted by federal law, based on an administrative immigration warrant listed in the NCIC database, in violation of Plaintiff Vargas' rights under the Fourth and Fourteenth Amendments and Article First, §§ 7 and 9 of the Connecticut Constitution to be free from unreasonable searches and seizures.

362.    As a result of Defendants' actions, Plaintiff Vargas suffered damages, including but not limited to violations of his Constitutional rights, loss of liberty, and emotional distress.

### TWENTIETH CLAIM FOR RELIEF
**Fourteenth Amendment Equal Protection Clause and Article First, § 20 of the Connecticut Constitution**
**(42 U.S.C. § 1983: Defendants DPD Officers John Does 6-8)**

363.    Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

364.    Defendant DPD Officers John Doe 6-8 targeted and arrested Plaintiff in a pretextual traffic-stop on the basis of his race, ethnicity, and national origin and for the purpose of investigating his immigration status through the NCIC database, in violation of Plaintiff Vargas' right to Equal Protection under the Fourteenth Amendment of the United States Constitution and Article First, § 20 of the Connecticut Constitution.

365.    Defendants subjected Plaintiff Vargas to selective law enforcement out of a malicious and bad faith intent to drive him and other drivers of Latino and/or foreign-born appearance from the City of Danbury, in violation of Plaintiff Vargas' right to Equal Protection under the Fourteenth Amendment of the United States Constitution and Article First, § 20 of the Connecticut Constitution.

366.    In targeting Plaintiff Vargas for arrest, Defendants intentionally treated him differently from other similarly situated drivers without any rational basis for doing so, in violation of Plaintiff Vargas' right to Equal Protection under the Fourteenth Amendment of the United States Constitution and Article First, § 20 of the Connecticut Constitution.

367.    As a result of Defendants' actions, Plaintiff Vargas suffered damages, including but not limited to violations of his Constitutional rights, loss of liberty, and emotional distress.

### TWENTY-FIRST CLAIM FOR RELIEF
### Personal Supervisory Liability
### (Defendants Boughton and Baker)

368.    Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

369.    Defendants Boughton and Baker are liable in their individual capacities as the supervisors of Defendant DPD Officers John Doe 6-8 for the violations of the Day-Laborer-Plaintiffs' rights described Claims 19-20.

370.    Defendants Boughton and Baker were personally involved in and proximately caused the aforementioned violations of Plaintiff Vargas' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom of making arrests based on administrative immigration warrants in the NCIC database.

371.    Defendant Boughton, the Mayor of Danbury, is responsible for promulgating, implementing, and administering the policies, practices and/or customs of the City of Danbury and for supervising and administering all City Departments.  He was directly involved in the promulgation, implementation, and administration of the policy, practice, and/or custom that proximately caused the violations of Plaintiff Vargas' rights described in Claims 19-20.

372.    Defendant Boughton was personally involved in and proximately caused the violations of Plaintiff Vargas' rights through his deliberate indifference to Plaintiff Vargas' constitutional rights and his grossly negligent supervision of his subordinates, including but not limited to Defendant Baker, who proximately caused the violations described in Claims 19-20. Defendant Boughton's gross negligence in supervising Defendant Baker permitted Baker and the DPD to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of Plaintiff Vargas' rights described in Claims 19-20.

373.    Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the DPD, and for supervising all DPD officers in the commission of their duties.  He was directly involved in the promulgation, implementation, and administration of the policy, practice, and/or

custom that proximately caused the violations of Plaintiff Vargas' rights described in Claims 19-20.

374.    Defendant Baker was personally involved in and proximately caused the aforementioned violations of Plaintiff Vargas' rights through his deliberate indifference to Plaintiff Vargas' rights and his grossly negligent supervision of his subordinates, including but not limited to Defendant DPD Officers John Doe 6-8, who proximately caused the violations described in Claims 19-20.

375.    As a result of Defendants' Boughton and Baker's acts and/or omissions, Plaintiff Vargas suffered damages, including but not limited to violations of his Constitutional rights, loss of liberty, and emotional distress.

**TWENTY-SECOND CLAIM FOR RELIEF**
**Municipal Liability**
**(42 U.S.C. § 1983: Defendant City of Danbury)**

376.    Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

377.    The City of Danbury is liable pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) for the promulgation and execution of municipal policy and/or custom by Defendants Boughton and Baker.  Defendants Boughton and Baker are individual policymakers who have been vested with final policymaking authority by municipal and state law.  Their acts and edicts represent city policy within the meaning of *Monell* and render the City of Danbury liable for the constitutional violations occasioned by those acts and edicts described in Claims 19-20.

378.    In addition, the City of Danbury is liable for the deliberate indifference of Defendants Boughton and Baker.  In their capacities as official policymakers, they were averted

71

to a potentially serious problem of unconstitutional conduct by Danbury Police Officers.  In spite of an obvious need for supervision and/or corrective action, Defendants Boughton and Baker failed to supervise their subordinates and/or investigate or rectify the situation, evidencing deliberate indifference to the violations of Plaintiff Vargas' constitutional rights described in Claims 19-20.

379.    Additionally, the unconstitutional conduct of Danbury Police Officers described in Claims 19-20 was so manifest as to imply the constructive acquiescence of Defendants Boughton and Baker in their capacities as policymaking officials, thus rendering the City of Danbury liable.

380.  All of the Danbury NCIC Defendants—including Boughton, Baker, and John Does 6-8– were employees of the City of Danbury at the time of the incidents in question.

### TWENTY-THIRD CLAIM FOR RELIEF
### False Arrest and False Imprisonment
### (Defendants John Does 6-8)

381.    Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

382.    Defendant DPD John Doe Officers 6-8 targeted Plaintiff Vargas for a pretextual traffic stop and arrested him on the basis of their race, ethnicity, and perceived national origins and arrested Plaintiff Vargas in a manner preempted by federal law for alleged civil violations of federal immigration law pursuant to an administrative warrant in the NCIC.

383.    Plaintiff Vargas was forcibly restrained and subsequently imprisoned by Defendants and suffered damages as a result of Defendants' actions.

384.    Defendants' actions constitute false arrest and false imprisonment under Connecticut common law.

## TWENTY-FOURTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### (Defendants John Does 6-8)

385.    Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

386.    Defendant DPD John Doe Officers 6-8, through the arrest of Plaintiff Vargas, intended to inflict emotional distress upon him, or should have known that Plaintiff's emotional distress was a likely consequence of their conduct.  Defendants' conduct was clearly extreme and outrageous, given the circumstances surrounding the arrests.

387.    The emotional distress of Plaintiff was caused by Defendants' conduct and was severe.

388.    Defendants' actions constitute intentional infliction of emotional distress under Connecticut common law.

## TWENTY-FIFTH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress
### (Defendant Baker, John Does 6-8, and the City of Danbury)

389.    Plaintiff Danilo Brito Vargas repeats and incorporates by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

390.    Defendant DPD John Doe Officers 6-8, through the arrest of Plaintiff Vargas, created an unreasonable risk of causing Plaintiff Vargas emotional distress.  It was clearly foreseeable that Defendants' conduct would cause Plaintiff Vargas emotional distress.

391.    Plaintiff Vargas' emotional distress was caused by Defendant John Does 6-8's conduct, and was severe enough that it might result in illness or bodily harm.

392.    Moreover, though fully aware that civil immigration arrests are preempted by federal law, Defendant Baker negligently failed to supervise Defendant John Does 6-8 as they executed Plaintiff Vargas' arrest and detention.

393.    Defendants Baker and John Does 6-8's actions constitute negligent infliction of emotional distress under Connecticut common law.

394.    Pursuant to Conn. Gen. Stat. §§ 7-465(a) and 7-101a, the City of Danbury is required to indemnify its employees "for all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for . . . for physical damages to person or property." Conn. Gen. Stat. § 7-465(a).

395.    The actions of the Defendants Baker and John Does 6-8 in causing Plaintiff Vargas the negligent infliction of emotional distress were not wanton or willful.

396.    Plaintiff Vargas has satisfied the notice requirement of Conn. Gen. Stat. § 7-465(a).

397.    Pursuant to Conn. Gen. Stat. § 52-557n(a), the City of Danbury is also directly liable for the "negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties."

398.    At all times relevant to this Complaint, Defendants Baker and John Does 6-8 were employees of the City of Danbury and acting within the scope of their employment and/or their official duties as employees.

399.    In all times relevant to this complaint, the Plaintiff Vargas was the identifiable and/or foreseeable victim of the actions of Defendants Baker and John Does 6-8.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

(1)    Enter a declaratory judgment that the actions of Defendant Danbury officials and/or Defendant ICE officials, both on September 19, 2006 and with respect to Plaintiff Vargas,

violated the United States Constitution, 42 U.S.C. § 1983, the Connecticut Constitution, and Connecticut common law.

    (2)      Award Plaintiffs compensatory damages in an amount to be proven at trial.

    (3)      Hold Defendants jointly and severally liable for compensatory damages.

    (4)      Award Plaintiffs punitive damages in an amount to be proven at trial.

    (5)      Award Plaintiffs the cost of this action and reasonable attorney fees.

    (6)      Grant such other relief as the Court deems just and equitable.


Dated May 29, 2009
New Haven, Connecticut

                    Respectfully submitted,

                    _____/s/_____
                    Michael Wishnie (ct27221)
                    Supervising Attorney

                    Christopher Lasch, Supervising Attorney
                    Ramzi Kassem, Supervising Attorney

                    Rebecca Engel, Law Student Intern
                    Rebecca Heller, Law Student Intern
                    Ari Holtzblatt, Law Student Intern
                    Dror Ladin, Law Student Intern
                    Elizabeth Simpson, Law Student Intern
                    JEROME N. FRANK LEGAL SERVICES
                      ORGANIZATION
                    Yale Law School
                    P.O. Box 209090
                    New Haven, Connecticut 06520
                    Phone: (203) 432-4800
                    *Counsel for Plaintiffs*

                    Joel M. Cohen (phv03297)
                    Sarah Blackman (phv03295)
                    Lawrence Bluestone (phv03296)
                    Elizabeth Goergen (phv03300)
                    Dan Michaels (phv03299)
                    Siham Nurhussein (phv03298)
                    CLIFFORD CHANCE US LLP

31 West 52nd Street
New York, New York 10019
Telephone: (212) 878-8000
*Counsel for Plaintiffs*