**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF CONNECTICUT**

```
----------------------------------------------------------X
                                                        :
JUAN BARRERA, JOSÉ CABRERA, DANIEL                      :
CHAVEZ, JOSÉ LLIBISUPA, ISAAC                           :
MALDONADO, EDGAR REDROVAN,                              :
NICHOLAS SEGUNDO SANCHEZ, and JUAN                      :
CARLOS SIMBAÑA,                                         :
,                                                       :
                                                        :
Plaintiffs,                                             :
                                                        :
        v.                                              :
                                                        :   Second Amended Complaint
MARK BOUGHTON, Mayor of Danbury, ALAN                   :   No. 3:07-cv-01436-RNC
BAKER, Chief of Police, Danbury Police                  :
Department, MITCHELL WESTON, Captain,                   :
Danbury Police Department, Danbury Police               :
Officers JOSÉ AGOSTO,RICHARD DEJESUS,                   :
JAMES A. FISHER, JAMES LALLI, JULIO                     :
LOPEZ, CRAIG MARTIN, JOSEPH NORKUS,                     :
LUIS RAMOS, JOHN DOES 1-5,                              :
CITY OF DANBURY                                         :
                                                        :
                                                        :
ICE Assistant Field Office Director GEORGE              :
SULLIVAN, ICE Deputy Field Office Director              :
JIM MARTIN, ICE Field Office Director BRUCE             :
CHADBOURNE, ICE Agents JAMES BROWN,                     :
RICHARD MCCAFFREY, RONALD PREBLE,                       :
JOHN DOES 6-11, and the UNITED STATES                   :
                                                        :
Defendants.                                             :
----------------------------------------------------------X
```

## SECOND AMENDED COMPLAINT

This is a civil rights suit to remedy the discriminatory and unauthorized enforcement of

federal immigration laws against Latino residents of the City of Danbury. Under the leadership

of Mayor Mark Boughton, Danbury and its police department have repeatedly and knowingly

made illegal civil immigration arrests, engaged in impermissibly discriminatory law

enforcement, and retaliated against residents for expressive activities secured by the First Amendment. In their frustration with the arrival of new immigrants to Danbury, Mayor Boughton and the police department have taken the law into their own hands. In some instances the City has acted unilaterally and at other times its officials have conspired with federal immigration agents in the conduct of this unlawful campaign.

Each of the ten Plaintiffs named in this action suffered illegal arrest and detention at the hands of Danbury Police Department ("DPD") officers for alleged civil immigration law violations. Yet federal immigration law preempts and prohibits local police from making civil immigration arrests unless explicitly authorized by prior written agreement with U.S. Immigration and Customs Enforcement ("ICE"). Mayor Boughton very publicly, and unsuccessfully, sought such a written agreement in Connecticut in 2005.

Despite Mayor Boughton's failure to secure authority for the civil enforcement of immigration laws, on September 19, 2006, the DPD instigated an undercover sting operation in which DPD officers, with the knowing and willing assistance of ICE, used extraordinary deception to arrest a group of Latino day-laborers who had gathered at Kennedy Park, a park in the center of downtown Danbury. DPD targeted the men based on their race, ethnicity, and perceived national origin, having no other reason to believe that any of them had violated immigration law. Furthermore, the DPD arrested the day-laborers without probable cause, in violation of the Fourth Amendment. The arrests were also calculated to silence the day-laborers' expression of their availability for work in a traditional public forum, in violation of the First Amendment, and to chill the speech of other day-laborers who now avoid the park for fear of arrest. Eight of the day-laborers arrested on September 19, 2006 are Plaintiffs in this action.

The DPD's rogue actions have resulted in numerous constitutional violations, caused Plaintiffs suffering and ignominy, and endangered the civil rights of Danbury's Latino and immigrant communities. Plaintiffs bring this action to redress the Defendants' unlawful and discriminatory enforcement of federal immigration law. They ask this Court to issue a declaration stating that Plaintiffs' arrests violate the law and to award Plaintiffs damages for the harm they have suffered as a result of Defendants' illegal actions.

## JURISDICTION AND VENUE

1.    This Court has jurisdiction over the Plaintiff's claims arising under the U.S. Constitution and federal statutes pursuant to 28 U.S.C. §§ 1331, 1343, and 1361 and supplemental jurisdiction over claims arising under the laws and Constitution of the State of Connecticut pursuant to 28 U.S.C. § 1367. Jurisdiction to grant declaratory judgment is conferred by 28 U.S.C. §§ 2201-02.

2.    Venue is proper in this district under 28 U.S.C. § 1391(b) in that all events complained of and giving rise to Plaintiffs' claims arose in this district.

## PARTIES

**Plaintiffs**

3.    Plaintiff **Juan Barrera**. DPD officers arrested Plaintiff Barrera on September 19, 2006 and subsequently transferred him to ICE custody. ICE detained Mr. Barrera in Hartford, Connecticut and then in the Suffolk County House of Corrections in Boston, Massachusetts, where he remained until his release on bond on or about October 3, 2006. Plaintiff Barrera is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

4.    Plaintiff **José Cabrera**. DPD officers arrested Plaintiff Cabrera on September 19, 2006 and subsequently transferred him to ICE custody. ICE detained Mr. Cabrera in Hartford,

Connecticut, the Plymouth County Detention Center in Plymouth, Massachusetts, and the Willacy Detention Center in Raymondville, Texas, where he remained until released on bond on or about October 23, 2006. Mr. Cabrera is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

5.    Plaintiff **Daniel Chavez**. DPD officers arrested Mr. Chavez on September 19, 2006 and subsequently transferred him to ICE custody. ICE detained Mr. Chavez in Hartford, Connecticut, the Plymouth County Detention Center in Plymouth, Massachusetts, and the Willacy Detention Center in Raymondville, Texas, where he remained until released on bond on or about October 23, 2006. Mr. Chavez is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

6.    Plaintiff **José Froilan Llibisupa**. DPD officers arrested Mr. Llibisupa on September 19, 2006 and subsequently transferred him to ICE custody. ICE detained Mr. Llibisupa in Hartford, Connecticut and then in the Suffolk County House of Corrections in Boston, Massachusetts, where he remained until released on bond on or about October 3, 2006. Mr. Llibisupa is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

7.    Plaintiff **Isaac Maldonado**. DPD officers arrested Plaintiff Maldonado on September 19, 2006 and subsequently transferred him to ICE custody. ICE detained Mr. Maldonado in Hartford, Connecticut and then in the Suffolk County House of Corrections in Boston, Massachusetts, where he remained until released on bond on or about October 3, 2006. Mr. Maldonado is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

8.    Plaintiff **Edgar Eladio Redrovan**. DPD officers arrested Mr. Redrovan on September 19, 2006 and subsequently transferred him to ICE custody. ICE detained Mr. Redrovan in Hartford, Connecticut, the Plymouth County Detention Center in Plymouth,

Massachusetts, and the Port Isabel Processing Center in Los Fresnos, Texas, where he remained until released on bond on or about October 23, 2006. Mr. Redrovan is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

9. Plaintiff **Nicolas Segundo Sanchez**. DPD officers arrested Mr. Sanchez on September 19, 2006 and subsequently transferred him to ICE custody. ICE detained Mr. Sanchez in Hartford, Connecticut, the Plymouth County Detention Center in Plymouth, Massachusetts, and the Willacy Detention Center in Raymondville, Texas, where he remained until released on bond on or about October 20, 2006. Mr. Sanchez is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

10. Plaintiff **Juan Carlos Simbaña**. DPD officers arrested Mr. Simbaña on September 19, 2006 and subsequently transferred him to ICE custody. ICE detained Mr. Simbaña in Hartford, Connecticut, the Plymouth County Detention Center in Plymouth, Massachusetts, and the Willacy Detention Center in Raymondville, where he remained until released on bond on or about October 26, 2006. Mr. Simbaña is of Latino race and ethnicity and is alleged by ICE to be a citizen of Ecuador.

**<u>Danbury Defendants</u>**

11. Defendant **Mark Boughton** is the Mayor of the City of Danbury, Connecticut. Under state and municipal law, he is the city official charged with ultimate responsibility for implementing and administering the policies, practices, and/or customs of the City of Danbury. Defendant Boughton is sued in his official and personal capacities. During all times mentioned in this complaint, Defendant Boughton was acting under color of state law.

12. Defendant **Alan Baker** is the Chief of Police of the Danbury Police Department. Under state and municipal law, he is the city official charged with ultimate responsibility for the

training and supervision of DPD officers and the administration and implementation of DPD

policies, practices, and/or customs. Defendant Baker is sued in his official and personal

capacities. During all times mentioned in this complaint, Defendant Baker was acting under

color of state law.

13. Defendant **Mitchell Weston** is a Captain in the Danbury Police Department and is the

supervisor for the Detective Bureau. Weston has supervisory responsibility for all of the DPD

Defendants in the Detective Bureau, including those whose conduct resulted in the arrest and

detention of Plaintiffs. He also had knowledge of the undercover sting operation before it

occurred, or he directed, authorized, approved, and/or acquiesced in the operation. Defendant

Weston is sued in his official and personal capacities. During all times mentioned in this

complaint, Defendant Weston was acting under color of state law.

14. Defendant **James Fisher** is a Detective Lieutenant in the DPD's Special

Investigations Division ("SID"). He is responsible for the training and supervision of SID

officers and for carrying out the policies, practices, and/or customs of the DPD. He was also the

lead DPD officer for the undercover sting operation on September 19, 2006. He is sued in his

official and personal capacities. During all times mentioned in this complaint, Defendant Fisher

was acting under color of state law.

15. Defendant **José Agosto** is a Danbury Police Officer. He is responsible for carrying

out the policies, practices, and/or customs of the DPD and participated in the undercover sting

operation on September 19, 2006. He is sued in his official and personal capacities. During all

times mentioned in this complaint, Defendant Agosto was acting under color of state law.

16. Defendant **Richard DeJesus** is a Danbury Police Officer. He is responsible for

carrying out the policies, practices, and/or customs of the DPD and participated in the

undercover sting operation on September 19, 2006. He is sued in his official and personal capacities. During all times mentioned in this complaint, Defendant DeJesus was acting under color of state law.

17. Defendant **James Lalli** is a Danbury Police Officer. He is responsible for carrying out the policies, practices, and/or customs of the DPD and participated in the undercover sting operation on September 19, 2006. He is sued in his official and personal capacities. During all times mentioned in this complaint, Defendant Lalli was acting under color of state law.

18. Defendant **Julio Lopez** is a Detective with the Danbury Police Department. He is responsible for carrying out the policies, practices, and/or customs of the DPD and participated in the undercover sting operation on September 19, 2006. He is sued in his official and personal capacities. During all times mentioned in this complaint, Defendant Lopez was acting under color of state law.

19. Defendant **Craig Martin** is a Detective with the Danbury Police Department. He is responsible for carrying out the policies, practices, and/or customs of the DPD and participated in the undercover sting operation on September 19, 2006. He is sued in his official and personal capacities. During all times mentioned in this complaint, Defendant Martin was acting under color of state law.

20. Defendant **Joseph Norkus** is a former Danbury police officer. While a Danbury Police Officer, he was responsible for carrying out the policies, practices, and/or customs of the DPD and participated in the undercover sting operation on September 19, 2006. He is sued in his official and personal capacities. During all times mentioned in this complaint, Defendant Norkus was acting under color of state law.

21. Defendant **Luis Ramos** is a Detective with Danbury Police Department. He is responsible for carrying out the policies, practices, and/or customs of the DPD and participated in the undercover sting operation on September 19, 2006. He is sued in his official and personal capacities. During all times mentioned in this complaint, Defendant Ramos was acting under color of state law.

22. Defendants **John Does 1-5** are Danbury Police Officers who took part in the arrests on September 19, 2006, but whose identities are as yet unknown. They are responsible for carrying out the policies, practices, and/or customs of the DPD, and they are sued in their official and personal capacities. During all times mentioned in this complaint, Defendants John Does 1-5 were acting under color of state law.

23. Plaintiffs are unaware of the true names and capacities, whether individual or otherwise, of Defendant Does 1 through 8, inclusive, and therefore sue those Defendants by fictitious names. These Doe Defendants are responsible and liable for the acts and/or damages alleged in this Complaint. Plaintiffs will amend this Complaint to allege the Doe Defendants' true names and capacities when they have been ascertained.

24. Defendant **City of Danbury** is a Connecticut municipal corporation. It is sued both under *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978) for the execution of its unconstitutional customs and policies and pursuant to Conn. Gen. Stat. §§ 52-557n, 7-465, and 7-101a for the tortious acts of its employees.

### ICE Defendants

25. Defendant **George Sullivan** is the Assistant Field Office Director for the Detention and Removal Office ("DRO") in Hartford, Connecticut. Sullivan has supervisory responsibility for all of the ICE Defendants in the Hartford office, including those whose conduct resulted in

the arrest and detention of Plaintiffs. Defendant Sullivan is sued in his personal capacity. During all times mentioned in this complaint, Defendant Sullivan was acting under color of federal law.

26. Defendant **Jim Martin** is the Deputy Field Office Director for the Boston regional DRO, which governs the Hartford sub-office. Defendant Martin has supervisory responsibility for all of the ICE Defendants in the Boston region, including those whose conduct resulted in the arrest and detention of Plaintiffs. Defendant Martin is sued in his personal capacity. During all times mentioned in this complaint, Defendant Martin was acting under color of federal law.

27. Defendant **Bruce Chadbourne** is the Field Office Director for the Boston regional DRO office, which governs the Hartford sub-office. Defendant Chadbourne is the federal official charged with the ultimate responsibility for the training and supervision of all ICE officers in the Boston region, and for the administration and implementation of the regional office's policies, practices, and/or customs. Defendant Chadbourne is sued in his personal capacity. During all times mentioned in this complaint, Defendant Chadbourne was acting under color of federal law.

28. Defendant **James E. Brown** is an agent of ICE's Detention and Removal Office, Fugitive Operations Unit, in Boston, Massachusetts. He is responsible for carrying out the immigration law enforcement operations of the Fugitives Operation Unit in Boston. He took part in the sting operation at Kennedy Park in Danbury and the arrest and detention of nine Plaintiffs on September 19, 2006. He is sued in his personal capacity. During all times mentioned in this complaint, Defendant Brown was acting under color of federal law.

29. Defendant **Richard L. McCaffrey** is an agent of the ICE Detention and Removal Office, Hartford Fugitive Operations Team ("HARFOT"). He is responsible for carrying out HARFOT immigration law enforcement operations. He took part in the sting operation at Kennedy Park in Danbury and the arrest and detention of nine Plaintiffs on September 19, 2006.

9

He is sued in his personal capacity. During all times mentioned in this complaint, Defendant McCaffrey was acting under color of federal law.

30. Defendant **Ronald L. Preble** is an agent of the HARFOT. He is responsible for carrying out HARFOT immigration law enforcement operations. He took part in the sting operation at Kennedy Park in Danbury and the arrest and detention of nine Plaintiffs on September 19, 2006. He is sued in his personal capacity. During all times mentioned in this complaint, Defendant Preble was acting under color of federal law.

31. Defendants **John Does 6-11** are agents of ICE who participated in the arrest and detention of nine Plaintiffs on September 19, 2006. They are responsible for carrying out the policies of ICE, and they are sued in their personal capacity. During all times mentioned in this complaint, Defendants John Does 6-11 were acting under color of federal law.

32. Plaintiffs are unaware of the true names and capacities, whether individual or otherwise, of Defendant Does 6 through 11, inclusive, and therefore sue those Defendants by fictitious names. Each of the Doe Defendants is responsible and liable for the acts and/or damages alleged in this Complaint. Plaintiffs will amend this Complaint to allege the Doe Defendants' true names and capacities when they have been ascertained.

33. During all times mentioned in this complaint, all Defendants were acting under color of law, that is, under color of the statutes, laws, charter, ordinances, rules, regulations, customs and usages of the United States, the State of Connecticut, or the City of Danbury.

## STATEMENT OF FACTS

### Immigration Law Enforcement in Danbury under Mayor Mark Boughton

34. Mayor Mark Boughton, first elected in 2001, has been a vocal advocate of strict immigration enforcement and of local government and police involvement in immigration enforcement.

35. Mayor Boughton has promoted the local enforcement of federal immigration laws in Danbury in direct response to an increase in the number of the city's immigrant and Latino residents and out of frustration over the federal government failure's to address the impact of sudden, large-scale immigration on local municipalities. In recent years, Danbury has seen a significant increase in immigrants from Brazil and other Latin American countries, especially Ecuador.

36. The arrival of new Latino immigrants, and the failure of the federal government to address immigration's local effects, has sparked a backlash from Mayor Boughton's administration.

37. For example, in early 2006, Mayor Boughton participated in or was present for discussions relating to his decision to create and lead a new nonprofit organization called "Mayors and County Executives for Immigration Reform." The organization, now disbanded, sought to lobby lawmakers to overhaul federal immigration laws.

38. Mayor Boughton's administration has also targeted, harassed, and intimidated Danbury's new city residents through a number of discriminatory policies. These policies include discriminatory enforcement of city ordinances, such as building code and vehicle registration regulations; shutting down neighborhood volleyball games; encouraging police harassment of day-laborers; encouraging direct police enforcement of civil immigration laws through traffic stops; and requests to U.S. Senators and Representatives and ICE for federal assistance in immigration law enforcement. Upon information and belief, these policies aim ultimately to

drive unwanted immigrants from Danbury and to deter future immigrants from making Danbury their home.

39. Mayor Boughton has especially directed these discriminatory policies against Danbury's Ecuadorian community. For example, both Mayor Boughton and Chief Baker were present for or participated in discussions relating to the effect of backyard volleyball games on the City of Danbury, its government, its police department, its residents, and its neighborhoods. Mayor Boughton and Chief Baker also participated in discussions relating to how to develop a backyard volleyball game ordinance, and whether to introduce it to the Danbury Common Council.

40. In April 2005, Danbury drew national media attention when the Danbury Common Council, with Mayor Boughton's support, considered an ordinance banning "repetitive outdoor group activities." The purpose of this ordinance was to shut down the Ecuadorian community's neighborhood volleyball games, one of the primary venues for community gatherings in the spring and summer.

41. Mayor Boughton also requested that the DPD aggressively police the volleyball games in order to harass the Ecuadorian community.

42. Around this same time, Mayor Boughton and Chief Baker also participated in or were present for discussions relating to housing code violations in heavily Ecuadorian neighborhoods in Danbury. They were also present for or participated in discussions relating to the creation, promotion, or operation of housing code enforcement programs, such as the Office of Neighborhood Assistance (ONA) and the Unified Neighborhood Inspection Team (UNIT).

43. Pursuant to Mayor Boughton's policy, city code inspectors discriminatorily enforced Danbury's fire and building codes and parking regulations against the Ecuadorian community.

For example, in a nighttime sweep on July 23, 2005, code enforcement officers shut down approximately seven sites that serviced the Ecuadorian community's neighborhood volleyball games.

44. The centerpiece of Danbury's harassment campaign under Mayor Boughton, however, has been the City of Danbury's escalating involvement in the enforcement of federal immigration laws, especially through the Danbury Police Department.

45. Mayor Boughton and other Danbury city officials are fully aware and have been informed by their own Office of Corporation Counsel that local police lack the legal authority to enforce federal civil immigration laws.

46. In a letter to Connecticut Attorney General Richard Blumenthal, dated April 15, 2005, Mayor Boughton requested that Attorney General Blumenthal enter into a Memorandum of Understanding ("MOU") with ICE to train, supervise, and deputize state police officers to enforce federal immigration laws, pursuant to 8 U.S.C. § 1257(g). State officials declined to pursue this course. Both Mayor Boughton and Chief Baker participated in or were present for discussions relating to this request for an MOU.

47. Despite this response from state officials, in a subsequent letter to Connecticut Governor Jodi Rell, Mayor Boughton stated that he had nevertheless instructed Danbury Police Chief Alan Baker to prioritize the resources of the DPD to assist with future federal and state immigration enforcement activities in Danbury.

48. In a letter to Connecticut Citizens for Immigration Reform, dated January 19, 2006, and based on legal advice from Danbury's Office of Corporation Counsel, Chief Baker acknowledged that DPD officers possess the authority to enforce only criminal-but not civil-immigration laws.

49. Despite their knowledge that DPD officers are not authorized to enforce civil immigration laws, Mayor Boughton and Chief Baker have nevertheless encouraged and instructed the DPD to carry out independent civil immigration law enforcement actions against Danbury's unwanted immigrant, Latino, and Ecuadorian residents without the requisite training, supervision, and written agreement with ICE as required by law.

50. Pursuant to the direction of Mayor Boughton and Chief Baker, the DPD's Special Investigations Division ("SID") has become especially active in civil immigration law enforcement activities.

51. SID is a special vice unit of the DPD that was established to investigate narcotics, gambling, prostitution, and organized crime. SID officers have received no formal training in immigration law enforcement and they are not supervised by ICE officers.

52. In a December 2004 letter to Eduardo Aguirre, Jr., Director of U.S. Citizenship and Immigration Services, which is an agency within the Department of Homeland Security ("DHS"), Mayor Boughton described the recent arrival of allegedly undocumented immigrants in Danbury and requested the assistance of the agency in enforcing immigration laws in Danbury. Mayor Boughton also sent a copy of this letter to Tom Ridge, then Secretary of DHS.

53. Mayor Boughton also sent copies of correspondence with state and other federal officials to the Secretary of DHS. This correspondence described the perceived problems Danbury faced as a result of illegal immigration and requested the assistance of state and federal authorities in enforcing immigration laws.

54. The ICE Defendants were fully aware of the Mayor's unlawful immigration enforcement campaign.

**Harassment of the Kennedy Park Day-Laborers Under Mayor Mark Boughton**

14

55. As part of their local immigration enforcement campaign, Mayor Boughton and the DPD have singled out the day-laborer community in Danbury's Kennedy Park for special harassment.

56. Upon information and belief, almost all of the day-laborers who gather at Kennedy Park each day are Latino men-many of Ecuadorian descent-and Mayor Boughton and the DPD have targeted them for harassment on the basis of their race, ethnicity, and perceived national origin. Plaintiffs Barrera, Cabrera, Chavez, Llibisupa, Maldonado, Redrovan, Sanchez, and Simbaña are all Latino and are all alleged by ICE to be citizens of Ecuador.

57. Kennedy Park is a small park, open to the public, located at the intersection of Main Street and Kennedy Avenue. Kennedy Park is at the center of Danbury's downtown district and within walking distance of City Hall.

58. In recent years, Kennedy Park has become a gathering site for day-laborers. Contractors in the construction, landscaping, and other industries drive by Kennedy Park in the early morning to solicit workers on a job-by-job basis. Normally, wages and work arrangements are negotiated at the park, and contractors then drive workers to worksites.

59. No ordinance in the Danbury Municipal Code prohibits the expression of one's availability to solicit work in a public forum.

60. Prior to September 2006, the daily and visible gathering of the day-laborers in Kennedy Park had become a source of political controversy in Danbury and subject of increasing debate among city residents.

61. Mayor Boughton and Chief Baker participated in or were present for discussions relating to Kennedy Park and other day-laborer sites, and the effect of such sites on the City of Danbury, its government, its police department, its residents, and its neighborhoods.

62. Mayor Boughton and Chief Baker also participated in or were present for discussions about the possibility of finding alternate sites where day-laborers could gather.

63. Upon information and belief, Mayor Boughton expressly directed the Danbury Police to harass and intimidate the day-laborers who gathered peaceably in Kennedy Park in order to silence their solicitation speech and prevent them from communicating with potential employers. Mayor Boughton and the DPD targeted the day-laborers for such harassment and intimidation on the basis of their race, ethnicity, and perceived national origin.

64. In accordance with Mayor Boughton's directives, DPD officers, from at least as early as August 2006, repeatedly harassed day-laborers gathering peaceably in Kennedy Park by threatening to ticket, cite, or arrest them on the grounds that they were interfering with the flow of traffic.

65. Police approached even day-laborers who were not crossing or about to cross the street in front of Kennedy Park and warned them not to congregate near the edge of the park.

66. The DPD's campaign of threats and harassment was intended to deter and effectively prohibit day-laborers from assembling peaceably in the park and to encourage them to leave Danbury. The DPD also directed these threats and harassment against the day-laborers on the basis of their race, ethnicity, and perceived national origin.

67. There is a second site in Danbury where immigrant day-laborers gather to solicit employment, located outside Minas Carne & Deli, a Brazilian restaurant at 36 Osborne Street.

68. The men who gather at the site on Osborne Street are predominantly of Brazilian descent, in contrast to the largely Ecuadorian Kennedy Park site.

69. Upon information and belief, no day-laborers have ever been arrested for civil immigration violations at the site on Osborne Street.

16

**The Arrest of Eleven Men on September 19, 2006**

Planning the Sting Operation-- Danbury Defendants

70. On September 19, 2006, DPD's harassment of the day-laborers culminated in an undercover immigration sting operation at Kennedy Park that resulted in the unlawful arrest of eleven men, nine of whom are Plaintiffs in this action.

71. Defendants Agosto, DeJesus, Fisher, Lalli, Lopez, Martin, Norkus, Ramos, Weston, and John Does 1-5 (collectively, the "DPD Officers") planned and/or executed the operation. Defendants Brown, McCaffrey, Preble, and John Does 6-11 (collectively, the "HARFOT Officers") were present in Danbury during the execution of the operation.

72. Consistent with Mayor Boughton and the DPD's efforts to drive new Latino and Ecuadorian immigrants from the city, Defendant DPD Officers determined, prior to September 19, 2006, to arrest day-laborers at Kennedy Park.

73. The DPD Officers knew of no particular "fugitive" or other alleged immigration violators in Kennedy Park and had no specific targets in mind in planning the undercover sting operation with ICE.

74. Nevertheless, Detective Fisher communicated with one or more of the HARFOT Officers regarding the potential presence of immigration violators, including immigrants with outstanding orders of deportation or removal, among the day-laborers at Kennedy Park.

75. The DPD communication to ICE was non-specific and based on group stereotypes. The communication targeted the day-laborers on the basis of their race, ethnicity, and perceived national origin, while providing no identifying information about any individuals who might have been in violation of federal law.

76. Furthermore, upon information and belief, Detective Fisher submitted the tip to retaliate against the day-laborers for gathering in public to express their availability to work and to communicate with potential employers.

77. Although Mayor Boughton and the DPD under the leadership of Chief Baker have repeatedly alleged, in letters to state officials and to the media, that immigration law violators are present at Kennedy Park, they have no basis for these allegations other than racial and ethnic stereotype and perceived national origin. Mayor Boughton and the DPD have made these allegations to further their campaign to drive the day-laborers from Kennedy Park and to instill fear in the rest of Danbury's immigrant population.

78. On or about September 18, 2006, Detective Fisher and the HARFOT Officers agreed that the operation would take place on September 19, 2006.

79. Defendant Weston was advised and knew about the planned operation in advance.

80. Defendant Weston also directed, authorized, approved, and/or acquiesced to the sting operation.

81. On or about September 18, 2006, Detective Fisher informed others, including but not limited to Captain Weston and DPD Officers DeJesus, Martin, and Norkus of the planned operation. Detective Fisher personally requested the assistance of DPD Officers DeJesus, Martin, and Norkus, who agreed to work extended shifts of duty on September 19, 2006.

82. Defendants DeJesus, Martin, and Norkus were fully aware of the purpose of the operation, knowingly and willingly agreed to assist, intentionally targeted the day-laborers for arrest based on their race, ethnicity, and/or perceived national origin, and intended to retaliate against the day-laborers for their peaceable expressive activities in Kennedy Park.

83. Detective Fisher or another of the DPD Officers arranged for the use of an undercover vehicle on September 19, 2006.

84. One of the Defendant DPD Officers dressed in clothing so as to resemble the sort of contractor or employer who typically hired day-laborers at Kennedy Park.

85. The DPD Officers and the HARFOT Officers met in Danbury in the early morning of September 19, 2006 to review final plans for the sting operation.

86. Defendant Weston knew or should have known that the DPD Officers had no authority to make civil immigration arrests. He knew or should have known that the DPD Officers would need to make difficult choices in questioning, detaining, and/or arresting day laborers for alleged federal immigration violations, and further, that proper supervision and training would make those choices less difficult.

87. Defendant Weston also knew or should have known that the DPD Officers were likely to commit constitutional violations in questioning, detaining, and/or arresting individual day-laborers without proper supervision or training.

88. Upon information and belief, although he was aware of a potentially serious problem of unconstitutional conduct by DPD Officers, and of the serious need for corrective action and supervision, Police Chief Baker failed to inform himself about or approve and otherwise adequately supervise the sting operation as required by DPD internal policies and procedures.

89. Chief Baker and Captain Weston failed to do so despite the importance of such procedures to protecting the rights of arrestees, their knowledge that local immigration enforcement is preempted under federal law, and their awareness of the DPD Officers' goals of suppressing the protected speech of the day-laborers, of singling out the day-laborers for

harassment on the basis of race, ethnicity, and perceived national origin, and of ultimately driving the Kennedy Park day-laborers from Danbury.

90. The DPD Officers' misconduct was so manifest as to imply the constructive acquiescence of Police Chief Baker in his capacity as supervisor and policymaking official for the City of Danbury.

Planning the Sting Operation-- ICE Defendants

91. Pursuant to Mayor Boughton and the DPD's goal of ridding Danbury of its new Latino and Ecuadorian immigrants, HARFOT Officers willfully and knowingly agreed to assist the DPD in an operation to arrest day-laborers at Kennedy Park. The HARFOT Officers were aware of the DPD Officers' discriminatory intent in undertaking the operation.

92. Before September 19, 2006, the HARFOT Officers did not identify any particular suspected immigration violators among the Kennedy Park day-laborers. The HARFOT Officers did not obtain any administrative or criminal arrest warrants in advance of the September 19th operation.

93. The HARFOT Officers were aware that the DPD Officers' tip contained no identifying information about any individuals who might have been in violation of federal law and that the DPD Officers provided it to them on a racially discriminatory basis.

94. Moreover, in participating in the sting operation, the HARFOT Officers themselves proceeded on the basis of racial and ethnic stereotype and perceived national origin, and without any identifying information about any individuals who might have been in violation of federal law.

95. The HARFORT Officers were members of a Fugitive Operations Team (FOT), whose congressional mandate is to identify, locate, apprehend, and remove dangerous fugitive aliens

from the United States, with the highest priority placed on those fugitives who have been convicted of crimes.

96. In 2006, there were fewer than seventy-five working FOTs operating in the United States. FOTs typically consist of seven members: a Supervisory Deportation Officer (SDO), an Immigration Enforcement Agent (IEA), a Deportation Assistant, and four Deportation Officers (DOs). The SDO is responsible for planning fugitive operations, which are carried out by the SDO and the DOs, with support from other team members.

97. Since at least early 2006, FOTs have come under increasing public criticism for a pattern of widespread constitutional violations. Over the past three years, FOTs have conducted warrantless home invasions, engaged in racial profiling, conducted coercive questioning, stopped and questioned subjects without reasonable suspicion, detained individuals without probable cause, denied detained subjects access to counsel and prohibited them from using the phone in states such as Arizona, California, Colorado, Connecticut, Florida, Georgia, Illinois, Iowa, Maryland, Massachusetts, Minnesota, Nebraska, New Jersey, New Mexico, New York, North Carolina, Ohio, Rhode Island, Tennessee, Texas, and Washington.

98. The FOTs' frequent constitutional violations in the course of operations have become such a widespread problem that Congress has held hearings on the issue. Nongovernmental organizations investigating the problem have revealed widespread constitutional violations ranging from due process violations, illegal entry of homes without warrants, and denying subjects access to counsel and phone calls once detained.

99. The FOT training program was woefully inadequate to prevent officers from engaging in frequent and egregious constitutional violations during their operations. The training program consists of a one-time three-week class for new FOT members, which focuses on

teaching agents how to prepare and review fugitive case files, locate fugitives through computer databases, use confidential informants, conduct surveillance, and plan operations.

100.    Much of the training is designed to show participants how to use the FOT fugitive database system and perform other administrative tasks. It does not sufficiently instruct agents in how to make arrests without violating constitutional rights.

101.    Although it is purportedly mandatory, many FOT members never attend this training. Even those who may work for up to two years on an FOT before they attend this training. ICE provides no national in-service training at any time to inform agents of new legal developments or ensure their understanding of lawful enforcement tactics. Inadequate training places FOT members at heightened risk of engaging in unconstitutional actions.

102.    Furthermore, ICE has no specific training program that provides instruction for FOT members about working with "partnering" cities such as Danbury, even though city police officers often participate in FOT activities alongside FOT members.

103.    Nor does ICE have a specific training program that provides instruction for FOT members about how to perform "sting" or undercover operations without violating arrestees' constitutional rights.

104.    Upon information and belief, Defendants Sullivan, Martin, and Chadbourne knowingly failed to implement an adequate training program for the HARFOT Defendants on how to question, detain, and make the arrests of individuals without violating their constitutional rights.

105.    Defendants Sullivan, Martin, and Chadbourne knew or should have known that the HARFOT Defendants would engage in questioning, detain individuals, and make arrests; that such questioning, detention, and arrests call for agents to make difficult choices that call for

22

special training to avoid serious and unconstitutional misconduct; that the FOT training provided to the HARFOT Defendants before September 19, 2006 was inadequate; that FOT teams had a long and known history of engaging in unconstitutional questioning, detention, and arrests; and that the HARFOT Defendants were likely to commit egregious constitutional violations in mishandled questioning, detention, and arrests. Defendants' failure to create an adequate training or supervision program caused Plaintiffs' injuries.

106.    Defendants Sullivan, Martin, and Chadbourne were also grossly negligent in their supervision and training of their ICE agent subordinates. They knew or should have known that there was a high degree of risk that their subordinates would violate individuals' constitutional rights in the course of their questioning, detention, and arrests, and yet they consciously or recklessly disregarded that risk by failing to take any corrective actions.

107.    Furthermore, the Hartford FOT had conducted numerous immigration enforcement operations or actions in and around Danbury prior to September 19, 2006.

108.    Some of the Hartford FOT operations or actions in Danbury prior to September 19, 2006 had been based on information provided by the DPD.

109.    In all Hartford FOT operations or actions in Danbury prior to September 19, 2006, whether based on DPD information or otherwise, the Hartford FOT had targeted a specific individual or individuals, at a specific location or locations.

110.    In addition, ICE regional and national public affairs officials regularly collect and circulate throughout the agency news clippings regarding immigration matters, including reports from local media sources. These agency distributions are known as "ICE Clips."

111.    Defendants Sullivan, Martin, and Chadbourne regularly receive distributions of ICE Clips.

112.    Defendants Sullivan, Martin, and Chadbourne knew or should of known of the anti-immigrant campaign and activities of Mayor Boughton and the City of Danbury before September 19, 2006, based on the inclusion of media accounts of these activities in ICE Clips, prior Hartford FOT operations or actions in Danbury, the absence of specific targets for the September 19, 2006 operation or action, and other sources.

113.    As the supervisors of an FOT unit that had an extensive history with Danbury, Defendants Sullivan, Martin, and Chadbourne knew or should have known that that there was a high degree of risk that the Danbury operation or action was discriminatory and non-specific, and that one or more of the HARFOT Defendants would violate the constitutional rights of the arrestees by participating in it. However, Defendants Sullivan, Martin, and Chadbourne either deliberately or recklessly disregarded that risk by failing to take any actions to supervise the operation, and that failure caused Plaintiffs' constitutional injuries.

**The Arrests**

114.    On the morning of September 19, 2006, each of the Plaintiffs Barrera, Cabrera, Chavez, Llibisupa, Maldonado, Redrovan, Sanchez, and Simbaña went to Kennedy Park to find work for the day.

115.    Some time early that morning, each of the Plaintiffs saw a vehicle drive up to the park. Each of the Plaintiffs approached the vehicle, and the driver offered each of them work for the day demolishing a fence. The driver did not appear to be looking for any specific individuals.

116.    In fact, the vehicle approached by each Day-Laborer Plaintiff was driven by one of the DPD Officers, and the offer of work demolishing a fence was a ruse.

117.    Each Day-Laborer Plaintiff reasonably relied on the misrepresentation of the offer of work and entered the vehicle.

24

118.    The vehicle made three trips to Kennedy Park that morning, picking up three to five workers each time.

119.    On each of the three trips from Kennedy Park, the vehicle drove several blocks to a fenced-in lot behind an office building on Main Street in Danbury. The vehicle stopped in the corner of the parking lot behind the building, which is surrounded by a tall chain link fence and closed off on the fourth side by the building.

120.    The undercover DPD officer driving the vehicle did not ask any questions of any of the Plaintiffs during the drive from Kennedy Park to the parking lot.

121.    Both DPD Officers and HARFOT Officers were present in the parking lot when each of the Plaintiffs arrived.

122.    When each Day-Laborer Plaintiff exited the vehicle, the DPD Officers and/or HARFOT Officers, who were waiting in the lot, immediately surrounded each man, some officers with weapons drawn, and roughly seized each Day-Laborer Plaintiff. Some of the arresting officers had apparently been hiding in or around several vehicles that were parked in the corner of the parking lot.

123.    Upon seizing each Day-Laborer Plaintiff, the DPD Officers and/or HARFOT officers then physically detained each Day-Laborer Plaintiff and told him that he was under arrest. The DPD Officers and/or HARFOT officers handcuffed each Day-Laborer Plaintiff, placed him in a white van that was parked in the lot, and closed the door to the van.

124.    Those Plaintiffs who arrived first were instructed to watch while the same thing happened to subsequent day-laborers. A total of eleven day-laborers were arrested and placed in the van.

125.     The DPD Officers arrested the Plaintiffs at approximately 7:00 am on September 19, 2006.

126.     In the alternative, Plaintiffs allege that HARFOT Officers arrested the Plaintiffs at some point on the morning of September 19, 2006.

127.     After being arrested in the parking lot, some of the Plaintiffs wanted to call a family member or a lawyer and asked to make a phone call. The arresting officers refused to let any of the Plaintiffs make such a call and confiscated the cell phones of those Plaintiffs who had them.

128.     Only after the Plaintiffs had been physically restrained, put under arrest by the DPD Officers and/or HARFOT Officers, and told that they could not call anyone, did law enforcement agents question the Plaintiffs about their identity, nationality, the place and manner of their entry into the United States, and their immigration status.

129.     While the Plaintiffs were detained in the parking lot, a DPD officer of Hispanic appearance, and who spoke Spanish well, told Plaintiff Barrera in Spanish that he had been arrested because he was standing in Kennedy Park, after the DPD had previously warned laborers not to stand there. Upon information and belief, this individual was Defendant José Agosto.

130.     None of the Plaintiffs had been previously warned, cited, or ticketed for standing in Kennedy Park or interfering with traffic in the area of Kennedy Park, and none had any record of causing any "safety issues" in Kennedy Park, whether related to traffic or otherwise.

131.     None of the Plaintiffs had an outstanding deportation or removal order, and no immigration warrants had been issued for any of them before their arrests on September 19, 2006.

132.    The DPD Officers and/or HARFOT Officers then transported the Plaintiffs from the parking lot to the Danbury Police Station, where DPD officers fingerprinted and questioned them and entered their booking records into the DPD's files.

133.    While at the Danbury Police Station, Plaintiff Chavez saw a DPD officer that he recognized to be José Agosto. Officer Agosto told Plaintiff Chavez in Spanish that he had been arrested because they had been standing at Kennedy Park, even though the DPD had previously warned the day-laborers not to stand there.

134.    Plaintiff Chavez had never been told by any police officer not to stand at or near Kennedy Park, nor had Plaintiff Chavez previously been warned, cited, or ticketed for interfering with traffic in the area of Kennedy Park.

135.    At the Danbury Police Station, Plaintiff Barrera was also mockingly told by a Danbury police officer of Hispanic appearance, and who spoke Spanish well, that when he could, Plaintiff Barrera should call family in Ecuador and tell them to meet him at the airport in Quito, because that was the first place that Plaintiff Barrera would be released from custody. Upon information and belief, this individual was Defendant José Agosto.

136.    According to DPD booking records, Danbury police arrested each Day-Laborer Plaintiff in the Danbury Executive Tower parking lot at 7:06 am on the charge of "Illegal Entry Into U.S."

137.    The booking reports list the arresting officer to be Defendant and DPD Officer James Lalli.

138.    No criminal charges have been filed against any of the Plaintiffs.

139.    Upon information and belief, Mayor Boughton was informed of the undercover operation and arrests no later than while they were occurring on the morning of September 19, 2006.

140.    At no point that morning, or any point afterwards, did Mayor Boughton attempt to prevent the arrests of the Plaintiffs in spite of his knowledge that the sting operation was illegal and violated the Plaintiffs' civil rights.

141.    Upon information and belief, Mayor Boughton allowed the arrests to take place pursuant to his administration's policy of promoting local civil immigration enforcement against Danbury's new Latino and Ecuadorian immigrants, targeting the City's Latino and Ecuadorian immigrants for discrimination, and retaliating against Latino and Ecuadorian day-laborers for their use of Kennedy Park to express their availability for work.

142.    Mayor Boughton also allowed the arrests to occur out of total disregard for the constitutional interests of the arrestees.

143.    Upon information and belief, Mayor Boughton took no disciplinary actions against the DPD Officers upon learning of the sting operation and the arrests of the Plaintiffs.

The Plaintiffs' Transfer to ICE Custody

144.    After detaining each Day-Laborer Plaintiff in a holding cell or otherwise for approximately two hours at Danbury Police Headquarters, DPD officers transferred custody of the Plaintiffs to ICE at approximately 9:00 am.

145.    The HARFOT Officers transported the Plaintiffs, handcuffed and shackled, to Hartford, Connecticut.

146.    The ICE Agents responsible for accepting custody of the Plaintiffs were the HARFOT Officers, Defendants Brown, McCaffrey, and Preble.

28

147.    Defendant McCaffrey also served as examining officer for the Plaintiffs, though he knew or should have known that doing so violated federal immigration regulations.

148.    As the examining officer, Defendant McCaffrey made the initial custody determination for each Day-Laborer Plaintiff.

149.    This initial custody decision for each Day-Laborer Plaintiff was memorialized on ICE Form I-286, Notice of Initial Custody Determination.

150.    The Form I-286 for each Day-Laborer Plaintiff was printed with the name "George Sullivan" and signed for Defendant Sullivan by Defendant McCaffrey.

151.    None of the Plaintiffs was in a category of persons determined by Congress to be subject to mandatory immigration detention pursuant to 8 U.S.C. § 1226(c).

152.    For persons not subject to mandatory detention, the factors relevant to an initial custody determination are dangerousness and risk of flight.

153.    None of the Plaintiffs was dangerous or a flight risk on September 19, 2006.

154.    When Defendant McCaffrey made the initial custody determination for each Day-Laborer Plaintiff on September 19 or 20, 2006, he had no evidence any one of the Plaintiffs was dangerous or a flight risk.

155.    Nevertheless, Defendant McCaffrey declined to set bond for each Day-Laborer Plaintiff, despite the fact that none of the Plaintiffs was subject to mandatory detention or presented a flight risk or posed any danger to the community.

156.    One of the HARFOT Defendants served the appropriate Form I-286 on each Day-Laborer Plaintiff and asked that Plaintiff whether he requested a redetermination of the initial custody decision by an Immigration Judge.

157.    Each Day-Laborer Plaintiff stated that he did request a review by an Immigration Judge of ICE's initial custody determination, and that request was noted on each Form I-286.

158.    However, ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Barrera's request for bond redetermination with any Immigration Court until March 5, 2007, 167 days after his request for review.

159.    ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Chavez's request for bond redetermination with any Immigration Court until October 13, 2006, 24 days after his request for review.

160.    160. ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Llibisupa's request for bond redetermination with any Immigration Court until March 5, 2007, 167 days after his request for review.

161.    ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Maldonado's request for bond redetermination with any Immigration Court until March 5, 2007, 167 days after his request for review.

162.    ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Simbaña's request for bond redetermination with any Immigration Court until March 5, 2007, 167 days after his request for review.

163.    ICE officials did not file or cause to be filed the Form I-286 with Plaintiff Sanchez's request for bond redetermination with any Immigration Court until October 13, 2006, 24 days after his request for review.

164.    ICE officials did not file or cause to be filed the Form I-286, with Plaintiff Cabrera's request for bond redetermination with any Immigration Court until October 19, 2006 30 days after his request for review.

30

165.    ICE officials did not file or cause to be filed the Form I-286, with Plaintiff Redrovan's request for bond redetermination with any Immigration Court until October 19, 2006, 30 days after his request for review.

166.    Defendants Sullivan, Martin, and Chadbourne supervise HARFOT officers in their detention-related decisions, and are responsible for training HARFOT officers on how to make initial custody determinations and how to set appropriate bond.

167.    Upon information and belief, Defendants Sullivan, Martin, and Chadbourne knowingly failed to implement an adequate training program for the HARFOT Defendants on how to make initial custody determinations, and how to set bond for detainees without violating their constitutional rights.

168.    By failing to implement an adequate training or supervision program on custody and bond decisions for the HARFOT officers, Defendants Sullivan, Martin, and Chadbourne acted with deliberate indifference to the rights of Plaintiffs. They knew their agents would make custody and bond decisions; that such decisions call for agents to make difficult choices that call for special training; that the current training was inadequate; and that agents were likely to commit egregious constitutional violations in mishandled custody and bond decisions without proper supervision or training. Defendants' Sullivan, Martin, and Chadbourne's failure to create an adequate training or supervision program caused Plaintiffs' injuries.

169.    Defendants Sullivan, Martin, and Chadbourne were also grossly negligent in their supervision and training of their ICE agent subordinates on custody and bond decisions. They knew or should have known that there was a high degree of risk that their subordinates would violate individuals' constitutional rights in the course of their custody and bond decisions, and yet they consciously or recklessly disregarded that risk by failing to take any corrective actions.

31

170.    As a result of Defendant McCaffrey's failure to set any bond for the Plaintiffs, even though there was no evidence that any of the Plaintiffs was dangerous or a flight risk or within a category of persons subject to mandatory detention, and of Defendants' failure to file or cause to be filed in Immigration Court the request of each Plaintiff for review of the ICE no-bond decision by an Immigration Judge --along with Defendant Sullivan, Martin and Chadbourne's failure to remedy these constitutional violations--the Plaintiffs were unconstitutionally detained in violation of the Fifth Amendment.

171.    Several of the Plaintiffs also suffered additional injuries, including a transfer to Texas, horrendous prison conditions, and higher bond payments, due to the actions of Defendants McCaffrey, Sullivan, Martin and Chadbourne.

**The Plaintiffs' Detention While in ICE Custody**

172.    After two nights in Hartford, ICE agents transferred Plaintiffs Barrera, Llibisupa, and Maldonado to the Suffolk County House of Corrections in Boston, Massachusetts. ICE agents transferred Plaintiffs Cabrera, Chavez, Redrovan, Sanchez, and Simbaña to Plymouth County Detention Center in Plymouth, Massachusetts.

173.    Throughout the course of their detentions, ICE officials and prison officials at the Plaintiffs' respective facilities denied each of the Plaintiffs access to a telephone for periods ranging from several days to several weeks, despite the Plaintiffs' repeated requests to call family members or a lawyer.

174.    Specifically, ICE officials denied Plaintiffs Barrera, Llibisupa, Maldonado, and Redrovan phone access while they were in custody in Hartford.

175.    ICE officials allowed Plaintiffs Cabrera and Chavez to use a phone on their first day in Hartford, but the phone did not work.

176.    While in custody in Hartford, ICE officers instructed the Plaintiffs to sign a document written in English, which had not been translated or explained to them, and which they could not read. ICE officers took the men out of the room one at a time and individually intimidated them and pressured them into signing the document. ICE officers gave the men a number of different and wholly inadequate explanations for what the paper was.

177.    Plaintiff Barrera did not understand what the document said. An officer who spoke some Spanish stated simply that he needed to sign it to be transferred.

178.    Another officer told Plaintiff Chavez that he needed to sign the document in order to see a judge.

179.    Plaintiff Maldonado similarly could not read the document, but the officers who addressed him angrily told him that he had to sign it anyway.

180.    Officers informed Plaintiff Simbaña that, practically speaking, he already "signed" the document and terrorized him into actually doing so, leading him to believe that he needed to sign the document in order to see an Immigration Judge.

181.    While the Plaintiffs were in custody in Massachusetts, an unknown law enforcement agent or agents questioned them as potential suspects or witnesses in a murder investigation. The agent told them that the victim had been murdered in Danbury by an Ecuadorian. During the interrogation, the agent did not offer Plaintiffs access to counsel, nor did he inform them of their Miranda rights, including their right to remain silent and to have counsel present during the interrogation. Instead, the agent promised them immigration benefits if they told him about the murder.

182.    Also while in custody in Massachusetts, prison officials subjected each of the Plaintiffs to a medical examination and full-body search.

183.    Prison officials forced at least Plaintiffs Barrera, Llibisupa, Maldonado, Redrovan, and Simbaña to give blood samples without their consent as part of the medical examination.

184.    Prison officials forced at least Plaintiffs Barrera, Maldonado, Redrovan, and Simbaña to give urine samples without their consent as part of the medical examination.

185.    Suffolk County correctional guards held Plaintiff Barrera in isolation for five days-in a cell with neither a toilet nor a sink-as a result of his blood test. At no point did officers explain the reason for his confinement.

186.    On October 2, 2006, Immigration Judge ("IJ") Matthew J. D'Angelo of the Immigration Court in Boston, Massachusetts held bond redetermination hearings for Plaintiffs Barrera, Llibisupa, and Maldonado. IJ D'Angelo found that Plaintiffs Barrera, Llibisupa, and Maldonado were neither a flight risk nor a danger to the community and set the statutory minimum bond of $1500 for each man.

187.    Plaintiffs Barrera, Llibisupa, and Maldonado were released on $1500 bond on October 3, 2006. In total, they each spent approximately 15 days in ICE custody.

**The Remaining Plaintiffs' Transfer to and Detention in Texas**

188.    The Boston Immigration Court calendared bond redetermination hearings for Plaintiffs Chavez, Sanchez, and Simbaña for 1:00 pm on October 3, 2006.

189.    On the morning of October 3, however, before their 1:00 pm bond hearings, ICE began the process of transferring Plaintiffs Chavez, Sanchez, and Simbaña, along with Plaintiffs Cabrera and Redrovan, to detention facilities in Texas. When the Immigration Judge in Boston attempted to call the bond cases for these Plaintiffs as scheduled at the 1:00 pm video-conference

calendar on October 3, jail officials informed the Court that the Plaintiffs were not available for court because they were in transit to Texas.

190.    On October 3, 2006, ICE flew Plaintiffs Cabrera, Chavez, Redrovan, Sanchez, and Simbaña, handcuffed and shackled, to Texas. ICE kept Plaintiffs in shackles for the entire journey to Texas-a period of nearly sixteen hours.

191.    ICE briefly held Plaintiffs Cabrera, Chavez, Sanchez, and Simbaña at the Port Isabel Processing Center in Los Fresnos, Texas and then detained them at the Willacy Detention Center in Raymondville, Texas. ICE continued to hold Plaintiff Redrovan at the Port Isabel Processing Center.

192.    While at the Willacy Detention Center, Plaintiffs Cabrera, Chavez, Sanchez, and Simbaña were subjected to horrendous detention conditions. The men endured extremely overcrowded and unsanitary conditions, and prison officials denied them adequate medical care and adequate amounts of food at regular intervals. At times, the detainees were forced to eat with their bare hands. Prison guards also frequently verbally insulted, taunted, and ridiculed the detainees.

193.    Immigration Judge ("IJ") Eleazar Tovar of the Immigration Court in Harlingen, Texas held telephonic bond redetermination hearings on October 16, 2006 for Plaintiffs Cabrera, Chavez, Sanchez, and Simbaña. IJ Tovar found that the detainees were neither a flight risk nor a danger to the community and set bond.

194.    IJ Peterson of the Immigration Court in Harlingen, Texas held a telephonic bond redetermination hearing for Plaintiff Redrovan. IJ Peterson found that Plaintiff Redrovan was neither a flight risk nor a danger to the community and set bond.

195.    Plaintiff Cabrera was released on $8,000 bond on or around October 23, 2006. In total, Mr. Cabrera was detained in ICE custody for approximately 35 days.

196.    Plaintiff Chavez was released on $10,000 bond on or around October 23, 2006. In total, Mr. Chavez was detained in ICE custody for approximately 35 days.

197.    Plaintiff Redrovan was released on $15,000 bond on or around October 23, 2006. In total, Mr. Redrovan was detained in ICE custody for approximately 35 days.

198.    Plaintiff Sanchez was released on $10,000 bond on or around October 20, 2006. In total, Mr. Sanchez was detained in ICE custody for approximately 32 days.

199.    Plaintiff Simbaña was released on $10,000 bond on or around October 26, 2006. In total, Mr. Simbaña was detained in ICE custody for approximately 38 days.

**Effect on Plaintiffs and Day-Laborer Community at Large**

200.    Defendants' unlawful and retaliatory arrest and detention of the Plaintiffs and the restrictions Defendants placed on Plaintiffs' liberty caused Plaintiffs to suffer humiliation, emotional distress, physical pain, and monetary damages.

201.    The Plaintiffs continue to fear that they, their families, or their acquaintances will be arbitrarily and unlawfully arrested by ICE, DPD, or both. Several of the Plaintiffs no longer gather in Kennedy Park for fear of harassment by ICE and DPD officers.

202.    While sparking a great deal of political engagement and advocacy by the immigrant and Ecuadorian community in Danbury and across the State of Connecticut, the Plaintiffs' unlawful arrests have also created a climate of fear among day-laborers at Kennedy Park and among Latino, Ecuadorian, and immigrant residents in Danbury more generally. This climate persists to this day.

203.     Fewer day-laborers in general now assemble at Kennedy Park to seek work, fearing that they too will be arrested by ICE, DPD, or both, and those who do continue to gather there do so in part as a statement of their disagreement with the anti-immigrant tactics of Mayor Boughton and the DPD.

204.     Latino, Ecuadorian, and immigrant residents in Danbury also remain fearful of harassment, detention, and arrest by ICE, DPD, or both.

## CLAIMS RELATING TO ARREST OF DAY-LABORERS

**FIRST CLAIM FOR RELIEF:**
**Fourth Amendment and Article First, §§ 7, 9 of the Connecticut Constitution**
**(42 U.S.C. § 1983 and *Binette v. Sabo*, 244 Conn. 23 (1998): Defendant DPD Officers)**

205.     The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

206.     Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos and John Does 1-5 violated the Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article First, §§ 7 and 9 of the Connecticut Constitution by arresting them for alleged civil immigration violations without valid warrants and in the absence of exigent circumstances, any probable cause, or any reason to believe that the Plaintiffs were engaged in any unlawful activity, and by stopping, detaining, investigating, searching, and effecting seizures and/or arrests of the Plaintiffs in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause.

207.     As a result of Defendant DPD Officers' actions, the Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

## SECOND CLAIM FOR RELIEF:
### Fourth Amendment and Article First, §§ 7, 9 of the Connecticut Constitution: Preemption
### (42 U.S.C. § 1983 and *Binette v. Sabo*: Defendant DPD Officers)

208.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

209.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 violated the Plaintiffs' rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article First, §§ 7 and 9 of the Connecticut Constitution by intentionally and knowingly detaining and/or arresting the Plaintiffs on suspicion of civil immigration violations. The arrest and detention of the Plaintiffs was unlawful, wholly without authority, and in violation of the Fourth and Fourteenth Amendments to the United States Constitution and Article First, §§ 7 and 9 of the Connecticut Constitution because federal law preempts state or local police from civil immigration enforcement activity and expressly and implicitly deprives local law enforcement officials of the authority to make civil immigration arrests. The Defendant DPD Officers lacked any authority under federal law to make civil immigration arrests.

210.    As a result of Defendant DPD Officers' actions, the Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

## THIRD CLAIM FOR RELIEF:
### Fourteenth Amendment Equal Protection Clause and Article First, § 20 of the
### Connecticut Constitution
### (42 U.S.C. § 1983 and *Binette v. Sabo*: Defendant DPD Officers)

211.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

212.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 intentionally targeted the Plaintiffs for an immigration sting operation and arrested and detained them on the basis of their race, ethnicity, and perceived national origin in violation of the Fourteenth Amendment to the United States Constitution and Article First, § 20 of the Connecticut Constitution.

213.    In addition, Defendant DPD Officers subjected the Plaintiffs to selective law enforcement on the basis of their race, ethnicity, and perceived national origin in violation of the Fourteenth Amendment to the United States Constitution and Article First, § 20 of the Connecticut Constitution.

214.    Defendant DPD Officers also subjected the Plaintiffs to selective law enforcement out of a malicious and bad faith intent to drive them out of the City of Danbury in violation of the Fourteenth Amendment to the United States Constitution and Article First, § 20 of the Connecticut Constitution.

215.    As a result of Defendant DPD Officers' actions, the Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

### FOURTH CLAIM FOR RELIEF
**First Amendment and Article First, §§ 4, 14 of the Connecticut Constitution
(Suppression of and Retaliation for Protected Speech)
(42 U.S.C. § 1983 and *Binette v. Sabo*: Defendant DPD Officers)**

216.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

217.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 knowingly and

intentionally stopped, detained, investigated, and arrested the Plaintiffs in retaliation for their

exercise of protected speech and association in a public forum, in violation of the First and

Fourteenth Amendments to the United States Constitution and Article First, §§ 4 and 14 of the

Connecticut Constitution.

218.    Defendant DPD Officers had no probable cause to stop, detain, investigate, or

arrest the Plaintiffs and had no reason to believe that they were in violation of any immigration

laws. The DPD does not have the legal authority to make arrests solely for violations of federal

civil immigration law.

219.    As a result of Defendant DPD Officers' actions, the Plaintiffs suffered damages,

including but not limited to violations of their Constitutional rights, loss of liberty, and emotional

distress.

**FIFTH CLAIM FOR RELIEF:**
**Due Process Rights Under the Fourteenth Amendment and Article First, § 8 of the**
**Connecticut Constitution**
**(42 U.S.C. § 1983 and *Binette v. Sabo*: Defendants DPD Officers)**

220.    The Plaintiffs repeat and incorporate by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

221.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James

Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 civilly arrested

the Plaintiffs and deprived them of their of their liberty in a manner that was without due process

of law and fundamentally unfair in the totality of its circumstances, in violation of the Fourteenth

Amendment to the United States Constitution and Article First, § 8 of the Connecticut

Constitution.

222.    As a result of Defendant DPD Officers' actions, the Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

**SIXTH CLAIM FOR RELIEF**
**Conspiracy**
**(42 U.S.C. § 1983: Defendant DPD Officers and HARFOT Officers)**

223.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

224.    Defendant DPD Officers and HARFOT Officers entered into an agreement, between and amongst themselves, to act in concert to inflict an unconstitutional injury on the Plaintiffs. Specifically, one or more Defendant DPD Officers spoke by telephone with one or more Defendant HARFOT Officers during the week or weeks prior to the September 19, 2006 arrests to plan the operation. Furthermore, Defendant DPD Officers met with Defendant HARFOT Officers in the early morning of September 19, 2006 for the purpose of planning the operation. The conspiracy included, but may not have been limited to, an agreement to arrest and detain Plaintiffs in violation of their rights under the United States and Connecticut Constitutions.

225.    Defendant DPD Officers and Defendant HARFOT Officers performed several overt acts in furtherance of this conspiracy, including but not limited to posing as a contractor in order to lure Plaintiffs in a vehicle, arresting Plaintiffs, and detaining Plaintiffs in violation of their rights under the U.S. and Connecticut Constitutions.

226.    Defendant DPD Officers played a significant role in the conspiracy and in the overt acts taken in furtherance thereof.

227.    As a result of the conspiracy between and among the Defendant DPD Officers

and the Defendant HARFOT Officers and the overt actions taken in furtherance thereof, the

Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights,

loss of liberty, and emotional distress.

**SEVENTH CLAIM FOR RELIEF**
**Conspiracy**
**(42 U.S.C. § 1985(3): Defendant DPD Officers and HARFOT Officers)**

228.    The Plaintiffs repeat and incorporate by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

229.    Defendant DPD Officers and Defendant HARFOT Officers entered into an

agreement to act in concert for the purpose of depriving the Plaintiffs of the equal protection of

the laws. Specifically, one or more Defendant DPD Officers spoke by telephone with one or

more Defendant HARFOT Officers during the week or weeks prior to the September 19, 2006

arrests to plan the operation. Further, Defendant DPD Officers met with Defendant HARFOT

Officers in the early morning of September 19, 2006 for the purpose of planning the operation.

The conspiracy included, but may not have been limited to, an agreement to arrest and detain

Plaintiffs in violation of their right to equal protection of the law.

230.    Defendant DPD Officers and Defendant HARFOT Officers performed several

overt acts in furtherance of this conspiracy, including but not limited to posing as a contractor in

order to lure Plaintiffs in a vehicle, arresting Plaintiffs, and detaining Plaintiffs in violation of

their right to equal protection of the law.

231.    Plaintiffs are Latino men and alleged by ICE to be citizens of Ecuador. The

conspiracy between and among the Defendant DPD Officers and the Defendant HARFOT

42

Officers and the overt actions taken in furtherance thereof were motivated by a discriminatory

animus against Plaintiffs based on their race, ethnicity, and/or perceived national origin.

232.    As a result of the conspiracy between and among the Defendant DPD Officers

and the Defendant HARFOT Officers and the overt actions taken in furtherance thereof, the

Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights,

loss of liberty, and emotional distress.

**EIGHTH CLAIM FOR RELIEF**
**Personal Supervisory Liability**
**(42 U.S.C. § 1983 and *Binette v. Sabo*: Defendants Boughton, Baker, Weston, and**
**Fisher)**

233.    The Plaintiffs repeat and incorporate by reference each and every allegation

contained in the preceding paragraphs as if fully set forth herein.

234.    Defendants Boughton, Baker, Weston, and Fisher are liable in their individual

capacities as the supervisors of Defendant DPD Officers for the violations of the Plaintiffs' rights

described in Claims 1-7.

235.    Defendants Boughton, Baker, Weston, and Fisher were personally involved in and

proximately caused the aforementioned violations of the Plaintiffs' rights by knowingly and

intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in

a policy, practice, and/or custom in which local police engaged in the unconstitutional conduct

described in Claims 1-7.

236.    Defendant Boughton, the Mayor of Danbury, is responsible for promulgating,

implementing, and administering the policies, practices, and/or customs of the City of Danbury

and for supervising and administering all City Departments. He was directly involved in the

promulgation, implementation, and administration of the policy, practice, and/or custom that

proximately caused the aforementioned violations of the Plaintiffs' rights described in Claims 1-7.

237.    Defendant Boughton was personally involved in and proximately caused the aforementioned violations of the Plaintiffs' rights described in Claims 1-7 because he failed to remedy these violations. Specifically, Defendant Boughton failed to act on information provided to him no later than on the morning of the Plaintiffs' arrests that alerted him to these violations before they occurred or while they were occurring. Upon learning of the violations, Defendant Boughton made no attempt to stop the violations from occurring, to minimize the harm that resulted from any violations that had already occurred, or to punish, sanction, or discipline the DPD Officers who committed the violations described in Claims 1-7.

238.    Defendant Boughton was personally involved in and proximately caused the violations of the Plaintiffs' rights through his deliberate indifference to the rights of the Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendant Baker and Defendant Fisher, who proximately caused the aforementioned violations described in Claims 1-7. Defendant Boughton's gross negligence in supervising Defendants Baker, Weston, and Fisher permitted them to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights described in Claims 1-7 and to plan and carry out the sting operation which resulted in those violations.

239.    Defendant Baker, the Chief of Police for Danbury, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the DPD, and for supervising all DPD officers in the commission of their duties. He was directly

44

involved in the promulgation, implementation, and administration of the policy, practice, and/or custom that proximately caused the violations of the Plaintiffs' rights described in Claims 1-7.

240.    Defendant Baker was personally involved in and proximately caused the aforementioned violations of the Plaintiffs' rights through his deliberate indifference to the rights of the Plaintiffs and his grossly negligent supervision of his subordinates, including but not limited to Defendants Weston and Fisher, who proximately caused the aforementioned violations described in Claims 1-7. Defendant Baker's gross negligence in supervising Defendants Weston and Fisher permitted Defendants Weston and Fisher to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and for Defendant Fisher to plan and carry out the sting operation which resulted in those violations.

241.    Defendant Weston, the supervisor the Danbury Police Detective Bureau, was directly involved in and proximately caused the aforementioned violations of the Plaintiffs' rights through his beforehand knowledge of the undercover sting operation, and/or through directing, authorizing, approving, and/or acquiescing in the unlawful arrests described in Claims 1-7. Defendant Weston knew of all relevant facts that made the actions of the DPD Officers unlawful.

242.    Defendant Weston was at all relevant times responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the Detective Bureau, and for supervising all DPD detectives in the commission of their duties. He was directly involved in the promulgation, implementation, and administration of the policy, practice, and/or custom that proximately caused the violations of the Plaintiffs' rights described in Claims 1-7.

243.    Defendant Weston was also personally involved in and proximately caused the aforementioned violations through his deliberate indifference to the rights of the Plaintiffs. He

knew to a moral certainty that his subordinates would need to make difficult choices in arresting day laborers with the assistance of ICE; he knew that proper supervision and training would make those choices less difficult, and he knew his subordinates were likely to commit constitutional violations without that supervision or training.

244.    Defendant Weston was also personally involved in and proximately caused the aforementioned violations of the Plaintiffs' rights through his grossly negligent supervision of his subordinates, including but not limited to Defendant Fisher, who proximately caused the aforementioned violations described in Claims 1-7. Defendant Weston's gross negligence in supervising Defendant Fisher permitted Defendant Fisher to promulgate, implement, and administer the aforementioned policies, practices, and customs which proximately caused the violations of the Plaintiff Day-Laborers' rights, and to plan and carry out the sting operation which resulted in those violations.

245.    Defendant Fisher was directly involved in and proximately caused the aforementioned violations of the Plaintiffs' rights by participating in the violations, and/or by ordering or instructing the other DPD Officers to commit the unlawful arrests described in Claims 1-7. Defendant Fisher knew of all relevant facts that made the actions of the DPD Officers unlawful.

246.    Defendant Fisher, the head of the DPD's SID, is responsible for promulgating, implementing, and administering the policies, practices, and/or customs of the SID, and for supervising all other SID officers in the commission of their duties. He was directly involved in the promulgation, implementation, and administration of the policy, practice, and/or custom that proximately caused the violations of the Plaintiffs' rights described in Claims 1-7.

247.    Defendant Fisher was personally involved in and proximately caused the aforementioned violations of the Plaintiffs' rights through his deliberate indifference to the rights of the Plaintiffs and his grossly negligent supervision of his subordinate DPD Officers who committed the violations of the Plaintiffs' constitutional rights described in Claims 1-7. Defendant Fisher knew or should have known of the DPD's policy, practice, or custom of making civil immigration arrests without probable cause, and failed to act to prevent the violations of the Plaintiffs' rights from occurring.

248.    As a result of Defendants Boughton, Baker, Fisher, and Weston's acts and/or omissions, the Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

**NINTH CLAIM FOR RELIEF**
**Municipal Liability**
**(42 U.S.C. § 1983: Defendant City of Danbury)**

249.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

250.    The City of Danbury is liable pursuant to *Monell v. New York City Dept. of Social Services*, 436 U.S. 658 (1978), for the promulgation and execution of municipal policy and/or custom by Defendants Boughton, Baker, Weston, and Fisher prior to and during the arrest of the Plaintiffs on September 19, 2006.

251.    As individual policymakers who have been vested with final policymaking authority by municipal and state law, Defendants Boughton, Baker, Weston, and Fisher's acts and edicts resulted in policies and/or customs exhibiting deliberate indifference to the constitutional rights of persons in the City of Danbury and occasioned the aforementioned violation of the Day-Laborers Plaintiffs' rights described in Claims 1-7.

252.    In addition, in their capacities as official policymakers, Defendants Boughton, Baker, Weston, and Fisher were alerted to a potentially serious problem of unconstitutional conduct by Danbury Police Officers described in Claims 1-7. In spite of an obvious need for supervision and/or corrective action, Defendants Boughton, Baker, Fisher, and Weston failed to supervise their subordinates and/or investigate or rectify the situation, evidencing deliberate indifference to the Plaintiffs' constitutional rights and conspiracies between local police and ICE to violate them, thereby rendering the City of Danbury liable.

253.    The unconstitutional conduct of Danbury Police Officers described in Claims 1-7 was so manifest as to imply the constructive acquiescence of Defendants Boughton, Baker, Weston, and Fisher in their capacities as policymaking officials, thus rendering the City of Danbury liable.

254.    All of the Danbury Defendants-including Officers Agosto, DeJesus, Lalli, Lopez, Martin, Norkus, Ramos, John Does 1-5, and Defendants Baker, Boughton, Weston, and Fisher-were, at the time of the incidents in question, employees of the City of Danbury.

**TENTH CLAIM FOR RELIEF**
**False Arrest and False Imprisonment**
**(Defendant DPD Officers)**

255.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

256.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 knowingly and intentionally arrested, detained, and imprisoned the Plaintiffs without a warrant and without probable cause, in retaliation for protected speech, based on impermissible racial, ethnic, and national origin discrimination, and in a manner preempted by federal law.

48

257.    The Plaintiffs were forcibly restrained and subsequently imprisoned by the Danbury Defendants and suffered damages as a result of the Danbury Defendants' actions.

258.    The Defendant DPD Officers' actions constitute false arrest and false imprisonment under Connecticut common law.

## ELEVENTH CLAIM FOR RELIEF
### Intentional Infliction of Emotional Distress
### (Defendant DPD Officers)

259.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

260.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 intended to inflict emotional distress upon the Plaintiffs by deceiving, arresting, detaining, and imprisoning them, or should have known that their conduct was likely to cause Plaintiffs' emotional distress. The Danbury Defendants' conduct was clearly extreme and outrageous, given the circumstances surrounding the arrests.

261.    The emotional distress of the Plaintiffs was caused by the Danbury Defendants' conduct and was severe.

262.    The Defendant DPD Officers' actions constitute intentional infliction of emotional distress under Connecticut common law.

## TWELFTH CLAIM FOR RELIEF
### Negligent Infliction of Emotional Distress
### (Defendant DPD Officers, Defendant Baker, Defendant Weston, and
### the City of Danbury)

263.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

264.    Defendant DPD Officers José Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, and John Does 1-5 created an unreasonable risk of causing the Plaintiffs emotional distress. It was clearly foreseeable that the Defendant DPD Officers' conduct would cause the Plaintiffs emotional distress.

265.    Defendant DPD Officers knew that their failure to act would likely subject a group of identifiable persons to imminent harm, namely, the Latino and immigrant day-laborers gathered in Kennedy Park.

266.    Moreover, Defendants Baker and Weston negligently failed to supervise Defendant DPD Officers as they executed the Plaintiffs' unlawful arrest and detention.

267.    The emotional distress of the Plaintiffs was caused by the Defendant DPD Officers' conduct and was severe enough that it might result in illness or bodily harm.

268.    The Defendant DPD Officers' actions constitute negligent infliction of emotional distress under Connecticut common law.

269.    Pursuant to Conn. Gen. Stat. §§ 7-465(a) and 7-101a, the City of Danbury is required to indemnify its employees "for all sums which such employee becomes obligated to pay by reason of the liability imposed upon such employee by law for damages awarded for . . . physical damages to person or property." Conn. Gen. Stat. § 7-465(a).

270.    All of the Plaintiffs have satisfied the notice requirement of Conn. Gen. Stat. § 7-465(a).

271.    The actions of the DPD officers, Chief Baker, and Captain Weston in subjecting the Plaintiffs to be free from negligent false arrest and false imprisonment were not wanton or willful.

272.     Pursuant to Conn. Gen. Stat. § 52-557n(a)(A), the City of Danbury is also directly liable for the "negligent acts or omissions of such political subdivision or any employee, officer or agent thereof acting within the scope of his employment or official duties."

273.     At all times relevant to this Complaint, the Danbury employees-including Officers Agosto, DeJesus, Fiser, Lalli, Lopez, Martin, Norkus, Ramos, John Does 1-5, Chief Baker, and Captain Weston-were employees of the City of Danbury and acting within the scope of their employment and/or their official duties as employees of the City of Danbury.

274.     In all times relevant to this complaint, the Plaintiffs were the identifiable and/or foreseeable victims of the Danbury employees' actions.

## THIRTEENTH CLAIM FOR RELIEF
### Fourth Amendment
### (*Bivens*: ICE Defendants)

275.     The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

276.     Defendant HARFOT Officers James Brown, Richard McCaffrey, Ronald Preble, and John Does 6-11 stopped, detained, investigated, searched, seized and/or arrested the Plaintiffs intentionally and knowingly and without probable cause and/or reasonable suspicion, in violation of the Plaintiffs' right to be free from unreasonable searches and seizures under the Fourth Amendment to the United States Constitution.

277.     As a result of Defendant HARFOT Officers' actions, the Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

## FOURTEENTH CLAIM FOR RELIEF:
### Fifth Amendment Equal Protection
### (*Bivens*: ICE Defendants)

51

278.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

279.    Defendant HARFOT Officers James Brown, Richard McCaffrey, Ronald Preble, and John Does 6-11 stopped, detained, investigated, searched, seized and/or arrested the Plaintiffs knowingly and intentionally on the basis of the Plaintiffs' race, ethnicity, and perceived national origin in violation of their right to Equal Protection under the Fifth Amendment of the United States Constitution.

280.    In addition, Defendant HARFOT Officers subjected the Plaintiffs to selective law enforcement on the basis of their race, ethnicity, and perceived national origin in violation of their right to Equal Protection under the Fifth Amendment of the United States Constitution.

281.    Defendant HARFOT Officers also subjected the Plaintiffs to selective law enforcement out of a malicious and bad faith intent to drive them out of the City of Danbury in violation of their right to Equal Protection under the Fifth Amendment of the United States Constitution.

282.    As a result of Defendant HARFOT Officers' actions, the Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

**FIFTHTEENTH CLAIM FOR RELIEF**
**Fifth Amendment Due Process**
**(*Bivens*: ICE Defendants)**

283.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

284.    Defendant HARFOT Officers James Brown, Richard McCaffrey, Ronald Preble, and John Does 6-11 civilly arrested and deprived Plaintiffs of their liberty in a manner that was

without due process of law and was fundamentally unfair in the totality of the circumstances, in violation of the Plaintiffs' rights under the Fifth Amendment of the United States Constitution.

285.    Defendant HARFOT Officer Richard McCaffrey made the initial custody determination for each of the Plaintiffs, memorialized on the ICE Form I-286 for each Plaintiff, thus failing to provide Plaintiffs with a neutral arbitrator as required by law, in violation of their rights to due process under the Fifth Amendment of the United States Constitution.

286.    Defendant HARFOT Officer Richard McCaffrey detained Plaintiffs without bond without any special justification to do so, in violation of their rights to due process under the Fifth Amendment of the United States Constitution.

287.    Defendant HARFOT Officer Richard McCaffrey or another ICE official failed to file or cause to be filed the request of each Day-Laborer Plaintiff for an Immigration Judge to review their detention without bond for periods of 24 to 167 days, in violation of their rights to due process under the Fifth Amendment of the United States Constitution.

288.    As a result of Defendant HARFOT Officers' actions, the Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

## SIXTEENTH CLAIM FOR RELIEF
### Conspiracy
### (*Bivens*: Defendant HARFOT Officers and DPD Officers)

289.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

290.    Defendant HARFOT Officers and DPD Officers entered into an agreement, between and amongst themselves, to act in concert to inflict an unconstitutional injury on the Plaintiffs. Specifically, one or more Defendant HARFOT Officers spoke by telephone with one

or more Defendant DPD Officers during the week or weeks prior to the September 19, 2006 arrests to plan the operation. Further, Defendant HARFOT Officers met with Defendant DPD Officers in the early morning of September 19, 2006 for the purpose of planning the operation. The conspiracy included, but may not have been limited to, an agreement to arrest and detain Plaintiffs in violation of their various rights under the United States and Connecticut Constitutions.

291.    Defendant HARFOT Officers and Defendant DPD Officers performed several overt acts in furtherance of this conspiracy, including but not limited to posing as a contractor in order to lure Plaintiffs in a vehicle, arresting Plaintiffs, and detaining Plaintiffs, in violation of their rights under the United States and Connecticut Constitutions and common law.

292.    Defendant HARFOT Officers played a significant role in the conspiracy and in the overt acts taken in furtherance thereof.

293.    As a result of the conspiracy between and among the Defendant HARFOT Officers and the Defendant DPD Officers and the overt actions taken in furtherance thereof, the Plaintiffs suffered damages, including but not limited to violations of their Constitutional rights, loss of liberty, and emotional distress.

**SEVENTEENTH CLAIM FOR RELIEF**
**Personal Supervisory Liability**
(***Bivens*: Defendants Sullivan, Martin, and Chadbourne**)

294.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

295.    Defendants Sullivan, Martin, and Chadbourne are liable in their individual capacities as the supervisors of Defendant HARFOT Officers James Brown, Richard McCaffrey,

Ronald Preble, and John Does 6-11 for the violations of the Plaintiffs' rights described in Claims 13-16.

296.    Defendants Sullivan, Martin and Chadbourne were personally involved in and proximately caused the aforementioned violations of Plaintiffs' rights by knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom, in which Defendant HARFOT Officers engaged in violations of Day-Laborers Plaintiffs' constitutional rights.

297.    Defendants Sullivan, Martin, and Chadbourne were deliberately indifferent to the rights of Plaintiffs because they knew to a moral certainty that their ICE agent subordinates would engage in questioning, detention, and arrests and make initial custody determinations for those arrested; that such questioning, detention, arrest and initial custody determinations call for agents to make difficult choices that call for special training; that the current FOT training was inadequate; that ICE had a long and known history of mishandling these decisions; and that their agents were likely to commit egregious constitutional violations in the absence of closer supervision and improved training.

298.    In the alternative, Defendants Sullivan, Martin, and Chadbourne were grossly negligent in their supervision and training of their ICE agent subordinates. They knew or should have known that there was a high degree of risk that their subordinates would violate individuals' constitutional rights in the course of both their arrests and their bond decisions, and yet they consciously or recklessly disregarded that risk by failing to take any corrective actions.

299.    Defendants Sullivan, Martin, and Chadbourne were also grossly negligent in regards to the Danbury operation in particular. As the supervisors of an FOT unit that had an extensive history of enforcement operations and actions within Danbury, and the recipients of

regular ICE media briefings on the anti-immigrant campaigns of Defendant Boughton and the City of Danbury, Defendants Sullivan, Martin, and Chadbourne knew or should have known that that there was a high degree of risk that the September 19, 2006 Danbury operation or action was discriminatory and non-specific, and that one of their subordinates would violate the constitutional rights of the arrestees by participating in it.

300.    Defendants Sullivan, Martin, and Chadbourne either deliberately or recklessly disregarded that risk by failing to take any actions to supervise the operation, and that failure caused Plaintiffs' constitutional injuries.

### EIGHTEENTH CLAIM FOR RELIEF
### Federal Tort Claims Act
### (28 U.S.C. § 1346(b); The United States)

301.    The Plaintiffs repeat and incorporate by reference each and every allegation contained in the preceding paragraphs as if fully set forth herein.

*False arrest and false imprisonment*

302.    Defendant HARFOT Officers Ronald L. Preble, Richard L. McCaffrey, James E. Brown, and John Does 6-11 knowingly and intentionally arrested, detained, and imprisoned the Plaintiffs without a warrant and without probable cause, in retaliation for protected speech, based on impermissible racial, ethnic, and national origin discrimination, and in a manner preempted by federal law.

303.    The HARFOT officers took custody of the Plaintiffs from Danbury police officers, or arrested them or caused their arrest, as but several of many Latino, Spanish-speaking, day-laborers at Kennedy Park on the morning of September 19, 2006. The "sting" operation-essentially a random sweep of the park-was based on mere speculation that immigration law violators would be found in the crowd of Latino day-laborers.

304.    Accordingly, the ICE Defendants lacked any reasonable basis for believing that the Plaintiffs in particular had violated immigration law. Rather, they arrested them on the basis of their race, ethnicity, and perceived national origins alone.

305.    ICE also unlawfully took custody of, arrested, or caused the arrest of, and unlawfully detained the Plaintiffs prior to asking them any questions regarding their immigration statuses, or even their names. Without any other reasonable basis for the arrest, ICE's enforcement actions-where officers took custody or arrested first and asked questions later-by definition lacked probable cause.

306.    The Plaintiffs were forcibly restrained and subsequently imprisoned by the ICE Defendants and suffered damages as a result of ICE Defendants' actions.

307.    The Defendant HARFOT Officers also unlawfully took custody of Plaintiffs by failing to provide a neutral adjudicator for their initial custody determination, by detaining Plaintiffs without any special justification or evidence of dangerousness or flight risk, and by failing to forward or cause to be forwarded the request of each Day-Laborer Plaintiff for an Immigration Judge to review ICE's denial of bond, as indicated on the Form I-286 served on each Day-Laborer Plaintiff.

308.    The Defendant HARFOT Officers' actions constitute false arrest and false imprisonment under Connecticut common law.

*Intentional infliction of emotional distress*

309.    Defendant ICE Officers Ronald L. Preble, Richard L. McCaffrey, James E. Brown, and John Does 6-11 also intended to inflict emotional distress upon the Plaintiffs by deceiving, arresting, detaining, and imprisoning them, or should have known that their conduct

was likely to cause Plaintiffs' emotional distress. The ICE Defendants' conduct was clearly extreme and outrageous, given the circumstances surrounding the arrests.

310.    The emotional distress of the Plaintiffs was caused by the ICE Defendants' conduct and was severe.

311.    The Defendant HARFOT Officers' actions constitute intentional infliction of emotional distress under Connecticut common law.

*Negligent infliction of emotional distress*

312.    Defendant HARFOT Officers Ronald L. Preble, Richard L. McCaffrey, James E. Brown, and John Does 6-11 further created an unreasonable risk of causing the Plaintiffs emotional distress. It was clearly foreseeable that the Defendant HARFOT Officers' conduct would cause the Plaintiffs emotional distress.

313.    Defendant HARFOT Officers knew that their failure to act would likely subject a group of identifiable persons to imminent harm, namely, the Latino and immigrant day-laborers gathered in Kennedy Park.

314.    Moreover, Defendant McCaffrey negligently failed to supervise Defendant ICE Officers as they executed the Plaintiffs' unlawful arrest and detention.

315.    The emotional distress of the Plaintiffs was caused by the Defendant ICE Officers' conduct and was severe enough that it might result in illness or bodily harm.

316.    The Defendant HARFOT Officers' actions constitute negligent infliction of emotional distress under Connecticut common law.

*Abuse of process*

317.    Defendant HARFOT Officers Ronald L. Preble, Richard L. McCaffrey, James E. Brown, and John Does 6-11 abused legal process for a purpose for which it was not intended

when they deceived, arrested, detained, transferred, imprisoned, coerced, intimidated, and humiliated the Plaintiffs in order to force them to abandon their legal rights and privileges.

318.    ICE officials also abused legal process by failing to provide a neutral arbitrator for Plaintiffs' initial custody determination, by detaining Plaintiffs without any special justification or evidence of dangerousness or flight risk, by failing to forward or cause to be forwarded the request of each Day-Laborer Plaintiff for an Immigration Judge to review ICE's refusal to set any bond, by transferring the Plaintiffs to detention facilities far from their friends, family and legal counsel, and by frivolously opposing bond in order to harass and intimidate the Plaintiffs into abandoning their immigration proceedings.

319.    From the outset, ICE's unnecessary and illegitimate detention of the Plaintiffs on the basis of the ICE District Sub-Office's initial custody determination subjected the Plaintiffs to extensive humiliation and harassment, isolated them from counsel and witnesses, and placed severe pressure on them to abandon their legal defense and to take voluntary departure.

320.    Similarly, ICE's abrupt transfer of the Plaintiffs to detention facilities as far away as Texas, where they endured horrendous prison conditions, and where the men have no friends, family, or ties to the community not only separated them from their legal counsel and witnesses, but secured a forum for ICE in a more favorable jurisdiction and placed further pressure on the men not to contest the charges against them. ICE continued its efforts to strong-arm the Plaintiffs into abandoning their legal defense at their bond hearings, where it opposed the setting of bond.

321.    Unknown ICE officials at the ICE Hartford Sub-Office also abused legal process by attempting to coerce the Plaintiffs into signing documents they could neither read nor understand, telling them that they had to do so.

322.    The Plaintiffs suffered damages as a result of Defendant ICE officials' actions.

59

323.    The Defendant ICE Officers' actions constitute an abuse of process under Connecticut common law.

324.    The United States is liable pursuant to the Federal Tort Claims Act ("FTCA") for the tortious acts of its employees in "circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

325.    At all times relevant to this Complaint, the ICE agents-including Officers Preble, McCaffrey, Brown, and John Does 6-11-were acting within the scope of their employment and/or their official duties as employees of U.S. Immigration and Customs Enforcement in the Department of Homeland Security ("DHS"), an agency of the U.S. Government.

326.    In these circumstances, if the United States were a private person, liability would be imposed in accordance with the law of Connecticut.

327.    The Plaintiffs have also administratively exhausted their claims under the FTCA. Pursuant to 28 U.S.C. § 2675(a), the Plaintiffs filed FTCA administrative claims with DHS for the tortious actions constituting false arrest and false imprisonment, intentional infliction of emotional distress, negligent infliction of emotional distress, and abuse of process committed by Defendant ICE officers. The claims were received on May 1, 2007.

328.    DHS has failed to make final disposition of the claims within six months after they were filed, and the Plaintiffs deem this failure a final denial pursuant to 28 U.S.C. § 2675(a).

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully requests that this Court:

(1) Enter a declaratory judgment that the actions of Defendant Danbury officials and/or Defendant ICE officials, on September 19, 2006 violated the United States Constitution, 42 U.S.C. § 1983, the Connecticut Constitution, and Connecticut common law.

(2) Award Plaintiffs compensatory damages in an amount to be proven at trial.

(3) Hold Defendants jointly and severally liable for compensatory damages.

(4) Award Plaintiffs punitive damages in an amount to be proven at trial.

(5) Award Plaintiffs the cost of this action and reasonable attorney fees.

(6) Grant such other relief as the Court deems just and equitable.

Dated October 1, 2009
New Haven, Connecticut

Respectfully submitted,

_____/s/_____
Michael Wishnie, Esq., ct27221, Supervising Attorney
Susan Hazeldean, Esq., ct28093, Supervising Attorney
Ari Holtzblatt, Law Student Intern
Rebecca Heller, Law Student Intern
Dror Ladin, Law Student Intern
Chesa Boudin, Law Student Intern
Sophie Hood, Law Student Intern
Lindsay Nash, Law Student Intern
Helen O'Reilly, Law Student Intern

JEROME N. FRANK LEGAL SERVICES
    ORGANIZATION
Yale Law School
P.O. Box 209090
New Haven, Connecticut 06520
Phone: (203) 432-4800

Joel M. Cohen, Esq., phv03297
Siham Nurhussein, Esq., phv03298
Elizabeth Goergen, Esq. phv03300
Alison Schary, Esq., phv03627

61

Joseph La Perla, Esq., phv03527

GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
Telephone: (212) 351-4000
Facsimile: (212) 351-4035
Counsel for Plaintiffs