```
              UNITED STATES DISTRICT COURT
                DISTRICT OF CONNECTICUT

JUAN BARRERA, et al,           :
                               :
    Plaintiffs,                :
                               :
    v.                         :   CASE NO. 3:07cv1436(RNC)
                               :
MARK BOUGHTON, et al.,         :
                               :
    Defendants.                :
```

RULING ON PLAINTIFFS' MOTION FOR PROTECTIVE ORDER

The plaintiffs bring this action against the Mayor of Danbury, Danbury police officers, the City of Danbury, United States Immigration and Customs Enforcement officers and the United States alleging that their arrest and detention violated their civil rights. Pending before the court is the plaintiffs' motion for a protective order.[1] (Doc. #284.) The motion is GRANTED IN PART and DENIED IN PART.

I.  Factual Background

The plaintiffs allege that they were arrested for immigration violations in an undercover sting operation conducted by Danbury police officers in conjunction with United States Immigration and Customs Enforcement ("ICE") agents. The targets of the operation

---

[1] The court previously denied the plaintiffs' motion for protective order (doc. #156) without prejudice and ordered that any new motion set forth each particular discovery request at issue. (Doc. #246; doc. #269, tr. 7/13/09 at 8.) The plaintiffs represent that since that ruling, the parties have conferred and "made significant progress in narrowing the issues in dispute." (Doc. #284, Pls' Mem. at 5.)

were Latino day laborers in Kennedy Park, a gathering site for day-laborers.  At the time of operation, the Danbury police were not aware of any particular immigration violators in Kennedy Park and did not have any specific targets in mind.  (Doc. #317, Second Am. Compl. ¶73.)  On September 19, 2006, the plaintiffs, eight Latino residents of Danbury, went to Kennedy Park to look for work.  (Am. Compl. ¶114.)  None of the plaintiffs had an outstanding deportation or removal order and no immigration warrants had been issued for any of them.  (Am. Compl. ¶131.)  Each of the plaintiffs approached a vehicle.  (Am. Compl. ¶115.)  They entered the vehicle after the driver, a Danbury police officer working undercover, offered them work.  (Am. Compl. ¶¶115-116.)  The undercover police officer driving the vehicle did not ask the plaintiffs any questions during the drive and drove them to a parking lot.  (Am. Compl. ¶¶119-120.)  Danbury police officers and ICE agents were waiting in the parking lot.  (Am. Compl. ¶122.)  When the plaintiffs exited the vehicle, Danbury police officers and/or ICE agents seized them and told them that they were under arrest.  (Am. Compl. ¶¶122-123.)

     After the plaintiffs were placed under arrest, law enforcement agents questioned each of them about their identity, nationality, the place and manner of their entry into the United States and their immigration status.  (Am. Compl. ¶128.)  ICE agents placed the plaintiffs in removal proceedings based on the statements they

made on the day of the arrest.[2]  (Am. Compl. ¶¶136, 138.)

The plaintiffs allege, <u>inter alia</u>, that federal immigration law prohibited local police from making civil immigration arrests and therefore the Danbury police were not authorized to make the arrests.  (Am. Compl. ¶86.)  They further allege that Danbury police officers and ICE agents improperly targeted them based on race, ethnicity, and perceived national origin, arrested them without probable cause and made the arrests in retaliation for the plaintiffs' exercise of protected speech and association in a public place.  (Am. Compl. at 2.)  The plaintiffs assert claims under the First, Fourth, Fifth and Fourteenth Amendments of the U.S. Constitution, Article First, §§ 4, 7, 8, 9 and 20 of the Connecticut Constitution and Connecticut common law.

II.  <u>Discussion</u>

The plaintiffs seek a protective order that they not be compelled to disclose information bearing on immigration status or

---

[2]During the removal proceedings, the plaintiffs invoked the Fifth Amendment privilege against self incrimination and refused to answer questions about alienage and immigration status. (Doc. #284, Pls' Mem. at 4.)  As alternative proof, the government offered a U.S. Immigration and Customs Enforcement Form I-213 ("I-213"), Record of Deportable Alien. (<u>Id.</u>)  ICE agents completed the I-213s based on their interviews with the plaintiffs on the day of their arrest. (<u>Id.</u>)  The Immigration Judge found that each I-213 "establishes that the respondent is an alien based on his birth in Ecuador" and that the government had "met its burden of proof by clear and convincing evidence." (Doc. #284, Ex. A, IJ decision at 12.)  The plaintiffs were either ordered removed or granted voluntary departure. (Doc. #284, Pls' Mem. at 4.)  The plaintiffs are appealing the Immigration Judge's ruling. (Doc. #284, Pls' Mem. at 3 n.3)

alienage.  The plaintiffs contend that such information is not relevant to their claims or to any defense the defendants might assert and that any potential relevance is outweighed by the oppressive and in terrorem effect of the request.  (Pls' Mem. at 6.) They further argue that compelling them to produce the requested information will prejudice their ability to defend themselves in the removal proceedings.  (Pls' Mem. at 4.)

"Immigration status discovery in cases where plaintiffs are possibly undocumented is a very sensitive area of inquiry." E.E.O.C. v. First Wireless Group, Inc., No. 03-CV-4990(JS)(ARL), 2007 WL 586720, at *3 (E.D.N.Y. Feb. 20, 2007).  In some cases, such information is not relevant; in other cases, "the in terrorem effect of the proposed inquiry outweighs the probative value of the discovery."  Id.  "The harm in disclosing Plaintiffs' immigration status is significant and real.  If disclosed . . . [undocumented plaintiffs] would fear criminal prosecution and deportation [and] would be reluctant to exercise their rights under existing state and federal laws."  Sandoval v. Rizzuti Farms, No. CV-07-3076(EFS), 2009 WL 959478, at *2 (E.D. Wash. Apr. 7, 2009).

At issue are requests propounded by the Mayor of Danbury and Danbury police defendants (hereinafter "Danbury defendants").[3]  In

---

[3] The plaintiffs' motion initially was directed to requests propounded by the Danbury defendants as well as the federal defendants.  The federal defendants withdrew the challenged requests without prejudice.  See doc. #301.  The federal defendants subsequently filed a motion to compel as to certain requests that the parties were unable to resolve.  See doc. #314.

addition to immigration status and alienage (production request 1, interr. 6), the Danbury defendants seek discovery that the plaintiffs contend implicates alienage and immigration status.  For each plaintiff, the Danbury defendants seek social security numbers (interr. 1); addresses of spouses and children over 18 (interr. 2, 3); place of birth (interr. 7); number of times of entry into the United States, including date, location, means, immigration status upon entry and whether the plaintiff had permission (interr. 10, 11, production request 2) and documents submitted to any employer including passport, driver's license and social security card (interr. 26, 27).[4]

The plaintiffs maintain they do not seek to withhold relevant discovery.  They indicate that they have "produced hundreds of pages in response" to the Danbury defendants' discovery requests.  (Pls' Mem. at 16.)  They have agreed, for example, to provide medical records, federal income tax returns and wage and employment records; they seek however to redact discrete information that might tend to reveal immigration status or alienage such as social security numbers and nationality.  (Requests for Production 3, 5, 6 and 7.) The plaintiffs also have agreed to provide information regarding any arrests, warnings and citations they might have received in the

---

[4] As required by the local rule and the court's order, the plaintiffs set forth the specific discovery requests at issue and the reason why each request should not permitted.  Contrary to the court's order, the Danbury defendants did not set forth for each request in dispute "why the request is relevant and should be permitted."  (Doc. #269, tr. 7/13/09 at 8.)

United States; however they seek protection from having to disclose any like incidents that occurred outside the United States. (Interr. 14, 15.)

A.  Claims and Defenses

The plaintiffs contend that immigration status and alienage is not relevant to any of their claims or defenses thereto. The Danbury defendants[5] disagree: they broadly assert that the plaintiffs' immigration status is the "heart of the case." (Doc. #451, tr. 2/24/10 at 64.) According to the defendants, the plaintiffs' complaint is "replete with allegations" that place the plaintiffs' immigration status and alienage at issue. (Doc. #303, Defs' Mem. at 9.) Examination of the plaintiffs' claims, however, does not bear out this argument.

The plaintiffs' causes of action fall into three categories: illegal seizure, arrest and detention; racial and ethnic profiling; and freedom of speech and association.

In the first category, the plaintiffs allege that the Danbury defendants were not authorized to enforce federal civil immigration laws. (Am. Compl. ¶45, count 2.) The plaintiffs' immigration status is not relevant to the defense of this claim.

The plaintiffs further allege that the Danbury defendants lacked reasonable suspicion to detain them and/or probable cause to

---

[5]The City of Danbury did not file a brief but filed a statement saying it joined the Danbury defendants' opposition. (Doc. #306.)

effect their arrests. (Pls' Mem. at 17; Am. Compl., counts 1, 2, 10 and 13.) The Danbury defendants argue that the plaintiffs' immigration status is relevant to the defense of these claims because it is "why [the plaintiffs] were arrested and that's why the defendants had probable cause to make the arrest." (Doc. #451, tr. at 56.) The defendants misapprehend the legal standards underpinning the plaintiffs' claims.

In a Terry stop, "the police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." United States v. Sokolow, 490 U.S. 1, 7 (1989) (quoting Terry v. Ohio, 392 U.S. 1, 30 (1968)). In determining whether reasonable suspicion exists, the court must determine: (1) when the plaintiffs were seized, within the meaning of the Fourth Amendment, i.e., when "a reasonable person would have believed that he was not free to leave," United States v. Mendenhall, 446 U.S. 544, 554 (1980); and (2) whether, based on the facts known to the officer at the time of seizure, there was some "objective justification for making the stop" more than an "inchoate and unparticularized suspicion or hunch of criminal activity." Sokolow, 490 U.S. at 7.

An arrest, as opposed to a Terry stop, must be supported by probable cause. Maryland v. Pringle, 540 U.S. 366, 370 (2003). "Whether probable cause exists depends upon the reasonable

7

conclusion to be drawn from the facts known to the arresting officer at the time of the arrest." Devenpeck v. Alford, 543 U.S. 146, 152 (2004).  "Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested."  United States v. Patrick, 899 F.2d 169, 171 (2d Cir. 1990).

Whether the defendants had a lawful basis for the detention and/or arrest of the plaintiffs depends on what the officers knew at the time they detained and/or arrested the plaintiffs. See Terry v. Ohio, 392 U.S. 1, 21-22 (1968) (only "the facts available to the officer at the moment of the seizure" may be evaluated in determining whether reasonable suspicion warranted the detention); Lowth v. Town of Cheektowaga, 82 F.3d 563, 570 (2d Cir. 1996)("[P]robable cause for an arrest must be determined on the basis of the information reasonably available to the arresting officer at the time of the arrest."); Mejia v. City of New York, 119 F. Supp.2d 232, 253 (E.D.N.Y. 2000) ("[S]ubsequently discovered evidence cannot be used to cure an arrest that was made without probable cause.")  The plaintiffs' immigration status and alienage is not probative of facts the defendants knew at the time of detention or arrest and therefore, contrary to the defendants'

argument, is not relevant to whether the defendants had reasonable suspicion or probable cause.

The second category of the plaintiffs' claims concerns unlawful profiling. (Am. Compl., counts 3, 5.) The plaintiffs allege they were singled out for discriminatory treatment based on their race, ethnicity and perceived national origin in violation of the Equal Protection Clause. To state a claim for an equal protection violation, the plaintiffs "must allege that a government actor intentionally discriminated against them on the basis of race, national origin or gender." Hayden v. County of Nassau, 180 F.3d 42, 48 (2d Cir. 1999). The defendants do not argue, nor can the court discern, how the plaintiffs' immigration status and alienage is relevant to rebutting allegations that the defendants acted discriminatorily.

Finally, the plaintiffs allege that they were retaliated against for the exercise of protected speech and association in a public forum in violation of the First Amendment and Article First §§ 4 and 14 of the Connecticut Constitution. (Am. Compl., count 4.) The defendants do not argue that the plaintiffs' immigration status is relevant to their First Amendment claim. Rather, they say that the information is relevant to the plaintiffs' claim under the Connecticut Constitution because, they contend, §§ 4 and 14 of the Connecticut Constitution apply only to United States "citizens." According to the defendants, the plaintiffs must "prove" they are

citizens to be entitled to any protection under these provisions of the state constitution. (Tr. at 58.) This argument appears to be foreclosed. The Danbury defendants previously moved to dismiss these state law claims on the grounds that the plaintiffs did not allege citizenship in the complaint and therefore failed to state a claim. (Doc. #49, Defs' Mem. at 8.) The court rejected this argument and denied the motion. (Doc. #129.)

B.   Credibility

In addition to discovery requests that seek immigration status specifically, the plaintiffs seek protection from having to respond to requests that implicate immigration status. These requests seek for each plaintiff: social security number, place of birth, the number of times of entry into the United States, including date, location, means, immigration status upon entry and whether each entered with permission and documents submitted to employers including passport, driver's license and social security card. During oral argument, the defendants argued that this information is discoverable because it is relevant to credibility.[6] They suggest, for example, that if any plaintiff used a false social security number, this information could be used as impeachment evidence.

In  Rengifo v. Erevos Enterprises, Inc., No. 06 Civ.

---

[6] During oral argument the defendants cited Fed. R. Evid. 608(b) as a basis for permitting discovery. They did not include any discussion of Rule 608(b) in their briefs.

4266(SHS)(RLE), 2007 WL 894376 (S.D.N.Y. Mar. 20, 2007), a Fair Labor Standards Act case, the plaintiff sought a protective order barring discovery related to his immigration status, social security number and authorization to work in the United States.  As here, the defendants argued that the validity of the plaintiff's social security number, immigration status and authorization to work in this country were relevant to his credibility.  The court granted the plaintiff's motion for a protective order, concluding that the opportunity to test the credibility of a party "does not outweigh the chilling effect that disclosure of immigration status has on employees seeking to enforce their rights."  Id. at *3.

The court reached a similar conclusion in E.E.O.C. v. First Wireless Group, Inc., No. 03-CV-4990(JS)(ARL), 2007 WL 586720 (E.D.N.Y. Feb. 20, 2007).  In that case, the defendants sought to compel the plaintiffs in an employment discrimination action to disclose information regarding the accuracy of their social security numbers.  The defendants argued that the information was relevant to the plaintiffs' credibility.  The court observed that although discovery of immigration status might be relevant, it "is a potential weapon for harassing and intimidating individuals."  Id. at *3.  The court denied the defendants' request, finding that there were other areas of inquiry the defendants could pursue to explore the plaintiffs' credibility that did not implicate their immigration status or social security number.  Id. at *4.

11

In Avila-Blum v. Casa de Cambio Delgado, Inc., 236 F.R.D. 190 (S.D.N.Y. 2006), an employment discrimination case, the defendants sought discovery of the plaintiff's immigration status as potential impeachment evidence. Id. at 192. The court determined that the "chilling" and "highly prejudicial" effects of such an inquiry outweighed the relevance and probative value of the discovery. Id. In so concluding, the court observed that "a witness's credibility is always at issue and may be tested in a variety of ways without imposing an undue burden on a party . . . . [T]hat a party's credibility is at issue does not by itself warrant unlimited inquiry into the subject of immigration status when such examination would impose an undue burden on private enforcement of employment discrimination laws." Id.

This court is similarly persuaded that whatever value the information might hold as to impeachment is outweighed by the chilling and prejudicial effect of disclosure.[7] See, e.g., Topo v. Dhir, 210 F.R.D. 76, 78 (S.D.N.Y. 2002) ("When the potential for abuse of procedure is high, the Court can and should act within its discretion to limit the discovery process, even if relevancy is determined.") See also Corona et al. v. Adriatic Italian Restaurant

---

[7]At oral argument, counsel for the City of Danbury suggested that the plaintiffs' immigration status was relevant to their claim for damages. Their alleged emotional distress, the argument goes, might be attributable to their immigration status. This claim was not briefed and in any event, does not alter the court's conclusion.

& Pizzeria, No. 08 Civ. 5399(KNF), 2010 WL 675702, at *1 (S.D.N.Y. Feb. 23, 2010) (granting motion in limine barring defendants from inquiring into plaintiffs' immigration status, noting that "defendants are free to employ all other means and methods typically available to litigants to attack the credibility of a witness"); David et al. v. Signal Intern., LLC, 257 F.R.D. 114, 124 (E.D. La. 2009) (in action pursuant to Trafficking Victims Protection Act, 18 U.S.C. § 1590, court granted plaintiffs' motion for protective order as to their immigration status, finding "defendants' opportunity to test the credibility of plaintiffs does not outweigh the public interest in allowing employees to enforce their rights."); Sandoval et al. v. American Bldg. Maintenance Industries, Inc., No. 06 CV 1772(RHK)(JSM), 2007 WL 7072423, at *19 (D. Minn. Oct. 23, 2007)(denying defendants' motion to compel plaintiffs to answer deposition questions regarding social security numbers they allegedly used, finding "the minimal bearing that using multiple social security numbers may have on plaintiffs' credibility does not outweigh the chilling effect it would have on them as victims of sexual harassment from coming forward to assert their claims"); Flores v. Albertson's, Inc., No. CV 01-0515 PA(SHX), 2004 WL 3639290, at *3 (C.D. Cal. Apr. 9, 2004) (court noted "[a] SSN (particularly if a false number) is a highly sensitive piece of information and could readily be used to determine a plaintiff's immigration status" and precluded production based on its in

13

terrorem effect).

Accordingly, the plaintiffs' motion for protective order is granted as to immigration status (production request 1, interr. 6); social security numbers (interr. 1); birthplace (interr. 7); information regarding the plaintiffs' entry into the United States (interr. 10, 11, production request 2); any arrests warnings and citations the plaintiffs might have received outside the United States (interr. 14, 15); and the plaintiffs' passports, driver's licenses and/or social security cards (interr. 26, 27).  The plaintiffs' motion for protective order as to interrogatories 2 and 3 is denied as moot in light of the court's ruling on the federal defendants' motion to compel.

III. Conclusion

For these reasons, the plaintiffs' motion for protective order is granted in part and denied in part.

SO ORDERED at Hartford, Connecticut this 19th day of March, 2010.

_____/s/_____
Donna F. Martinez
United States Magistrate Judge