# UNITED STATES DISTRICT COURT

# DISTRICT OF CONNECTICUT

| | |
|---|---|
| JUAN BARRERA, et al. | CIVIL ACTION NO. |
| | 3:07cv01436(RNC) |
| **Plaintiffs,** | |
| V. | |
| MARK BOUGHTON, et al. | APRIL 9, 2010 |
| **Defendants.** | |

## DANBURY DEFENDANTS' OBJECTION TO MAGISTRATE JUDGE'S RULING ON PLAINTIFFS' MOTION FOR PROTECTIVE ORDER

## TABLE OF CONTENTS

I.   FACTS AND PROCEDURAL HISTORY ........................................................................ 1

II.  STANDARD OF REVIEW ......................................................................................... 4

III. DISCUSSION .......................................................................................................... 5

   A.  The evidence is relevant to the plaintiffs' claims and the defenses thereto ...................... 6

      1.   The plaintiffs' immigration status and alienage is relevant to their claims under Article
      First, §§ 4 and 14 of the Connecticut Constitution .................................................. 7

         a.   The Magistrate Judge incorrectly found that the argument regarding the plaintiffs'
         citizenship had been foreclosed ......................................................................... 7

         b.   Evidence of immigration status and alienage is relevant because citizenship is
         required to assert claims under Article First, §§ 4 and 14 of the Connecticut Constitution.
         ...................................................................................................................... 12

      2.   The plaintiffs' immigration status and alienage is relevant to their claims for emotional
      distress ......................................................................................................... 14

      3.   The plaintiffs' immigration status and alienage is relevant to their allegation of a
      policy, practice and/or custom of harassment ......................................................... 17

         a.   Plaintiffs have alleged a policy, practice, and/or custom of harassment of members
         of the Ecuadorian and immigrant communities in Danbury ........................................ 18

         b.   The plaintiffs alleged that the policy, practice and/or custom caused the deprivation
         of their rights ................................................................................................. 20

         c.   Evidence of the plaintiffs' immigration status is relevant to the existence and extent
         of the policy, practice and/or custom that they plaintiffs allege caused the deprivation of
         their rights ..................................................................................................... 21

   B.  The relevance is not outweighed by any potential in terrorem effect ............................ 24

IV.  CONCLUSION ....................................................................................................... 31

# TABLE OF AUTHORITIES

**Statutes**

28 U.S.C. § 636(b)(1)(A) ............................................................................................................ 5

Conn. Gen. Stat. § 29-28 ........................................................................................................... 14

**Cases**

Aguilar v. Immigration & Customs Enforcement Div., No. 07 Civ. 8224 (JGK)(FM) (S.D.N.Y.
    January 7, 2009) ................................................................................................................... 16

Aguilar v. Immigration & Customs Enforcement Div., No. 07 Civ. 8224(JGK)(FM), 2009 U.S.
    Dist. LEXIS 54669 (S.D.N.Y. June 23, 2009) .......................................................... 16, 17, 27

Avila-Blum v. Casa de Cambio Delgado, Inc., 236 F.R.D. 190 (S.D.N.Y. 2006) (plaintiff
    claiming employment discrimination under Title VII) ...................................................... 25, 26

Benjamin v. Bailey, 234 Conn. 455, 662 A.2d 1226 (1995) ........................................................ 13

Catskill Dev., L.L.C. v. Park Place Entm't Corp., 206 F.R.D. 78, 86 (S.D.N.Y. 2002) ............... 5

Corona v. Adriatic Italian Rest. & Pizzeria, No. 08 Civ. 5399(KNF), 2010 U.S. Dist. LEXIS
    15788 (S.D.N.Y. Feb. 23, 2010) ...................................................................................... 25, 26

David v. Signal Int'l, LLC, 257 F.R.D. 114 (E.D. La. 2009) ...................................................... 25

E.E.O.C. v. First Wireless Group, Inc., No. 03-CV-4990(JS)(ARL), 2007 U.S. Dist. LEXIS
    11893  (E.D.N.Y. Feb. 20, 2007) ..................................................................................... 25, 27

Flores v. Albertson's, Inc., No. CV 01-0515 PA(SHX), 2004 U.S. Dist. LEXIS 29083 (C.D. Cal.
    April 9, 2004) ....................................................................................................................... 25

Hocza v. City of New York, No. 06 Civ. 3340, 2009 U.S. Dist. LEXIS 3574 (S.D.N.Y. Jan. 19,
    2009) .................................................................................................................................... 29

Kuck v. Danaher, No. 08-5368-cv, 2010 U.S. App. LEXIS 5899 (2d Cir. Mar. 23, 2010) ... 13, 14

McIntosh v. Bank of Am., 06-CV-0708S(Sr), 2009 U.S. Dist. LEXIS 80879 (W.D.N.Y. Sept. 4,
    2009) .................................................................................................................................... 30

Rengifo v. Erevos, No. 06 Civ. 4266(SHS)(RLE), 2007 U.S. Dist. LEXIS 19928 (S.D.N.Y. Mar.
    20, 2007) .............................................................................................................................. 25

Romero-Hernandez v. Alexander, No. 3:08CV93-M-A, 2009 U.S. Dist. LEXIS 61017 (N.D. Miss. June 24, 2009) ........................................................................................ 29, 30

Sandoval v. Amer. Bldg. Maintenance Industries, Inc., No. 06-CV-1772(RHK/JSM), 2007 U.S. Dist. LEXIS 97773 (D. Minn. Oct. 23, 2007) ........................................................ 25

State v. Sinchuck, 96 Conn. 605, 115 A. 33 (1921) ..................................................... 13

Thomas E. Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990) ................................. 5

Topo v. Dhir, 210 F.R.D. 76 (S.D.N.Y. 2002) ....................................................... 25, 30

United States v. Isiofia, 370 F.3d 226, 232 (2d Cir. 2004).......................................... 5

United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948) ........ 5

**Rules**

Fed. R. Civ. P. 72(a) ............................................................................ 4, 8

Local Rule 72.2 ..................................................................................... 4

Pursuant to Rule 72(a) of the Federal Rules of Civil Procedure and Local Rule 72.2, the defendants, Alan Baker, Jose Agosto, Richard DeJesus, James Fisher, James Lalli, Julio Lopez, Craig Martin, Joseph Norkus, Luis Ramos, Mitchell Weston, and John Does ("Danbury Defendants"), respectfully submit this Objection to Magistrate Judge Martinez's Ruling on Plaintiffs' Motion for Protective Order, dated March 13, 2010 (Doc. 459).  For the reasons set forth below, the Danbury Defendants respectfully request that the Ruling, granting in part the plaintiffs' motion for a protective order, be set aside.

## I.   FACTS AND PROCEDURAL HISTORY

The facts and procedural history set forth herein pertain principally to those events that are necessary for the Court's consideration of the present Objection.  On November 26, 2007, the plaintiffs filed an Amended Complaint alleging deprivation of constitutionally protected rights they claim to have suffered when soliciting work on Main Street in Danbury, Connecticut. Several of the plaintiffs' Claims for Relief in the Amended Complaint sought relief under Article First, §§ 4 (free speech), 8 (due process), 14 (right to peaceable assembly) and 20 (equal protection) of the Connecticut Constitution.  These allegations were re-alleged in the plaintiffs' Second Amended Complaint (Doc. 317), which is the operative complaint in this case.

On August 27, 2009, the plaintiffs filed a Motion for a Protective Order, in an effort to preclude the Danbury Defendants from conducting any discovery with respect to the plaintiffs' immigration status and alienage.  (Doc. 284.)  The plaintiffs argued that discovery of this information was irrelevant to these proceedings, and that it would only serve to have an *in terrorem* effect on the plaintiffs.  The plaintiffs also filed an Emergency Motion for Protective Order Forbidding Inquiry into Plaintiffs' Immigration Status and Alienage at Plaintiffs' Depositions (Doc. 285) on August 29, 2009.  Magistrate Judge Martinez denied that motion

1

without prejudice on the basis that "the court declines to issue a protective order in the absence of a record indicating the specific questions to which the plaintiffs object and the basis of the objection."  Magistrate Judge Martinez instructed the parties to "make a record that will permit meaningful judicial evaluation upon motion after the deposition has concluded."

On September 17, 2009, the deposition of plaintiff Juan Carlos Simbana was taken.  At Simbana's deposition the parties did begin to make such a record, and counsel for the plaintiffs illustrated just how broadly their Motion for a Protective Order was to be interpreted.  Counsel for the plaintiffs instructed Simbana not to answer, and invoked the Fifth Amendment privilege against self-incrimination on his behalf, in response to the following lines of inquiry:  "Where were you born,"  "How long have you lived in the United States," "Have you lived anywhere else in the United States other than Danbury, Connecticut," "Where did you attend high school," "Why did you come to Danbury, Connecticut," and "Why haven't you tried obtaining employment anywhere else other than Kennedy Park."(See Ex. F, Simbana Dep. Tr.)  Simbana was also instructed not to answer questions concerning whether the individuals he lived with at the time of the incident were of Ecuadorian descent, and concerning whether the workers who gathered at Kennedy Park were of the same ethnicity.  Thus, Simbana was also instructed not to answer questions at his deposition regarding someone other than himself.  (A more detailed discussion of the lines of inquiry at Simbana's deposition, as well as his objections to same, has already been submitted to the Court in connection with the Motion to Compel which was filed by the Danbury Defendants on December 28, 2009 (Docs. 399 & 400).

In response to these lines of inquiry, counsel for Simbana objected on the basis that said questions were oppressive under Federal Rule of Civil Procedure 30.  Specifically, counsel claimed that these questions would require Simbana to disclose information that could possibly

implicate his immigration status or alienage, however remote the connection may have been.
The plaintiffs have objected on similar grounds in the depositions of the other plaintiffs and the
objections asserted at Simbana's deposition are illustrative of the broad interpretation by the
plaintiffs of information that could implicate immigration status and alienage.

The plaintiffs filed their Second Amended Complaint (Doc. 317) on October 1, 2009.
The Second Amended Complaint is substantially similar to the plaintiffs' Amended Complaint
dated November 26, 2007, with the primary difference being that additional parties have been
named as defendants.  It alleges that the purpose of the present action is to "remedy the
discriminatory and unauthorized enforcement of federal immigration laws against Latino
residents of the City of Danbury."  The plaintiffs allege:

> Under the leadership of Mayor Mark Boughton, Danbury and its police department
> have repeatedly and knowingly made illegal civil immigration arrests . . .  In their
> frustration with the arrival of new immigrants to Danbury, Mayor Boughton and the
> police department have taken the law into their own hands. . . .  Each of the ten
> Plaintiffs . . . suffered illegal arrest and detention at the hands of Danbury Police
> Department ("DPD") officers for alleged civil immigration law violations. . . .  The
> DPD's rogue actions have endangered the civil rights of the Danbury's Latino and
> immigrant communities.  Plaintiffs bring this action to redress the Defendants'
> unlawful and discrimination enforcement of federal immigration law.

(2d Am. Compl. at 1-3.)  The plaintiffs further allege:

> Mayor Boughton's administration has also targeted, harassed and intimidated
> Danbury's new city residents through a number of discriminatory policies.  These
> policies include . . . encouraging direct police enforcement of civil immigration laws
> through traffic stops . . .   [T]hese policies aim ultimately to drive unwanted
> immigrants from Danbury and to deter future immigrants from making Danbury their
> home. . . .  The centerpiece of Danbury's harassment campaign . . . has been the City
> of Danbury's escalating involvement in the enforcement of federal immigration laws,
> especially through the Danbury Police Department. . . .  Mayor Boughton and Chief
> Baker have . . . encouraged and instructed the DPD to carry out independent civil
> immigration law enforcement actions against Danbury's unwanted immigrant,
> Latino, and Ecuadorian residents . . . .

(Id. ¶¶ 38, 44 & 49.)  The Second Amended Complaint continues for some 328 paragraphs—204

of which precede the claims for relief—to discuss the alleged misconduct of the defendants, as a result of this alleged immigration enforcement campaign, and in particular, the alleged harassment of the Latino, immigrant, day-laborer and/or Ecuadorian communities in Danbury by the Danbury Defendants.  (See, e.g., id. ¶¶ 39-41.)

On February 24, 2010, Magistrate Judge Donna F. Martinez heard oral argument on the plaintiffs' Motion for a Protective Order (Doc. 284).  On March 19, 2010, Magistrate Judge Martinez issued her Ruling on the Plaintiffs' Motion for Protective Order (the "March 19 Ruling") (Doc. 459), in which she granted in part and denied in part the plaintiffs' motion. Specifically, Magistrate Judge Martinez granted the plaintiffs' motion with respect to written interrogatories seeking the following information of the plaintiffs:  immigration status; birthplace; information regarding entry into the United States; arrests, warnings or citations received outside of the United States; and passports, driver's licenses and/or social security cards.  (March 19 Ruling, Doc. 459, at 14.)  She denied the motion as to two of the interrogatories as moot in light of an earlier ruling (Doc. 454) on a similar issue regarding a motion to compel filed by the Federal Defendants.  With regard to the substance of the parties' legal arguments that formed the basis for her decision, Magistrate Judge Martinez concluded that the plaintiffs' immigration status and alienage was not relevant to any of their claims and that any relevance it held in terms of the plaintiffs' credibility was outweighed by the potential *in terrorem* effect.  Additional facts and procedural history will be set forth below as necessary.

## II.   <u>STANDARD OF REVIEW</u>

When a party objects to a magistrate judge's order on a non-dispositive motion, such as a discovery motion, the district judge reviews that ruling and must modify or set aside the order if is "clearly erroneous or contrary to law."  Fed. R. Civ. P. 72(a); <u>see</u> 28 U.S.C. § 636(b)(1)(A);

see also Thomas E. Hoar, Inc. v. Sara Lee Corp., 900 F.2d 522, 525 (2d Cir. 1990) (pre-trial discovery issues generally considered non-dispositive matters).  A finding is clearly erroneous if "the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum Co., 333 U.S. 364, 395, 68 S. Ct. 525, 92 L. Ed. 746 (1948); United States v. Isiofia, 370 F.3d 226, 232 (2d Cir. 2004).  An order is contrary to law "when it fails to apply or misapplies relevant statutes, case law, or rules of procedure."  Catskill Dev., L.L.C. v. Park Place Entm't Corp., 206 F.R.D. 78, 86 (S.D.N.Y. 2002) (citation omitted).

## III.  DISCUSSION

Magistrate Judge Martinez granted the plaintiffs' Motion for Protective Order (Doc. 284) concluding (1) that the plaintiffs' immigration status and alienage was not relevant to any of the plaintiffs' claims and (2) that the relevance of such information to the credibility of the plaintiffs was outweighed by its potential *in terrorem* effect.  This ruling is both contrary to fact and misapplies applicable law.  The Magistrate Judge's March 19 Ruling (Doc. 459) should be set aside because evidence of the plaintiffs' immigration status and alienage is relevant to more than just their credibility, and that relevance is not outweighed by the potential *in terrorem* or prejudicial effect.

First, in concluding that information concerning the plaintiffs' immigration status and alienage was not relevant, Magistrate Judge Martinez adopted an overly narrow view of the plaintiffs' claims in this case.  In fact, the plaintiffs' active complaint is replete with allegations and claims against the Danbury Defendants that implicate the plaintiffs' immigration status and alienage.  In addition, the plaintiffs assert claims under certain sections of the Connecticut Constitution that are not available to aliens.  Immigration status and alienage is thus highly

relevant to the plaintiffs' claims.  Second, this high degree of relevance is not outweighed by any potential *in terrorm* or prejudicial effect of such discovery.  The Magistrate Judge's ruling relied almost exclusively on employment discrimination cases and other cases where immigration status and alienage were collateral issues.  In the instant case, the plaintiffs' immigration status and alienage are directly relevant to the plaintiffs' factual allegations and claims for relief, as well as the Danbury Defendants' defenses.  It is especially relevant to those claims under the Connecticut Constitution that are not available to aliens.

**A.      The evidence is relevant to the plaintiffs' claims and the defenses thereto**

The plaintiffs' immigration status and alienage is relevant to more than the plaintiffs' credibility and should be discoverable by the Danbury Defendants.  First, the Magistrate Judge improperly construed this Court's earlier ruling (Doc. 129) denying the Danbury Defendants' Motion to Dismiss the claim under Article First, §§ 4 and 14 of the Constitution of Connecticut, which only apply to "citizens."  Contrary to the Magistrate Judge's Ruling, this earlier decision has no impact on the present issue and does not foreclose the Danbury Defendants' argument as to relevance here.  The plaintiffs' immigration status and alienage is essential to the Danbury Defendants' defense against these Connecticut Constitutional claims.  Second, the Magistrate Judge adopted an overly narrow reading of the plaintiffs' factual allegations and claims for relief in their Second Amended Complaint, and failed to consider those allegations against the Danbury Defendants that implicated the plaintiffs' immigration status and alienage.  Immigration status and alienage is relevant to more than just the credibility of the plaintiffs.  Finally, the plaintiffs' immigration status and alienage is also relevant to their claims for emotional distress.

1.      **The plaintiffs' immigration status and alienage is relevant to their claims under Article First, §§ 4 and 14 of the Connecticut Constitution**

In their fourth claim for relief, the plaintiffs allege violations of their rights under, *inter alia*, Article First, §§ 4 and 14 of the Constitution of Connecticut.  Section 4 provides:  "Every *citizen* may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."  (Emphasis added.)  Section 14 provides:  "The *citizens* have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for redress of grievances, or other proper purposes, by petition, address or remonstrance."  (Emphasis added.)  In their opposition to the plaintiffs' Motion for Protective Order, the Danbury Defendants argued that the plaintiffs' immigration status and alienage were relevant because these constitutional protections do not apply to aliens.  It was argued that the Danbury Defendants must be entitled to inquire into the plaintiffs' immigration status and alienage to defend against these claims.[1]  The Magistrate Judge dismissed this argument, presumably based on the representation by the plaintiffs that the Court had already resolved this issue and found that citizenship was not required to maintain these claims.  This representation was inaccurate.  This issue has not been foreclosed and the Danbury Defendants are entitled to this highly relevant information.

a.      **The Magistrate Judge incorrectly found that the argument regarding the plaintiffs' citizenship had been foreclosed**

As the following factual and procedural history demonstrates, the Danbury Defendants'

---

[1]As discussed above, the plaintiffs' have broadly construed the type of information that could implicate their current immigration status and alienage to include citizenship.  Therefore, immigration status and alienage is covered by the protective order.  Moreover, Magistrate Judge Martinez specifically granted the protective order with respect to interrogatory questions regarding the plaintiffs' birthplace, information regarding their entry into the United States, social security numbers, and their passports, driver's licenses and social security cards.  (March 19 Ruling, Doc. 459, at 14.)

position that citizenship is required to assert claims under Article First, §§ 4 and 14 of the

Connecticut Constitution has not been resolved.  On February 1, 2008, the Danbury Defendants[2]

filed a Motion to Dismiss (Doc. 49) seeking to dismiss, *inter alia*, certain of the plaintiffs' state

constitutional claims on the grounds that the Connecticut Supreme Court has not recognized a

private cause of action under these constitutional provisions, and that the plaintiffs had failed to

establish that they were entitled to relief under those provisions.  In response, the plaintiffs filed

a Cross-Motion to Certify Questions of Law to the Connecticut Supreme Court (Doc. 67).

On March 10, 2009, the Court, *Chatigny, J.*, heard oral argument on the Motion to

Dismiss as well as the Cross-Motion to Certify.  A copy of the entire transcript of those

proceedings has been attached as <u>Exhibit A</u> to this Objection.  The Danbury Defendants'

argument in support of their Motion to Dismiss with respect to the plaintiffs' claims for relief

under Article First, §§ 4 and 14 of the Connecticut Constitution was that these particular

provisions provide for rights that are available only to *citizens*,[3] and that the plaintiffs failed to

allege anything with respect to their citizenship status:

> [O]ur argument is that the plaintiffs' . . . complaint cannot survive our motion to
> dismiss because their complaint is legally insufficient as pled.  They make no
> allegations with respect to their citizenship status.  And as such . . . they're not really
> letting us know whether or not they are entitled to relief . . . .  So it's also unclear
> what questions they hope to get certified to the Supreme Court.  Because . . . in order
> to properly frame questions for certification, you have to establish that your
> questions are justiciable.  And one of the requirements is that you're showing the
> Court that you are entitled to practical relief if you were to get an answer to the
> question.  But in the plaintiffs' briefs, they have clearly indicated that they . . . will
> neither affirm nor deny their citizenship status, and as such the Court has no way of
> knowing whether any practical relief can be afforded to them if those questions were
> to be decided.

(Ex. A, March 10, 2009 Tr. 62-63).  In response to the Danbury Defendants' argument, Judge

---

[2]Defendants Lopez, Ramos, and Weston were not parties to this action at that time.

Chatigny stated as follows:

> As I understand the plaintiffs' position on the point, they would rely on the Connecticut Supreme Court to tell them what the language means and thus find out whether they qualify as citizens of Connecticut, and then we would know.

(Id. at 63-64).  Judge Chatigny further stated:

> As a practical matter, if we were to go that route, if we were to certify some question under these provisions, I think at this state of the game it would be clear that the plaintiffs are not citizens of the United States and that they would like to be protected by the Connecticut constitution on the theory that they are citizens of Connecticut. This would seem to be implicit in their claim.

(Id. at 64-65).  Judge Chatigny did no more than *acknowledge* that the plaintiffs might claim that

provisions in the Connecticut Constitution granting protection to citizens might somehow apply

to the plaintiffs.  He certainly did not endorse this argument.  Judge Chatigny then denied the

Motion to Dismiss without reaching the substance of the issue:

> With regard to the other counts [state constitutional claims for relief] addressed in the motion, I want to think about how to proceed.  It may be that certifying one or more questions to the Connecticut Supreme Court would serve everybody's interest.  Were I to do that, I would certify it along the lines we discussed.  That is, I would ask them whether the allegations state a claim for relief.  In that regard I think that the equal protection clause in particular might provide a basis for a certification and perhaps the free speech and free assembly sections as well.  But I'm denying the motion to dismiss those and I'll get back to you on whether I think we should certify one or more of those questions to the Connecticut Supreme Court.

(Id. at 94-95).  The above-quoted language makes clear that Judge Chatigny did not adopt,

endorse, or agree with the plaintiffs' argument with respect to their state constitutional claims.

Then on March 25, 2009, Judge Chatigny conducted a telephonic conference with regard

to his ruling on the plaintiffs' Cross-Motion to Certify.  A copy of the entire transcript of those

proceedings has been attached as Exhibit B to this Objection.  Judge Chatigny informed the

parties that he was denying the Cross-Motion to Certify, although declining to address whether

---

[3]See section III.A.i.b, infra.

citizenship was required under the relevant sections of the Connecticut Constitution:

> Essentially as far as I can tell, the state law claims do not provide or at least no argument has been made that they do provide relief that would be unavailable to the plaintiffs under the federal claims. So as a practical matter, I would be certifying questions that really do not need to be decided . . . . Should the time come when the plaintiffs conclude that in fact one or more of these provisions of the state constitution provide some additional or different form of relief than would available to the plaintiffs under federal law, then at that event, at that time, I would be willing to reconsider. But until then I don't think it makes sense and so I'm not going to certify anything at this time.

(Ex. B, March 25, 2009 Tr. 2-3). As the above again makes clear, Judge Chatigny did not

conclude that a non-citizen or an undocumented alien is entitled to protection under Article First,

§§ 4 and 14 of Connecticut Constitution.

Turning to the present Motion for Protective Order—and Ruling that is the subject of this

Objection—on February 24, 2010, Magistrate Judge Donna F. Martinez heard oral argument on

the plaintiffs' Motion for a Protective Order. A copy of the entire transcript of those proceedings

has been attached as Exhibit C to this Objection. In support of their Motion for a Protective

Order the plaintiffs incorrectly represented to Magistrate Judge Martinez during oral argument

that the court, *Chatigny, J.*, had found that citizenship was not required under the relevant

sections of the Connecticut Constitution:

> He [Charles Deluca - Counsel for the Danbury Defendants] argues that they need this information to defend against our claims under the Connecticut constitution. ***Judge Chatigny has already denied their motion to dismiss. In doing so, he found that pleading only to residency was sufficient to move forward with our claims***.

(Ex. C, Feb. 24, 2010 Tr. 81) (emphasis added). This representation by plaintiff's counsel

misstates the Court's earlier decision. The language quoted above from the March 10, 2009

transcript makes clear that Judge Chatigny made no such findings when he denied the Motion to

Dismiss concerning the plaintiffs' state constitutional claims for relief. Additionally, Judge

Chatigny never even used the terms "residents" or "residency" at any point during the March 10, 2009 hearing or the March 25, 2009 conference with the parties.  The plaintiffs alone made that reference at the March 10, 2009 hearing,[4] and then again at the February 24, 2010 hearing.[5]  There is no evidence whatsoever that Judge Chatigny ruled that undocumented aliens were citizens under the Connecticut Constitution.

The plaintiffs made a similar representation in their September 30, 2009 Reply to the Danbury Defendants' Opposition to their Motion for Protective Order (Doc. 316).  In that Reply, the plaintiffs' acknowledge the Danbury Defendants' argument regarding the relevance of immigration status and alienage to the state constitution claims, but state that "Judge Chatigny has already considered the argument that Plaintiffs' speech and assembly rights under the Connecticut Constitution depend on their citizenship or immigration status."  (Pl's Reply to Opp. to Mot. for Protective Order, Doc. 316, at 11.)  This rhetorical sleight of hand obscures the fact that, although Judge Chatigny may have "considered" this issue, he certainly did not resolve it.

Magistrate Judge Martinez relied on the plaintiffs' misstatement of Judge Chatigny's ruling on the Motion to Dismiss in her ruling on the plaintiffs' Motion for a Protective Order that is the subject of this Objection:

---

[4]During their argument in opposition to the Motion to Dismiss, the plaintiffs argued:

In the case of the free speech and freedom of assembly clauses, the defendants would have this court exclude 240,000 Connecticut residents from the unique protections of the free speech and freedom of assembly provisions.

(Ex. A, March 10, 2009 Tr. 71).  Judge Chatigny did not indicate whether he agreed with the plaintiffs' proposition. Judge Chatigny merely stated in response:  "Let me understand this claim.  In what way was the free speech provision violated?"  (Ex. A, March 10, 2009 Tr. 71).

[5]The plaintiffs also represented, at the February 24, 2010 hearing, that:  "we haven't pled citizenship. We've pled only to residency."  (Ex. C, Feb. 24, 2010 Tr. 81).  Article First, § 4 of our state constitution provides: "Every *citizen* may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."  Article First, Section 14 of our state constitution provides:  "The *citizens* have a right, in a peaceable manner, to assemble for their common good, and to apply to those invested with the powers of government, for

>     According to the defendants, the plaintiffs must "prove" they are citizens to be
>     entitled to any protection under these provisions of the state constitution. . . .  This
>     argument appears to be foreclosed.  The Danbury Defendants previously moved to
>     dismiss these state law claims on the grounds that the plaintiffs did not allege
>     citizenship in the complaint and therefore failed to state a claim. . . .  The court
>     rejected this argument and denied the motion.

(March 19 Ruling, Doc. 459, at 9-10).

This conclusion by Magistrate Judge Martinez was wrong because this Court did not

previously reject the Danbury Defendants' argument that the plaintiffs must be citizens to assert

claims under Article First, §§ 4 and 14.  Because Connecticut law requires a plaintiff to be a

citizen in order to assert claims under Article First, §§ 4 and 14, the Ruling should be set aside

and the Danbury Defendants should not be foreclosed from conducting discovery on these

claims.

> **b.  Evidence of immigration status and alienage is relevant
> because citizenship is required to assert claims under Article
> First, §§ 4 and 14 of the Connecticut Constitution**

Since at least 1921, Connecticut courts have interpreted the Connecticut Constitution as

precluding aliens from bringing claims under those sections that provide protection to "citizens."

This interpretation remains in effect today.  Thus, the plaintiffs' immigration status and alienage

is clearly relevant to their ability to bring claims under Article First, §§ 4 and 14 of the

Connecticut Constitution.

This precise issue was addressed and decided by the Connecticut Supreme Court in State

v. Sinchuck, 96 Conn. 605, 115 A. 33 (1921).  In that case, the defendants, non-citizen aliens,

challenged a state statute on the basis that it deprived them of their rights under, *inter alia*,

Article First, § 5 of the Connecticut Constitution.  Section 5 (the current § 4), provided, as it

---

redress of grievances, or other proper purposes, by petition, address or remonstrance."  Conn. Const., art. 1, §§ 4, 14

does today:  "Every citizen may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that liberty."  The Court held that the privilege in § 5 "is on its face confined to citizens."  <u>Sinchuck</u>, 96 Conn. at 614.  It added that because "it is a principle of constitutional law that no one has a right to attack a statute as unconstitutional unless he can show that its enforcement against him has violated or will violate his constitutional rights, the defense of unconstitutionality is not open to the defendants in this action."  <u>Id.</u> at 615.

The Connecticut Supreme Court's holding in <u>Sinchuck</u> has not been disturbed in the nearly ninety years since it was decided.  It was more recently referenced in the Court's decision in <u>Benjamin v. Bailey</u>, 234 Conn. 455, 662 A.2d 1226 (1995).  There, the Supreme Court recognized that Article First, §§ 4 and 14 "limits the right conferred to 'citizens.'"  <u>Id.</u> at 464 n.6.  It also acknowledged the holding of <u>Sinchuck</u> that these sections "by their express terms do not apply to aliens," and declined to revisit that holding.  <u>Id.</u>  Thus, the Court's holding in <u>Sinchuck</u> that §§ 4 and 14 only apply to citizens and do not apply to aliens still stands.

Additionally, the Second Circuit recently addressed another section of the Connecticut Constitution that only applies to "citizens."[6]  <u>See</u> <u>Kuck v. Danaher</u>, No. 08-5368-cv, 2010 U.S. App. LEXIS 5899 (2d Cir. Mar. 23, 2010).  In that case, the plaintiff challenged a requirement that he submit proof of citizenship to obtain a gun license in Connecticut.  <u>Id.</u> at *3.  The plaintiff was told that it could not issue a permit to any "alien illegally or unlawfully present in the United States."  <u>See</u> Conn. Gen. Stat. § 29-28(b).  In discussing this statute and its prohibition on issuing permits to illegal aliens, the court also cited to Article First, § 15 of the Connecticut Constitution—and its limitation of the right to bear arms to "citizens"—thus drawing a

_____

(emphasis added).  Absent from these constitutional provisions is the term "residents."

[6]The court there was addressing Article First, § 15 of the Connecticut Constitution, which provides:  "Every

distinction between illegal aliens and "citizens," as the word is used in the Connecticut

Constitution.  Kuck, 2010 U.S. App. LEXIS 5899, at *3-4.  Later, in evaluating the plaintiff's

substantive due process claim, it also stated that "the fact that state officials required Kuck to

produce proof of citizenship *or* legal residency in connection with his permit renewal application

is hardly outrageous or shocking."  Id. at *21 (emphasis added).  The implication is that the

Second Circuit considers citizenship and legal residency to be separate statuses.

That an alien is not a citizen under the Connecticut Constitution has been settled law for

nearly ninety years.  The fact is that since at least 1921, the Connecticut Supreme Court has

interpreted Article First, §§ 4 and 14 to apply only to citizens and not to aliens.  The plaintiffs

have brought claims under §§ 4 and 14 in their fourth claim for relief.  Information concerning

the plaintiffs' immigration status and alienage, therefore, is highly relevant to these claims.

## 2.     The plaintiffs' immigration status and alienage is relevant to their claims for emotional distress

The Magistrate Judge also declined to address the Danbury Defendant's argument that

the plaintiffs' immigration status and alienage is relevant to their claims for emotional distress.

(March 19 Ruling, Doc. 459, at 12 n.7).  Although Magistrate Judge Martinez declined to review

the claim,[7] she stated that "in any event, [it] does not alter the court's conclusion."  Id.  This

conclusion is contrary to law.  Evidence of immigration status and alienage is relevant to the

plaintiffs' claims for emotional distress.

The plaintiffs' eleventh and twelfth claims for relief sound in intentional infliction of

---

citizen has a right to bear arms in defense of himself and the state."

[7]It is significant to note that the Danbury Defendants did argue that the plaintiffs' immigration status and
alienage were relevant to their claims for emotional distress in their April 30, 2009 Memorandum of Law in
Opposition to Plaintiffs' Motion for Protective Order (Doc. 171), which was incorporated in the Danbury
Defendants' subsequent September 15, 2009 Memorandum of Law in Opposition to Plaintiffs' Renewed Motion for
Protective Order (Doc. 303).  See Memo. of Law in Opp. to Pls.' Mot. for Protective Order, Doc. 171, at 9; Memo.

emotional distress and negligent infliction of emotional distress, respectively.  Additionally, claims 1-8, and 16, all allege damages including emotional distress against the Danbury Defendants.  (2d Am. Compl. ¶¶ 207, 210, 215, 219, 222, 227, 232, 248, 293.)  In their eleventh claim for relief (intentional infliction of emotional distress), the plaintiffs allege, *inter alia*, that the "Danbury Defendants' conduct was clearly extreme and outrageous, given the circumstances surrounding the arrests."  (Id. ¶ 260.)  In the twelfth claim (negligent infliction of emotional distress), the plaintiffs allege, *inter alia*, that it "was clearly foreseeable that the Defendant DPD Officers' conduct would cause the plaintiffs emotional distress" and that "Defendant DPD Officers knew that their failure to act would likely subject a group of identifiable persons to imminent harm, namely, the Latino and immigrant day-laborers gathered in Kennedy Park."  (Id. ¶¶ 264-65.)

The plaintiffs' immigration status and alienage is relevant to their claims and alleged damages involving emotional distress because it is probative of whether the plaintiffs' emotional distress arose from a fear that they might be arrested or detained in connection with their immigration status, which the plaintiffs allege occurred in this case,[8] and that this fear preexisted the events of September 19, 2006.

The identical issue was addressed by the United States District Court for the Southern District of New York in two recent decisions denying a similar motion for protective order.  See Aguilar v. Immigration & Customs Enforcement Div., No. 07 Civ. 8224 (JGK)(FM) (S.D.N.Y. January 7, 2009) ("Aguilar I," Ex. D); Aguilar v. Immigration & Customs Enforcement Div., No.

---

of Law in Opp. to Pls.' Renewed Mot. for Protective Order, Doc. 303, at 2.
    [8]The first claim for relief alleges that the Danbury Defendants arrested the plaintiffs "for alleged *civil immigration violations* . . . ."  (2d Am. Compl. ¶ 206) (emphasis added).  Similarly, the second claim alleges that the Danbury Defendant arrested and/or detained the plaintiffs "on suspicion of *civil immigration violations*."  (Id. ¶ 209) (emphasis added).  Similar allegations are repeated throughout the complaint.  (See, e.g., id. ¶¶ 35, 44, 212, 218.)

07 Civ. 8224(JGK)(FM), 2009 U.S. Dist. LEXIS 54669 (S.D.N.Y. June 23, 2009) ("Aguilar II," Ex. E).  The plaintiffs there sued ICE claiming that ICE "subjected them to unlawful searches of their homes in violation of the Fourth Amendment."  Aguilar I, at 1.  The plaintiffs filed a motion for protective order seeking the exclusion of any discovery of their immigration status "so that they can pursue this litigation without fear of negative immigration consequences."  Id. at 2.  The court denied the motion for a protective order.  It concluded that "the issue of immigration status is central, not collateral, to the parties' claims.  Id. at 4.

The plaintiffs moved for reconsideration, and the court denied the motion and affirmed its earlier decision.  See Aguilar II, 2009 U.S. Dist. LEXIS 54669, at *14.  In denying the motion for consideration, the court specifically cited the relevance of the plaintiffs' immigration status to their allegations of emotional distress.  Id. ("[T]he immigration status of the named Plaintiffs and putative class members may be relevant to their allegations of emotional and mental distress.").  Specifically, the court concluded that "the Defendants may be able to demonstrate that at least some of a Plaintiff's emotional distress arose from a fear that the Plaintiff might be detained by ICE which existed in advance of an actual raid."  Id.

As in Aguilar, the plaintiffs here have alleged emotional distress resulting from civil immigration arrests in violation of, *inter alia*, their rights under the Fourth Amendment.  The Danbury Defendants are entitled to discovery which could defend or mitigate the potential damages resulting from this claim.  Evidence that the plaintiffs were illegally present in the United States on September 19, 2006, would tend to prove that they feared arrest for immigration violations prior to that date.  This would, of course, have an impact on any potential damages for emotional distress, as the court in Aguilar II recognized.  It would also impact their claims for negligent and intentional infliction of emotional distress.  This evidence is relevant and

Magistrate Judge Martinez erred in dismissing this argument.

### 3. The plaintiffs' immigration status and alienage is relevant to their allegation of a policy, practice and/or custom of harassment

The plaintiffs' Second Amended Complaint (Doc. 317) is replete with allegations that the Danbury Defendants targeted Danbury's Ecuadorian and immigrant communities as part of a policy or practice that caused the alleged deprivation of the plaintiffs' rights. It also alleges that "Danbury's unwanted immigrant, Latino, and Ecuadorian residents" were targeted by the defendants. It is this policy, practice and/or custom that the plaintiffs allege caused the deprivation of their rights. Therefore, whether the plaintiffs were part of that "Ecuadorian community" or the immigrant community is, of course, relevant to these allegations because it is highly probative of whether the Danbury Defendants did in fact unfairly target the "Ecuadorian community" or immigrant population, and whether this "policy, practice and/or custom" caused the deprivation of the plaintiffs' rights, as they repeatedly allege.

Rather than consider the individual allegations of the complaint, the Magistrate Judge broadly categorized the plaintiffs' claims according to the stated cause of action.[9] The error in this approach is that it ignores the more than 200 paragraphs of detailed factual allegations that form the bases of these claims. It is not the role of the court to determine how the plaintiffs' factual allegations, all of which have been incorporated in the entirety into all of the claims for relief, will be used to support those claims for relief. Rather, it is up to the parties to discover facts that prove or disprove these allegations and then, at the appropriate time, render their

---

[9]Magistrate Judge Martinez grouped the plaintiffs' claims into three categories: (1) illegal seizure, arrest and detention; (2) racial and ethnic profiling; and (3) freedom of speech and association. Ruling at 6. Addressing each of the categories, she broadly concluded that immigration status and alienage was not relevant to any of the claims or defenses thereto. See id. at 6-10. Although these categories include the specific causes of action directed against the Danbury Defendants, they fail to address the actual allegations put forth by the plaintiffs in the complaint that form the bases of these claims.

respective arguments and defenses.  In this regard, the Magistrate Judge's ruling has prejudiced the Danbury Defendants because it prevents them from discovering information that is in fact relevant to its defenses.

**a.**     **Plaintiffs have alleged a policy, practice, and/or custom of harassment of members of the Ecuadorian and immigrant communities in Danbury**

Prior to their claims for relief, the plaintiffs set forth some 204 paragraphs containing various allegations against the defendants.  These paragraphs are not mere preamble.  They represent the substance of the plaintiffs' allegations against the defendants in this case. Specifically, these paragraphs allege, in some detail, what the plaintiffs claim constitutes a "harassment campaign" by the Danbury Defendants aimed against Danbury's Ecuadorian community, immigrant population and/or day-laborers.  (See, e.g., 2d Am. Compl. ¶¶ 38, 44.)  It is this custom, policy and/or practice that the plaintiffs alleged proximately caused the deprivation of their rights.[10]  (See id. ¶¶ 235, 250.)

The plaintiffs allege that United States Immigrations and Customs Enforcement ("ICE") alleges that they are citizens of Ecuador.  (2d Am. Compl. ¶¶ 3-10.)  The plaintiffs subsequently allege that the Danbury Defendants have "directed . . . discriminatory policies against Danbury's Ecuadorian community."  (Id. ¶ 39.)  For example, they allege that defendants Boughton and Baker considered a city ordinance, the purpose of which was "to shut down the Ecuadorian community's neighborhood volleyball games, one of the primary venues for community gatherings in the spring and summer."  (Id. ¶ 40.)  They allege that Boughton "requested that the DPD aggressively police volleyball games in order to harass the Ecuadorian community."  (Id. ¶ 41.)  The plaintiffs allege that Boughton and Baker "participated in or were present for

18

discussions relating to housing code violations in heavily Ecuadorian neighborhoods in Danbury" and "[p]ursuant to Mayor Boughton's policy, city code inspectors discriminatorily enforced Danbury's fire and building codes and parking regulations against the Ecuadorian community." (Id. ¶¶ 42-43.)

The plaintiffs further allege that "[t]he centerpiece of Danbury's harassment campaign under Mayor Boughton . . . has been the City of Danbury's escalating involvement in the enforcement of federal immigration laws, especially through the Danbury Police Department." (Id. ¶ 44.) They further allege that Boughton and Baker "encouraged and instructed the DPD to carry out independent civil immigration law enforcement actions against Danbury's unwanted immigrant, Latino, and Ecuadorian residents . . . ." (Id. ¶ 49.) These allegations directly relate the alleged "harassment campaign" against the Danbury "Ecuadorian community" involving the volleyball games and housing code enforcement to the conduct that is the focus of this case: the arrest of the plaintiffs on September 19, 2006.

The plaintiffs also allege a campaign of harassment of day-laborers in Danbury. First, the plaintiffs allege that "almost all of the day-laborers who gather at Kennedy Park each day are Latino men–many of Ecuadorian descent . . . ." (Id. ¶ 56.) Among the allegations related to treatment of day-laborers, the plaintiffs allege that Boughton "expressly directed Danbury police to harass and intimidate the day-laborers who gathered peaceably in Kennedy Park in order to silence their solicitation speech and prevent them from communicating with potential employers." (Id. ¶ 63.) The plaintiffs repeat similar allegations against Boughton and the other Danbury Defendants in the complaint. (See, e.g., id. ¶¶ 38, 55-66.)

The plaintiffs also allege that there is a second site in Danbury where day-laborers gather

---

[10]See section III.A.2.b, infra.

to solicit work and that the day-laborers at this location are predominantly of Brazilian descent.

(Id. ¶¶ 67-68.)  They allege that "no day-laborers have ever been arrested for civil immigration

violations" at this site.  (Id. ¶ 69.)  The clear implication is that the plaintiffs are alleging that the

Ecuadorian day-laborer community was treated differently by the Danbury police than the

Brazilian day-laborer community.

> **b.** **The plaintiffs alleged that the policy, practice and/or custom caused the deprivation of their rights**

The policy, practice and/or custom alleged by the plaintiffs, as described above, is

directly implicated in their claims for relief.  The eighth claim for relief, "personal supervisory

liability," is directed against Danbury Mayor Mark Boughton, Police Chief Alan Baker, Captain

Mitchell Weston, and Detective Lieutenant James Fisher.  In this claim, the plaintiffs allege that

these defendants "were personally involved in and proximately caused the aforementioned

violations of the Plaintiffs' rights by knowingly and intentionally creating, implementing,

enforcing, encouraging, sanctioning, and/or acquiescing in a *policy, practice, and/or custom* in

which local police engaged in the unconstitutional conduct described in Claims 1-7."[11]  (2d Am.

Compl. ¶ 235) (emphasis added).  They specifically allege that Boughton, Baker, Weston, and

Fisher were "directly involved in the promulgation, implementation, and administration of the

*policy, practice, and/or custom* that proximately caused the aforementioned violations of the

Plaintiffs' rights described in Claims 1-7."  (Id. ¶ 236; see id. ¶¶ 239, 242, 246) (emphasis

added).  Additionally, the ninth claim, "municipal liability" against the City of Danbury alleges

liability on the part of the City "for the promulgation and execution of municipal policy and/or

---

[11]Claims 1-7 allege violations by the Danbury Defendants of the plaintiffs' rights against unreasonable search and seizure, and to equal protection, free speech, and due process under the constitutions of the United States and Connecticut.

custom by Defendants Boughton, Baker, Weston, and Fisher prior to and during the arrest of the Plaintiffs on September 19, 2006." (Id. ¶ 250.)

The "policy, practice, and/or custom" referenced in the above allegations is not set forth in the eighth or ninth claims for relief. Instead, they incorporate the previous allegations set forth where the plaintiffs allege, in detail, the conduct by the Danbury Defendants that they claim caused the violations of their rights through their "knowingly and intentionally creating, implementing, enforcing, encouraging, sanctioning, and/or acquiescing in a policy, practice, and/or custom in which local police engaged in the unconstitutional conduct." (See id. ¶¶ 235, 250.) These paragraphs include allegations that the Danbury Defendants targeted the Ecuadorian, immigrant, and/or day-laborer communities in Danbury. The Danbury Defendants could reasonably conclude, based on the allegations of the complaint, that it is this alleged practice, policy and/or custom that the plaintiffs allege caused the deprivation of their rights.

### c. Evidence of the plaintiffs' immigration status is relevant to the existence and extent of the policy, practice and/or custom that they plaintiffs allege caused the deprivation of their rights

The allegations in the eighth and ninth claims, involving the "policy, practice, and/or custom" that the plaintiffs alleged *caused* the September 19, 2006 incident, are based on the alleged harassment by the of Danbury's Ecuadorian, immigrant, Latino and/or day-laborer communities. Whether the plaintiffs were part of the Ecuadorian or immigrant communities in Danbury is relevant to these allegations. If they were, their experiences, particularly as related to this case, would be probative of the existence and extent of the alleged policy, practice and/or custom of harassment in Danbury.[12]

---

[12]The Aguilar plaintiffs made a similar allegation regarding a "policy, practice and/or custom." They alleged that the defendants "implemented, enforced, encouraged and/or sanctioned a *policy, practice and/or custom*

As elaborated above, the plaintiffs have alleged a campaign of harassment by the Danbury Defendants against four communities or groups in Danbury: immigrants, Ecuadorians, Latinos, and day-laborers.  The plaintiffs admit they are Latinos and day-laborers.  (See, e.g., id. ¶¶ 3-10, 114, 116.)  However, they refuse to provide any information as to whether they are immigrants or Ecuadorian on the basis that this could implicate their immigration status and alienage.  This severely prejudices the ability of the Danbury Defendants to rebut the factual allegations regarding the treatment of the immigrant and Ecuadorian communities in Danbury.

It is also significant that the plaintiffs have taken an overly expansive view of the information that could possibly implicate immigration status and alienage.  This has had the effect of precluding discovery by the Danbury Defendants of information having only a tangential connection, at best, to the plaintiffs' immigration status and alienage.  The plaintiffs have, for example, refused to answer any question as to whether they were born in Ecuador and, by extension, consider themselves to be part of the "Ecuadorian community" in Danbury.[13]  (See Simbana Dep. Tr. 11-12, Ex. F.)  They have refused to answer questions as remote as whether a plaintiff *considered* obtaining employment anywhere else other than Kennedy Park on the basis that a response could implicate immigration status or alienage.  (See id. at 89-91.)  The Danbury Defendants have been denied relevant information based on the plaintiffs' contention that responses to questions that do not directly address immigration status could potentially do so, however remote the connection may be.

---

of . . . stopping, detaining, investigating, searching and effecting seizures in the absence of a reasonable, articulable suspicion of unlawful activity or probable cause" in violation of the Fourth Amendment.  Aguilar II, 2009 U.S. Dist. LEXIS 54669, at *10 (emphasis added).  The court denied the motion for protective order and concluded that immigration status was relevant to the plaintiffs' claim.  Id. at *14.

[13]During the deposition of plaintiff Simbana, the plaintiff also refused to answer such questions as whether he lived anywhere else in the United States other than Danbury (Ex. F at 24), where he attended high school, (id. at 25-27), and why he has not tried obtaining employment anywhere else other than Kennedy Park (id. at 89-91).  See

Magistrate Judge Martinez's ruling on the Motion for Protective Order reflects the plaintiffs' overly broad interpretation of information that could implicate immigration status and alienage. The Magistrate Judge granted the Motion for Protective Order not just with respect to immigration status, but also information regarding birthplace, entry into the United States, arrests, warnings or citations received outside of the United States, and the plaintiffs' passports, driver's licenses and/or social security cards. (March 19 Ruling, Doc. 459, at 14.) Therefore, when the plaintiffs argue that information concerning their immigration status and alienage is irrelevant, they seek to deny the Danbury Defendants discovery of information not directly related to immigration status and alienage. This protective order, then, has the effect of precluding the Danbury Defendants from discovering not just their immigration status and alienage, but also other information relevant to the plaintiffs' claims concerning the Ecuadorian and immigrant communities in Danbury.

Moreover, the Danbury Defendants cannot fully anticipate at this stage of the case how the factual allegations involving the treatment of the Ecuadorian, Latino, day-laborer and/or immigrant communities will be used by the plaintiffs to support their other claims for relief. These allegations are incorporated into every one of the plaintiffs' claims. The plaintiffs—not the defendants—made these allegations in their complaint. It is the defendants' right during discovery to uncover facts relevant to their defenses to those factual allegations and claims. Given the broad purview of discovery, the plaintiffs should not be permitted to make allegations implicating immigration status and alienage and then hide behind them. If the plaintiffs want to revise their complaint to remove the allegations regarding the treatment of the immigrant and Ecuadorian communities, they are free to do so. But as long as these allegations remain, the

---

also Memo. in Support of Danbury Defs.' Mot. to Compel Dep. Responses, Doc. 400, at 17-31).

defendants are entitled to discover facts to potentially rebut them.

**B.    The relevance is not outweighed by any potential *in terrorem* effect**

The relevance of the plaintiffs' immigration status and alienage is not outweighed by any potential prejudicial or *in terrorem* effect.  On the relevance side, the Magistrate Judge erred by only considering the information relevant to the plaintiffs' credibility.  As detailed above, this evidence is relevant to more than just the plaintiffs' credibility, including their claims of emotional distress, the alleged policy, practice and/or custom of harassment, and the claims under the sections of the Connecticut Constitution that do not provide protection to aliens.  In terms of the potential *in terrorem* effect, the Magistrate Judge erred in relying on cases that are distinguishable and overstating the prejudicial effect disclosure would have on the plaintiffs.

Almost all of the cases relied on by the Magistrate Judge are distinguishable because they arose in the employment context where the fact that a plaintiff may have been an illegal immigrant was a collateral issue because there were no claims relating to the treatment of immigrants by the employer.  See Rengifo v. Erevos, No. 06 Civ. 4266(SHS)(RLE), 2007 U.S. Dist. LEXIS 19928 (S.D.N.Y. Mar. 20, 2007) (suit against former employer to recover unpaid overtime wages under FLSA and New York labor law) (Ex. G); E.E.O.C. v. First Wireless Group, Inc., No. 03-CV-4990(JS)(ARL), 2007 U.S. Dist. LEXIS 11893  (E.D.N.Y. Feb. 20, 2007) (charging parties are former Hispanic employees of defendant employer who EEOC claims were paid less than similarly-situated Asian employees and who allegedly were retaliated against when they complained of the treatment) (Ex. H); Avila-Blum v. Casa de Cambio Delgado, Inc., 236 F.R.D. 190 (S.D.N.Y. 2006) (plaintiff claiming employment discrimination under Title VII); Corona v. Adriatic Italian Rest. & Pizzeria, No. 08 Civ. 5399(KNF), 2010 U.S. Dist. LEXIS 15788 (S.D.N.Y. Feb. 23, 2010) (plaintiffs brought claim against employer under

FLSA) (Ex. I); Sandoval v. Amer. Bldg. Maintenance Industries, Inc., No. 06-CV-

1772(RHK/JSM), 2007 U.S. Dist. LEXIS 97773 (D. Minn. Oct. 23, 2007) (plaintiffs brought

claims of sexual harassment, discrimination, and retaliation under Title VII and Minnesota

Human Rights Act) (Ex. J); Flores v. Albertson's, Inc., No. CV 01-0515 PA(SHX), 2004 U.S.

Dist. LEXIS 29083 (C.D. Cal. April 9, 2004) (plaintiffs brought claims against employer under

FLSA and California labor law) (Ex. K).[14]

   In each of these cases, the plaintiffs' immigration status was in fact irrelevant and the

defendants did not seek the information in relation to any of the plaintiffs' factual allegations or

claims.  For example, in Avila-Blum, the defendants sought discovery of the information

regarding the plaintiff's immigration status "for the purposes of attacking [the plaintiff's]

credibility."  Avila-Blum, 236 F.R.D. at 191.  Likewise, in Corona, the defendants opposed the

motion for protective order, "arguing that evidence of the plaintiffs' immigration status is

pertinent to the credibility of each plaintiff and, further, that Fed. R. Evid. 608 authorizes the

defendants to elicit evidence, on cross-examination, concerning the plaintiffs' character for

truthfulness."  Corona, 2010 U.S. Dist. LEXIS 15788, at *2.[15]

   Conversely, in those cases where immigration status and alienage is relevant to the

_____

[14]The two other cases cited by the Magistrate Judge, David v. Signal Int'l, LLC, 257 F.R.D. 114 (E.D. La. 2009) and Topo v. Dhir, 210 F.R.D. 76 (S.D.N.Y. 2002), both turned on specific factual and legal issues that are not applicable in the present case.  Although the plaintiffs in David brought claims outside of the employment law context, the defendants' argument that the plaintiffs' immigration status was relevant relied principally on the plaintiffs' claims for unpaid back wages.  David, 527 F.R.D. at 122-23.  The issue in Topo was also limited and distinguishable from the present case.  In that case, the plaintiffs brought a claim against the defendants under the Alien Tort Claims Act ("ATCA"),

[15]Other cases cited by the plaintiffs, though not specifically relied up in the Magistrate Judge's ruling, are also distinguishable as they arose within the employment context.  See Trejos v. Edita's Bar & Rest., Inc., No. CV-08-1477(ARR), 2009 U.S. Dist. LEXIS 21239 (E.D.N.Y. Mar. 17, 2009) (plaintiffs brought claim against employer under Fair Labor Standards Act) (Ex. L); Hocza v. City of New York, No. 06 Civ. 3340, 2009 U.S. Dist. LEXIS 3574 (S.D.N.Y. Jan. 19, 2009) (plaintiff brought claims against employer sounding in negligence and violation of state labor laws) (Ex. M); Zeng Liu v. Donna Karan Int'l, Inc., 207 F. Supp. 2d 191 (S.D.N.Y. 2002) (plaintiff brought claim against employer under Fair Labor Standards Act); but see Romero-Hernandez v. Alexander, No.

plaintiffs' claim—as is the case here—the court has permitted discovery of that information despite the alleged *in terrorem* effect.  The Aguilar case is a perfect example where a court has permitted discovery of a plaintiff's immigration status, despite a possible *in terrorem* effect, because the information was relevant to the plaintiffs' allegations.

As discussed above in greater detail, the plaintiffs in Aguilar sued ICE, making strikingly similar claims as the plaintiffs in this case.  The Aguilar plaintiffs sought the exclusion of any discovery of their immigration information, citing the possible *in terrorem* effect, "so that they can pursue this litigation without fear of negative immigration consequences."  (Aguilar I, at 2.)  The court denied the motion for a protective order.  It explained that in that case, "*unlike in employment litigation*, the issue of immigration status is central, not collateral, to the parties' claims."  (Aguilar I, at 4 [emphasis added].)  It further added that "evidence of a particular plaintiff's illegal status may support the Defendants' assertion that they had a reasonable basis to suspect as much even before they went to the residence where the plaintiff was later detained." (Aguilar I, at 5.)

Subsequently, in Aguilar II the court denied a motion to reconsider its earlier ruling denying the protective order based largely on the same reasoning.  It also distinguished E.E.O.C. v. First Wireless Group, Inc., 2007 U.S. Dist. LEXIS 11893, which was relied upon by the Magistrate Judge in her ruling.  The Aguilar II court stated:  "As the Plaintiffs correctly observe, in [E.E.O.C.], the court precluded such an inquiry in connection with the claimant's emotional distress damage claims.  There, however, the immigration status bore *no relation* to the harm alleged, which was workplace pay inequality.  Here, by contrast, the Defendants may be able to

---

3:08CV93-M-A, 2009 U.S. Dist. LEXIS 61017 (N.D. Miss. June 24, 2009) (denying motion for protective order in part because immigration status relevant in FRSA claim to plaintiff's claims for back pay) (Ex. N).

demonstrate that at least some of a Plaintiff's emotional distress arose from a fear that the

Plaintiff might be detained by ICE which existed in advance of an actual raid." Aguilar II, 2009

U.S. Dist. LEXIS 54669, at *14 (emphasis added).  Not only is the distinction between the

current case and an employment case such as E.E.O.C. applicable here, but also the plaintiffs in

the present case have made emotional distress claims against the Danbury Defendants in the

eleventh and twelfth claims for relief of their second amended complaint.

The present case is also similar to Catalan v. Vermillion Ranch L.P., No. 06-cv-01043-

WYD-MJW, 2007 U.S. Dist. LEXIS 22638 (D. Colo. Mar. 28, 2007) (Ex. P).  In that case, the

plaintiffs were Chilean cattle herders who came to the United States to work for the defendants

under H-2A work visas.[16]  Id. at *2.  The plaintiffs brought the suit to recover damages for

injuries under the FLSA, the Trafficking Victims Protection Reauthorization Act, RICO, and

various Colorado statutory and common theories.  Id. at *2-3.  The plaintiffs moved for a

protective order regarding information pertaining to their immigration status based on its

potential chilling and *in terrorem* effect.  Id. at *3.  The defendants argued "that Plaintiffs have

placed, at issue, their immigration status and subsequent employment since it is uncontested that

Plaintiffs were employed by petitioning Defendants as H-2A visa workers."  Id. at *4.  They also

argued that it was relevant to the plaintiffs' claims for emotional distress.  Id.  The court denied

the motion for protective order because "the requested discovery is probative on the issues

pending before this court and outweighs any prejudice or injury that maybe caused by such

disclosure."  Id. at *5-6.  In particular, the court concluded that the information was relevant to

---

[16]"The H-2A program, administered by the United States Department of Labor, grants foreign workers temporary work visas for employment in the United States, but only if the employer first demonstrates that he has made a good faith, active attempt to recruit American workers but could not find sufficient able, willing, and qualified workers for his needs."  Romero-Hernandez v. Alexander, No. 3:08CV93-M-A, 2009 U.S. Dist. LEXIS 61017, at *16 (N.D. Miss. June 24, 2009) (Ex. N).

the requirement of H-2A employers, such as the defendants, to report absconders and the fact that the failure to do so would subject them to liquidated damages.  Id. at *5.  Like the plaintiffs in the present case, the plaintiffs in Catalan placed their immigration status at issue by virtue of their claims against the defendants.  It is not a collateral issue, as in the cases cited by the Magistrate Judge in her ruling.

Courts have also permitted discovery of immigration status—when relevant—in employment cases, even where immigration is not a central focus of the case.  For example, in Hocza v. City of New York, No. 06 Civ. 3340, 2009 U.S. Dist. LEXIS 3574 (S.D.N.Y. Jan. 19, 2009) (Ex. M), where the plaintiff brought claims against his employer sounding in negligence and violation of state labor laws, the court employed a balancing test in which it weighed the probative value of information relating to immigration status against its prejudicial value.  First, the court noted that "New York courts have repeatedly held that facts related to immigration status are relevant to the question of lost future earnings."  Id. at *2.  The court ultimately concluded that "[t]he City may not discuss or inquire into Hocza's immigration status with respect to the possibility that he will be deported.  However, Hocza's immigration status may be relevant to the question of the job opportunities he would have had in this country.  The parties may therefore address Hocza's immigration status with respect to its impact on opportunities for employment in the United States."  Id. at *10-11.  Therefore, where it was relevant to a particular issue, the court admitted evidence of the plaintiff's immigration status.[17]

Likewise, in Romero-Hernandez v. Alexander, No. 3:08CV93-M-A, 2009 U.S. Dist. LEXIS 61017 (N.D. Miss. June 24, 2009) (Ex. N), the plaintiffs brought claims against their

---

[17]It should also be noted that Hocza concerned the admissibility of evidence, while the current motion to compel is concerned with discovery, which is much broader in scope.

employer under the FLSA, as well as H-2A employment visa contract claims.  Like the plaintiffs

in the instant case, they brought a motion for a protective order prohibiting discovery related to

their immigration status.  Id. at *14.  First, the court noted the possible *in terrorem* effect of such

information, but stated that it is only a concern where the information is *irrelevant* to the

plaintiffs' claims.  Id. at *16.  It concluded that the plaintiffs' immigration status could be

relevant to their claims for back pay under the FLSA as well as their means for obtaining the H-

2A work visas.  Id. at *21-22.  The court, therefore, denied the motion for protective order

insofar as it would prevent discovery of the plaintiffs' immigration status relative to those

claims.  Id. at *27-28.

Similarly, in Topo v. Dhir, 210 F.R.D. 76 (S.D.N.Y. 2002), a case relied upon by the

Magistrate Judge in her ruling granting to protective order, the District Court noted that "Courts

have generally recognized the *in terrorem* effect of inquiring into a party's immigration status

*when irrelevant to any material claim*."  Id. at 78 (emphasis added).  It further noted that

"allowing parties to inquire about the immigration status of other parties, *when not relevant*,

would present a 'danger of intimidation [that] would inhibit plaintiffs in pursuing their rights.'"

Id. (emphasis added).  The phrase "when not relevant" is, of course, a very significant caveat; it

recognizes that the possible *in terrorem* effect of inquiring about immigration status exists only

when it is not central to any material claim in the case.

More recently, the United States District Court for the Western District of New York

denied a motion for a protective order filed by the plaintiff in an employment claim under Title

VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act.  See McIntosh v.

Bank of Am., 06-CV-0708S(Sr), 2009 U.S. Dist. LEXIS 80879 (W.D.N.Y. Sept. 4, 2009) (Ex.

O).  The plaintiff moved for the protective order on the grounds that "defendant's questioning

during that deposition was abusive and harassing." Id. at *4. Specifically, the plaintiff objected

to questions regarding the plaintiff's "immigration status." Id. The court denied the motion for a

protective order and concluded that the defendant "is entitled to inquire as to the facts underlying

plaintiff's claims and to ascertain information regarding her background, employment and

medical history in order to properly defend itself against plaintiff's allegations." Id. at *5. This

case is consistent with those within the Second Circuit that have permitted the discovery and

even admission of evidence relating to immigration status when it is relevant to the claims

underlying the case. This same reasoning should be applied to the present case.

These cases do not apply an across-the-board bar on all evidence related to a party's

immigration status or alienage. Rather, they limit it to cases were the information is not

irrelevant, thereby defeating any fear of a possible *in terrorem* effect. Additionally, Magistrate

Judge Martinez erred in weighing only the relevance as to credibility against the possible *in*

*terrorem* effect. (See March 19 Ruling, Doc. 459, at 12 ("This court is similarly persuaded that

whatever value the information might hold as to impeachment is outweighed by the chilling and

prejudicial effect of disclosure.")). Evidence of the plaintiffs' immigration status and alienage is

also relevant to the plaintiffs' claims of emotional distress, the alleged policy, practice and/or

custom of harassment, and the claims under certain sections of the Connecticut Constitution.

See section III.A of this brief, supra. Evidence of the plaintiff's immigration status and alienage

is highly relevant to their claims under Article First, §§ 4 and 14 of the Connecticut Constitution,

in particular, because those sections do not provide protection to aliens. Therefore, the

Magistrate judge erred in concluding that the possible *in terrorem* effect outweighed the

relevance of the evidence.

IV.    __CONCLUSION__

Based on the foregoing, the Danbury Defendants respectfully submit that the Magistrate Judge's Ruling (Doc. 459) on the plaintiffs' Motion for Protective Order (Doc. 284) should be set aside because it is contrary to fact and misapplies applicable law.  First, the Magistrate Judge incorrectly concluded that evidence of the plaintiff's immigration status and alienage was relevant only to their credibility.  This evidence is also relevant to their claims of emotional distress, the alleged policy, practice and/or custom of harassment, and the claims under the sections of the Connecticut Constitution that do not provide protection to aliens.  It is also directly relevant to more than 200 paragraphs of factual allegations that are all incorporated into the plaintiffs'' claims for relief.  These are the plaintiffs' allegations and so long as they remain in the complaint the defendants are entitled to discovery to rebut them.  Second, the Magistrate Judge incorrectly concluded that the possible *in terrorem* effect and prejudice outweighed the relevance.  This conclusion is in error because the relevance of the evidence was incorrectly limited only to credibility and the potential *in terrorem* or prejudicial effects were overstated based on a misapplication of the relevant law.  Specifically, the Magistrate Judge failed to distinguish the present case from those cases where the *in terrorem* effect outweighed the relevance because immigration status was a collateral issue.  In the present case, the plaintiffs' immigration status is indeed central to their case and directly relevant to a number of their claims against the defendants.  The ruling should be set aside and the plaintiffs' Motion for Protective Order should be denied.

Dated: April 9, 2010

THE DEFENDANTS,
ALAN BAKER, JOSE AGOSTO, RICHARD
DEJESUS, JAMES FISHER, JAMES LALLI,
JULIO LOPEZ, CRAIG MARTIN, JOSEPH
NORKUS, LUIS RAMOS, MITCHELL
WESTON, JOHN DOES

By:_____/s/_____
    Charles A. Deluca, Esq., (ct05255)
    Catherine S. Nietzel, Esq. (ct18573)
    Joseph J. Arcata III, Esq. (ct27104)
    Clarisse N. Thomas, Esq. (ct27583)
    William N. Wright, Esq. (ct28148)
    Ryan Ryan Deluca LLP
    707 Summer Street
    Stamford, CT   06901
    Phone No. 203-357-9200

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2010, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

_____/s/_____
William N. Wright, Esq.

I:\procases\415.027\obj to magistrate judge ruling on mot for protective order.doc

415.027

33